Edmundo Robaina (#018125)
ROBAINA & KRESIN PLLC
5343 N. 16th Street, Suite 200
Phoenix, Arizona 85016
Telephone: (602) 682-6450
Facsimile: (602) 682-6455
epr@robainalaw.com

Lynne Bernabei (admitted *pro hac vice* July 8, 2014)
Peter M. Whelan (admitted *pro hac vice* January 12, 2016)
Bernabei & Kabat, PLLC
1775 T Street, N.W.
Washington, D.C. 20009-7102
Telephone: (202) 745-1942
Facsimile: (202) 745-2627
Bernabei@BernabeiPLLC.com
Whelan@BernabeiPLLC.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Walt Hunter et al., | |
| Plaintiffs, | CV-14-1304-PHX-DMF |
| v. | **SECOND SUPPLEMENTAL COMPLAINT** |
| Town of Florence, et al., | |
| Defendants. | (Jury Trial Demanded) |

## SECOND SUPPLEMENTAL COMPLAINT

### Preliminary Statement

1.     This is a civil action by Walt Hunter ("Hunter") and Jarris A.H.

Varnrobinson Vonzombie ("Varnrobinson"), former detectives of the Florence Police

Department ("FPD"), against the Town of Florence, Arizona ("the Town"), Daniel

Hughes ("Hughes"), Himanshu Patel ("Patel"), Tom Rankin ("Rankin"), Terry Tryon

("Tryon"), and Charles Montoya ("Montoya").

2.     As set forth below, on June 11, 2014, Plaintiffs brought suit against

Defendants for violations of their rights and retaliation under 42 U.S.C. §1983, Title VII of the Civil Rights Act of 1964 ("Title VII"), and 42 U.S.C. § 1981.

3.      Since Plaintiffs filed the original Complaint on June 11, 2014, and the First Supplemental Complaint on January 3, 2017, Defendants have continued their pattern of retaliation against Plaintiffs Hunter and Varnrobinson.

4.      Plaintiffs bring this Second Supplemental Complaint against the Defendants to allege events that occurred subsequent to the events set forth in the First Supplemental Complaint.

### JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367.

6.      This Court has personal jurisdiction over Defendants, who reside or conduct business within the state of Arizona.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.

8.      Varnrobinson has exhausted his administrative remedies, pursuant to Title VII, by timely submitting a charge of employment discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 30, 2013. The EEOC issued Varnrobinson a Notice of Right to Sue on March 13, 2014. Undersigned counsel filed the original complaint in this case within ninety days of receipt of the Notice of Right to Sue letter.

9.      Hunter has exhausted his administrative remedies, pursuant to the Americans with Disabilities Act, by timely submitting a charge of employment discrimination with the EEOC on May 10, 2017. The United States Department of Justice issued Hunter a Notice of Right to Sue on July 27, 2017. Undersigned counsel filed this Second Supplemental Complaint within ninety days of receipt of the Notice of Right to Sue letter.

//

1

## PARTIES

2
3
4
5
6
7

10.    Plaintiff Hunter, a Caucasian adult male, is a citizen of the United States and a resident of Arizona. Hunter was a Detective with the FPD until December 14, 2012, when the Town terminated his employment. The Town reinstated Hunter as a Patrol Officer on October 15, 2013, after a Hearing Officer ordered the Town to reinstate him. In retaliation for Hunter pursuing this lawsuit against him, Hughes again recommended Hunter for termination, and the Town terminated him on March 27, 2017.

8
9
10
11

11.    Plaintiff Varnrobinson, an African-American adult male, is a citizen of the United States and a resident of Arizona. Varnrobinson was a Detective with the FPD until December 14, 2012, when the Town terminated his employment. The Town did not reinstate Varnrobinson.

12
13

12.    Defendant Town of Florence is an incorporated municipality in Pinal County, Arizona.

14
15
16
17

13.    Defendant Hughes, a Caucasian adult male, is a citizen of the United States and a resident of Arizona. From July 15, 2013, to the present, Defendant Hughes has been interim and permanent Chief of the FPD. He is sued in his individual and official capacities.

18
19
20
21

14.    Defendant Montoya, an adult male, is a citizen of the United States and a resident of California. From January 30, 2013, to July 13, 2015, Defendant Montoya was the Town Manager of Florence and a resident of Arizona. He is sued in his individual and official capacities.

22
23
24
25

15.    Defendant Patel, an adult male, is, on information and belief, a citizen of the United States. Defendant Patel is a resident of Arizona. Defendant Patel was the Town Manager of Florence at all times relevant to this Complaint until he resigned on December 14, 2012. He is sued in his individual and official capacities.

26
27

16.    Defendant Rankin, a Caucasian adult male, is a citizen of the United States and a resident of Arizona. Rankin was Mayor Elect of Florence from March 13, 2012,

28

until June 10, 2012. He served as Mayor of Florence from June 2012 to November 2016. He is sued in his individual and official capacities.

17.     Defendant Tryon, a Caucasian adult male, is a citizen of the United States and a resident of Arizona. At all relevant times, Tryon has been Lieutenant of the FPD, second in command to the Chief. He is sued in his individual and official capacities.

## FACTUAL ALLEGATIONS

### PLAINTIFFS ENGAGED IN PROTECTED ACTIVITY BY REPORTING ILLEGAL CONDUCT AND BY FILING THIS LAWSUIT

18.     Plaintiffs incorporate as though fully restated herein each of the factual allegations stated in paragraphs 1 through 420, and each of paragraphs 1 through 12 of the Prayer for Relief, of their Third Amended Complaint, filed on April 30, 2014 (Doc. No. 37). In addition, Plaintiffs incorporate as though fully restated herein each of the factual allegations stated in paragraphs 1 through 75 of their Supplemental Complaint, filed on January 3, 2017 (Doc. No. 170).

19.     Prior to his firing on March 27, 2017, Hunter had served as a law enforcement officer for over twenty years. He was hired by FPD in 2003 as a Patrol Officer. He was promoted to Detective in 2004, and remained a Detective until his termination on December 14, 2012. He was reinstated and demoted to Patrol Officer in 2013.

20.     Prior to his firing on December 14, 2012, Varnrobinson had served as a law enforcement officer for nearly twenty years. He was hired by FPD as a part-time Patrol Officer in 2000, promoted to full-time Patrol Officer in 2003, and promoted to Detective in 2008.

21.     Between 2007 and 2012, Plaintiffs witnessed and reported illegal activity by Defendant Tryon, including Tryon's unauthorized return of evidence to suspects or witnesses in at least two FPD criminal cases, in order to prevent prosecutions in those cases.

22.     Plaintiffs engaged in protected activity when they original Complaint on June 11, 2014, and again engaged in protected activity when they filed the First Supplemental Complaint on January 3, 2017.

23.     Before and after the filing of Plaintiffs' First Supplemental Complaint, Defendants have continued a campaign of retaliation against Plaintiffs for their protected disclosures of illegal activity and for the filing of the complaints in this lawsuit. Specifically, Defendants have continued to retaliate against Hunter by subjecting him to unjustified disciplinary actions, ordering him to undergo a fitness for duty test, suspending him without pay, and eventually firing him on March 27, 2017. Defendants have continued to retaliate against Varnrobinson by obstructing his ability to obtain similar work with other law enforcement agencies.

**HUNTER ENGAGED IN PROTECTED ACTIVITY IN MAY 2016, DEFENDANTS REFUSED TO INVESTIGATE HUNTER'S COMPLAINTS, AND DEFENDANTS CONTINUED TO RETALIATE AGAINST HUNTER.**

24.     As set forth in detail in the First Supplemental Complaint, Hunter engaged in protected activity during an interaction with Defendant Hughes on May 4, 2016, when he opposed Defendant Hughes' repeated attempts to intimidate him in retaliation for filing a lawsuit against Hughes. After Hughes stared down Hunter for an extended time and asked Hunter, "Is something wrong?" Hunter replied, "Yeah, every time you come in here you try to stare me down. You did the same thing in court (sic) and tried to lie about it. You have done everything you could to ruin my career. I think that is quite enough, don't you?".

25.     When Defendant Hughes entered the briefing room on May 4, 2016, no formal briefing was taking place.

26.     After Defendant Hughes entered the briefing room on May 4, 2016, he did not speak to any officers before he asked Hunter, "Is something wrong?"

27.     In the audio-recording of the May 4, 2016 incident in the briefing room,

Defendant Hughes' voice cannot be heard on the recording until he asks Hunter, "Is something wrong?".

28.   None of the officers present in the briefing room on May 4, 2016—other than Hunter—was positioned in such a way that allowed them to observe whether Defendant Hughes made extended eye contact with Hunter.

29.   Upon information and belief, on May 4, 2016, Defendant Hughes positioned himself near the door in the rear of the briefing room so that he could make eye contact with Hunter without other officers noticing him doing so.

30.   On May 4, 2016, Defendant Hughes continued to make eye contact with Hunter even after Hunter broke eye contact with Hughes more than once.

31.   On May 4, 2016, Defendant Hughes continued to make eye contact with Hunter even after observing Hunter's face redden.

32.   In retaliation for Hunter's protected activity on May 4, 2016, Defendant Hughes placed Hunter on administrative leave that same day.

33.   On May 5, 2016, Hunter complained about Defendant Hughes' retaliatory actions, including his aggressive staring on several separate occasions, in an email to Scott Barber, the Human Resources Director for Defendant Town of Florence, with a subject line, "Continuing Retaliation by Chief Hughes."

34.   On May 10, 2016, Barber acknowledged receipt of Hunter's complaint, and wrote that he was "receiving this complaint under the general intent of the provisions of the Town of Florence Personnel Policy, Article II, Section 210, "Workplace Violence/Harassment." Barber ignored the fact that Hunter complained about retaliation, not about workplace violence or harassment. Barber also wrote that he would not investigate Defendant Hughes' actions in staring down Plaintiffs during breaks in his deposition in this lawsuit on April 27 and 28, 2016.

35.   As set forth in detail in the First Supplemental Complaint, Defendant Hughes ordered Hunter on May 18, 2016 to undergo a psychological fitness for duty examination, purportedly in response to Hunter's May 4, 2016 comments that Defendant

1   Hughes intentionally provoked.

2        36.    In her May 26, 2016 report summarizing her findings of the fitness for

3   duty examination, the psychologist hired by the Defendant Town of Florence noted that

4   Hunter's performance on a psychological test known as the Pittsburgh Sleep Quality

5   Index revealed that Hunter "reported difficulty falling asleep more than 3 times a week.

6   He reported waking up in the night at least 3 times per week. He rated his sleep as

7   'fairly bad' and reported he is only sleeping 4-5 hours a night. He attributed problems to

8   'work related stress.'"

9        37.    The Town's psychologist diagnosed Hunter in May 2016 with "major

10   depression," and noted in her "conclusions with recommendations" that Hunter "has had

11   acute stress, difficulty sleeping and believes he is being retaliated against," and implied

12   that Hunter at the time of diagnosis lacked the "ability to control emotions, particularly

13   anger and feelings of being persecuted."

14        38.    Defendant Hughes was aware of the Town psychologist's diagnosis and

15   her "conclusions with recommendations," and forwarded her report to Hunter.

16        39.    On June 28, 2016, Defendant Hughes notified Hunter that the Town

17   agreed with the Town psychologist's recommendation that Hunter provide updates to

18   the psychologist regarding his treatment, and notified Hunter that he would be expected

19   to undergo a follow-up fitness for duty examination on or about October 3, 2016.

20   Defendant Hughes also notified Hunter that he would be placed on leave pursuant to the

21   Family and Medical Leave Act, and that the leave would be without pay once Hunter

22   exhausted his available accrued leave.

23        40.    On or about October 3, 2016, the Town's psychologist conducted Hunter's

24   follow-up fitness for duty examination, noted that Hunter was "sleeping normally,"

25   concluded that Hunter's major depression was in remission, and further concluded that

26   Hunter was fit to return to duty.

27   //

28   //

**UPON LEARNING THAT HE COULD NOT USE UNFITNESS FOR DUTY AS A JUSTIFICATION TO FIRE HUNTER, DEFENDANT HUGHES INITIATED AN INTERNAL INVESTIGATION INTO HUNTER TO JUSTIFY HIS FIRING.**

41.     On October 4, 2016, the Town returned Hunter to administrative leave with pay, rather than without pay, as a result of the Town's psychologist's determination that he was fit to return to duty. However, the Town did not return Hunter to active duty.

42.     Barber wrote to the Town's psychologist on October 26, 2016 and asked what "actions or speech" Hunter might exhibit to signal a "reoccurrence of psychological disease or defect" that the psychologist initially diagnosed (major depression). Barber also asked the Town's psychologist whether her conclusion that Hunter was fit for duty "allow[ed] for an unqualified return by Mr. Hunter to all duties and functions, with or without reasonable accommodation?".

43.     Before the Town's psychologist responded to Barber's October 26, 2016 letter, Defendant Hughes requested on November 21, 2016 that the Apache Junction (AZ) Police Department conduct an internal investigation on behalf of the Town into Hunter's actions on May 4, 2016 in the squad briefing room. Defendant Hughes requested that an outside agency conduct the internal investigation because of Hunter's ongoing lawsuit against him and the Town.

44.     Defendant Hughes initiated the internal investigation into Hunter because Hughes realized that the fitness for duty process would not provide the justification necessary to fire Hunter.

45.     At Defendant Hughes' request, Lt. Jeffrey Kirkham of the Apache Junction (AZ) Police Department investigated Defendant Hughes' allegations that on May 4, 2016, Hunter violated Town policies regarding Insubordination, Conduct Unbecoming, and Use of Digital Recorders.

**THE TOWN'S PSYCHOLOGIST WARNED DEFENDANTS ABOUT HUNTER'S RISK OF RELAPSE INTO MAJOR DEPRESSION AND THE NEED TO TRANSITION BACK GRADUALLY TO FULL DUTY; DEFENDANTS DISREGARDED HER WARNINGS AND IMMEDIATELY SUBJECTED HUNTER TO AN INTERNAL INVESTIGATION INTERVIEW.**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

46.     In an undated response to his October 26, 2016 letter, received by Barber on or about December 13, 2016, the Town's psychologist warned Barber that Hunter's "returning to work in the same environment could lead to a relapse of symptoms. The most telling symptoms are generally increased anger, defiance or disrespect to authority." The Town's psychologist also stated that she "do[es] not necessarily support [Hunter's] full return to all duties and functions, as it is often prudent to have a transition plan from no duty to full duty; light duty would be acceptable first to make sure [Hunter] can handle the stress."

47.     On December 14, 2016—one day after Barber received the Town's psychologist's warning regarding Hunter's likelihood of relapse into major depression—Defendant Tryon wrote to Lt. Kirkham and stated that he (Tryon) "was just approached and asked if you have given notice to Mr. Hunter of the investigation. Would you please let me know if you have or when you do give notice?" Defendant Tryon did not identify the individual who had "approached" him to ask whether Hunter had received notice that he was the subject of an internal investigation.

48.     Upon information and belief, it was Defendant Hughes who "approached" Defendant Tryon to ask whether Hunter had received notice that he was the subject of an internal investigation.

49.     Upon information and belief, Defendant Hughes, relying on the Town's psychologist's express warning, intentionally tried to provoke a relapse of Hunter's "increased anger, defiance or disrespect to authority" by forcing him to undergo immediately an interview in connection with the internal investigation Hughes initiated.

50.     That same day—December 14, 2016—Lt. Kirkham ordered Hunter to attend a mandatory interview that next day in connection with the internal investigation initiated by Defendant Hughes.

51.     Hunter requested from Barber on November 8, 2016 a copy of the Town psychologist's report from his October 3, 2016 follow-up fitness for duty examination,

but Barber refused to provide it to Hunter prior to his December 15, 2016 interview with Lt. Kirkham.

52.     On December 15, 2016, Lt. Kirkham interviewed Hunter in connection with the internal investigation.

53.     The following day, December 16, 2016, Barber sent Hunter the Town psychologist's report from his October 3, 2016 follow-up fitness for duty examination, as well as her letter warning about the risks of relapse.

54.     Defendants never returned Hunter to active duty before he was fired.

**UPON DEFENDANT HUGHES' RECOMMENDATION, THE TOWN FIRED HUNTER BECAUSE OF ALLEGED CONDUCT THAT RESULTED DIRECTLY FROM HIS DISABILITY.**

55.     On January 24, 2017, Defendant Hughes notified Hunter in writing of his intent to fire him for alleged "willful and repeated" violations of policies including policies prohibiting insubordination, conduct unbecoming, and unauthorized use of a digital recorders.

56.     All three alleged policy violations are based on Hunter's May 4, 2016 conduct, which Defendant Hughes perceived to be "angry" and "disrespectful" to Defendant Hughes' authority as chief.

57.     Defendant Hughes alleges that Hunter failed to follow "direct orders" from Sergeant Morris and Sergeant Campbell during the May 4, 2016 incident.

58.     However, in their respective depositions, neither Sergeant Morris nor Sergeant Campbell could define "direct order"; neither could identify the specific direct order they gave to Hunter on May 4, 2016; and neither agreed on what conduct by Hunter was necessary to demonstrate compliance with those purported direct orders.

59.     Hunter did not willfully fail or refuse to obey a "direct order" on May 4, 2016 because he reasonably did not understand to have received a "direct order."

60.     On February 2, 2017, Defendant Hughes submitted a written recommendation to Town Manager Brent Billingsley that Hunter be fired.

-10-

61.     On February 21, 2017, Billingsley notified Hunter of his intent to fire Hunter, and emphasized what he perceived to be Hunter's "level of anger, frustration, defensiveness, and combativeness displayed by Officer Hunter coupled with his disregard for department policy and lack of respect for supervisors."

62.     Billingsley's reasons for terminating Hunter match almost perfectly the Town psychologist's description of the "most telling symptoms" of a relapse by Hunter into major depression: "increased anger, defiance or disrespect to authority."

63.     On March 27, 2017, Town Manager Billingsley fired Hunter.

**THE TOWN INQUIRED INTO VARNROBINSON'S EMPLOYMENT STATUS WITH OTHER LAW ENFORCEMENT AGENCIES, ALMOST FOUR YEARS AFTER FIRING HIM.**

64.     On or about November 9, 2016, Florence Police Department Sergeant Renee Klix telephoned the Town of Superior (AZ) police department and inquired into Plaintiff Varnrobinson's employment status with Superior.

65.     Since the Defendant Town fired Varnrobinson in December 2012, he has not applied for employment with the Defendant Town.

66.     Defendant Hughes had knowledge that Klix contacted Superior on or about November 9, 2016 to inquire about Varnrobinson, and upon information and belief, ordered Klix to call Superior to inquire about Varnrobinson, or ratified Klix's decision to call Superior to inquire about Varnrobinson.

67.     Upon information and belief, Klix also contacted AZPOST on or about November 9, 2016 and communicated to AZPOST information about Varnrobinson's employment with the Town of Superior.

**THE TOWN OF FLORENCE CONTINUED TO PROVIDE DAMAGING INFORMATION ABOUT VARNROBINSON TO HIS POTENTIAL EMPLOYERS.**

68.     Upon information and belief, Klix, as a representative of the Town, provided false and/or damaging information about Varnrobinson to his potential

employers, in an effort to interfere with his ability to obtain employment as a law enforcement officer.

69.     In the last six months, Varnrobinson has been rejected from at least six law enforcement positions for which he is well-qualified, and upon information and belief, was rejected only after the background check process began.

**THE TOWN OF FLORENCE CONTINUED ITS RETALIATION BY SUBMITTING DOCUMENTS TO THE ARIZONA PEACE OFFICER STANDARDS AND TRAINING ("AZPOST") BOARD TO INITIATE DISCIPLINARY ACTION AGAINST HUNTER FOLLOWING HIS TERMINATION.**

70.     In 2013, following Hunter's initial termination from the FPD, Hughes requested that the Arizona Peace Officer Standards and Training ("AZPOST") Board investigate Hunter. After Hunter was reinstated, instead of withdrawing the complaint, as Hughes said he would, Hughes asked AZPOST to continue their investigation of Hunter. AZPOST closed the investigation after three months, without taking action.

71.     In March 2017, continuing a pattern of using possible AZPOST discipline as an indirect method of retaliating against Hunter, the Town again submitted information to AZPOST that alleged that Hunter may have been involved in misconduct.

72.     If AZPOST finds that Hunter violated integrity rules, Hunter could lose his peace officer certification, effectively ending his career in law enforcement.

**THE TOWN OF FLORENCE SUBMITTED KNOWINGLY FALSE OR MISLEADING INFORMATION ABOUT HUNTER TO THE PINAL COUNTY ATTORNEY'S OFFICE IN AN EFFORT TO ENSURE HE REMAINS INCLUDED ON THE LAW ENFORCEMENT INTEGRITY DATABASE ("*Brady List*").**

73.     In 2014, the Town sent documents, which contained known inaccuracies and falsehoods about Hunter and Varnrobinson, to the Pinal County Attorney's Office's

("PCAO") Law Enforcement Integrity Committee ("Committee"), which keeps a record of officers who have knowingly lied in an official capacity. This record is known as the Law Enforcement Integrity Database, or colloquially as the "*Brady* list." The Town knowingly submitted inaccurate and negative information about Hunter and Varnrobinson in the hope of convincing the Committee to add them to the *Brady* List.

74.     On February 15, 2017, Hunter and Varnrobinson requested that the Committee review their inclusion on the *Brady* List. The Committee agreed to review Hunter and Varnrobinson's inclusion on the list at their meeting in March 2017.

75.     On February 28, 2017, Jim Heard ("Heard"), Chair of the PCAO's Committee, notified Hunter and Varnrobinson that the Committee would not review their inclusion on the list as planned because, on the eve of the March meeting, the Town sent additional documents regarding Officers Hunter and Varnrobinson to the PCAO. The Committee postponed Hunter and Varnrobinson's review until the April 20, 2017, meeting.

76.     Heard later denied that he received additional information from the Town. This contradicted his initial letter, which stated that the receipt of documents from the Town was the reason he delayed the review until April.

77.     On April 19, 2017, the Town actually did submit to PCAO additional documents to the Committee on the eve of their April 20, 2017 meeting, intentionally causing yet another delay in their review of Hunter and Varnrobinson's placement on the *Brady* List. The Town had these documents in their possession for several weeks before the April 20, 2017 hearing.

78.     On May 19, 2017, the Town of Florence again submitted additional documents to the Committee that the Town had in their possession for several months before submitting them.

79.     On May 25, 2017, the Committee voted to keep Hunter and Varnrobinson on the *Brady* list.

80.     Upon information and belief, the Committee relied on false or misleading

information submitted by the Town in reaching its decision to keep Hunter and Varnrobinson on the *Brady* list.

## COUNTS I-IX

81.     Plaintiffs incorporates as though fully restated herein each of the allegations stated in Counts I through IX (paragraphs 249 through 411) of their Third Amended Complaint, filed on April 30, 2014 (Doc. No. 37).

**COUNT X—DISCRIMINATORY DISCHARGE OF PLAINTIFF HUNTER IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT ("ADA"), 42 U.S.C. §  12101 et seq., AGAINST DEFENDANT TOWN OF FLORENCE.**

82.     Plaintiffs incorporate as though fully restated herein each of the allegations set forth above.

83.     The ADA prohibits discrimination in the terms or conditions of employment on the basis of a disability.  This prohibition extends to the discriminatory discharge of employees. 42 U.S.C. § 12111(a).

84.     Under the ADA, Hunter is a qualified individual with a disability who, with or without reasonable accommodation, can perform the essential functions of a police officer for the Town of Florence Police Department.

85.     Hunter has a disability under 42 U.S.C. § 12102 because he suffers from, has a record of, or is regarded as having major depression that substantially limits his major life activities of sleeping and working.

86.     Defendant Town of Florence is an employer as defined in 42 U.S.C. § 12111(5)(A) because it engaged in an industry affecting commerce, and it had 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

87.     The Town's termination of Hunter on March 27, 2017, was a discriminatory action against him on the basis of his disability, as set forth in 42 U.S.C. § 12112.

88. Hunter was terminated for conduct caused by his diagnosed disability of major depression. Defendants terminated Hunter because of his anger, defiance, and disrespect of authority—the very symptoms the Town's psychologist identified as "the most telling" symptoms of Hunter's major depression.

89. Conduct resulting from a disability is considered part of the disability, and thus Defendants unlawfully terminated Hunter because of his disability.

90. Defendant's unlawful and discriminatory motives in their treatment of Hunter's employment, in disregard of his rights under the ADA, were willful, wanton, and malicious. As a result, Hunter is entitled to full relief under the law, including, but not limited to, economic, compensatory and punitive damages.

**COUNT XI—FAILURE TO ACCOMMODATE PLAINTIFF HUNTER IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT ("ADA"), 42 U.S.C. § 12101 et seq., AGAINST DEFENDANT TOWN OF FLORENCE**

91. Plaintiffs incorporate as though fully restated each of the allegations in the paragraphs above.

92. Under the ADA, Hunter is an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of a police officer for the Town of Florence Police Department.

93. Hunter has a disability under 42 U.S.C. § 12102, in that he suffers from, has a record of, or is regarded as having major depression that substantially limits his major life activities of sleeping and working.

94. The Town is an employer as defined in 42 U.S.C. § 12111(5)(A) because it engaged in an industry affecting commerce and it had 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

95. The Defendants' failure to accommodate includes, but is not limited to: failure of defendants to engage in an interactive process with Hunter to identify and implement appropriate reasonable accommodations; failure to make reasonable

accommodations for Hunter's disability; and terminating Hunter's employment because of his disability, instead of providing him with reasonable accommodations.

96.     Defendants failed to engage in an interactive process with Hunter to identify and implement appropriate reasonable accommodations, despite notice of his need for accommodations.

97.     Defendant Hughes and the Town were aware Hunter's need for an accommodation because the Town's psychologist indicated in her May 26, 2016 fitness for duty report that the Town regarded Hunter as "disabled" before she even completed her evaluation of him. At the very latest, the Town recognized Hunter's need for an accommodation upon receipt of the fitness for duty report on May, 26 2016.

98.     The Town never engaged Hunter in an interactive process to identify and implement appropriate reasonable accommodations.

99.     Following Hunter's return from unpaid FMLA leave in October 2016, Defendants continued to fail to engage Hunter in any interactive process.

100.     Defendants failed to provide reasonable accommodations for Hunter's disability, and instead terminated his employment because of his disability.

101.     Defendants' unlawful and discriminatory motives in their treatment of Hunter's employment were willful, wanton, and malicious. As a result, Hunter is entitled to full relief under the law, including, but not limited to, economic, compensatory and punitive damages.

## **DAMAGES**

102.     Plaintiffs incorporates as though fully restated herein each of the allegations stated in the Damages sections (paragraphs 412 through 420) of their Third Amended Complaint, filed on April 30, 2014 (Doc. No. 37).

## **REQUESTED RELIEF**

NOW, WHEREFORE, Plaintiffs pray this court for the following relief:

1.     Award Plaintiffs economic damages, including back pay, front pay, lost benefits, and other pecuniary damages proven at trial, to redress injuries suffered as a result of Defendants' adverse actions taken against Plaintiffs;

2.     Award Plaintiffs compensatory damages to redress injuries suffered as a result of Defendants' adverse actions taken against Plaintiffs;

3.     Award Plaintiffs reputational damages to redress injuries suffered as a result of Defendants' injury to Plaintiffs' professional reputations;

4.     Award Plaintiffs punitive damages against Defendants to redress injuries suffered as a result of Defendants' adverse employment actions taken against Plaintiffs;

5.     Award Plaintiffs presumed and punitive damages against Defendants to redress injuries suffered as a result of Defendants' publication of false and defamatory statements about Plaintiffs;

6.     Award Plaintiffs their attorneys' fees and costs incurred in bringing this action pursuant to 42 U.S.C. § 1988 and to 42 U.S.C. § 2000e-5(k);

7.     Expunge Plaintiffs' Personnel Records so that all references to the adverse employment actions taken against Plaintiffs are removed, including, but not limited to, any disciplinary actions;

8.     Order Defendant Hughes to withdraw from the PCAO the termination memoranda and other materials he submitted to the PCAO;

9.     Order Defendant Town to reinstate Plaintiff Hunter to the FPD as a Detective;

10.     Order Defendant Town to reinstate Plaintiff Varnrobinson to the FPD as a Detective;

11.     Issue a declaratory judgment declaring that Defendants' conduct violated Plaintiffs' constitutional and statutory rights;

12.     Grant such other relief as this court deems just and necessary.

1

2

3    RESPECTFULLY SUBMITTED this 3rd day of August, 2017.

4
                                    **BERNABEI & KABAT, PLLC**
5

6                           By    /s/ Peter M. Whelan
                                  Lynne Bernabei
7                                 Peter M. Whelan

8                                   **ROBAINA & KRESIN, PLLC**
9

10                                       Edmundo Robaina

11                                       *Attorneys for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-18-

1

## **DEMAND FOR JURY TRIAL**

2

3      Plaintiffs Walt Hunter and Jarris Varnrobinson Vonzombie hereby demand a jury

4  trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

5

6  RESPECTFULLY SUBMITTED this 3rd day of August, 2017.

7

8                                    **BERNABEI & KABAT, PLLC**

9                                    By  ___/s/ Peter M. Whelan_____

10                                          Lynne Bernabei
                                        Peter M. Whelan
11

12                                   **ROBAINA & KRESIN, PLLC**

13                                          Edmundo Robaina

14

15                                        *Attorneys for Plaintiffs*

16

17

18

19

20

21

22

23

24

25

26

27

28