1  Edmundo Robaina (#018125)
   ROBAINA & KRESIN PLLC
2  5343 N. 16th Street, Suite 200
   Phoenix, Arizona 85016
3  Telephone: (602) 682-6450
   Facsimile: (602) 682-6455
4  epr@robainalaw.com

5  Lynne Bernabei (admitted *pro hac vice* July 8, 2014)
   Peter M. Whelan (admitted *pro hac vice* January 12, 2016)
6  Bernabei & Kabat, PLLC
   1400 16th Street, N.W., Suite 500
7  Washington, D.C. 20036
   Telephone: (202) 745-1942
8  Facsimile: (202) 745-2627
   Bernabei@BernabeiPLLC.com
9  Whelan@BernabeiPLLC.com

10 *Attorneys for Plaintiffs*

11              **UNITED STATES DISTRICT COURT**

12                  **DISTRICT OF ARIZONA**

13 Walt Hunter and Jarris A.H.
   Varnrobinson Vonzombie,
14                                        No. 2:14-cv-01304-DMF
               Plaintiffs,
15
   v.
16                                        **PLAINTIFFS' RESPONSES AND**
   Town of Florence; Daniel Hughes;      **OBJECTIONS TO DEFENDANTS'**
17 Himanshu Patel; Tom Rankin; Terry     **STATEMENT OF FACTS**
   Tryon; Charles Montoya,               **SUPPORTING DEFENDANTS'**
18                                        **SUMMARY JUDGMENT MOTION**
               Defendants.               **ON ALL CLAIMS**
19

20

21

22

23         Plaintiffs Walt Hunter and Jarris Vonzombie, through undersigned counsel, and

24 pursuant to LRCiv 7.2(m) and LRCiv 56.1(b), hereby submit their responses and

25 objections to Defendants' Statement of Facts Supporting Defendants' Summary

26 Judgment Motion on All Claims.

27

28

I.     **Responses to Defendants' Statement of Facts Not in Dispute.**

**1.     The Town of Florence ("the Town" or "Florence") has and has had a very small Police Department. From 2010 through early 2012, in addition to the Chief, the Florence Police Department ("FPD") had one Lieutenant, four Sergeants, three Detectives and, on average, 17-20 Police Officers, as well as civilian employees. [Declaration of Terry Tryon ("Tryon Decl.") ¶ 2 (Ex. 1)]**

**Responses and Objections:** Not disputed.

**2.     Robert Ingulli served as Florence Police Chief from October 30, 2000 to July 13, 2012, with a break of approximately five months, when he left to run unsuccessfully for Pinal County Sheriff. [Declaration of Scott Barber ("Barber Decl.") ¶ 4] (Ex. 2)**

**Responses and Objections:** Not disputed.

**3.     Terry Tryon has served as the Florence Police Department ("FPD") Lieutenant since 2007. [Tryon Dec. ¶ 1 (Ex. 1)]**

**Responses and Objections:** Not disputed.

**4.     The Town Manager between 2002 and December 14, 2012 was Himanshu Patel. [Deposition of Himanshu Patel ("Patel Dep.") 7:24-8:1; 135:20-23, attached at Ex. 3]**

**Responses and Objections:** Not disputed.

**5.     The Police Department had major internal problems for years. Ingulli believed that there was a split in the department between supporters of Tryon and those who supported him. Ingulli felt the split was pretty much divided equally and that Hunter and Varnrobinson supported him. [Ingulli Dep. 55:2-17; 56:4-15; 79:7-80:15 (Ex. 4); Patel Decl. ¶ 2 (Ex. 5)]**

**Responses and Objections:** Not disputed. Many FPD employees observed the department "split." FPD Evidence Technician Tom Clifford testified that, when he started working for the FPD in July 2009, it was immediately apparent to him that the department was divided into two camps—one camp loyal to then-Chief Ingulli, and one camp loyal to Lieutenant Tryon. (Ex. 18, Clifford Dep., at 46:7-13.)

**6.     Ingulli did not trust those Department personnel who he viewed as supporting Tryon and at times wanted information shared only with those in the**

1

**department who he viewed as being on his side. [Ingulli Dep. 105:6-106:2; 111:20-112:12; 208:8-209:6 (Ex. 4)]**

2

3

4

     **Responses and Objections:** Disputed. The cited deposition testimony does not support the assertion. Ingulli testified that he asked Hunter and Varnrobinson to keep their review of the Kemp case concealed from Tryon and Detective Klix because Ingulli thought Tryon would interfere with the review if he learned about it, and because Ingulli did not want to further divide the department. (Ex. 08, Ingulli Dep., at 105:6-106:2; 111:20-112:12; 208:8-209:6.)

5

6

7

8

9

10

     **7.    As Town Manager, Patel was sufficiently concerned about what he viewed as a dysfunctional police department that he recommended that the Town Council authorize an expenditure of $50,000 to have an independent professional audit done of the department. Based on the size of the Town's budget, that was a substantial expense for the Town to incur, but in July 2011, the Council approved retaining a company called International City/Council Management Association ("ICMA") Center for Public Safety Management to analyze the entire department. [Patel Decl. ¶ 3 (Ex. 5)]**

11

12

13

14

15

16

17

18

19

     **Responses and Objections:** Disputed. Patel testified in his deposition that he recommended the ICMA audit to Council to determine whether the FPD was "utilizing public resources to the best of our ability and in an efficient manner" during a period in which there was a "tremendous amount of downturn in the economy." Patel made no mention of recommending the ICMA audit because of concerns about a "dysfunctional police department." (Ex. 06, Patel Dep. 79:5-80:14.)

20

21

22

23

     **8.    After sharing interim reports with the Town Manager, in February 2012, ICMA issued a comprehensive report noting numerous problems with the FPD and recommending approximately 100 changes to increase the operational efficiency of the FPD. [Patel Decl. ¶ 4 Ex. A (Ex. 5)]**

24

25

26

     **Responses and Objections:** Not disputed. The ICMA report speaks for itself. Hearsay objection to the extent Defendants rely on the ICMA report for the truth of the matters asserted therein.

27

28

     **9.    Among other things, the ICMA Report indicated that the Department had been "experiencing a significant breakdown in internal communications [that]**

**contribute in large part to a breakdown in the chain of command, discipline, and to a poor sense of morale." [Patel Decl. ¶ ¶ 4 Ex. A (Ex. 5)]**

**Responses and Objections:** Not disputed. The ICMA report speaks for itself. Hearsay objection to the extent Defendants rely on the ICMA report for the truth of the matters asserted therein.

**10. Some of the recommendations in the ICMA Report were:**
**a. Detectives should be utilized more, increase felony clearance rates, and report to the Lieutenant, who should be directly accountable for work performed. [Patel Decl. ¶ 4, Ex. A (Ex. 5); Ingulli Dep. 51:10-19 (Ex. 4)]**
**b. The criminal investigations unit was overstaffed and two full-time detectives should be sufficient to handle the workload of the department, and one full-time dedicated supervisor should be assigned to manage their investigations. [Patel Decl. ¶ 4, Ex. A (Ex. 5)]**
**c. All police officers and detectives should self-report weekly or monthly activity sheets summarizing their personal patrol and investigative activities, which should be monitored by supervisors on a continual basis to evaluate the performance of all members of the department. [Patel Decl. ¶ 4, Ex. A (Ex. 5)]**

**Responses and Objections:** Not disputed. The ICMA report speaks for itself. At the time the ICMA Report was issued in February 2012, the FPD had recently asked DPS to investigate Detective Varnrobinson's allegations that Tryon had illegally tampered with evidence. (Ex. 06, Patel Dep., at 63:16-64:17, 65:4-15); (Ex. 29, DPS Investigation Report, at 3.)

**<u>The Desert Rape Investigation</u>**

**11. On October 27, 2017, FPD officers responded to a call for service regarding a sexual assault that allegedly had occurred at a party attended by several juveniles in an area of Florence known as "the Flats." [April 26, 2016 Deposition of Walt Hunter ("Hunter Dep.") (Vol. 1) Ex. 14 at pp. 148-152 (Ex. 6)]**

**Responses and Objections:** Not disputed.

**12. This incident, FPD Case No. F07002247, became known as the "Desert Rape" case. [Hunter Dep. (Vol. 1) 269:14-22 & Ex. 14 (Ex. 6)]**

**Responses and Objections:** Not disputed.

1

2

3

**13.     Mickey Tryon, Lt. Tryon's son, was one of the individuals who brought an alleged rape victim to the FPD after Mickey, who was at a friend's house at the time, received a call from someone at the party indicating that the girl may have been sexually assaulted there. Mickey [Hunter Dep. (Vol. 1) 271:19-272:21 & Ex. 14 at p. 149 (Ex. 6)]**

4

5

6

7

**Responses and Objections:** Disputed. Tryon's son claimed to have been at a friend's house at the time the girl was allegedly sexually assaulted. The citations do not support the assertion that he was actually present at a friend's house, rather than at the scene of the Desert Rape party all along.

8

9

10

11

**14.     When interviewed, the alleged victim admitted that she had been drinking heavily and that she did not remember having sex with anyone, did not believe she had sex with anyone, and could not recall many other details about the evening. [Hunter Dep. (Vol. 1) 274:2-4 & Ex. 14 at p. 148-149 (Ex. 6)]**

12

**Responses and Objections:** Not disputed.

13

14

15

16

17

**15.     Numerous witnesses who had observed the alleged victim's behavior reported that she had been drinking heavily, started stripping off her clothes and dancing, tried to grab, kiss, and rub herself against numerous males, asked males at the party to "fuck" her, and pulled at least one male on top of her in the back of a pick-up truck before having sex with him in front of several witnesses. [Hunter Dep. (Vol. 1) 273:1-6, 22-274:1, 274:5-9, & Ex. 14 at pp. 149-158; 171-180 (Ex. 6)]**

18

19

20

**Responses and Objections:** Not disputed. The alleged victim in the Desert Rape case was 15 years old. (Ex. 33, Hunter Dep. I, at 304:20-305:12.) When her blood was tested later that evening at the hospital, her blood alcohol content was 0.288. (*Id.* at 275:2-6, Dep. Ex. 14 at 35.)

21

22

23

**16.     The witnesses further reported that people at the party had taken video footage of what took place with their cell phones. [Hunter Dep. (Vol. 1) 273:15-18 & Ex. 14 at pp. 149-158 (Ex. 6)]**

24

**Responses and Objections:** Not disputed.

25

26

**17.     17. The case was assigned to Hunter for investigation. [Hunter Dep. (Vol. 1) 282:6-12 (Ex. 6)]**

27

**Responses and Objections:** Not disputed.

28

18.     **Hunter never formed an opinion that the eye witnesses to the event were untruthful or inaccurate in their accounts. [Hunter Dep. (Vol. 1) 274:10-12 (Ex. 6)]**

**Responses and Objections:** Disputed. The cited testimony supports only the assertion that Hunter never formed an opinion with regard to witnesses who stated that the 15-year-old alleged victim "had pulled the young man on top of her and then they began to have sex." (Ex. 33, Hunter Dep. I, at 274:5-12.)

19.     **Several cell phones were collected from witnesses, the content of which were downloaded by the Department's Evidence Technician, Paul Brannon. [Hunter Dep. (Vol. 1) Ex. 14 at p. 161-165, 171 (Ex. 6)]**

**Responses and Objections:** Not disputed. On October 27, 2007, at 3:30 a.m., Sergeant Morris turned over to Brannon two cell phones which Brannon labeled as #589-01 and -02. (Ex. 33, Hunter Dep. I, at 275:25-276:5, Dep. Ex. 14 at 162.) On October 29, 2007, Brannon downloaded the content from the cell phones #589-01 and -02 because Tryon had ordered that the cell phones be returned to their owners. (*Id.* at 161-163.) Brannon deleted the content from the cell phones before they were returned to their owners. (*Id.*)

20.     **Sgt. Morris was on duty the night of the incident, was aware that cell phones had been collected from several people and put into evidence. The Sergeant's expectation was that the Department's evidence employee would make copies of whatever evidence was on the phones and then return the phones to their owners. [March 17, 2016 Deposition 1 of Scott Morris ("Morris Dep. 1") 15:4-25, 17:13-22, attached as Ex. 7]**

**Responses and Objections:** Disputed. Sgt. Morris testified that a search warrant for those cell phones should have been obtained *before* the evidence technician downloaded the content of those cell phones, so that any evidence obtained from those cell phones would be admissible in court. (Ex. 16, Morris Dep. I, at 85:19-87:20.) Sgt. Morris does not know whether search warrants were obtained for the cell phones prior to Brannon downloading their contents. (*Id.* at 87:21-88:3.)

21.     **Hunter was aware that the collected cell phones had been given to**

Brannon and that Brannon's understanding was that Lt. Tryon wanted the cell phone evidence downloaded so that, once the evidence was in hand, the cell phones could be returned to their owners. Hunter also was aware that Brannon had in fact downloaded the cell phone evidence. [Hunter Dep. (Vol. 1) 276:18-277:2, 277:25-278:1 (Ex. 6)]

**Responses and Objections:** Disputed. Hunter did not have personal knowledge of Brannon's actions, and testified only that Brannon had written in his case supplement that Tryon wanted to return the cell phones to their owners.

22.     Lt. Tryon's involvement in the Desert Rape investigation was limited. He accompanied Hunter to the local high school to facilitate an introduction to the school principle and witnessed Hunter interview four high school students. While at the high school, Tryon contacted Pinal County Attorneys' Office Attorney Jeff Sandler, and relayed to Hunter that Sandler had advised him the cell phones could be returned to the students after the information on them had been downloaded into evidence. [Tryon Decl. ¶ 3; Hunter Dep. 1 Ex. 14 pp. 33-35 (Ex. 6)]

**Responses and Objections:** Disputed. Tryon was extensively involved in the Desert Rape investigation, yet admits that he never wrote a case supplement documenting any of his actions. (Ex. 04, Tryon Dep., at 63:12-64:10, Dep. Ex. 01.) Tryon's significant involvement in the Desert Rape investigation included (1) ordering that cell phones #589-01 and -02 be returned to their owners prior to the issuance of a search warrant for those phones (Ex. 04, Tryon Dep., at Ex. 01 at 20.); (2) accompanying Hunter to the high school to interview students and obtain students' cell phones (Ex. 33, Hunter Dep. I, at 282:21-283:3, Dep. Ex. 14 at 33); (3) speaking with Jeff Sandler at the PCAO without Hunter's involvement, purportedly to determine how to gather evidence from the students' cell phones without seizing the phones themselves or obtaining a search warrant (*Id.*); (4) overruling Hunter's decision to seize the students' phones, obtain a search warrant, and download the videos, and instead ordering Hunter to return the students' cell phones, purportedly consistent with the advice that Tryon received from Sandler (*Id.*); and (5) telling Hunter that Tryon's son Mickey had informed Tryon that the alleged 15-year-old victim "likes to fuck" (Ex. 33, Hunter Dep. I, at 304:3-24).

**23.     During the investigation, Hunter did not try to go back to obtain the cell phones that had been returned. [Hunter Dep. (Vol. 1) 281:10-24 (Ex. 6)]**

**Responses and Objections:** Disputed to the extent that Hunter did not attempt to obtain cell phones #589-01 and -02 because Brannon had already deleted the content from the cell phones before they were returned to their owners, so there was no longer any evidence to recover. (Ex. 33, Hunter Dep. I, at 281:18-282:5, Dep. Ex. 14 at 163.)

**24.     Hunter understood that the witnesses who took photos or videos of the incident could have testified in a prosecution. [Hunter Dep. (Vol. 1) 273:15-21 (Ex. 6)]**

**Responses and Objections:** Not disputed.

**25.     At the time of the investigation in 2007, Hunter read all of the police reports that were completed by the various members of the FPD. [Hunter Dep. (Vol. 1) 269:4-13 & Ex. 14 pp. 11-15 (Ex. 6)]**

**Responses and Objections:** Not disputed to the extent that Hunter read all the police reports regarding the Desert Rape Case. He did not read every single police report completed about all FPD cases in 2007.

**26.     At the time, if a detective felt that a search warrant was warranted, he or she had the authority to try to obtain one. [Ingulli Dep. 95:8-96:5 (Ex. 4)]**

**Responses and Objections:** Not disputed.

**27.     Hunter did go out later to get search warrants for cell phones, but not the ones that had been returned, and not until about a month after the incident occurred. When Hunter finally did seek search warrants, he did so not for the purpose of proving an assault had occurred against the victim, but rather for the purpose of gathering evidence to bring charges for "Sexual Exploitation of a Minor" against the individuals who videotaped the assault on the basis that they**

1   **had distributed child pornography. [Hunter Dep. (Vol. 1) 281:25-282:5, 284:13-19,**
2   **291:19-24 & Ex. 14 at pp. 63-82, 178 (Ex. 6)]**

3       **Responses and Objections:** Not disputed that Hunter obtained search warrants
4   in the Desert Rape case. Not disputed that Hunter did not attempt to obtain search
5   warrants for cell phones #589-01 and -02 because Brannon had already deleted the
6   content from the cell phones before they were returned to their owners pursuant to
7   Tryon's orders. (Ex. 33, Hunter Dep. I, at 281:18-282:5, Dep. Ex. 14 at 163.)

8       Disputed that Hunter sought warrants only to bring charges against the
9   individuals who taped the alleged assault. Hunter testified that he sought warrants to
10  prove the assault *and* to support charges against the individuals who taped the alleged
11  assault. (Ex. 33, Hunter Dep. I, at 284:11-19.)

12

13      **28.     Ingulli did not believe that Tryon committed a crime if he spoke to**
14  **the County Attorney's office and had the approval of that office to return the**
    **phones. [Ingulli Dep. 26:19-24 (Ex. 4)]**

15

16      **Responses and Objections:** Not disputed that Ingulli held that belief. Whether
17  or not Tryon actually obtained approval from the PCAO to return the cell phones to
18  their owners before obtaining search warrants is a central disputed issue of fact. (Ex. 33,
19  Hunter Dep. I, at 282:13-283:3); (Ex. 04, Tryon Dep., at 58:14-63:11.)

20

21                          **The Home Invasion Investigation**

22

23      **29.     On November 23, 2008, Jarris Varnrobinson responded to the scene**
24  **of an armed robbery that had taken place at a residence. [Tryon Decl. ¶ 4, Ex. A p.**
    **2 (Ex. 1)]**

25

26      **Responses and Objections:** Not disputed.

27      **30.     This incident, FPD Case No. F08112301, became known as the "Home**
28  **Invasion" case. [Tryon Decl. ¶ 4 (Ex. 1)]**

1

2      **Responses and Objections**: Not disputed.

3

4      **31.     As noted in Varnrobinson's Deputy Supplemental Report, witnesses
at the scene described vehicles that were observed leaving the area of the crime.
5      One witness described a "red colored sedan with a spoiler" and another described
a "red or maroon colored car" and a "silver color suburban" leaving the area at
6      the time of the incident. [Tryon Decl. ¶ 4, Ex. A p. 2 (Ex. 1)]**

7

8      **Responses and Objections:** Not disputed.

9

10     **32.     The victim indicated that he had been held at gunpoint by two
masked assailants. [Tryon Decl. ¶ 4, Ex. A p. 2 (Ex. 1)]**

11

12     **Responses and Objections:** Not disputed.

13

14     **33.     A single .223 caliber shell casing was found on the living room floor.
15     [Tryon Decl. ¶ 4, Ex. A p. 2 (Ex. 1)]**

16

17     **Responses and Objections:** Not disputed.

18

19     **34.     One of the victim's housemates told Varnrobinson that he had found
a cell phone lying on the ground near a fence, which he believed belonged to the
20     suspects. By December 4, 2008, Varnrobinson had connected the cell phone to two
individuals, "Angel" and "Bobby," who had been seen in a Chevy Suburban at the
21     time they borrowed the cell phone; Bobby was described as a "short white guy."
[Tryon Decl. ¶ 4, Ex. A p. 4 (Ex. 1)]**
22

23     **Responses and Objections:** Not disputed.

24

25     **35.     On December 13, 2008, Aaron Binkley, who worked at the
correctional facility in Florence at the time, contacted the Florence Police
26     Department to initiate a request for a welfare check at the residence he shared
with his ex-girlfriend, Chantel Delacruz. Binkley, who was not home at the time,
27     indicated that Delacruz texted him from his residence and threatened to commit
suicide using one of Binkley's weapons. [Aaron Binkley Decl. ("Binkley Decl.") ¶¶**
28

- 10 -

1-3 ( Ex. 8)]

      **Responses and Objections:** Not disputed.

      **36.**     **Varnrobinson and Sgt. Samuel Pankey responded to the call for service at Binkley's home. When they arrived, they collected and removed Binkley's weapons for safe-keeping. [Deposition of Terry Tryon ("Tryon Dep."), 137:23-138:4 & Ex. 8 p. 2, attached as Ex. 9]**

      **Responses and Objections:** Not disputed.

      **37.**     **Varnrobinson seized all of Binkley's weapons, and impounded them for safekeeping. The only weapon he impounded as evidence, as opposed to safekeeping, was a .223 caliber AR-15 style assault rifle. [Tryon Dep. Ex. 8, p. 2 (Ex. 9)]**

      **Responses and Objections:** Not disputed.

      **38.**     **Varnrobinson reported that the caliber of the rifle was consistent with the shell casing found at the Home Invasion crime scene. [Tryon Dep. Ex. 8, p. 2 (Ex. 9)]**

      **Responses and Objections:** Not disputed.

      **39.**     **Because the victim from the Home Invasion incident stated the masked assailants in that matter might have been white males, and a .223 shell had been located at the scene, Varnrobinson believed he had established probable cause to retain Binkley's .223 caliber weapon. Varnrobinson did not, however, obtain a search warrant to retain the rifle. [Tryon Dep. Ex. 8, p. 3 (Ex. 9); April 29, 2016 Deposition of Jarris Varnrobinson (Vol. 2) 81:8-15] (Ex. ~~10~~ 12)**

      **Responses and Objections:** Not disputed that Varnrobinson reasonably believed he had established probable cause to retain Binkley's .223 caliber weapon. Florence Town Attorney James Mannato thought that a judge might agree that Varnrobinson had

1   established probable cause and issue a search warrant. (Ex. 29, DPS Investigation

2   Report, at 14.)

3          Not disputed that Varnrobinson did not obtain a search warrant for the .223

4   caliber weapon between Saturday, December 13, 2008 when the weapon was secured as

5   potential evidence, and Monday, December 15, 2008, when Varnrobinson first learned

6   that the weapon had been returned to Binkley at Tryon's order. (Ex. 27, Varnrobinson

7   Dep. II, at 81:8-15); (Ex. 29, DPS Investigation Report, at 22.)

8          Disputed that Varnrobinson simply did not obtain a search warrant—Tryon

9   admits that Varnrobinson did not have time to obtain a search warrant for Binkley's

10  firearm because Tryon the return of the firearm to Binkley. (Ex. 04, Tryon Dep., at

11  114:25-115:4.)

12

13  **40.    In his March 28, 2009 supplemental report in the Home Invasion**
    **case, Varnrobinson stated there was "reasonable suspicion" to believe that Angel**
14  **Sergio Gortariz, who owned a grey Chevy Suburban, and Bobby James Henley,**
    **who had been observed in the vehicle with Angel in the area of the Home Invasion**
15  **residence at the time of the incident, were involved in the home invasion. [Tryon**
16  **Dep. Ex. 8, p. 14 (Ex. 9)]**

17  **Responses and Objections:** Not disputed.

18
    **41.    Varnrobinson did not mention Aaron Binkley as a possible suspect in**
19  **the home invasion case at any time, and did not indicate that he was in any way**
    **related to the case. [Tryon Dep. Ex. 8, p. 2 (Ex. 9)]**
20

21

22  **Responses and Objections:** Disputed. Varnrobinson indicated in the supplement

23  he recorded in the Home Invasion case that Tryon returned Binkley's weapon from

24  evidence before it could be tested to determine whether it matched the casing found at

25  the crime scene, and that the extractor, bolt, and firing pin on Binkley's AR-15 could

26  easily be switched out. Tryon's actions therefore made it impossible for Varnrobinson

27  to confirm whether Binkley was a possible suspect or in any way related to the case.

28  (Ex. 04, Tryon Dep., at 106:5-108:21.)

1

2    **42.     Varnrobinson understood at the time that it was Binkley who
     initiated the call to the police to express concern about a potentially suicidal**

3    **woman. [April 28, 2016 Deposition of Jarris Varnrobinson ("Varnrobinson Dep.")
     (Vol. ~~1~~ 2) 77:15-24 (Ex. ~~10~~ 12)].**

4

5
     **Responses and Objections:** Not disputed.
6

7
     **43.     From the time that he took Binkley's weapon until it was returned to**
8    **Binkley, Varnrobinson had not done any investigation into Binkley; nor had he
     asked Hunter or anyone else to do that. [Varnrobinson Dep. (Vol. ~~1~~ 2) 79:20-24;**

9    **81:16-25 (Ex. ~~10~~ 12)].**

10

11
     **Responses and Objections:** Not disputed that Varnrobinson "had not done any
12
     investigation into Binkley," nor asked anyone else to do that, between Saturday,
13
     December 13, 2008, when the weapon was secured as potential evidence, and Monday,
14
     December 15, 2008, when Varnrobinson first learned that the weapon had been returned
15
     to Binkley at Tryon's order. (Ex. 27, Varnrobinson Dep. II, at 81:8-15); (Ex. 29, DPS
16
     Investigation Report, at 22.)
17

18
     **44.     Binkley came to the FPD, complained to Sgt. Nate Saunders about the**
19   **seizure of his weapons, contended that he was the victim of an illegal search and
     seizure and that his second amendment rights were being violated, and threatened**
20   **to sue the FPD if the weapon was not returned to him immediately. [Binkley Decl.**
     **¶ 6 (Ex. 8)]**
21

22

23   **Responses and Objections:** Objection to admission of unsigned, unsworn

24   declaration.

25
     **45.     At the time he contacted the FPD, Binkley barely knew Lt. Terry**
26   **Tryon, and had only interacted with Tryon on two occasions that he could**
     **remember. [Binkley Decl. ¶ 8 (Ex. 8)]**
27

28

1

2
**Responses and Objections:** Objection to admission of unsigned, unsworn declaration.

3

4
**46.      Neither Varnrobinson nor anyone else at the FPD ever asked Binkley about whether he had any relationship with Tryon. [Binkley Decl. ¶ 12 (Ex. 8)]**

5

6

7
**Responses and Objections:** Objection to admission of unsigned, unsworn declaration.

8

9

10
**47.      Varnrobinson spoke to Tryon and Saunders and learned that Sgt. Saunders shared Tryon's view that FPD did not have probable cause to retain the weapon, and it was returned to Binkley. [Tryon Dep. Ex. 8, p. 2 (Ex. 9)]**

11

12

13

14
**Responses and Objections:** Not disputed that Tryon ordered the weapon returned to Binkley. Tryon told Hunter that Varnrobinson could not take weapons "from every white boy in town." (Ex. 33, Hunter Dep. I, at 7:4-18.)

15

16

17

18

19

20
**48.      Jack Harris, an expert in the field of law enforcement policies and procedures, and retired City of Phoenix Police Chief, agrees with the opinion of Tryon and Saunders that the FPD did not have probable cause to hold the .223 caliber rifle as evidence in a crime, given that the only description Varnrobinson had of the suspects in the Home Invasion case was that they were possibly white males, and that there was a .223 caliber shell casing impounded at the scene of the Home Invasion incident. [Declaration of Jack Harris ("Harris Decl.") ¶ 1 & Ex. A (Ex. 11)]**

21

22

23

24

25

26

27
**Responses and Objections:** Not disputed that this states Mr. Harris' opinion, but disputed as to whether or not the FPD had probable cause to hold the weapon as evidence. Florence Town Attorney James Mannato thought that a judge might agree that Varnrobinson had established probable cause and issue a search warrant. (Ex. 29, DPS Investigation Report, at 14.)

28
**49.      According to Harris, the two factors upon which Varnrobinson based**

**his probable cause could apply to thousands of white males who own a .223 caliber rifle. Varnrobinson also did not cite any factors that would indicate Binkley was tied to the Home Invasion incident, or that his weapon was likely used in the crime. [Harris Decl. at Ex. A (Ex. 11)]**

**Responses and Objections:** Objection. Harris has no personal knowledge that Varnrobinson relied only on the two factors cited above.

**50.    Hunter was not involved in the Home Invasion case. He only knew what Varnrobinson had told him, which was that the caliber of the gun collected matched the gun used in the Home Invasion case and the owner of the gun matched the description of "the guy" at the scene. [Hunter Dep. (Vol. 1) 6:20-25, 22:23-24:2 (Ex. 6)]**

**Responses and Objections:** Disputed. Hunter personally observed Tryon and Evidence Technician Melanie Ahart give the weapon back to Binkley. Hunter told Tryon that Varnrobinson had stored the weapon as potential evidence, and that Tryon should not return the weapon. Tryon told Hunter that "we could not be taking weapons from every white boy in town." Hunter then told Varnrobinson that Tryon was giving his evidence away. (Ex. 33, Hunter Dep. I, at 7:4-18.)

**51.    Hunter never discussed the return of the guns with any member of the PCAO. [Hunter Dep. (Vol. 1) 24:25-25:6 (Ex. 6)]**

**Responses and Objections:** Disputed. The cited testimony shows that Hunter could not recall whether he discussed the issue with any member of the PCAO.

**Hunter's Report That Lt. Tryon Committed Felonies**

**52.    On January 13, 2010, Hunter gave Ingulli a document addressed to the Chief. [Hunter Dep. (Vol. 1) 258:20-259:6 & Ex. 13 at p. 1 (Ex. 6)] The document was three pages long and contained a long list of personal grievances that Hunter had with Tryon. [Hunter Dep. 1, Ex. 13 (Ex. 6)]**

1

2          **Responses and Objections:** Not disputed that Hunter gave Ingulli the cited

3   document, which speaks for itself. Disputed as improperly argued that that the

4   document "contained a long list of personal grievances Hunter had with Tryon."

5

6          **53.    On the second page of the document, Hunter mentioned the Desert**
**Rape investigation that had occurred more than two years earlier and the return**

7   **of Aaron Binkley's weapon, which occurred nearly a year earlier. [Hunter Dep.**
**(Vol. 1) Ex. 13 p. 2 (Ex. 6)]**

8

9          **Responses and Objections:** Not disputed.

10

11         **54.    The last sentence of Hunter's document to Ingulli states: "Please**

12  **address this matter prior to me seeking further legal remedy which will negate the**
**current hostile work environment." [Hunter Dep. (Vol. 1) Ex. 13 p. 3 (Ex. 6)]**

13

14         **Responses and Objections:** Not disputed.

15

16         **55.    When asked what Hunter wanted Ingulli to do to address this matter,**

17  **Hunter responded that he felt constantly harassed by Tryon and that he "wanted**
**him to get Tryon off my back." [Hunter Dep. (Vol. 1) 259:11-23 & Ex. 13 p. 3 (Ex.**

18  **6)]**

19

20         **Responses and Objections:** Not disputed to the extent that Hunter wanted

21  Ingulli to "get Tryon off my back."

22

23         **56.    Ingulli told Hunter that he would talk to Patel about Hunter's**
**concerns. [Hunter Dep. (Vol. 1) 259:24-260:2 (Ex. 6)]**

24

25         **Responses and Objections:** Not disputed.

26

27         **57.    When Ingulli received Hunter's grievance, he did not conduct and**

28  **investigation, to determine whether Tryon had acted inappropriately in returning**

**the weapons, and did not report any concerns about Tryon's potential tampering with evidence to an outside agency. [Ingulli Dep. 134:17-136:12 (Ex. 4)]**

**Responses and Objections:** Disputed. The cited testimony shows that Ingulli could not recall whether he conducted any investigation or reported concerns to an outside agency.

**58.   When asked why Tryon would have blocked a full investigation and possible prosecution in the Desert Rape case, Hunter testified that he felt at the time that it could possibly have been because football players at the party were friends of Tryon's son. [Hunter Dep. (Vol. 1) 284:5-10 (Ex. 6)]**

**Responses and Objections:** Not disputed.

**Varnrobinson's Report that Lt. Tryon Committed Felonies**

**59.   On January 4, 2012, Varnrobinson submitted a document to Human Resources Director Jeanette Grady with the subject line "Harassment and Hostile Work Environment," on which he copied Ingulli. In the document, Varnrobinson complained that: Lt. Tryon was "using" Sgt. Morris to investigate Varnrobinson for abuse of sick leave; Lt. Tryon would often hit the FPD walls with his fists while walking through the hallways; that employees told him Lt. Tryon was trying to "dig up dirt" on him; and that Lt. Tryon had created a divide between officers who were loyal to him versus officers who were loyal to Ingulli. [Tryon Dep. Ex. 27 p. 1-2 (Ex.9)]**

**Responses and Objections:** Not disputed that Varnrobinson submitted to Human Resources Director Jeanette Grady the cited document, which speaks for itself. Disputed that the cited facts accurately and completely summarize the document.

**60.   Halfway through page 3 of his 4-page grievance, Varnrobinson alleged that Tryon had interfered with the Home Invasion investigation by returning an assault rifle. Varnrobinson indicated that Tryon did this because he disliked Varnrobinson "for some unknown reason." [Tryon Dep. Ex. 27 p. 3 (Ex. 9)]**

- 17 -

**Responses and Objections:** Not disputed. The document speaks for itself.

**61.     Varnrobinson pointed to a "second known fact of evidence tampering," contending that Tryon "caused for cellular phones collected as evidence by Detective Hunter to be returned to the suspects, without the permission of the County Attorney, prior to the video and photographs of the incident being downloaded and collected," which "affected the overall outcome of the investigation." Varnrobinson suggested that Tryon did this to protect his son and football team members who were at the party the night of the incident. The FPD's own investigator reports, however, noted that Mikey Tryon had not been at the party, until he drove there to assist the young woman who may been sexually assaulted. [Tryon Dep. Ex. 27 p. 3 (Ex. 9)]**

**Responses and Objections:** Not disputed that the cited document speaks for itself. Disputed whether Mickey Tryon was actually present at the party all along, or whether he arrived there only after receiving a telephone call about the alleged sexual assault. (Ex. 33, Hunter Dep. I, at 353:17-354:24.)

**62.     Varnrobinson had no knowledge as to whether Tryon and Binkley ever socialized with one another. [Varnrobinson Dep. (Vol. 1) 35:2-4 (Ex. 10)]**

**Responses and Objections:** Not disputed.

**63.     Varnrobinson was not involved in the investigation of the Desert Rape case and never spoke to anyone at the PCAO about it. [Varnrobinson Dep. (Vol. ~~2~~ 1) 19:1-10 (Ex. ~~12~~ 46)]**

**Responses and Objections:** Not disputed.

**64.     Everything Varnrobinson knows about the Desert Rape case is what Hunter told him, which was that Tryon had caused cell phones that had been collected to be returned. [Varnrobinson Dep. (Vol. ~~2~~ 1) 23:5-8, 24:24-25:7, 25:17-26:2 (Ex. ~~12~~ 46)]**

**Responses and Objections:** Disputed. Varnrobinson learned from Paul Brannon

that Tryon had told him to return the evidence in the case. Varnrobinson learned from Gary Lewis that the FPD collected items of evidence. (Ex. 27, Varnrobinson Dep. II, at 115:15-25.)

**65.     After consulting with Ingulli, Patel initiated an investigation with the state Department of Public Security ("DPS") regarding Tryon. Patel decided to send the investigation to an outside agency because there had now been multiple complaints about Tryon's conduct during the two investigations. [Patel Dep. 54:22-55:6, 55:22-56:1, 56:13-63:7 (Ex. 3)]**

**Responses and Objections:** Not disputed.

**66.     During his investigation, the DPS investigator interviewed retired PCAO attorney Jeff Sandler, who reported that he recalled speaking with Tryon about the cellphones. Sandler confirmed that he would have approved returning cellphones after the evidence was obtained and downloaded by a certified technician. [Patel Dep. Ex. 10, p. 7 (Ex. 3)]**

**Responses and Objections:** Disputed. As stated in the cited DPS Report, Sandler told Baroldy that he "would not have told Tryon it was ok to download [the] video to an Email address. Sandler said he would have been ok with returning the cellular telephone after the video was obtained *legally* and downloaded by a certified technician." (emphasis added). (Ex. 29, DPS Investigation Report, at 7.)

**67.     The DPS investigation file was turned over to the Pinal County Attorney's Office ("PCAO"). [Patel Dep. Ex. 10, p. 15 (Ex. 3)]**

**Responses and Objections:** Not disputed.

**68.     On September 25, 2012, the PCAO sent a letter to Chief Hughes indicating that the agency had declined to bring charges against Tryon. [Patel Dep. Ex. 11 (Ex. 3)]**

**Responses and Objections:** Not disputed.

**69.     According to Susan Crawford, PCAO's Criminal Supervising Prosecuting Attorney/Bureau Chief of Special Crimes Unit at that time the letter that was sent was a form letter that an administrative employee sent as a matter of course where the PCAO decided that it would not prosecute. [Deposition of Susan Crawford ("Crawford Dep.") 52:18-53:20 (Ex. 13)]**

**Responses and Objections:** Not disputed.

### The Duty to Report A Suspected Crime

**70.     According to Ingulli, any officer who believes that another officer in the Department committed a crime has a duty to report such conduct. [Ingulli Dep. 96:23-97:9 (Ex. 4)]**

**Responses and Objections:** Not disputed.

**71.     The Town Police Department General Orders in effect under Chief Ingulli included the following as a basis for disciplinary action against an officer: Failure to report to an appropriate superior authority incompetence, misconduct, inefficiency, neglect of duty, or any other form of misconduct or negligence of which the employee has knowledge. [Tryon Decl. ¶ 5 Ex. B (Ex. 1)]**

**Responses and Objections:** Not disputed.

**72.     Jarris Varnrobinson understood that it was his responsibility as a certified police officer to report what he believed was a crime, regardless of who was committing it. [Varnrobinson Dep. (Vol. 1) 160:12-16, attached as Ex. ~~10~~ 46]**

**Responses and Objections:** Not disputed.

**73.     Plaintiffs' own expert on police issues, Ronald Hergert, "absolutely" would have expected an officer at the police departments he worked for to report another officer if he believed a crime had been committed. In his opinion, in fact, it is the duty of any sworn officer regardless of the agency. [Deposition of Ronald Hergert ("Hergert Dep.") 7:6-22, attached as Ex. 14]**

1

2      **Responses and Objections:** Not disputed.

3

4      **Dan Hughes Hired As Police Chief and His Interim Work in that Position**

5

6      **74.     Based on her observations of what was taking place in the FPD, the
Human Resources Director at the time, Jeannette Grady, became concerned that**

7      **Police Chief Robert Ingulli and others within the Department were trying to get
Lt. Terry Tryon terminated. [Declaration of Jeannette Grady ("Grady Decl.") ¶ 2,**

8      **attached as Ex. ~~29~~ 45]**

9

10     **Responses and Objections:** Not disputed that Grady was trying to protect

11     Tryon.

12

13     **75.     Grady also wrote to the Town Manager at the time opining that
Ingulli had been dishonest during an investigation surrounding an altercation that**

14     **Hunter had engaged in with his supervisor. [Grady Decl. ¶ 3 (Ex. ~~29~~ 45)] The
Town Manager considered Grady's memo about Ingulli in considered whether to**

15     **replace Ingulli as Chief.**

16

17     **Responses and Objections:** Objection to the second sentence. No citation

18     supports the assertion that the "Town Manager considered Grady's memo about Ingulli

19     in considered [sic] whether to replace Ingulli as Chief."

20

21     **76.     Pursuant to a Town Council vote on May 18, 2009 (Ordinance No.
506-09), the Chief of Police was hired and fired by the Town Manager. Prior to**

22     **that, the Chief was hired and could be fired by the Town Council. The Chief
worked on an at-will basis both before and after the Council vote to give the**

23     **Manager hiring and firing authority for that position. [Patel Decl. ¶ 5 (Ex. 5)]**

24

25     **Responses and Objections:** Not disputed.

26

27     **77.     Patel gave notice in May 2012 that he was resigning as Town
Manager effective December 14, 2012. He did in fact resign on that date. [Patel**

28

Dep. 90:15-24 & Ex. 15 (Ex. 3)]

**Responses and Objections:** Not disputed.

78.     In late June or early July 2012, Patel began to believe that it was best to hire a new Chief in order to move the department in a new direction. As a result, Patel contacted Interim Public Management ("IPM"), a company that assists public employers in locating qualified individuals to fill management roles on an interim basis, until a permanent hire can be found. [Patel Decl. ¶ 6 (Ex. 5); Deposition of Tim Pickering ("Pickering Dep.") 10:13-24, attached as Ex. 15; Patel Dep. 106:5-107:14 (Ex. 3)]

**Responses and Objections:** Disputed. One of the central disputed issues of fact in this case is the date on which Patel decided to fire Ingulli as Chief of Police and replace him with Hughes.

Patel contacted IPM long before late-June or early-July 2012. On May 25, 2012, Patel interviewed Hughes and two other candidates selected by IPM as potential replacements for Chief Ingulli, and made the decision to hire Hughes that same day. (Ex. 13, Pickering Dep., at 10:16-12:20.)

However, Patel also claimed in his deposition that he made the decision to fire Ingulli at most two weeks prior to July 13, 2012, the date on which Patel actually fired Ingulli. (Ex. 06, Patel Dep., at 101:17-105:25.) Patel's Declaration submitted on summary judgment therefore contradicts his deposition testimony.

79.     Patel contacted IPM's owner, Tim Pickering, indicating that he needed IPM's assistance with finding an interim police chief and wanting to know if IPM had people available for an interim chief position. [Patel Dep. 106:20-107:6 (Ex. 3); Pickering Dep. 27:13-16 (Ex. 15)]

**Responses and Objections:** Not disputed. Patel contacted Pickering at some point prior to May 25, 2012, the date on which he interviewed Hughes and the two other potential candidates to replace Chief Ingulli. (Ex. 13, Pickering Dep., at 10:16-12:20.)

80.     Patel advised Pickering that he was considering replacing the Town's current Chief of Police, and Pickering then reviewed the resumes of IPM clients who might be qualified for the Florence position. Pickering then selected three candidates and he sent their resumes to Patel for his review. One of those was Daniel Hughes. [Pickering Dep. 10:13-11:11, 10:25-11:11 (Ex. 15); Patel Dep. 107:23-108:24 (Ex. 3)]

**Responses and Objections:** Not disputed.

81.     IPM set up interviews for those three candidates. [Pickering Dep. 11:12-17 (Ex. 15)]

**Responses and Objections:** Not disputed.

82.     Patel selected Daniel Hughes to act as interim Police Chief, based on his belief that Hughes was the most qualified for the position. [Patel Dep. 108:15-24 (Ex. 3); Patel Decl. ¶ 9 (Ex. 5)]

**Responses and Objections:** Not disputed.

83.     One service IPM offers is conducting background checks for candidates for any position. Pickering contacted the City Manager of the City of Surprise as part of his background check on Dan Hughes. Hughes had worked as police chief in Surprise for approximately nine and a half years. [Pickering Dep. 24:1-10 (Ex. 15); April 27, 2016 Deposition of Daniel Hughes ("Hughes Dep.") (Vol. 1) 27:19-28:5, 59:23-60:1, attached as Ex. 16]

**Responses and Objections:** Not disputed.

84.     Patel gave Ingulli the option of resigning or being terminated. When Ingulli chose not to resign, Patel terminated him on July 13, 2012. [Ingulli Dep. 88:10-10 (Ex. 4); Patel Decl. ¶ 7 (Ex. 5) ]

**Responses and Objections:** Not disputed.

85.     Patel considered Grady's concerns about Ingulli's dishonesty when

- 23 -

**deciding to make a change in leadership for the FPD and ultimate decision to terminate Ingulli. [Patel Decl. ¶ 8̶—̶ (Ex. 5̶–̶)]**

**Responses and Objections:** Disputed. When asked during his deposition what led him to decide to fire Ingulli, Patel made no mention of Ingulli's alleged dishonesty, but rather stated that Ingulli had made insufficient progress in implementing the recommendations of the ICMA audit report. (Ex. 06, Patel Dep., at 101:17-102:13.)

**86.     Hughes did not know Patel, any member of the Florence Town Council, or Lt. Tryon when he was hired to serve as the interim Chief. [Hughes Dep. 63:25-64:23 (Ex. 16)]**

**Responses and Objections:** Not disputed that Hughes testified this.

**87.     Hughes began working as the interim Police Chief on July 16, 2012. [Tim Pickering Dep. ("Pickering Dep.") 21:7-23, Pickering Dep. Ex. 4, attached as Ex. 15)**

**Responses and Objections:** Not disputed.

**88.     Patel specifically discussed with Hughes the rift within the department and what he viewed as a breakdown in communications, and provided him with a copy of the ICMA report. Patel told Hughes that he wanted him to clean up the problems and professionalize the Department. [Patel Decl. ¶ 10 (Ex. 5)]**

**Responses and Objections:** Not disputed.

**89.     Patel had the sole authority to terminate the police lieutenant, who worked on an at will basis, so Patel could have fired Lt. Tryon with or without good cause. [Patel Decl. ¶ 11 (Ex. 5)]**

**Responses and Objections:** Not disputed.

**90.     Patel advised Hughes that, if Hughes concluded the Lt. Tryon should**

1    **be replaced, he would support that decision. [Patel Decl. ¶ 12 (Ex. 5)]**

2

3            **Responses and Objections:** Not disputed.

4            **91.     In line with the ICMA report recommendations, Hughes started to**
5    **review the crime statistics for the Town in order to determine how the Detectives**
6    **and officers could best be utilized, including whether there was a need for three**
     **Detectives. [Declaration of Daniel Hughes ("Hughes Decl.") ¶ 2 (Ex. 17)]**

7

8            **Responses and Objections:** Not disputed that Hughes stated this in his
9    Declaration.

10

11           **92.     Hughes also met with the sergeants, who advised him that Hunter**
     **and Varnrobinson had been protected by Ingulli, which made the sergeants feel**
12   **that they could not evaluate them as they thought they should. Although he was**
     **Plaintiffs' supervisor at the time, Sgt. Morris expressed to Hughes that he was**
13   **reluctant to criticize Hunter or Varnrobinson while Ingulli was Chief, because**
14   **Ingulli would tell Morris to leave them alone. Morris also told Hughes that Ingulli**
     **instructed Morris to improve the scores on evaluations that Morris had prepared**
15   **for Hunter and Varnrobinson. [Hughes Decl. at ¶ 3 (Ex. 17)] Morris Depo 1, 9:4-**
16   **22, 12:19-22, 93:21-25 (Ex. 17)**

17

18           **Responses and Objections:** The first sentence is disputed and objected to

19   insofar as it does not identify the "sergeants" at issue. Remainder not disputed.

20

21                    **Problems With Plaintiffs' Performance**

22           **93.     The Town had a long-standing relationship with the Pinal County**
23   **Family Advocacy Center ("FAC"), which operated in conjunction with the PCAO**
     **to provide assistance with training Detectives on the proper protocol for**
24   **investigating allegations of sexual abuse against juveniles. [Hughes Decl. ¶ 4 (Ex.**
25   **17)]**

26

27           **Responses and Objections:** Not disputed.

28

**94.**     **Shortly after Hughes started working in his interim capacity, the lead investigator for the FAC, Alden "Butch" Gates, met with him to discuss the FAC. [Hughes Decl. at ¶ 5 (Ex. 17)]**

**Responses and Objections:** Disputed. A disputed issue of material fact in this case is whether or not Tryon orchestrated the meeting between Gates and Hughes. At Hunter's September 2013 reinstatement hearing, Gates testified that Tryon called him on his personal cell phone and asked him to bring Hughes the case file of a minor who had accused her stepfather of raping her (the "MH case") and to speak with Hughes about Hunter and Varnrobinson's interview of the alleged victim, and Hughes agreed that Tryon orchestrated the meeting. (Ex. 01, Hughes Dep. I, at 241:15-243:2, Dep. Ex. 34.) Tryon, however, denied that he arranged the meeting between Gates and Hughes. (Ex. 04, Tryon Dep., at 352:3-353:16.)

It is further disputed that the purpose of the meeting was to discuss the FAC. Tryon asked Gates to speak with Hughes specifically about Hunter and Varnrobinson's interview of the alleged victim in the MH case—not about the FAC. (Ex. 01, Hughes Dep. I, at 241:3-245:12, Dep. Ex. 34.)

**95.**     **Lt. Tryon previously had been advised by Lisa Swinton, a Detective with the Pinal County Sheriff's Office, that the interviews done by Hunter and Varnrobinson in a case involving an allegation by a minor ("MH")1 that her stepfather had raped her, were so bad that the FAC was using them for training purposes to demonstrate what should not be done during interviews of an alleged sexual assault of a minor. [Tryon Decl. ¶ 7 (Ex. 1)]**

**Responses and Objections:** Disputed. In response to Hunter and Varnrobinson's December 2010 interview of the alleged victim in the MH case, Susan Crawford of the Pinal County Attorney's Office requested that a meeting be held with members of the PCAO and the FPD to discuss the interviewing techniques used by Hunter and Varnrobinson. (Ex. 22, Crawford Dep., at 34:19-37:21.)  Crawford did not want Hunter or Varnrobinson punished or disciplined for their actions in interviewing the alleged

1   victim. (*Id.* at 37:22-38:7.) The meeting was held at the PCAO in September or October

2   2011. (Ex. 01, Hughes Dep. I, at Dep. Ex. 34 at 7) The meeting attendees determined

3   that Gates would provide additional training or directives to Hunter and Varnrobinson

4   regarding their interviewing techniques. (Ex. 22, Crawford Dep., at 39:21-40:3.)

5        The PCAO attorneys considered Hunter and Varnrobinson's actions during the

6   MH interview to be a training issue, not a disciplinary issue. (Ex. 08, Ingulli Dep., at

7   235:18-236:12); (Ex. 21, Hergert Dep. I, at 119:13-120:5.) Accordingly, Ingulli did not

8   discipline Hunter or Varnrobinson in connection with the interview. (Ex. 08, Ingulli

9   Dep., at 235:18-236:12.)

10       The MH interview took place on December 2, 2010, over eighteen months before

11  Hughes started working for the Town as Interim Chief. (Ex. 09, Tatlock Dep., at 20:4-6,

12  Dep. Ex. 01 at 5.)

13

14       **96.    When Tryon learned that Gates would be meeting with Chief Hughes,

15  he asked Gates to bring the information relating to the MH case, which remained
    an open case that had not yet gone to trial. [Tryon Decl. ¶ 8 (Ex. 1)]**

16

17       <u>**Responses and Objections:**</u> Disputed that Tryon asked Tryon to bring the MH

18  case file to Hughes "when [he] learned" about the meeting. Tryon knew that Gates

19  would be meeting with Hughes because Tryon himself arranged the meeting. (Ex. 01,

20  Hughes Dep. I, at 241:15-245:4, Dep. Ex. 34.) Not disputed that Tryon asked Gates to

21  bring the MH case file to his meeting with Hughes.

22

23       **97.    Tryon wanted Gates to bring the information because of what he had
    learned from Det. Swinton, and he thought that, as a new Chief who was

24  evaluating the entire Department, it was something that Chief Hughes should be
    aware of. [Tryon Decl. ¶ 9 (Ex. 1)]**

25

26       <u>**Responses and Objections:**</u> Not disputed that Tryon wanted Gates to present to

27  Hughes damaging information about Hunter and Varnrobinson. Disputed to the extent

28

that a jury could conclude that Tryon wanted Gates to bring the information to Hughes

in retaliation for Plaintiffs' complaints against Tryon.

**98.     When Hughes met with Gates, Gates gave the Chief a typed up list with concerns that had been raised about Hunter's and Varnrobinson's interviews in the MH case, which included, among other things, that the Detectives:**

**a. Did not use forensic interview techniques;**

**b. Conducted biased interviews from the start;**

**c. Did not allow the victim to give an open narrative;**

**d. Did not interview other witnesses who were in the home at the time of the assault; and**

**e. Gave the suspect detailed information about the evidence that allowed him to "make up" why the evidence was present. [Hughes Decl. at ¶ 6 (Ex. 17)]**

**Responses and Objections:** Not disputed.

**99.     The MH investigation came to Gates' attention when PCAO attorney Susan Crawford, who was the Sex Crimes Bureau Chief at the time, brought the case to Gates, complained about the way it had been investigated. Crawford told Gates that the Detectives had accused the victim of lying, which was contradicted by forensic evidence indicating that a sexual act had in fact occurred between the juvenile victim and the suspect. Because of the way the case had been handled, and what the Detectives had asked and said during the victim's interview, Crawford told Gates that she felt it was going to be very difficult to prosecute the case [Walt Hunter Appeal Tr. 1, Alden Gates Testimony 271:14-273:1] (Ex. 19)**

**Responses and Objections:** Not disputed.

**100.    Crawford asked Gates to review the MH case, and make a list of things done incorrectly or inadequately. [Walt Hunter Appeal Tr. 1, Alden Gates Testimony 273:18-274:14] (Ex. 19)**

**Responses and Objections:** Disputed. Crawford did not ask Gates to make a list, but did ask Gates to review the case. (Ex. 22, Crawford Dep., at 36:1-37:11.)

**101.    Gates indicated in the document with his list of the Plaintiffs' numerous mistakes that PCAO attorneys Jason Holmberg, Matt Long, and Susan Crawford were irate about how the MH case was handled. Gates included this statement because those attorneys had expressed that they were angry with the way the Detectives had interviewed the victim. [Walt Hunter Appeal Tr. 1, Alden Gates Testimony 321:4-322:11] (Ex. 19)**

**Responses and Objections:** Disputed. Crawford thought that, during Gates' reinstatement hearing testimony, he did not accurately state Crawford's intent. For example, Gates testified that Crawford was "complaining about the way the case had been investigated," whereas Crawford testified that she "had concerns about how the case had been investigated." (Ex. 22, Crawford Dep., at 35:8-36:25.) Crawford did not want Hunter or Varnrobinson punished or disciplined for their actions in interviewing the alleged victim in the MH case. (*Id.* at 37:22-38:7.)

**102.    Gates advised Chief Hughes that the Detectives' mishandling of the victim in the MH case was so bad that the County Attorney's Office was probably going to retain experts to diffuse the negative impact of their interviews. [Hughes Decl. at ¶ 10— (Ex. 17); Walt Hunter Appeal Tr. 2, Alden Gates Testimony 375:13-376:9] (Ex. 20).**

**Responses and Objections:** Objected to and disputed to the extent that there is no admissible evidence that Gates told Hughes that the detectives had "mishandl[ed] the victim in the MH case…so bad."

Not disputed that Gates testified that the PCAO would "probably bring in an expert witness." (Ex. 25, Hunter Appeal Hrg.II, (Alden Gates Testimony), at 376:5-6.)

**103.    In September 2012, Hunter and Varnrobinson brought Hughes a copy of a police file concerning an investigation into the shooting death of a nine year old boy that had taken place in February 2009, referred to as the "Kemp**

1   Case" or "Shooting Case." [Hughes' Decl. ¶ 11 (Ex. 17); Hughes Dep. (Vol. 1)
2   215:14-25 & Ex. 31 (Ex. 16)]

3       **Responses and Objections:** Not disputed.
4

5       **104.    The detective assigned to the Kemp Case when the shooting was
6   reported, and who always remained in charge of it, was Renee Klix. [Hughes Decl.
    ¶ 12 (Ex. 17)]**
7

8       **Responses and Objections:** Not disputed.
9

10      **105.    The police file documents that Plaintiffs gave to the Chief were
11  marked up with numerous comments, indicating Plaintiffs' opinions as to what
    Klix and others had done wrong during the investigation. [Hughes Decl. ¶ 7 (Ex.
12  17)]**

13

14      **Responses and Objections:** Disputed. The document speaks for itself, and the

15  comments on their face appear to identify unanswered questions and unresolved issues

16  in the Kemp investigation. (Ex. 27, Varnrobinson Dep. II, at 60:2-61:4, Dep. Ex. 9.)

17      **106.    When the Chief asked Klix about her investigation and the comments
18  in the marked-up file he received, she became very upset, advising Hughes that she
    had no idea that Hunter and Varnrobinson were critiquing her work or doing
19  anything at all in what had been her case for years. [Hughes Decl. ¶¶ 8-9 (Ex. 17)]**

20

21      **Responses and Objections:** Not disputed.
22

23      **107.    When McCormack read the notations on the report, he thought it
24  "was like they were nitpicking the case as to what was or was not done, almost a
    second guessing. It kind of appeared to me that they didn't particularly care for
25  the person that had done the investigation." Hughes recalls McCormack opining
    that it appeared as though someone simply wanted to criticize the Detective who
26  had been working on the case, because there was nothing constructive being
    offered as to what further investigation should be done. [Hughes Decl. ¶ 11 (Ex.
27  17); Deposition of James McCormack ("McCormack Dep.") 48:9-49:20, attached
    as Ex. 21)]**
28

**Responses and Objections:** Objection. McCormack has no personal knowledge regarding why Hunter and/or Varnrobinson made notations on the Kemp case file.

**108.    Hughes asked the PCAO's Chief investigator James McCormack to review the marked up file, Varnrobinson and Hunter had given him. [Hughes Decl. ¶ 10]**

**Responses and Objections:** Not disputed.

**109.    Hughes asked McCormack to set up a meeting with the attorneys handling the Kemp case in order to discuss any issues they had with the investigation. [Hughes Decl. (Ex. 17)]**

**Responses and Objections:** Disputed. The fact that Hughes gave McCormack a copy of Varnrobinson's marked-up version of the Kemp case file, rather than Klix's original case file from the Spillman system, suggests that the real reason Hughes wanted to meet with PCAO was to give them an opportunity to express their anger at Varnrobinson's undisclosed recording of PCAO attorney Hazard, which Hughes had intentionally disclosed to PCAO, so that Hughes could get a seemingly-neutral third party to provide a pretext for Plaintiffs' terminations. (Ex. 39, McCormack Dep., at 12:21-14:6); (Ex. 11, Klix Dep. I, at Ex. 11); (Ex. 27, Varnrobinson Dep. II, at Ex. 09 at 35.)

**110.    The Chief was then notified that PCAO attorneys wanted to meet with him at the PCAO about concerns they had. [Hughes Decl. ¶ 10]**

**Responses and Objections:** Not disputed.

**111.    The Chief and Tryon, met at the PCAO on September 24, 2012 with the following individuals: Chief Criminal Deputy Attorney Richard Platt, Criminal Supervising Prosecuting Attorney/Bureau Chief of Special Crimes Unit Susan Crawford, Prosecutor Greg Hazard, and McCormack. [Walt Hunter Appeal Tr.**

**Vol. 1 ("Hunter Appeal Tr. 1"), 136:13-137:12, 221:20-222:2, 240:3-241:2, attached at Ex. 19]**

**Responses and Objections:** Not disputed.

**112.    Hazard and McCormack had approached Crawford because Hazard was very upset about the fact that he had been recorded without his knowledge. Crawford conveyed the information to Richard Platt, who directed Crawford to set up a meeting with Chief Hughes. [Susan Crawford Dep. ("Crawford Dep.") 46:3-11 (Ex. 13)]**

**Responses and Objections:** Not disputed.

**113.    PCAO personnel were upset when they learned that Hazard had been secretly recorded by Varnrobinson. They felt that a confidence had been violated, and that it had been inappropriate and unprofessional conduct. Hunter was also part of that discussion, because he was partners with Varnrobinson, and there was a feeling that they could not be trusted, which made the attorneys afraid to speak frankly about cases. [McCormack Dep. 18:4-19:8 (Ex. 21)]**

**Responses and Objections:** Objection. McCormack has no personal knowledge as to whether unnamed "PCAO personnel" felt "upset" or "that a confidence had been violated, and that it had been inappropriate and unprofessional conduct."

Disputed as to whether anyone present at the September 24, 2012 meeting actually knew that Hunter had no involvement in Varnrobinson's recording of Hazard. (Ex. 22, Crawford Dep., at 46:3-47:22.)

**114.    The Attorneys in the trial unit were upset, and the information "spread throughout the office." [McCormack Dep. 19:9-18 (Ex. 21)]**

**Responses and Objections:** Disputed to the extent that it is unclear to which "attorneys" and which "information" this statement refers.

**115.    Crawford "absolutely" shared the concern that the secret recording**

would have a "chilling effect" because it raised concerns about trust and open conversations regarding the investigation and prosecution of a case. She had never before heard of a law enforcement officer secretly recording one of the PCAO prosecutors. [Crawford Dep. 46:24-48:5 (Ex. 13)]

**Responses and Objections:** Not disputed that Crawford had never before heard of a law enforcement officer recording a conversation with a PCAO attorney; however, Crawford admitted that this did not mean it had never happened. (Ex. 22, Crawford Dep., at 46:4-48:5.) Not disputed that Crawford expressed concern about a "chilling effect," but Crawford could not explain how an audio recording would create a purported "chilling effect" while verbatim written notes would not. (*Id.* at 46:24-48:5.)

116.   Platt told Hughes that the PCAO attorneys were upset because they could not trust officers who would secretly record conversations with them. [Walt Hunter Appeal Tr. 1, Richard Platt Testimony, 162:3-163:6; Hughes Decl. ¶ 12 (Ex. 17)]

**Responses and Objections:** Disputed to the extent that it is unclear to which "PCAO attorneys" this statement refers. Objection to Platt's statements that "the PCAO attorneys were upset" and that the attorneys "could not trust officers" because Platt has no personal knowledge of the unnamed attorneys' feelings.

117.   The major concern brought up at the September 24, 2012 meeting was the lack of trust between the PCAO and the FPD as a result of the secret recording. [Walt Hunter Appeal Tr. 1 (Ex. 19), Susan Crawford Testimony 256:4-9 (Ex. 13)]

**Responses and Objections:** Not disputed.

118.   At the September 24 meeting, concerns were also raised about Plaintiffs' investigation into allegations that a stepfather had raped his teenage stepdaughter (the "MH"). [Crawford Dep. 7:11-12; 35:1-36:25 (Ex. 13)].

1    **Responses and Objections:** Disputed. The cited portion of the Crawford

2    transcript does not reference the September 24, 2012 meeting, but instead references the

3    September/October 2011 meeting at the PCAO during which Gates, Crawford, Ingulli,

4    Hunter, and Varnrobinson discussed best practices with regard to the Detectives'

5    December 2010 interview of the alleged victim in the MH case.

6

7    **119.    PCAO Attorneys at the meeting discussed with Hughes and Tryon the**
     **list that Gates had prepared regarding the mistakes Plaintiffs' had made in the**

8    **investigation. [Hughes Decl. at ¶ 13 (Ex. 17)]**

9

10   **Responses and Objections:** Not disputed.

11

12   **120.    At the meeting, there was further discussion about the general way**
     **Hunter and Varnrobinson handled rape cases. One case had been sent back to**

13   **McCormack with concerns expressed about how they had handled the victim.**
     **Although McCormack cannot recall the specifics, he does recall that the PCAO**

14   **lawyers opined that that case had been handled egregiously. [McCormack Dep.**
     **27:25-29:5 (Ex. 21)]**

15

16

17   **Responses and Objections:** Objection. McCormack has no personal knowledge

18   of this.

19

20   **121.    The PCAO personnel raised a concern that Hunter and Varnrobinson**
     **had a tendency to "attack the victim" in rape cases, in that they would approach**

21   **the victim as though the victim made up the story and attempt to get the victim to**
     **admit it really did not happen before conducting any investigation into the matter.**

22   **[McCormack Dep. 25:23- 26:15 (Ex. 21)]**

23

24   **Responses and Objections:** Disputed. In the cited transcript, McCormack

25   cannot identify a single "PCAO personnel" who raised such concerns. (Ex. 39,

26   McCormack Dep., at 25:23-30:8.)

27

28   **122.    In addition, during the meeting, Hazard expressed concern about the**
     **fact that Varnrobinson had created confusion by implying that he and Hunter had**

**been assigned to replace Klix as lead detectives on the Kemp investigation, which turned out not to be true. [Walt Hunter Appeal Tr. 1, Greg Hazard Testimony 226:7-16, 229:7-230:11 (Ex. 19), Susan Crawford Testimony 252:8-18 (Ex. 13)]**

**Responses and Objections:** Disputed. No confusion was created, because, if a PCAO attorney needed to identify the case agent for a particular case, they could just call the agency handling the case to ask. (Ex. 23, Hazard Dep., at 47:19-22.)

**123.    At the meeting, Crawford conveyed to Hughes that she had declined to prosecute several cases based on either Plaintiffs' investigation or the way they wrote the police report. [Crawford Dep. 62:23-63:3; 77:12-17 (Ex. 13); Hughes Decl. ¶ 14 (Ex. 17)]**

**Responses and Objections:** Disputed. In his November 8, 2012 memoranda recommending Hunter and Varnrobinson's terminations, Hughes wrote that Crawford was going to give him "five or more cases that cannot be filed because of Detectives Hunter and Varnrobinson's inability to conduct proper investigations." (Ex. 22, Crawford Dep., at 58:1-64:25.) However, Crawford denied ever telling Hughes that Hunter and Varnrobinson were unable to conduct proper investigations. (*Id.*) A material dispute of fact therefore exists as to whether Hughes fabricated this statement.

**124.    Chief Hughes left the meeting with the clear impression that the lawyers in the Pinal County Attorney's Office would prefer not to have to work with Varnrobinson and Hunter in the future. [Hughes Decl. ¶ 16 (Ex. 17)]**

**Responses and Objections:** Not disputed.

**125.    After this meeting, while Hughes waited for Crawford to send the additional cases she referenced, he consulted with Human Resources Director Scott Barber regarding his concerns about the ability to continue employing two Detectives who had so violated the trust of the PCAO. [Hughes Decl. ¶ 17 (Ex. 17)]**

**Responses and Objections:** Disputed that "two Detectives…had so violated the trust of the PCAO." Crawford believed that, if Hunter did not have anything to do with the recording of Hazard, then he should not be held accountable for Varnrobinson's actions. (Ex. 24, Hunter Appeal Hrg. I, at 256:2-257:12.)

**126.    In late September 2012 or early October 2012, an IT employee notified Lt. Tryon that he had uncovered evidence that Varnrobinson was violating the Town's policies regarding permissible use of internet; Tryon relayed this information to Hughes. [Tryon Decl. at ¶ 10 (Ex. 1)]**

**Responses and Objections:** Disputed. In his deposition, Tryon testified that he personally directed IT to perform an internet usage report for Hunter and Varnrobinson (but not Klix), purportedly because a person named "Shawn" in IT, who was "doing some type of service to the system," had determined that Varnrobinson was "actively working on a personal Website" and that "Hunter was also on the Internet quite often." (Ex. 04, Tryon Dep., at 390:25-392:13.)

In contradiction to Tryon's testimony, Hughes testified that internet usage is "just one of those things you look at through your normal course of duty," and that Hunter and Varnrobinson's internet usage reports were triggered when the FPD "terminated a crime analyst for…doing things on the internet." (Ex. 24, Hunter Appeal Hrg. I, at 103:5-104:1.) Hughes further testified that he asked IT to review Hunter's internet usage because he "has access to the computer and is in his office a lot on the computer." *Id.* Material disputes of fact therefore exist as to who ordered the internet usage report for Hunter and Varnrobinson, and as to why the report was ordered.

**127.    On approximately October 2, 2012, Chief Hughes asked IT to pull a report of the Detectives' internet usage so he could evaluate the situation. [Hughes Decl. at ¶ 18 (Ex. 17)]**

**Responses and Objections:** Disputed. *See* Response to ¶ 126.

1

2      **128.    Chief Hughes specifically asked that IT run the report on the**
**Detectives because, unlike Police Officers, who spend the majority of their time in**
3      **the field on patrol, the Detectives had their own office, and each had an assigned**
**computer. [Hughes Decl. ¶ 19 (Ex. 17)]**
4

5
       **Responses and Objections:** Disputed. According to Hughes' own testimony, the
6
       FPD "terminated a crime analyst for…doing things on the internet." (Ex. 24, Hunter
7
       Appeal Hrg. I, at 103:5-104:1.) Yet, Hughes did not ask IT to run reports on crime
8
       analysts. Moreover, Hunter and Varnrobinson were not the only FPD employees to have
9
       assigned computers. (Ex. 90, Hunter Decl., at ¶ 6.)
10
              Not disputed that Hughes instructed IT to perform internet usage reports only on
11
       Hunter and Varnrobinson.
12

13     **129.    In October 2012, Hunter and Varnrobinson were the only two**
**Detectives in the FPD. [Tryon Decl. ¶ 6]**
14

15
       **Responses and Objections:** Not disputed.
16

17     **130.    Hughes received a report of Varnrobinson's internet usage for the**
**period of August 1, 2012 to October 5, 2012. [Hughes Decl. ¶ 20 (Ex.17)]**
18

19
       **Responses and Objections:** Not disputed.
20

21

22     **131.    The reports that Hughes received from IT indicated that**
**Varnrobinson had spent a substantial amount of his workday on the internet,**
23     **including spending worktime building a website for his personal tattoo business**
**(www.vonzombie,com), on websites related to merchandising products for his**
24     **business (www.zazzle.com and www.cafepress.com, for example), and other non-**
**work-related websites. [Jarris Varnrobinson Appeal Tr. 1, Testimony of Trent**
25     **Shaeffer 107:17-109:15 (Ex.22_)]**
26

27
       **Responses and Objections:** Disputed. The cited transcript excerpt does not
28

support any portion of this assertion.

**132.    The following are examples of how much worktime Varnrobinson spent actively using websites related to his personal business: on August 15, 2012, Varnrobinson was on these sites for 4 hours and 9 minutes of his workday; on August 30, 2012, Varnrobinson was on these sites for 5 hours and 15 minutes of his workday. [Jarris Varnrobinson Appeal Tr. 1, Testimony of Trent Shaeffer 101:4-104:16 (Ex.22)]**

**Responses and Objections:** Disputed. The cited testimony refers only to the total amount of time Varnrobinson was allegedly using the internet, regardless of whether or not the internet usage was related to his job. The cited testimony does not support the assertion that Varnrobinson spent these blocks of time "actively using websites related to his personal business."

**133.    Hughes also received a report of Hunter's internet usage for the period of August 1, 2012 to October 5, 2012 [Hughes Decl. ¶ 21 (Ex.17)]**

**Responses and Objections:** Not disputed.

**134.    The report for Hunter indicated that he also spent worktime on websites that did not appear to be work related, including facebook.com, azcentral.com, twitter.com, and Yahoo mail. [Walt Hunter Appeal Tr. 1, Testimony of Dan Bennington 105:5-11; 109:15-113:16 (Ex._19)]**

**Responses and Objections:** Not disputed that Hunter spent work time on the listed websites. Disputed as to whether Hunter was accessing those sites for work-related purposes. Nothing in the cited testimony establishes that Hunter was not accessing those websites for work-related purposes, such as for research on a case.

**135.    Although Hunter had at one time acted as the FPD's Public Information Officer (PIO), the Department's sole PIO at that time was Larry Lawrence. [Hughes Decl. at ¶ 22 (Ex. 17)]**

1

2        **Responses and Objections:** Not disputed.

3

4        **136.    Hunter did not offer as a defense to the notice of intent to terminate**
**his employment that he was a Public Information Officer at the time his internet**
5   **use was audited. [Patel Decl. at ¶ 14 (Ex. 5)]**

6

7        **Responses and Objections:** Not disputed.

8

9        **137.    Chief Hughes, Lt. Tryon, and Patel had no knowledge that Hunter**
**was working in a secondary role as PIO, at any time after Hughes was hired, even**
10  **if he ever did. They had never observed Hunter working as PIO during the time**
**that Hughes was Chief. [Hughes Decl. at ¶ 22 (Ex. 17); Patel Decl. at ¶ 15 (Ex. 5);**
11  **Tryon Decl. at ¶ 11 (Ex. 1)]**

12

13       **Responses and Objections:** Not disputed.

14

15       **138.    Prior to Hughes taking over as Chief, Detectives Hunter,**
**Varnrobinson, and Klix typically submitted monthly reports of their case activity.**
16  **[Tryon Decl. ¶ 12 (Ex. 1)]**

17

18       **Responses and Objections:** Not disputed.

19

20       **139.    When he took over as interim Chief, in line with the**
**recommendations in the ICMA report, Hughes began to review the reported**
21  **activity of the Patrol Officers and Detectives to evaluate the workload and**
**performance of sworn officers. [Hughes Decl. ¶ 25 (Ex. 17)]**
22

23       **Responses and Objections:** Disputed. Hughes evaluated the performance of
24
Hunter and Varnrobinson, but not Klix. Hughes never conducted a full review of Klix's
25
performance as a detective, not even after Klix resumed her detective duties in
26
December 2012. (Ex. 01, Hughes Dep. I, at 143:15-144:20, 147:10-149:4.)
27

28       **140.    Officers are supposed to log into the Spillman system, the FPD's all**

1  **initial police reports, supplemental reports, and any other type of case**
2  **recordkeeping for all FPD cases. [Morris Dep. 12:23-13:7 (Ex. 7–)]**

3       **Responses and Objections:** Disputed. Ingulli instructed Hunter and
4  Varnrobinson not to enter their review of the Kemp case into the Spillman system in
5  order to minimize the divide within the agency and to ensure that Tryon and Morris
6  would not find out and interfere. (Ex. 08, Ingulli Dep., at 110:14-113:8, 208:14-208:22.)
7

8       **141.   In approximately early September 2012, Hughes talked to Sgt. Morris**
9  **about the need for officers reporting to Morris to get all of their cases up to date**
   **and to close out all old cases in Spillman. [Hughes Decl. ¶ 23]**
10

11       **Responses and Objections:** Not disputed.
12

13       **142.   After reviewing the Detectives' reported activity for August and**
14  **September 2012, Hughes had concerns about the number of open cases that the**
    **Detectives had, some of which dated back several years. [Hughes Decl. ¶ 24 (Ex.**
15  **17)]**
16

17       **Responses and Objections:** Not disputed.

18       **143.   Hughes asked Tryon to obtain reports of the Plaintiffs' case activity**
19  **for the past twelve months so that he could evaluate the Detectives' activity**
    **because Hughes wanted to assign responsibility of the criminal investigations unit**
20  **to the lieutenant, in line with the ICMA audit recommendations, and Hunter and**
    **Varnrobinson were the only two Detectives at the time. [Hughes Dep.1 (Vol. 1)**
21  **143:15-144:20 (Ex. 16); Hughes Decl. ¶ 25 (Ex. 17)]**
22

23       **Responses and Objections:** Disputed that Hunter and Varnrobinson were "the
24  only two detectives at the time." Klix had been a detective for 5-6 years prior to
25  Hughes' arrival at FPD (Ex. 11, Klix Dep. I, at 7:13-8:16), yet neither Hughes nor
26  Tryon evaluated Klix's activity by reviewing reports of her case activity as a detective,
27  (Ex. 01, Hughes Dep. I, at 143:15-144:13.)
28

Hughes instructed Tryon to gather evidence of Hunter and Varnrobinson's job performance in August 2012 while Tryon was being investigated by the PCAO for charges of felony tampering with evidence due to Varnrobinson's January 2012 written complaint. (Ex. 01, Hughes Dep. I, at 107:18-110:20, 143:15-146:23, 152:23-154:8, 165:4-12.)

**144.   After receiving Plaintiffs' reports of case activity for the prior year, Hughes asked Tryon to go into the Spillman system to review the case activity and also to review the hard copy case files, and provide the facts to Hughes as to what the cases on the Detectives' lists involved and what activity had been taking place on them. [Hughes Dep. 1 (Vol. 1) 274:3-12 (Ex. 16); Hughes Decl. ¶ 26 (Ex. 17)]**

**Responses and Objections:** Disputed. Hughes asked Tryon to do this only with regard to Hunter and Varnrobinson's cases, and not Klix's cases. (Ex. 01, Hughes Dep. I, at 143:15-144:13.)

In August 2012, Hughes directed Tryon to conduct case status reports on Hunter and Varnrobinson. (Ex. 04, Tryon Dep., at 307:8-309:11.) In turn, on September 13, 2012, Tryon directed Morris to review case reports on Hunter and Varnrobinson. (*Id.* at 307:16-309:11, Dep. Ex. 30) Tryon did not direct Morris to conduct such a review of anybody else in the department. (Ex. 04, Tryon Dep., at 307:16-309:11.) Tryon further directed Morris not to tell Hunter and Varnrobinson why this information was being sought. (*Id.* at 311:20-22.) The majority of these reviews occurred while Tryon was still under investigation by DPS due to Hunter and Varnrobinson's allegations against him. (*Id.* at 308:20-309:3.)

Tryon told Hughes that he had concerns about reviewing Varnrobinson while he was still under investigation based on Varnrobinson's complaint, but Hughes instructed him to do it anyway. (*Id.* at 309:12-310:2.)

**145.   Tryon reviewed the information about the cases listed by Hunter and Varnrobinson available in Spillman and the hard copy case reports available in the**

records department, noted the information in Spillman and the case reports, and supplied his notes to Hughes along with the actual case files where available. [Hughes Dep. (Vol. 1)152:17-153:20 & Ex. 16 (Ex. 16); Tryon Decl. ¶ 13 (Ex. 1)]

**Responses and Objections:** Not disputed.

146.    In the notes he provided to Hughes, Tryon did not editorialize or offer opinions as to Plaintiffs' report-writing, but rather simply went into the files and wrote down the factual information in those reports. [Declaration of Phillip Riccomini ("Riccomini Decl.") ¶ 4 attached as Ex. 23; Tryon Decl. ¶ 13]

**Responses and Objections:** Objection. Whether or not Tryon "editorialize[d]"

or "offer[ed] opinions" is an argument, not a statement of fact. Disputed to the extent

that the document speaks for itself. (Ex. 01, Hughes Dep. I, at Ex. 18.)

147.    While Hughes reviewed Tryon's case notes, he also independently reviewed actual case files provided to him by Tryon and conducted his own review of many of the Detectives' cases in the Spillman document management system. [Hughes Dep. 1 (Vol 1) 149:13-25; Hughes Dep. (Vol 1) (Ex. 15 16); Hughes Dep. (Vol 1) Ex. 38 p. 10 ¶ 7; Hughes Decl. ¶ 27 (Ex. 17)]

**Responses and Objections:** Disputed. Hughes did not review any of Detective

Klix's case files. (Ex. 01, Hughes Dep. I, at 143:15-144:13.)

Disputed that Hughes reviewed "many" of Hunter and Varnrobinson's case files.

Hughes does not know which cases or how many cases he reviewed. (*Id.* at 274:8-25.)

Hughes did not independently verify each case mentioned in Tryon's evaluation

of Hunter and Varnrobinson's case work and case documentation. (*Id.* at 269:13-274:25,

Dep. Exs. 18, 38-39.)

148.    Hughes had a number of concerns regarding Plaintiffs' case reports, including the lack of investigation activity, and what he viewed as questionable case reporting. [Hughes Decl. ¶ 28 (Ex. 17)]

**Responses and Objections:** Not disputed.

**149.   In September 2012, Sgt. Tatlock requested a doctor's note from Hunter after Hunter called out sick for his shift. Hunter filed a grievance about Sgt. Tatlock's request, indicating that the request for a doctor's note was improper. [Hughes Decl. ¶ 29 (Ex. 17)]**

**Responses and Objections:** Disputed. Hunter filed a grievance against Tatlock because Tatlock directed him to obtain a doctor's note excusing his one-day absence, in violation of a Town policy that dictates that an individual must be absent for a total of three consecutive sick days before the Town may require a doctor's note. Hunter also filed this grievance because this incident was just the latest in a series of harassing actions that Tatlock took against him. (Ex. 09, Tatlock Dep., at Ex. 04.) The grievance speaks for itself.

**150.   Tatlock made his request based on his own judgment, and was not directed by Hughes, Tryon, or anyone else to make the request. Tatlock was not aware that Hunter or Varnrobinson had ever reported that Tryon had committed any crime. [Declaration of William Tatlock ¶¶ 2-3 (Ex. 24)]**

**Responses and Objections:** Not disputed.

**151.   On September 20, 2012, Hunter and Varnrobinson approached Hughes regarding a case involving a gunshot victim by the name of Eric Myers ("Myers Case"), indicating that they had just completed an interview of Myers' roommate and believed that the roommate had played a part in Myers' death. Plaintiffs did not provide Hughes with the case file when discussing this information with him. [Hughes Decl. ¶ 31⸺ (Ex. 17)]**

**Responses and Objections:** Not disputed.

**152.   When Hughes reviewed the case file in the Spillman system, he found that there had been no substantive report supplements submitted by Plaintiffs indicating what work they had performed on the case in the twelve months during**

1   **which the case had been assigned to them, and that the case reports lacked updates**
2   **regarding what interviews had taken place, and whether any search warrants or**
    **evidence had been obtained. [Hughes Decl. at ¶ 32 (Ex. 17)]**

3

4       **Responses and Objections:** Disputed. It was not standard operating procedure
5   to write supplements in the Spillman system before Hughes became the Chief in 2012.
6   (Ex. 04, Tryon Dep., at 54:22-57:4, 108:22-109:9.)

7

8       **153.    On October 22, 2012, Varnrobinson submitted a case summary to**
    **Hughes about the Myers case, which Hughes determined was not completed on an**
9   **approved report form, contained numerous grammatical errors and incorrect**
    **dates, and did not identify the author of the report. [Hughes' term rec.; Hughes**
10  **Decl. at ¶ 33 (Ex. 17)]**

11

12      **Responses and Objections:** Not disputed that Varnrobinson asked Hughes for
13  advice and for a case review on the Meyers case, and gave Hughes his working case file
14  on November 21, 2012. (Ex. 57, November 21, 2012 Audio Recording, at 5:11-5:21.)

15      Hughes met with Varnrobinson, Hunter, and Tryon to provide the case review on
16  November 21, 2012, sixteen days *after* Hughes submitted his memoranda
17  recommending that Hunter and Varnrobinson be terminated. (Ex. 01, Hughes Dep. I, at
18  Exs. 38-39.)

19      The case summary in question is not identified as an exhibit but would speak for
20  itself.

21

22      **154.    HR Director Barber was particularly troubled by the PCAO's stated**
    **concerns about the Detectives, because he believed that a good relationship**
23  **between the FPD and PCAO was critical. [Scott Barber Decl. ("Barber Decl.") at ¶**
    **7, attached as Ex. 2] The Recommendations and Decisions to Terminate**
24

25      **Responses and Objections:** Objection. Barber has no personal knowledge of the
26  "PCAO's stated concerns."
27

28      **155.    Hughes also shared his concerns verbally with Patel, who directed**

- 44 -

1   **Hughes to provide him with detailed information and documentation so that he**
2   **could fully evaluate the situation. Patel Decl. ¶ 13 (Ex. 5)]**

3       **Responses and Objections:** Disputed. Patel testified that he was unaware of
4   Hunter and Varnrobinson's alleged performance issues prior to November 8, 2012,
5   when Hughes submitted his termination recommendation memoranda. (Ex. 06, Patel
6   Dep., at 149:18-150:19.) Patel also testified that he was surprised when he received
7   Hughes' termination memoranda. (*Id.* at 149:18-150:13.)
8

9       **156.    On November 8, 2012, Hughes submitted two documents to Patel:**
10  **"Termination Recommendation – Jarris Varnrobinson" and "Termination of**
    **Detective Walt Hunter for Cause." [Hughes Dep. (Vol 1) & Exs. 38-39 (Ex. 16)]**
11

12      **Responses and Objections:** Not disputed.
13

14      **157.    In the termination recommendation memoranda, Hughes outlined**
    **the following concerns that he believed warranted termination of Hunter's and**
15  **Varnrobinson's employment:**
            **a. The negative feedback Hughes had received from multiple**
16      **individuals at the PCAO regarding the Detectives' conduct and**
        **performance problems, which included the poorly handled MH**
17      **investigation, misleading the PCAO into believing that they were now the**
        **lead detectives in the Kemp Case, the secret recording of a PCAO attorney**
18      **and the PCAO's resulting lack of trust toward the Detectives by members of**
19      **the PCAO, and that PCAO Attorney Susan Crawford indicated there were**
        **numerous additional cases for which the PCAO had been unable to bring**
20      **charges due to the Detectives' inadequate case investigations;**
            **b. The Detectives' performance during the MH investigation,**
21      **including the list of 25 mistakes provided by Gates;**
            **c. The Detectives' conduct in secretly recording discussions with**
22      **PCAO personnel;**
            **d. The Detectives excessive internet usage, as shown in internet audit**
23      **reports; and**
24          **e. The Detectives' substandard case management, which included**
        **failure to close out cold cases, failure to document case involvement in the**
25      **Spillman records management system, failure to conduct proper or**
26      **complete investigations in numerous cases, inflating reports of case**
        **involvement to include cases not actually assigned to the individual**
27      **Detectives. [Hughes Dep. (Vol. 1) Exs. 38-39]**
28

1

2      **Responses and Objections:** Disputed to the extent that this statement varies

3   from or mischaracterizes the referenced termination memoranda. The cited documents

4   speak for themselves.

5
       **158.    When considering whether to terminate Plaintiffs, the statements
6   made by the PCAO lawyers during their September 24, 2012 meeting were most
    important to Hughes. [Hughes' Decl. ¶ 36 (Ex. 17)]**
7

8
       **Responses and Objections:** Disputed. Hughes testified that there was no
9
    "tipping point" that ultimately led him to issue the termination recommendations, but
10
    rather that this decision was "cumulative." (Ex. 01, Hughes Dep. I, at 266:10-14.)
11

12     **159.    When hired as the interim Police Chief, Hughes did not know Tryon
    or anyone else at the FPD. At the time that Hughes recommended Plaintiffs'
13  terminations, he had a working relationship with Tryon, but did not socialize with
    him outside of work; they were not friends. [Hughes Decl. at ¶ 34 (Ex. 17)]**
14

15

16     **Responses and Objections:** Not disputed.

17

18     **160.    Hughes personally listened to the recorded interview of the victim in
    the MH Case and was appalled by what he heard. [Hughes' Dec. ¶ 39 (Ex. 17)]**
19

20     **Responses and Objections:** Not disputed.
21

22     **161.    Regardless of who actually turned on the recorder, Hughes saw both
    Plaintiffs as responsible for secretly recording Hazard, because they approached
23  him about the Kemp investigation with Klix's file together and they always spoke
    in terms of being partners in their investigations. Also, the PCAO had indicated
24  that they were upset that "they" had secretly recorded Hazard. [Hughes' Decl. ¶
    37 (Ex. 17)]**
25

26

27     **Responses and Objections:** Not disputed.

28

1
2
3

    **162.**    **Varnrobinson did tell Hunter that he recorded his conversation with Hazard. [Varnrobinson Dep. (Vol. 1) 108:4-11 (Ex. 46~~10~~)]**

4
5
6
7

    <u>**Responses and Objections:**</u> Disputed to the extent that Varnrobinson did <u>not</u> tell Hunter that he recorded his conversation with Hazard without Hazard's prior knowledge. (Ex. 28, Varnrobinson Dep. I, at 108:4-11.)

8
9
10

    **163.**    **Rankin did not make any recommendation or provide input concerning whether Hunter or Varnrobinson should be terminated. He never even had any discussions about that issue with Hughes or Patel. [Tom Rankin Decl. ("Rankin Decl.") ¶ 2, attached as Ex. 25)**

11
12
13
14
15
16
17

    <u>**Responses and Objections:**</u> Disputed. Following a April 3, 2012 confrontation with Varnrobinson during the execution of a search warrant, Rankin repeatedly complained to Lewis that the "n***er" Varnrobinson had threatened to arrest him. (Ex. 07, Lewis Dep., at 176:22-178:5.) Rankin also told Lewis that Varnrobinson no longer "belong[ed]" with the FPD. (*Id.* at 179:25-180:15.)

18
19
20

    Rankin complained to Town Manager Patel about Varnrobinson's actions during the execution of the search warrant. (Ex. 05, Rankin Dep., at 151:21-153:5); (Ex. 47, Rankin Resps. to Varnrobinson's 2d Set of Interrogs., at 6.)

21
22
23
24

    Rankin told Patel that Plaintiffs should be fired. (Ex. 05, Rankin Dep., at 231:5-12.) In fact, Rankin told "a lot of people" that Plaintiffs should be fired. (*Id.* at 231:5-17.)

25
26
27
28

    In late-June or early-July 2012, before Hughes started working as Interim Chief, Hughes, Rankin, and Patel met at a Cracker Barrel restaurant in Casa Grande. (Ex. 08, Ingulli Dep., at 83:14-84:7); (Ex. 05, Rankin Dep., at 131:8-132:10, 134:25-135:3,

142:25-143:13, 217:19-218:7, 219:15-221:13, 266:14-17, 299:5-18.) Rankin admits that he discussed Plaintiffs with Patel and Hughes, and told Hughes that Hughes should "look into" Plaintiffs' December 2010 interview of MH. (*Id.*)

At some time shortly before or shortly after Mayor-elect Rankin was sworn in as Mayor on June 11, 2012 (Ex. 19 at ¶ 17), Morris heard Rankin tell a group of FPD officers that Plaintiffs would be fired as soon as Hughes began working as Interim Chief. (Ex. 17, Adams Dep., at 61:3-22, 64:11-16.).

On July 4, 2012, Rankin told several FPD officers that Ingulli was going to be terminated and replaced by someone from Surprise. (Ex. 08, Ingulli Dep., at 82:13-20); (Ex. 16, Morris Dep. I, at 32:25-33:12.)

**164.    Rankin was not aware that Hunter and Varnrobinson had brought any complaints against Lieutenant Terry Tryon prior to the time that the Town terminated Hunters' and Varnrobinson's employment. [Rankin Dec. ¶ 3 (Ex. 25)]**

**Responses and Objections:** Disputed. Rankin learned from Tryon that Tryon was under investigation, that Plaintiffs made the allegations against him, and that DPS was "doing an investigation." (Ex. 05, Rankin Dep., at 236:15-237:22.) The DPS investigation started in February 2012 and ended in August 2012. (Ex. 29, DPS Investigation Report, at 3.) Tryon told Rankin the allegations were "unfounded" and a "bunch of bullshit." (Ex. 05, Rankin Dep., at 236:15-238:4.)

In his subsequent Declaration, Rankin now claims that, prior to the time that the Town terminated Plaintiffs' employment on December 14, 2012, he was not aware that either of them had ever suggested that Tryon had committed any crime. (Rankin Decl., Doc. 248-1, at ¶ 2.)

**165.    Hughes never even spoke to Rankin about the two Detectives before**

**Hughes recommended that they be terminated. [Hughes Dep. 1, 303:3-5 (Ex. 16–)]**

**Responses and Objections:** Disputed. Hughes and Rankin spoke about Hunter and Varnrobinson on at least three occasions before Hughes recommended their terminations. First, after Hughes was selected to become Interim Chief in May 2012 and before he started as Interim Chief in July 2012, Rankin told Hughes that he should "look into" Hunter and Varnrobinson. (Ex. 05, Rankin Dep., at 219:15-221:13.) Second, Rankin, Hughes, and Patel discussed Hunter and Varnrobinson at a meeting that occurred at some point between May and July 2012. (*Id.* at 131:8-132:10, 134:25-135:3, 142:25-143:13, 219:20-220:11, 266:14-17, 299:5-18.) Third, at some point after Hughes became Interim Chief in July 2012, Rankin told him that he should look into Hunter and Varnrobinson's December 2010 interview of the alleged victim in the MH case. (*Id.* at 217:19-218:7.)

**166.    Tryon did not make any recommendation regarding Plaintiffs terminations, had no part in drafting the termination recommendation memoranda, and in fact had no knowledge that Chief Hughes was even considering terminating Plaintiffs. [Tryon Decl. ¶ 14 (Ex. 1); Hughes Dep. 1, 266:1-9 (Ex. 16)]**

**Responses and Objections:** Disputed.  Tryon arranged for Butch Gates from PCAO to bring to Hughes' attention Plaintiffs' December 2010 interview in the MH case, which later became one of Hughes' and Patel's justifications for their firing. (Ex. 25, Hunter Appeal Hrg. II, at 374:14-22.)

On October 1, 2012, Tryon submitted a memorandum to Hughes summarizing what Tryon perceived to be the deficiencies in Varnrobinson's cases. (Ex. 04, Tryon Dep., at 373:5-374:10, Dep. Ex. 33.) Hughes then copied and pasted Tryon's findings directly into his Termination Recommendation, which he submitted to Patel on November 8, 2012. (Ex. 01, Hughes Dep. I, at 269:13-274:25, Dep. Ex. 18, 38-39); (Ex. 24, Hunter Appeal Hrg. I, at 172:20-173:13.)

1

2      **167.   When he received Hughes' November 8, 2012 memoranda**
3  **recommending termination of Plaintiffs' employment, Patel reviewed the details of**
   **Hughes' recommendations and the supporting documentation he provided. Patel**
4  **then conducted his own review of FPD case files, listened to audio recordings of the**
   **MH investigation interviews, and spoke directly to PCAO attorney Susan**
5  **Crawford regarding Plaintiffs' job performance. Patel also consulted with Human**
   **Resources Director Scott Barber. [Patel Decl. ¶ 17 (Ex.5)]**
6

7      **Responses and Objections:** Disputed. Patel did not know if Hughes provided
8  Plaintiffs with an opportunity to respond to the content of the termination memoranda
9  before he submitted them to Patel. (Ex. 06, Patel Dep., at 200:2-21.)
10         After receiving Hughes' termination recommendation memoranda, Patel claimed
11 that he independently reviewed the recommendations by reviewing (1) an audio
12 recording of Plaintiffs' interview of MH; (2) the Kemp case file; and (3) Plaintiffs'
13 Spillman logs of their case reports. (*Id.* at 152:5-14.)
14         Patel also claims that he spoke with Hughes, Crawford, Belinda Sichling (the
15 FPD Record's Clerk), HR Director Scott Barber, and possibly Town Attorney James
16 Manatto. (*Id.* at 170:14-171:21.) Patel did not take notes of any of those purported
17 conversations.  (*Id.* at 173:8-174:4.)
18         Patel did not know that the MH interview had taken place almost two years
19 before Hughes submitted his termination recommendations. (*Id.* at 153:8-19.) Nor did
20 Patel know that Gates brought the MH case file to Hughes only because Tryon had
21 specifically asked him to. (*Id.* at 165:22-167:10.) Patel did not confirm whether
22 Plaintiffs' conduct during the MH interview violated any law, ordinance, or FAC
23 protocol. (*Id.* at 153:25-155:18.)
24         With regard to the Kemp case, Patel testified that he was concerned that
25 Plaintiffs re-investigated it without authorization; however, Patel did not bother to ask
26 Hunter, Varnrobinson, or Ingulli whether Plaintiffs were authorized, (*Id.* at 156:16-
27

28

- 50 -

159:2), so Patel's failure to investigate led him to believe falsely that Plaintiffs had no such authorization.

With regard to the Spillman logs, Patel's explanation of his review of the logs is as follows: "But it's just -- just to look at the data analysis of the -- on the cases and their status. It's all on the computer." (*Id.* at 170:1-12.)

With regard to his conversation with Sichling, Patel stated that Sichling told him that she input info on Plaintiffs' cases in the Spillman system, but did not know whether Sichling also input info on Klix's cases, or if Plaintiffs or Ingulli asked her to do so. (*Id.* at 171:24-173:7.)

Patel also based his decision to fire Plaintiffs on the fact that they seemed "very inactive" on the expensive Spillman system. (*Id.* at 169:22-173:16.)

Tryon testified, however, that it was not standard operating procedure to write supplements in the Spillman system before Hughes became the Chief in 2012. (Ex. 04, Tryon Dep., at 54:22-57:4, 108:22-109:9.)

With regard to his purported conversation with Crawford, Patel stated that their discussion focused on Plaintiffs' alleged "inability to conduct proper investigation." (Ex. 06, Patel Dep., at 160:10-21.) However, Crawford does not recall this purported conversation, and does not recall ever discussing Plaintiffs with Patel. (Ex. 22, Crawford Dep., at 65:5-24). Crawford never stated that Plaintiffs were unable to conduct investigations. (*Id.* at 63:8-15.)

Hughes based his termination recommendations in part on Plaintiffs' purported excessive internet use, but Patel also failed to review the Florence Internet Use Policy while he was deciding whether or not to terminate Plaintiffs. (Ex. 06, Patel Dep., at 180:15-19.)

On November 29, 2012, Patel issued his Notices of Intent to Terminate Plaintiffs (NOIs). (Ex. 06, Patel Dep., at 151:5-16, Dep. Exs. 25-26.) Plaintiffs' responses were due on December 10, 2012, and Patel's last day as Town Manager was scheduled for December 14, 2012. (Ex. 06, Patel Dep., at 186:9-20, Dep. Exs. 25-26.)

1    At the time he issued the NOIs, Patel still did not know whether it was Hunter or

2    Varnrobinson who had recorded Hazard. (Ex. 06, Patel Dep., at 202:17-203:14.)

3

4    **168.    On November 29, 2012, in separate meetings, Patel provided Hunter
     and Varnrobinson a Notice of Intent to Dismiss, which notified Plaintiffs of their
5    right to respond to the proposed termination orally or in writing in order to show
     why they should not be terminated, or to request a pre-termination review session.
6    [Hunter Dep. 1 (Vol. 1) Ex. 2 (Ex. 6), Varnrobinson Dep. 1 Ex. 6 (Ex. 10)]**

7

8    <u>**Responses and Objections:**</u> Not disputed.

9

10   **169.    Hunter attended his meeting with union representative, Jim Parks,
     Himanshu Patel, Chief Hughes, and Scott Barber, where he received the
11   memorandum in which Chief Hughes provided specific information regarding his
     recommendation to terminate Hunter's employment in 2012. [Hunter Dep. 1, 50:1-
12   22 & Ex. 3 (Ex. 6)]**

13

14   <u>**Responses and Objections:**</u> Not disputed.

15

16   **170.    Hunter left that meeting understanding that he could respond orally
     or in writing as to why he felt he should not be terminated. [Hunter Dep. 1, 51:25-
17   52:4 (Ex. 6)]**

18

19   <u>**Responses and Objections:**</u> Not disputed.

20

21   **171.    On December 10, 2012, Hunter submitted to Patel a written response
     to the notice of intent to dismiss him. [Hunter Dep. 1, 57:7-19; 59:9-11 & Ex. 4 (Ex.
22   6)]**

23

24   <u>**Responses and Objections:**</u> Not disputed.

25

26   **172.    On December 14, 2012, Hunter received a notice of dismissal from
     Patel, which set forth his right to appeal; he did appeal and was represented by
27   attorney Edmundo Robaina at an evidentiary hearing at which Robaina presented
     witnesses on Hunter's behalf. [Hunter Dep. 1, 58:20-59:11 & Ex. 5 (Ex. 6)]**

28

1

2      **Responses and Objections:** Not disputed.

3

4      **173.    During a meeting with his union representative, Thomas Parker,**
**Himanshu Patel, Chief Hughes, and Scott Barber, Varnrobinson received the**

5      **memorandum in which Chief Hughes provided specific information regarding his**
**recommendation to terminate Varnrobinson's employment. [Varnrobinson Dep. 1**

6      **(Vol. 2) 38:16-39:8, 42:8-16 & Ex. 7 pp. 1-2 (Ex. 12~~110~~)]**

7

8      **Responses and Objections:** Not disputed.

9

10     **174.    At the meeting, Varnrobinson was notified in writing that he had ten**
**days during which he could respond to the proposed termination orally and/or in**

11     **writing, and that he could request a meeting to provide cause why the termination**
**action should not be taken. [Varnrobinson Dep. 1 (Vol. 2) 44:1-10 & Ex. 7 pp. 1-2**

12     **(Ex. 12~~110~~)]**

13

14     **Responses and Objections:** Not disputed.

15

16     **175.    On December 10, 2012, Varnrobinson submitted a written response to**
**the notice of intent to dismiss him. [Varnrobinson Dep. (Vol. 1) Ex. 8 (Ex. 12~~110~~)]**

17

18     **Responses and Objections:** Not disputed.

19

20     **176.    Varnrobinson was sent a Notice of Dismissal by Patel which set forth**
**his right to appeal; he did appeal, was represented by an attorney; but not Ed**

21     **Robaina, at a full evidentiary hearing. [Jarris Varnrobinson Appeal Hearing]**

22

23     **Responses and Objections:** Not disputed.

24

25     **177.    The Town hired retired judge Richard McAnally to act as Hearing**
**Officer over both appeal proceedings. [Mannato Decl. ¶ 2 (Ex. 26)]**

26

27

28     **Responses and Objections:** Not disputed.

**178.    The Town's practice for appeal hearings at that time was to treat the Hearing Officer's recommendation as binding. Mannato stated on the record that the Town would accept the Hearing Officer's recommendation. [Mannato Decl. ¶ 3 (Ex. 26)]**

**<u>Responses and Objections:</u>** Not disputed.

**179.    Neither Hunter nor Varnrobinson ever requested to strike the appointed hearing officer, Richard McAnally. [Mannato Decl. at 5 (Ex. 26)]**

**<u>Responses and Objections</u>: Not disputed.**

**180.    Neither Hunter nor Varnrobinson pursued a legal action to challenge McAnally's decisions. [Mannato Decl. at 6 (Ex. 26)]**

**<u>Responses and Objections:</u>** Denied. This action in part challenges McAnally's decisions.

**181.    In his Findings of Fact and Order in the Matter of the Appeal of Jarris Varnrobinson (Case No. FAPB2013-002), issued on September 20, 2013, McAnally found that the "Termination Order of the Town Manager of December 14, 2012 must be upheld." [Barber Decl. ¶ 8, Ex. A p. 17 (Ex. 2)]**

**<u>Responses and Objections:</u>** Not disputed.

**182.    McAnally upheld the termination decision as to Varnrobinson because he found three of the four rationale for termination to be proven by a preponderance of the evidence, and that the seriousness of Varnrobinson's violations warranted termination. Specifically, McAnally found credible support to find that Varnrobinson had secretly recorded a PCAO attorney, which led to "great distrust and interruption of the [] team of prosecution shared by police departments and prosecutors," that Varnrobinson had a history of below standard case reporting, and that Varnrobinson had violated the Town's Internet Usage Policy, and that much of his time had been spent on a website to further Varnrobinson own businesses. [Barber Decl. ¶ 8__, Ex. A__ p. 7-17 (Ex. 2)]**

1

2      **Responses and Objections:** Not disputed, except to the extent it varies from the

3      Hearing Officer's decision and order, which speaks for itself.

4

5      **183.    In his Findings of Fact and Order in the Matter of the Appeal of Walt**
       **Hunter (Case No. FAPB2013-001), issued on September 20, 2013, McAnally found**

6      **that termination for Hunter should be overturned because, in his opinion, two of**
       **the rationale for Hunter's termination, Hunter's performance during the MH**

7      **investigation and the secret recording of a PCAO attorney could not be used to**

8      **support his termination. Specifically, McAnally found that Chief Ingulli had**
       **already dealt with the MH investigation performance issue by requiring Hunter to**

9      **receive retraining regarding questioning juvenile victims, and that Hunter was not**
       **involved in making the secret recording at issue, but rather Varnrobinson had**

10     **made the recording on his own. [Hunter Dep. 1, Ex. 6 pp. 5-8 (Ex. 6)]**

11

12     **Responses and Objections:** Not disputed, except to the extent it varies from the

13     Hearing Officer's decision and order, which speaks for itself.

14

15     **184.    The Hearing Officer did find grounds to support two of the bases for**
       **Hunter's termination. While McNally could not support Hunter's termination he**

16     **indicated that other lesser discipline would be appropriate, including loss of**

17     **backpay and a demotion. [Hunter Dep. Vol 1 Ex 6]**

18

19     **Responses and Objections:** Disputed in part. Judge McAnally did not

20     specifically state that the Town should demote Hunter or decrease his back pay. (Ex. 33,

21     Hunter Dep I., at Ex. 06 at 12.)

22

23     **185.    [Blank]**

24

25     **Responses and Objections:** n/a

26

27     **Hunter's Reinstatement and the Town's New Town Manager**

28

1
2
3
4
5

**186.   Town Attorney Jim Mannato followed the Hearing Officer's suggestions of what would be disciplinary actions short of termination he could support, which Mannato thought were appropriate, and then prepared the letter to Hunter with those conditions for the Town Manager's signature. [Mannato Decl. ¶ 4(Ex. 26)] 187. Charles Montoya was hired as Florence Town Manager in January 2013 and was only in this position until July 13, 2015. [Montoya Dep. 41:1-12 (Ex. 27); Montoya Decl. ¶ 1 (Ex. 28)]**

6
7
8
9
10
11

**Responses and Objections:** Disputed, to the extent that Montoya prevented Plaintiffs from discovering information related to this SOF by asserting attorney-client privilege. Defendants cannot now offer new evidence to support their summary judgment motion that they refused to produce during discovery on grounds of attorney-client privilege.

12
13
14

**188.   Before interviewing with the Town Council for the Town Manager position, Montoya did not know Dan Hughes, Tom Rankin, or Terry Tryon. [Charles Montoya Dep. ("Montoya Dep.") 23:2-28:25, 40:5-10, attached as Ex. 27]**

15
16
17
18

**Responses and Objections:** Not disputed; however, the citation does not support the assertion. Montoya testified that he did not speak to Tryon before becoming Town Manager. (Ex. 10, Montoya Dep., at 100:8-20.)

19
20

**189.   Montoya did not get involved in anything regarding Plaintiffs' personnel actions. [Montoya Dep. 66:6-22, 174:5-13 (Ex. 27)]**

21
22
23
24
25

**Responses and Objections:** Disputed. Montoya prevented Plaintiffs from discovering information related to this SOF by asserting attorney-client privilege. Defendants cannot now offer new evidence to support their summary judgment motion that they refused to produce during discovery on grounds of attorney-client privilege.

26
27
28

**190.   Montoya did not know that Hunter or Varnrobinson had complained of obstruction of justice or other felonies by Tryon. [Montoya Dep. 99:17-100:7, 223:12-224:2, 225:12-17 (Ex. 27)]**

- 56 -

1

2       **Responses and Objections:** Disputed. Montoya prevented Plaintiffs from

3   discovering information related to this SOF by asserting attorney-client privilege.

4   Defendants cannot now offer new evidence to support their summary judgment motion

5   that they refused to produce during discovery on grounds of attorney-client privilege.

6

7       **191.     Montoya left it to the Town Attorney, James Mannato, to work out**
    **the terms of Hunter's reinstatement because Montoya had not been involved in**

8   **Plaintiffs' termination, and did not know all the reasons why Plaintiffs were**
    **terminated. [Montoya Dep. 27:6-23, 84:15-22,174:1-18 (Ex. 27)]**

9

10      **Responses and Objections:** Not disputed.

11

12      **192.     The letter prepared to Hunter for Montoya's signature included the**

13  **following terms: Hunter would be reinstated retroactive to December 14; Hunter's**
    **first day back in service would be October 15, 2013; Hunter would be classified as**

14  **a Police Officer; Hunter's pay rate would be at a 5% reduction to the hourly rate**
    **Hunter made in December 2012 due to the fact that the classification of Police**

15  **Detective had been eliminated; Hunter would only receive backpay for the period**
    **of time from June 14, 2013 through October 15, 2013 with the earlier period of**

16  **which backpay would not be given treated as disciplinary suspension; Hunter**

17  **would become eligible for an employee insurance benefit package effective**
    **November 1, 2013; Hunter would be placed with a Field Training Officer for a**

18  **period of 6 weeks due to the time that elapsed since Hunter's last day of service**

19  **with the Town; and Hunter's reinstatement would be reported to AZPOST.**
    **[Montoya Dep. 103:25-104:18 & Ex. 5 pp. 2-3 (Ex. 27)]**

20

21

22      **Responses and Objections:** Not disputed, except to the extent it varies from the

23  letter, which speaks for itself.

24

25      **193.     Other than signing the letter with the terms of reinstatement,**
    **Montoya did not initiate or weigh in on any discipline against Hunter. [Montoya**

26  **Dep. 107:1-11, 107:19-108:6 (Ex. 27)]**

27

28      **Responses and Objections:** Disputed. Montoya prevented Plaintiffs from

discovering information related to this SOF by asserting attorney-client privilege and refusing to answer questions on the topic during his deposition. Defendants cannot now offer new evidence to support their summary judgment motion that they refused to produce during discovery on grounds of attorney-client privilege.Not disputed, according to Montoya's testimony.

**194.   Montoya had no conversations with Lt. Tryon while Montoya was the Town Manager except when Chief Hughes was gone and Tryon was serving as Acting Chief; at that time, Montoya simply told Tryon to call him if he needed anything. [Montoya Dep. 183:24-184:2 (Ex. 27)]**

**Responses and Objections:** Not disputed.

**195.   While Town Manager, Montoya never socialized with Tom Rankin and never had a meeting or a discussion when only the two of them participated. [Montoya Dep. 188:2-7 (Ex. 27)]**

**Responses and Objections:** Not disputed.

**196.   Montoya's only meetings with Rankin occurred when others were present and related to Town business. [Montoya Dep. 188:2-22 (Ex. 27)]**

**Responses and Objections:** Not disputed. However, Rankin testified that he may have told Montoya that Hunter "needed to be fired." (Ex. 05, Rankin Dep., at 257:18-258:4, 262:4-263:13.)

**197.   Hunter was reinstated as a Patrol Officer with the Florence Police Department on October 15, 2013. [Montoya Dep. 103:25-104:17 & Ex. 5 p. 2 (Ex. _)]**

**Responses and Objections:** Not disputed.

**198.   Montoya was not involved with anything having to do with Hunter**

**and AZ POST. [Montoya Dep. 77:20-78:4 (Ex. 27); Montoya Decl. ¶ 5 (Ex. 27)**

**Responses and Objections:** Not disputed

**Hunter's Complaint That the Police Department Did A Background Check on Him After He Was Reinstated and Assigned Him to Code Enforcement Duties**

**199.    On October 24 or 25, 2013, Jack Lane, who was the AZ POST Manager at the time, called Hughes. Lane stated that, per AZ POST regulations, the FPD would need to conduct a full background investigation on Hunter prior to reinstating him as a Police Officer because he had not worked for the FPD for more than 30 days. Lane emphasized that Hunter could not perform the duties of a police officer until his background packet was complete and had been reviewed by AZ POST. [Hughes Decl. ¶ 31 (Ex. 17_)]**

**Responses and Objections:** Disputed. On October 22, 2013, Mike Rosenberger at the AZPOST told Hughes and Tatlock that Hunter had an active certification from his appointment with Kearny PD; thus, according to Rosenberger, Hunter would be permitted to act as a peace officer upon his reinstatement. (Ex. 02, Hughes Dep. II, at 350:7-19.) However, as a result of Hughes' response, in which he informed Rosenberger that Hunter had been suspended for six months, AZPOST decided to conduct background investigation into Hunter. (Ex. 01, Hughes Dep. I, at 350:24-351:8.)

**200.    While his background check was pending and Hunter had code enforcement duties, he received the same pay and benefits as if he had been placed on patrol duty. [Barber Decl. 11(Ex. 2)]**

**Responses and Objections:** Not disputed.

**201.    While his post-reinstatement background check was pending, as part of his duties as a Patrol Officer, Hunter was given a code enforcement assignment. [Hughes Decl. ¶ 40 (Ex. 17)]**

1

2      **Responses and Objections:** Not disputed; however, Hunter also stayed on code

3   enforcement duty for about five months after he was recertified – from February 19,

4   2014 until July 15, 2014. (Ex. 02, Hughes Dep. II, at 366:23-368:5.)

5

6      **202.    Prior to Hunter's reinstatement, the assistant Town Manager had**
    **made code enforcement a priority, and requested the FPD's assistance with code**

7   **enforcement issues. [Hughes Decl. ¶ 41 (Ex. 17)]**

8

9      **Responses and Objections:** Disputed. Hughes testified that, during his tenure at

10  the FPD, no other employee was assigned to code enforcement duty other than Hunter.

11  (Ex. 02, Hughes Dep. II, at 353:6-9.)

12

13     **203.    Numerous FPD Officers have assisted with code enforcement duties,**
    **both before and after Hunter's reinstatement. [Hughes Decl. ¶ 42——, (Ex. 17)]**

14

15     **Responses and Objections:** *See* Response to ¶ 202.

16

17  **Hunter's Complaint That he Was not Reinstated to a Detective Position or Later**

18                  **Awarded a Special Assignment As Detective**

19

20     **204.    Prior to Hunter's reinstatement, in line with the recommendations**
    **from the ICMA audit, Hughes recommended restructuring the Department in a**

21  **manner that would eliminate the position of Police Detective, and would instead**
    **allow Patrol Officers to work as a Detective on two-year special assignments on a**

22  **rotating basis. [Hughes Decl. ¶ 43 (Ex. 17)]**

23

24     **Responses and Objections:** Not disputed to the extent that Hughes did alter the

25  procedures for applying to be a detective. However, although the detective position was

26  termed an "assignment" rather than a "position," the duties for both were the same. (Ex.

27  02, Hughes Dep. II, at 424:18-425:17.) Hughes initiated this policy change ten days

28

1   after Hunter's reinstatement. (*Id.* at 420:9-15.) At the time, Hughes was aware that

2   Hunter wanted to be reinstated to his prior detective position. (*Id.* at 418:3-14.)

3

4       **205.    In approximately June 2013, before the Council meeting to discuss
the budget, Montoya and Hughes discussed eliminating the Detective's position**

5   **and having regular patrol positions handle Detective work on a rotating basis for
cross-training purposes. They discussed the fact that Florence PD was a small**

6   **department, they were short-staffed, and small departments did not typically have**

7   **detective positions. [Montoya Dep. 113:5-22 (Ex. 27)].**

8

9       <u>**Responses and Objections:**</u> Not disputed.

10

11       **206.    Hughes' recommendation to eliminate the Detective position was
consistent with Hughes' practice while working as the Surprise Police Chief.**

12   **[Hughes Decl. ¶ 44 (Ex. 17)]**

13

14       <u>**Responses and Objections:**</u> Not disputed.

15

16       **207.    Montoya accepted the Chief's recommendation, and the
recommendation to eliminate the Police Detective position from the Town's**

17   **classification system went to the Town Council in June 2013 and was approved.
[Barber Decl. ¶ 9 (Ex. 2)]**

18

19       <u>**Responses and Objections:**</u> Not disputed.

20

21       **208.    The Town Council voted to eliminate the two Police Detective**

22   **positions. [Montoya Dep. 112:2-12, 130:19-131:2 (Ex. 27); Barber Decl. ¶ 9 (Ex. 2)]**

23

24       <u>**Responses and Objections:**</u> Not disputed.

25       **209.    Since the elimination of the Detective position was eliminated in June
2013, the Town has not had a separate Police Detective position. [Barber Decl. ¶ 10**

26   **(Ex. 2)]**

27

28

1

**Responses and Objections:** Not disputed.

2

3       **210.    On April 17, 2013, Hughes issued a memorandum to FPD personnel notifying them of an opportunity to apply for the opportunity to be a Detective. [Hughes Decl. ¶ 45 (Ex. 17)]**

4

5

6       **Responses and Objections:** Not disputed.

7

8       **211.    Patrol Officers Lisa Gaston, Scott Rose, and Dan Helsdingen submitted letters of interest for the Detective assignment, and Gaston was selected for the assignment effective August 24, 2013. [Hughes Decl. ¶ 46 (Ex. 17)]**

9

10

11      **Responses and Objections:** Not disputed. Hunter also applied and was not

12      selected. (Ex. 02, Hughes Dep. II, at 419:6-420:8, 423:16-425:6, Dep. Ex. 53.)

13

14      **212.    When Renee Klix was promoted to a Sergeant position in March 2014, the FPD administration selected Dan Helsdingen to fill the vacant spot for a Detective special assignment and intended to place him in that role once the Patrol Division's staffing issues had been resolved. [Hughes Decl. ¶ 47— (Ex. 17)]**

15

16

17      **Responses and Objections:** Not disputed.

18

19      **213.    Hunter submitted a letter on June 4, 2014 indicating that he wanted to be placed into a Detective's position. At that time there was no Police Detective position in the Town's classification system, and Hunter did not request a special assignment to a Detective role in accordance with FPD's Specialized/Temporary Assignment Procedures policy ("ADM-10"). [Hughes Dep. 1 (Vol 2) 413:17-414:6 & Ex. 53 pp. 2-3 (Ex. 29)]**

20

21

22

23

24      **Responses and Objections:** Disputed. Hughes knew exactly what Hunter was

25      applying for. (Ex. 02, Hughes Dep. II, at 419:6-420:8, 423:16-425:6, Dep. Ex. 53.)

26

27      **214.    At the time he made his request, Hunter also did not meet the eligibility requirements of ADM-10 for special assignments because he had not worked for an uninterrupted minimum period of one year prior to requesting the**

28

assignment, and because he had received "major disciplinary action" in the form of written reprimands and a suspension during the previous year. [Hughes Dep. 1 (Vol 2) Ex. 53 pp. 2-3 (Ex. 29)]

**Responses and Objections:** Not disputed.

215.    Hunter also would not have been eligible at the time he made his request for a Detective special assignment because he had been placed in the PCAO's Law Enforcement Integrity Database four months earlier. [Hughes Decl. at ¶ 48 (Ex. 17)]

**Responses and Objections:** Disputed. ADM-10 does not reference this requirement.

**FPD's Submissions to AZ POST**

216.    As required by A.R.S. § 41-1828.01(A) and AZ POST regulations, the FPD submitted Termination Reports notifying AZ POST that Hunter and Varnrobinson had been involuntarily terminated and that misconduct was involved. [Hughes Decl. ¶ 49 (Ex. 17)]

**Responses and Objections:** Disputed. Neither A.R.S. § 41-1828.01(A) and AZ POST regulations required Hughes to submit information to AZ POST he knew to be false.

217.    On October 10, 2013, AZ POST Compliance Specialist Mike Deltenre contacted Hughes, requested that the FPD send him information regarding the terminations of Hunter and Varnrobinson. [Hughes Decl. ¶ 50 (Ex. 17)]

**Responses and Objections:** Not disputed.

218.    On October 24, 2013, Deltenre emailed Hughes to request additional information related to the MH case and information about Hunter's internet use while working as an FPD Detective. [Hughes Decl. ¶ 54 (Ex. 17)]

1

2      **Responses and Objections:** Not disputed.

3

4          **219.**    On October 28, 2013, Hughes sent a letter to Deltenre to notify him
that Hunter's status had changed, that he had been reinstated to a Patrol Officer

5      position, and that he had received a disciplinary suspension in lieu of termination.
[Hughes Decl. ¶ 53 ~~Ex.~~ (Ex. 17)]

6

7

8          **Responses and Objections:** Not disputed.

9          **220.**    On November 4, 2013, Deltenre contacted Hughes to request an

10     unredacted copy of Plaintiffs' recorded interview of MH, and to ask for more
information related to Hunter's reinvestigation of the Kemp Case. Hughes

11     provided the requested information. [Hughes Dep. 1 (Vol. 1) Ex. 41 p. 1 (Ex. 16);
Hughes Decl. ¶ 54 (Ex. 17)]

12

13

14         **Responses and Objections:** Not disputed.

15

16                         **Hunter's Complaint About His Shift**

17

18         **221.**    When Hunter was returned to work as a Patrol Officer, Hughes
made the decision to assign him to Sgt. Samuel Pankey's squad. Hughes made this

19     decision because Hunter had previously had conflicts with Sergeants Morris and
Tatlock, but seemed to have gotten along well with Sgt. Pankey, and Hughes

20     believed Pankey was a strong supervisor. Hughes felt that it would be best to have
Hunter supervised by Pankey when he first returned to patrol officer duties. At the

21     time, Sgt. Pankey was assigned to the graveyard shift. [Hughes Decl. ¶ 54 (Ex.
17)]

22

23

24         **Responses and Objections:** Not disputed that this is Hughes' asserted

25     justification for placing Hunter on the graveyard shift.

26         **222.**    The shift bid process for Patrol Officers had already taken place in

27     January 2013. [Hughes Decl. ¶ 56 ] (Ex. 17)

28

1

**Responses and Objections:** Not disputed.

2

3      **223.    During the first shift bid process that occurred after Hunter's he**

4  **reinstatement, Hunter submitted a shift bid and, based on the bidding procedures,**
**was assigned to a different shift. [Hughes Decl. ¶ 57— (Ex. 17)]**

5  **Hunter's Complaints About Reprimands**

6

7      **Responses and Objections:** Not disputed that his is Hughes' stated justification.

8

9      **224.    On November 6, 2013, Sergeant Tatlock issued Hunter a written**

10 **"admonishment" for "insubordination to a Superior Officer." In the document,**
**Tatlock described an incident in which Hunter interrupted him in a disrespectful**

11 **manner while he was speaking to a civilian, and a second incident in which Hunter**
**become loud and interrupted Tatlock while he was trying to give Hunter a**

12 **directive. As he stated in the admonishment, Sgt. Tatlock wanted to address the**
**issue with Hunter because he wanted Hunter to "not repeat past errors but move**

13 **forward and help create a positive working enforcement for everyone. I am here to**

14 **assist in that endeavor." [Billingsley Decl. ¶ __ Ex. 30]**

15

16     **Responses and Objections:** Disputed that Hunter spoke to Tatlock in a

17 disrespectful manner, and disputed to the extent it varies from the content of the letter,

18 which speaks for itself.

19

20     **225.    On November 14, 2015, FPD Officer and Firearms Instructor**
**Andrew Salazar began a three-day Tactical Firearms Shoot Training ("Firearms**

21 **Training"), with students Walt Hunter, Kyle Kakar, Darwin Banks, and Mike**
**Alston in attendance. Andy Salazar Decl. ("Salazar Decl." ¶ 3-7— (Ex. 31)]**

22

23     **Responses and Objections:** Not disputed.

24

25

26     **226.    On November 16, 2015, Salazar submitted to Lt. Tryon a written**

account of his experiences with Hunter during the Firearms Training. [Id.]

27

28

1  **Responses and Objections:** Not disputed.

2

3  **227.   In the letter, Salazar reported that, as part of his range safety rules,**

4  **the officers were expected to point their muzzles down at all times. [Id.]**

5

6  **Responses and Objections:** Not disputed, except to the extent it varies from the

7  content of the letter, which speaks for itself.

8

9  **228.   Salazar reported that on the first day of training, he had to remind**
   **Hunter "five or more times" to not point his rifle in the air, which Hunter would**

10  **do while holding the pistol grip one hand and resting the rifle butt on his belt. [Id.]**

11

12  **Responses and Objections:** Disputed in part. Hunter testified that Salazar

13  reminded the entire group of the safety rules; thus, Salazar did not remind Hunter of the

14  safety rules any more than he reminded the other officers. (Ex. 34, Hunter Dep. II, at

15  63:8-24, 65:4-11.) Moreover, as a result of unsafe shooting range conditions, every

16  officer at the training engaged in the same safety rule violations as Hunter did. (*Id.* at

17  48:15-49:12.) Hunter testified that he complained about the dangerous conditions on the

18  shooting range several times. His primary complaint was that the participants were

19  standing too close together, so that the hot shell casings kept hitting the person next to

20  the shooter. At one point, after a shell casing hit Darwin Banks in the ear, Banks turned

21  to face Hunter and pointed his loaded gun at him. This re-occurred several times

22  throughout the day with other participants. (*Id.* at 47:8-48:17.) Hunter also testified that

23  Salazar himself pointed a loaded gun at Hunter. (*Id.* at 48:20-23.)

24

25  **229.   Salazar also reported that during the second day of training, after**
   **Salazar instructed all officers to holster their firearms as part of a night fire**

26  **exercise, Hunter turned around from the line of fire with his loaded weapon**
   **pointing at Salazar's lower torso. [Id.]**

27

28

- 66 -

1    **Responses and Objections:** Disputed. Hunter explicitly denied this assertion

2    during his deposition. (Ex. 34, Hunter Dep. II, at 65:12-21.)

3

4    **230.    Salazar reported that he advised Hunter to holster his weapon, after**

**which Hunter turned back around to the target with his pistol muzzle pointing**

5    **toward Officer Kakar, before holstering the pistol. [Id.]**

6

7    **Responses and Objections:** Disputed. Hunter explicitly denied that this incident

8    with Officer Kakar ever happened. (Ex. 34, Hunter Dep. II, at 58:10-20.)

9

10   **231.    Salazar stated that he told Hunter he was "dangerous" and warned**

**Hunter that he would be ejected from the firing range if he continued to commit**

11   **safety violations, but later that same day, Hunter again carelessly pointed his**

**muzzle toward the other officers attending the training and committed an**

12   **additional safety violation. [Id.]**

13

14   **Responses and Objections:** Disputed. Hunter testified that he decided to leave

15   the training; he was not kicked out. (Ex. 34, Hunter Dep. II, at 50:19-51:5.) Hunter also

16   explicitly denied that Salazar threatened to expel him from the shooting range. (*Id.* at

17   66:4-8.) Moreover, if Hunter had been behaving dangerously, it would have been

18   Salazar's responsibility to pull him out of the training and either clear up the issue or

19   remove him from the shooting range. (*Id.* at 53:2-8.)

20

21   **232.    On the morning of the final day of training, according to Salazar's**

**report, Hunter confronted Hunter, apologized for his unsafe behavior, but**

22   **disagreed with Salazar's assessment that he was dangerous; Salazar reported that**

**he advised Hunter that he could leave the training if he "was unhappy." And that**

23   **Hunter chose not to attend the final day of training. [Id.]**

24

25   **Responses and Objections:** Disputed. Hunter testified that he was not present

26   on the third day of training. (Ex. 34, Hunter Dep. II, at 55:6-12.) However, on the first

27   and second days, Hunter and Salazar had a disagreement during which Salazar said

28   something to the effect of: "For an expert shot, you can damn sure be dangerous." The

following morning, i.e., the second day of training, Hunter told Salazar that he did not appreciate Salazar's comment. So, when Salazar then said, "If you don't like it, you can leave," Hunter chose to leave. (*Id.* at 55:13-56:16.)

**233.    No one asked or directed Salazar to advise Tryon of any problems concerning Hunter. Salazar told Tryon what occurred because he felt it was important to communicate what he viewed as a serious safety concern. Salazar also had no knowledge of any complaints that Hunter may have made against Lt. Tryon. *Id.***

**Responses and Objections:** Not disputed.

**234.    The Firearms Training Instructor reported to the Lt. [Tryon Dec. ¶ ]**

**Responses and Objections:** Disputed. Hunter testified that Tryon was not Salazar's immediate supervisor at the time; thus, his report directly to Tryon was inappropriate because it did not follow the chain of command. (Ex. 34, Hunter Dep. II, at 56:24-57:7.)

**235.    Based on the unsafe conduct reported by Salazar, which was confirmed by written statements from the other officers present at the training, Hughes made the decision to issue Hunter a Record of Employee Counseling with a letter of Reprimand on November 24, 2015. [Hughes Decl. ¶ 6-7 (Ex. 17)]**

**Responses and Objections:** Disputed. Hunter testified that Tryon, not Hughes, prepared the Record of Employee Counseling. (Ex. 34, Hunter Dep. II, at 41:14-43:24.)

**236.    In a statement submitted by Hunter about the incident shortly after**

**the Firearms Training.**

**Responses and Objections:** n/a

**237.    Hunter "admitted [he] was not being range compliant and apologized for not following [Salazar's] range rules." [Hunter Dep. 2, 60:19-62:15 & Ex. 3 (Ex. 32)]**

**Responses and Objections:** Disputed in part. Hunter apologized for violating what Salazar believed to be a safety rule. Hunter did not believe his conduct violated range rules; however, in an effort to be "non-confrontational," he decided to apologize. (Ex. 34, Hunter Dep. II, at 60:19-61:5.)

**238.    Prior to the Firearms Training incident, Hunter and Salazar had always gotten along very well. [Hunter Dep. 2 49:22-25 (Ex. 32)]**

**Responses and Objections:** Not disputed.

**239.    When asked what would motivate Salazar or the other officers to write statements that he acted unsafely, Hunter indicated that Salazar is a "hothead with a big mouth, and when he gets mad at you, he will not ever admit he's wrong. " [Hunter Dep. 2, 50:1-17 (Ex. 32)]**

**Responses and Objections:** Disputed in part. Hunter did state that Salazar was "a hothead with a big mouth. And when he gets mad at you, he will not ever admit he's wrong." However, prior to that statement, Hunter asserted that he and Salazar had always gotten along well. With regard to the other officers, Hunter insinuated that they may have been confused because everyone was in very close proximity at the training. (Ex. 34, Hunter Dep. II, at 50:1-17.) It would have been easy to mistake Hunter for another officer because every officer at the training committed the same alleged rule

1   violation due to unsafe shooting range conditions. *See* Response to ¶ 228.

2

3   **240.    On July 22, 2015, Jazmine Lopez filed an FPD Citizen Action Request Form complaining that, during an interaction with him the previous day, Hunter had been unprofessional and insensitive to her wellbeing. [Hughes Dep. 2 (Vol. 3) 495:10-22 & Ex. 64 p. (Ex. 33)]**

4

5

6

7   **Responses and Objections:** Not disputed. Lopez did submit this complaint. However, Hunter asserted that he merely told Ms. Lopez to calm down, which is standard procedure when someone is agitated. (Ex. 03, Hughes Dep. III, 495:10-22, Dep. Ex. 64 at 26.)

8

9

10

11   **241.    Lopez complained that Hunter had allowed her ex-boyfriend, Tyrone Neal, to enter her residence even though Lopez had an order of protection against Neal that prohibited it. [Hughes Dep. 2 (Vol. 3) 491:2-15 & Ex. 64 (Ex. 33)]**

12

13

14   **Responses and Objections:** Not disputed. However, Lopez lied on the 9-1-1 call. She told the dispatcher that she was across the street from her house, but Hunter and Officer Kevin Mount were at her house and Lopez was not present. (Ex. 03, Hughes Dep. III, at 497:14-498:2.)

15

16

17

18

19   **242.    The July 14, 2015, Order of Protection ("Order"), signed by Judge Thomas Shope, lists Jazmine Lopez as the Plaintiff and Tyrone Neal as the Defendant, and indicates that Defendant shall have "NO CONTACT" with Plaintiff, except through attorneys or other legal process. The Order further indicates that "Defendant shall not go to or near the Plaintiff's [residence, workplace, or school/other], and that Neal was not to approach Lopez in public. [Hughes Dep. 2 (Vol. 3) 491:2-15 & Ex. 63 pp. 1-2 (Ex. 33)]**

20

21

22

23

24

25   **Responses and Objections:** Not disputed.

26

27   **243.    The notification at the bottom of the Order warns that defendants who violate the Order will be subject to arrest and prosecution for interfering with judicial proceedings. The Order also states, in bold letters: "Only the Court, in**

28

1   writing, can change this Order. This Order is effective for one year from date of

2   service." [Hughes Dep. 2 (Vol. 3) 491:2-15 & Ex. 63 pp. 1-2 (Ex. 33)]

3       **Responses and Objections:** Not disputed.

4

5       244.   **FPD Internal Investigations policy, ROC-04 and its addenda, which**

6   **went into effect in April 2014, requires that all complaints of alleged policy**

7   **violations, rules, regulations, and orders be investigated and that every reasonable**

8   **effort be made to assure that an impartial investigator is assigned to investigate the**
    **complaint. The policy gives the Chief of Police discretion to use outside sources to**

9   **conduct the investigation. [Hughes Dep. 2 (Vol. 3) 491:2-15 & Ex. 59 pp. 5-10 (Ex.**
    **33)]**

10

11      **Responses and Objections:** Not disputed.

12

13      245.   **Chief Hughes asked an independent law enforcement agency, the**
    **Pinal County Attorney's Office, to conduct the investigation into Jazmine Lopez's**

14  **complaint. [Hughes Decl. ¶ 59—(Ex. 17)]**

15

16      **Responses and Objections:** Not disputed. Hughes requested this due to Hunter's

17  ongoing lawsuit against the Town. (Ex. 03, Hughes Dep. III, at 507:18-508:14.)

18  However, Hughes only requested an internal investigation into Hunter, despite the fact

19  that Mount was also present at the scene and failed to arrest Tyrone Neal for violating

20  the protective order. (*Id.* at 510:4-9.)

21

22      246.   **The investigation was assigned to Detective Cruz of the Pinal County**
    **Sheriff's Office of Professional Standards. [Hughes Dep. 2 (Vol. 3) 491:2-15 & Ex.**

23  **64 p. 6 (Ex. 33)]**

24

25      **Responses and Objections:** Not disputed.

26

27      247.   **Cruz's investigation report indicated that Hunter told the Sergeant**
    **on duty at the time, David Peterson, that the applicable Order of Protection**

28  **allowed Neal to get his property as long as Lopez was not at the residence, and that**

**Judge Shope had indicated it was not necessary to arrest Neal even though he did not call the police before going to Lopez's residence. Peterson took Hunter's word as to what the Order stated, and also as to what Judge Shope had told Hunter. Peterson stated that after he had reviewed the actual Order, however, he felt Neal's conduct had violated the order and, had he known at the time of the incident, he would have arrested Neal for the violation. [Hughes Dep. 2 (Vol. 3) Ex. 64 p. 20-21 (Ex. 33)]**

**Responses and Objections:** Not disputed. This statement is accurate per the report; however, the portion of the report to which the defendants cite appears to be Hughes' administrative review report. (Ex. 03, Hughes Dep. III, at 533:2-22, Dep. Ex. 64 at 20-21.) Moreover, in his report to Sgt. Peterson, Hughes did not determine whether Hunter intentionally or accidentally omitted the fact that Neal went to Lopez's house and searched for his property. (Ex. 03, Hughes Dep. III, at 533:2-535:15.)

**248.    Cruz reported that during, in his interview, Hunter admitted to hanging up on Lopez, that he did not tell Judge Shope that Neal was armed at the time he arrived at Lopez's residence without a police escort, that he did not attempt to reference the Order of Protection until late in the day, and that he did not obtain a copy of the Order until shortly before his investigation interview, which took place on September 10, 2015 (several weeks later). [Hughes Dep. 2 (Vol. 3) Ex. 64 p. 23-26 (Ex. 33)]**

**Responses and Objections:** Disputed in part. In his report, Cruz stated that Hunter's response to whether or not he hung up on Lopez was, "I mean I'm going to hang up eventually on everybody." (Ex. 03, Hughes Dep. III, Dep. Ex. 65 at 25.) Hunter also stated that he informed Lopez that he could not arrest Neal and, when Lopez asked for his supervisor, he said that he would put her in touch with him and hung up the phone. (*Id.*)

Additionally, Hughes testified that, if Hunter had told Judge Shope that Neal was armed, this would not have changed the way that Hughes dealt with the investigation. (Ex. 03, Hughes Dep. III, at 516:21-517:16.)

On July 21, 2015, Hunter requested a copy of the Protective Order from dispatch.

- 72 -

However, Hughes testified that Hunter never requested the Order; not until the recording of Hunter's call to dispatch was played for him during his deposition did Hughes admit that Hunter did, in fact, request the Order. (*Id.* at 513:-14-514:17.) Hunter also testified that he looked at the Order on the day of the incident and obtained a copy shortly before his interview with Cruz on Wednesday, September 16, 2015.  (Ex. 03, Hughes Dep. III, at Ex. 65 at 23, 26.)

**249.   Cruz further reported that when he interviewed Judge Shope, the judge stated that Hunter had called him after hours to ask if it was a violation for Neal to be at the residence to retrieve his property. Judge Shope responds was that Neal would be there if there an officer there for a civil standby. [Hughes Dep. 2 (Vol. 3) Ex. 64 p. 10 (Ex. 33)]**

**Responses and Objections:** Not disputed. This statement is accurate per the report. However, Cruz did not record his interview with Judge Shope. (Ex. 03, Hughes Dep. III, at 498:14-499:3.) Hughes and Tryon later met with Judge Shope to discuss the Lopez complaint and the subsequent internal investigation. (*Id.* at 499:10-501:7.)

**250.   Cruz reported that Judge Shope was not aware that Neal had arrived at Lopez's residence prior to being with law enforcement, and indicated that he was not supposed to enter the property or be present without Lopez's knowledge. [Hughes Dep. 2 (Vol. 3) Ex. 64 p. 10 (Ex. 33)]**

**Responses and Objections:** Not disputed. This statement is accurate per the report.

**251.   On November 6, 2015, Hunter received a reprimand for unsatisfactory work performance for failing to perform required duties, in that he did not appropriately enforce the Order of Protection against Neal, and for conduct unbecoming, for the unprofessional, discourteous, and argumentative way he communicated with Lopez, and for dishonesty, based on the fact that Hunter omitted material facts to his supervisor. [Hughes Dep. 1 (Vol. 1) Ex. 52 (Ex. 29)]**

**Responses and Objections:** Not disputed that he received the reprimand. However, Hughes confirmed that the "required duty," which Hunter allegedly failed to perform was arresting Neal; however, no one else arrested Neal. (Ex. 03, Hughes Dep. III, at 525:6-526:1.)

**252.    Hughes decided what discipline was appropriate, and asked Sgt. Renee Klix, as the Sergeant in charge of internal affairs investigations, to physically give the reprimand with a Notice cover memo to Hunter. [Hughes Dep. 1 (Vol. 2) 406:14-407:2, 410:21-24 & Ex. 52 (Ex. 29)]**

**Responses and Objections:** Not disputed. Klix's signature on the reprimand's cover form resulted from "an incorrect assumption in [the] development of the original draft of the memo," which was not corrected. (Ex. 03, Hughes Dep. III, at 537:25-538:8, Dep. Ex. 67.) Although Hughes testified that he authored the entire reprimand, he did not sign it. (Ex. 02, Hughes Dep. II, at 411:3-9); (Ex. 03, Hughes Dep. III, at 539:16-540:14.)

**253.    Hunter was not the only one disciplined. Based on Cruz's investigation report, Hunter's Sergeant, David Peterson, also received a reprimand. [Hughes Decl. ¶ 59 ~~Ex.~~ (Ex. 17)]**

**Responses and Objections:** Not disputed.

**254.    When asked what he viewed as retaliatory about the discipline he received related to the Lopez complaint, Hunter stated that he believes it was retaliatory that an internal affairs investigation was conducted at all. [Hunter Dep. 1, 165:9-166:2 (Ex. 6)]**

**Responses and Objections:** Not disputed.

**Hunter's Complaint That Chief Hughes Had An IA Investigation Done In Response to A Citizens Complaint**

**255.    On May 2, 2016, Florence citizen Gary Ryan called in a complaint to Sgt. Klix concerning an officer using offensive language. [See 5/19/16 LTR from Kirkham to Ryan (FLORENCE.014109); Klix Decl. ¶ _ (Ex. _)Hughes Decl. ¶ 61-62 Ex. E (Ex 17)]**

**Responses and Objections:** Not disputed.

**256.    Ryan later identified Hunter as the officer in question, indicating that Hunter had lost his temper when Ryan pulled his car next to Hunter's and told Hunter that he had failed to signal before crossing lanes. More specifically, Ryan complained that Hunter told him to "shut the fuck up and drive." [Id.]**

**Responses and Objections:** Disputed in part. Klix's memorandum to Hughes does not say that Hunter lost his temper. (Ex. 12, Klix Dep. II, at 291:15-18, Dep. Ex. 26.)

**257.    On May 10, 2016, Chief Hughes requested Apache Junction Police Department ("AJPD") Chief Thomas Kelly to have his department conduct an internal investigation into Mr. Ryan's complaint. Chief Kelly assigned the investigation to AJPD Lieutenant Jeffrey Kirkham [Hughes Decl. ¶ 62_ (Ex. 17)]**

**Responses and Objections:** Disputed in part. On May 11, 2016, Hughes requested assistance in conducting an investigation into a citizen's complaint against Hunter from Chief Thomas Kelly, Chief of Apache Junction. (Ex. 12, Klix Dep. II, at 298:3-17, Dep. Ex. 27.) On June 1, Apache Junction Police Department issued a notice of investigation into the citizen complaint against Hunter. (Ex. 03, Hughes Dep. III, at 569:15-19, Dep. Ex. 76.)

**258.    Following the investigation, Lt. Kirkham provided the FPD with a report of his investigation findings. [see Apache Junction Police Department Internal Affairs report related to I.A. 2016-003 (FLORENCE.014046-14164); Hughes Decl. ¶ 63_ (Ex. 17)]**

**Responses and Objections:** Not disputed.

**259.    Kirkham concluded that, during the incident with Mr. Ryan, Hunter failed to signal multiple lane changes during the course of his driving, which brought doubt as to the driving predictability of the officer as perceived by Mr. Ryan. [see Kirkham IA Conclusion (FLORENCE.014055-56)].**

**Responses and Objections:** Not disputed.

**260.    Kirkham further found that a verbal exchange did take place between Hunter and Ryan, and that Hunter admitted to using language that was inappropriate toward a citizen, which violated FPD Rules of Conduct: ROC-03 IV.A.4. [Id.]**

**Responses and Objections:** Disputed in part. Hunter did not admit that the language he used was inappropriate. Hunter told Kirkham that Ryan asked, "What would you have done if you were off duty and you saw somebody driving and they didn't use a blinker?" To that Hunter replied, "Well I would have kept my mouth shut and kept on driving." (*Id.* at 17.) Kirkham concluded that such language was inappropriate.  (*Id.* at 8.)

**261.    Kirkham further reported that Hunter denied cursing at the citizen, stating that he would not use that language because he is a religious man. [Id.]**

**Responses and Objections:** Not disputed.

**262.    When the investigator questioned two FPD Officers, however, one said he had personally heard Hunter use the word "fuck", and the other indicated he had heard Hunter use profanity while on duty, but not directed at a particular person. [see Kirkham's summaries of Kakar and Guilin interviews**

**(FLORENCE.014072-80]**

**Responses and Objections:** Not disputed.

**263.    Due to the conflicting content of Ryan's and Hunter's version of events, Kirkham found that Ryan's allegation that Hunter had used the word "fuck" during their exchange was not sustained. [Id.]**

**Responses and Objections:** Not disputed.

**264.    Rather than finding Hunter's story not credible, based on the statements of Ryan and the two Officers interviewed, or asking the investigator to interview additional officers concerning Hunter's use of profanity, Chief Hughes chose to take no action against Hunter. [Hughes Decl. ¶ 63 (Ex. 17)]**

**Responses and Objections:** Not disputed.

**265.    Hunter complains about the fact that the Chief had an investigation done at all in response to Ryan's complaint, and, in particular, by an outside agency. [Hunter Dep. 2, 71:9-22 (Ex. 32)]**

**Responses and Objections:** Not disputed. Hunter found the accusation so "innocuous" that there was no need for a "full-fledge" investigation conducted by an outside agency. (Ex. 34, Hunter Dep. II, at 71:9-72:1.)

**266.    At the same time, Hunter admits that he would not have wanted the FPD Sergeant in charge of internal affairs investigations, Renee Klix, to conduct the investigation. [Hunter Dep. 2, 71:23-72:12 (Ex. 32)]**

**Responses and Objections:** Not disputed.

**267.    According to Hunter, Ryan's complaint was minor and "anybody**

who knows him would know he didn't do it," so it would be acceptable to "look into it," but not conduct a "full-fledge IA." [Hunter Dep. 2, 71:13-22 (Ex. 32)]

**Responses and Objections:** Not disputed.

### The May 4, 2016 Squad Briefing

268.    On May 4, 2016, Hunter was attending an FPD squad briefing, when Hughes walked into the briefing room and stood near Sgt. Morris, next to the wall just inside the room's entrance. Sgt. Don Campbell, and Police Officers Keven Mount, Kyle Kakar, Jarrod Ballard, and Jesse Guilin also were in attendance. [Hughes Dep. 2 (Vol. 3), 587:5-12 & Ex. 81 pp. 56, 61 (Ex.33)]

**Responses and Objections:** Not disputed.

269.    Officer Kakar later reported he could see Chief Hughes in the squad room when he turned his head, and that after he faced the front of the briefing room, he saw Officer Hunter make an "unusual facial expression." Right after this, Kakar and several others in the room heard Hughes say something to the effect of "are you alright?" [Hughes Dep. 2 (Vol. 3), 587:5-12 & Ex. 81 pp. 56, 61 (Ex. 33)]

**Responses and Objections:** Not disputed.

270.    As Hunter admitted in his May 5, 2016 memo to HR Director Scott Barber after the Chief asked him if something was wrong, Hunter replied "Yeah, every time you come in here you try to stare me down. You did the same thing in court the other day and tried to lie about it. You have done everything you could do to ruin my career. I think that is quite enough don't you." *cite

**Responses and Objections:** Not disputed.

271.    According to witness statements HR Director obtained in response to Hunter's May 5 memo, and Hunter responded to the Chief's question immediately, raising his voice, and becoming upset [Hughes Dep. 2 (Vol. 3), 587:5-12 & Ex. 81 pp. 62-64, 66 (Ex. 33)]

1    **Responses and Objections:** Not disputed.

2

3    **272.    Those who remained in the room reported that Sergeants Campbell
     and Morris had to intervene, that Morris told Hunter "that's enough," but that
4    Hunter continued to say things to Hughes even after the Sergeants told him to stop,
     responding to Morris: "No, I don't think it is enough!" [Hughes Dep. 2 (Vol. 3),
5    587:5-12 & Ex. 81 pp. 62-64, 67 (Ex. 33)]**

6

7    **Responses and Objections:** Disputed. Cited record does not support assertion

8    that Campbell and Morris "had to intervene," or that Hunter continued to speak to

9    Hughes (rather than to Morris or Campbell).

10

11   **273.    None of the personnel present observed anything that, in their view,
     would explain Hunter's confronting the Chief in the manner they observed.
12   [Hughes Dep. 2 (Vol. 3), 587:5-12 & Ex. 81 pp. 55-61 (Ex. 33)]**

13

14   **Responses and Objections:** Not disputed.

15

16   **274.    Communications Supervisor Regina Quinones reported that, while
     she was in her office with the door to the communications room closed, she could
17   hear what sounded like yelling coming from the briefing room. [Hughes Dep. 3,
     587:5-12 & Ex. 81 pp. 68 (Ex. 33)]**

18

19
     **Responses and Objections:** Not disputed.
20

21
     **Hunter's Complaints That He Was Placed on Leave With Pay And Sent For A**
22
     **Fitness Duty Exam**
23

24   **275.    Later on May 4, Sgt. Campbell issued a Memorandum notifying
     Hunter that he was being placed on paid administrative leave effective
25   immediately. [Hunter Dep. 3, 65:24-65:4 & Ex. 2 (Ex. 37~~33~~)]**

26

27   **Responses and Objections:** Not disputed.

28

1

2          **276.    Based on Hunter's interaction with Gary Ryan and his actions
    during the Squad Briefing Incident, Hughes and Barber, in consultation with the
3   **Town Attorney, made the decision to place Hunter on a paid administrative leave
    until such time as Hunter could submit to a fitness for duty exam. [Hughes Decl. ¶**
4   **70— (Ex. 17)]**

5

6          **Responses and Objections:** Disputed in part. Hughes testified that Hunter was

7   placed on paid administrative leave because of the May 4th incident, not because of the

8   Gary Ryan complaint. (Ex. 03, Hughes Dep. III, at 575:4-12.)

9

10         **277.    On May 18, 2016, Chief Hughes provided Hunter with notice that he
    was being directed to submit to a psychological Fitness for Duty Evaluation with**
11  **Dr. Connie S. Pyburn of Arizona Police Psychology. [Scott Barber Dep. ("Barber
    Dep.") 74:24-75:6 & Ex. 7, attached as Ex. 34]**
12

13

14         **Responses and Objections:** Not disputed. On May 18, 2016, following the May

15  4th incident, Hughes ordered Hunter to undergo a psychological fitness for duty

16  evaluation. (Ex. 03, Hughes Dep. III, at 564:15-565:3, Dep. Ex. 71.) Dr. Pyburn

17  conducted the evaluation. (Ex. 36, Pyburn Dep., at 31:12-14, Dep. Ex. 01 at 6.)  Also on

18  May 18, 2016, Hughes sent Dr. Pyburn a background memorandum on Hunter, which

19  he prepared with Barber. (Ex. 36, Pyburn Dep., at 33:25-34:8, Dep. Ex. 02.)

20         **278.    Dr. Pyburn has been a licensed psychologist since 2004, in the areas of
    preemployment screenings and fitness for duty examinations, primarily on police**
21  **and public safety clientele. [Pyburn Decl. ¶ 1— (Ex. 35)]**
22

23

24         **Responses and Objections:** Not disputed.

25         **279.    Dr. Pyburn conducted a psychological fitness for duty evaluation of
    Walt Hunter on May 26, 2016. [Pyburn Dep. 31:9-14 & Ex. 1 at p. 1 (Ex. 36)]**
26

27

28         **Responses and Objections:** Not disputed.

1

2   **280.    Dr. Pyburn typically gives the officers a series of psychological tests,**
3   **including tests designed to detect personality disorders specific to public safety**
    **personnel. [Pyburn Dep. 10:8-11:19 & Ex. 1 at p. 5 (Ex. 36)]**

4

5       **Responses and Objections:** Not disputed.

6

7   **281.    According to Dr. Pyburn, psychopathological functioning is not static**
    **and therefore psychopathology measurements can change in a matter of weeks;**
8   **however, personality traits are intrinsic and not subject to change in the short-**
    **term." [Pyburn Dep. 48:23-49:12 (Ex. 36—)]**
9

10      **Responses and Objections:** Not disputed, but she said that "psychological
11  functioning is not static," not psychopathological functioning. (Ex. 36, Pyburn Dep., at
12  49:5-12.)
13

14  **282.    Dr. Pyburn found Hunter was "NOT fit to return to duty in full law**
15  **enforcement. [Pyburn Dep. Ex. 1 at p. 6 (Ex. 36)]**

16

17      **Responses and Objections:** Not disputed.

18

19  **283.    Dr. Pyburn suggested that Hunter be placed on FMLA leave and**
    **subject to a re-evaluation before being cleared to return to work. [Pyburn Dep. Ex.**
20  **1 at p. 6 (Ex. 36)]**

21

22      **Responses and Objections:** Not disputed.

23

24  **284.    When Hunter left the squad briefing room, he believed that he was**
    **eventually going to be terminated and was upset about what had occurred in the**
25  **squad briefing. [Hunter Dep. 3, 65:16-23 (Ex.37)]**

26

27      **Responses and Objections:** Not disputed.

28

1

2

285.    When Hunter got the May 4, 2016 memorandum from Sgt. Campbell advising that he was being placed on administrative leave, it upset him. [Hunter Dep. 3, 65:24-65:4, 66:25-67 & Ex. 2 (Ex. 37)]

3

4

**Responses and Objections:** Not disputed.

5

6

7

8

286.    Hunter testified that the entire time he was on administrative leave after getting Sgt. Campbell's memo was very stressful because FPD personnel could drop by at any time, could call him in at any time, and he felt he could be fired at any time. [Hunter Dep. 3, 67:2-11; 68:8-69:23 (Ex. 37–)]

9

10

**Responses and Objections:** Not disputed.

11

12

13

14

15

287.    On June 28, 2016, based on the results of Hunter's fitness for duty evaluation, the Town informed Hunter that his leave qualified as FMLA leave, that he would be required to exhaust available paid leave, that any additional FMLA leave needed thereafter would be unpaid, and that he would be required to undergo a follow-up examination to determine his ability to return to work. [Barber Decl. ¶ 13–Ex. 2— (Ex. 34)]

16

17

**Responses and Objections:** Not disputed.

18

19

20

288.    Hunter complains that, while he was on FMLA leave, employees Tom Clifford and Ken Burnside volunteered to donate time to him but the Town denied it. [Hunter Dep. 2, 22:18-23:23 (Ex. 32)]

21

22

**Responses and Objections:** Not disputed.

23

24

25

289.    Hunter is aware that officers receive emails from the Town regarding the option of donating time to others who need it. [Hunter Dep. 2, 23:18-23 (Ex. 32)]

26

27

**Responses and Objections:** Not disputed.

28

290.    While Hunter was on FMLA leave, the Town sent numerous emails to Town employees inquiring whether anyone wanted to donate leave to him. [Declaration of Virginia Felix ("Felix Decl.") ¶¶ 2-3 (Ex. 38)]

**Responses and Objections:** Not disputed.

291.    Town policy explicitly states what kind of leave time can be donated to another employee. No one offered to donate leave that could be used by Walt Hunter under the Town's policy. [Felix Decl. ¶¶ 4-6 (Ex. 38)]

**Responses and Objections:** Disputed. Hunter testified that both Tom Clifford and Ken Burnside offered to donate their time to him. (Ex. 34, Hunter Dep. II, at 22:22-23:13, 24:13-15.)

### Hunter's 2017 Termination

292.    Hughes requested the assistance of the Apache Junction Police Department to investigate the incident. Hughes elected to use an outside agency in order to ensure neutrality. On November 21, 2016, the investigation was assigned to Lt. Jeff Kirkham. [Hughes' Decl. ¶ 62-64 —Ex. — p. 3 (Ex. 17)]

**Responses and Objections:** Disputed in part. Hughes did not testify that it was specifically to ensure neutrality. On November 21, 2016, Hughes requested that the Apache Junction conduct an internal investigation on behalf of the Town into Hunter's actions in the May 4th incident, due to Hunter's ongoing lawsuit against both himself and the Town. (Ex. 03, Hughes Dep. III, at 587:15-588:11, Dep. Ex. 81 at 3.)

293.    Kirkham interviewed Hunter as part of the investigation upon Hunter's return to duty, after Pyburn's fitness for duty clearance. [Hughes Decl. ¶ 65 Ex. F, ¶ 70 (Ex. 17 —Ex. —(Ex. )]

- 83 -

**Responses and Objections:** Not disputed. On December 15, 2016, Lt. Kirkham interviewed Hunter in connection with the internal investigation. (Ex. 03, Hughes Dep. III, Dep. Ex. 81 at 11.)

**294.    Hunter did not ask that the meeting with Kirkham be postponed. [Hunter Depo. Vol 3 p. 51, line 25 – p. 52, line 2 (Ex. 37)** ~~Hughes Decl. ¶___ (Ex. 37_)~~**]**

**Responses and Objections:** Not disputed. (Ex. 35, Hunter Dep. III, at 51:25-52:2.)

**295.    During his interview with Kirkham, Hunter admitted that he had secretly recorded the squad briefing incident. [Hughes Decl. ¶ 65_ Ex. F__ (Ex17)]**

**Responses and Objections:** Not disputed.

**296.    While Hunter acknowledged to Kirkham an understanding that secretly recording other officers would violate department policies, Hunter expressed no remorse for his actions, instead indicating that he was "glad" he had recorded the meeting, and that his actions were justified for "self protection." [Hughes Decl. ¶ 65** ~~Ex.___~~ **(Ex.17)]**

**Responses and Objections:** Disputed to the extent that whether or not he expressed remorse is a completely subjective opinion, not a fact.

**297.    Hunter also raised his voice when making these statements to Kirkham, indicating that he obeyed the prohibition on secret recordings until he started working with Hughes, "a pathological liar" who is "obsessed with ruining me." [Hughes Decl. ¶ 65** ~~Ex.___~~ **(Ex._17)]**

**Responses and Objections:** Not disputed. Kirkham's report stated that Hunter's tone became louder when he discussed his psychological evaluation, which was before his comment about Hughes being a pathological liar. (Ex. 03, Hughes Dep. III, at Ex. 81

at 13-14.)

**298.    The Town Police Department General Orders in effect under Chief Ingulli included the following as a basis for disciplinary action against an officer: Failure to report to an appropriate superior authority, incompetence, misconduct, inefficiency, neglect of duty, or any other form of misconduct or negligence of which the employee has knowledge. [Tryon Decl. ¶ 5– (Ex. 1)]**

**Responses and Objections:** Not disputed.

**299.    In his investigation report, Lt. Kirkham concluded that Hunter had knowingly violated FPD Rules of Conduct regarding insubordination and conduct unbecoming by engaging continuing his "argumentative and disrespectful" communication toward command personnel after being told by a superior officer to stop. [Hughes' Decl. ¶ 65— Ex. F— p. 6 (Ex. 17—)]**

**Responses and Objections:** Not disputed.

**300.    Lt. Kirkham's investigation further concluded that Hunter "knowingly violated policy by surreptitiously recording Florence Police Department personnel" during the briefing incident, which constituted seven separate violations of the policy based on the number of people at the squad briefing. [Hughes' Decl. ¶ 65— Ex. F— p. 6 (Ex. 17)]**

**Responses and Objections:** Not disputed.

**301.    On January 24, Hughes issued to Hunter a "Notice of Termination Recommendation," in which he notified Hunter that he intended to recommend that the Town Manager terminate Hunter's employment based on the combination of Hunter's prior disciplinary record, Hunter's insubordinate conduct during the May 4, 2016 squad briefing incident, which demonstrated a serious lack of respect for Hughes as Chief, and for Hunter's conduct in secretly recording the incident. [Hughes' Decl. ¶ __ Ex. __ (Ex. 17)]**

**Responses and Objections:** Disputed to the extent it varied from the Notice, which speaks for itself.

- 85 -

1

2          **302.    In March 2017, Brent Billingsley was the Town Manager for the
Town of Florence. Billingsley made the decision to terminate Hunter's**
3    **employment. [Billingsley Dep. 15:21-24 (Ex. 39–)]**

4

5          **Responses and Objections:** Not disputed.

6

7          **303.    Chief Hughes sent Billingsley a memorandum dated February 2,
2017, in which he recommended that Hunter be terminated. [Billingsley Dep.**
8    **53:13-18 & Ex. 10 (Ex. 39–)]**

9

10         **Responses and Objections:** Not disputed.

11

12         **304.    After he reviewed the Chief's memorandum, Billingsley did
substantial research concerning the information in the memorandum that**
13    **convinced him that termination was warranted. [Billingsley Dep. 25:19-26:12 (Ex.
39)]**

14

15         **Responses and Objections:** Disputed. There are several key pieces of evidence,

16    which Billingsley did not consider during his investigation into Hughes' memorandum.

17    Billingsley did not consider Hunter's mental state when he decided to terminate Hunter.
18
(Ex. 15, Billingsley Dep., at 74:2-76:10.) At the time Billingsley decided to terminate
19
Hunter, he was aware that Dr. Pyburn had identified anger, defiance, and disrespect to
20
21    authority as the most telling symptoms of a relapse of major depression. (*Id.* at 86:9-14.)

22    However, Billingsley did not consider whether Hunter's behavior was a sign that he
23
had, in fact, relapsed. (*Id.* at 87:9-12.) In addition, Billingsley was not aware of the 2012
24
25    DPS investigation into Tryon's alleged evidence tampering when he decided to

26    terminate Hunter. (*Id.* at 93:22-97:22.) Furthermore, Billingsley did not independently

27

28

verify the allegations pertaining to Hunter's record of disciplinary action. (*Id.* at 90:25-91:5.)

**305.    Billingsley then sent a memorandum to Barber, dated February 21, 2017, regarding "Notice of Intent to Terminate Walt Hunter's Employment," for delivery to Hunter [Billingsley Dep. 55:8-25 & Ex. 12 (Ex. 39–)]**

**Responses and Objections:** Not disputed.

**306.    Hunter responded to the Notice with a memorandum. [Billingsley Dep. 93:1-4 & Ex. 13 (Ex. 39–)]**

**Responses and Objections:** Not disputed.

**307.    After receiving Hunter's response, Billingsley reviewed the questions Hunter had raised and decided that his initial conclusion that termination was warranted was correct. [Billingsley Dep. 25:19-26:17 (Ex. 39–)]**

**Responses and Objections:** Disputed. In Hunter's February 24, 2017 response, Hunter requested that Billingsley seriously consider Hughes' acts of retaliation and investigate them. (Ex. 15, Billingsley Dep., at 21:19-22:6, Dep. Ex. 13 at 1.) Billingsley testified that although he took Hunter's complaints very seriously, he did not believe it was his responsibility to investigate whether or not the retaliation occurred. (Ex. 15, Billingsley Dep., at 24:21-27:8.) Instead, according to Billingsley, it was the Human Resources Department and PCAO's job to conduct such an investigation. (*Id.* at 27:14-18.) However, Billingsley was unaware of whether Scott Barber, the head of the Human Resources Department, actually investigated Hunter's retaliation reports. (*Id.* at 27:17-28:24.) In addition, Billingsley was not concerned that Hughes retaliated against any other subordinates at the FPD, despite Varnrobinson's reports of retaliation. (*Id.* at 34:19-35:24.)

**308.   As a result, Billingsley sent a letter to Hunter notifying him that his employment was terminated. [Billingsley Dep. 97:23-98:1 & Ex. 14 (Ex. 39_)]**

**Responses and Objections:** Not disputed.

**309.   While Chief Hughes' recommendation memorandum included a record of prior discipline, Billingsley focused on three points: surreptitious recordings, insubordination, and conduct unbecoming of an officer. [Billingsley Dep. 54:7-18 (Ex. 39_)]**

**Responses and Objections:** Not disputed.

**310.   He read all the written statements propounded by the individuals who were at the squad briefing meeting and also reviewed the audio of the briefing; he also reviewed the IA report and later reviewed the interviews of those officers who were at the briefing. [Billingsley Dep. 60:3-19, 67:5-7, 68:2-12 (Ex. 39_)]**

**Responses and Objections:** Disputed in part. Billingsley was not aware that four of the five witnesses to the May 4th incident whose depositions were taken testified under oath that they did not think Hunt's conduct on May 4th warranted termination. (Ex. 15, Billingsley Dep., at 73:2-11.)

**311.   Billingsley determined that Hunter had not only displayed anger and disrespect for authority at the May 4th briefing, but also during the interview of the IA investigator after he had been released to return to full-time duty. [Billingsley Dep. 79:3- 24 (Ex. 39_)]**

**Responses and Objections:** Not disputed.

**312.   Billingsley has had a minimal amount of contact with Lieutenant Tryon. [Billingsley Dep. 36:24-37:3 (Ex. 39_)]**

**Responses and Objections:** Not disputed.

313.    On March 27, 2013, per AZ POST requirements, Renee Klix submitted a Termination Report to AZ POST indicating that Hunter had been terminated for misconduct relating to FPD policy violations. [~~Klix Decl. ¶ ___ Ex. ___~~ ~~(Ex. __~~ Hughes Decl. ¶ 67 (Ex. 17)]

**Responses and Objections:** Disputed. Klix submitted the Termination Report to AZ POST on March 27, 2017. (Ex. 12, Klix Dep. II, at 312:19-24.)

314.    Hunter has no knowledge as to what information the Town submitted to AZ POST in March 2017, or as to who, if anyone, from the Town was in direct communications with AZPOST at that time. [Hunter Dep. 3, 92:19-93:2, 93:3-7 (Ex. 37~~-~~)]

**Responses and Objections:** Not disputed.

315.    As far as Hunter knows, AZ POST has not taken any disciplinary action against him in 2017. [Hunter Dep. 3, 93:8-12 (Ex. 37~~-~~)]

**Responses and Objections:** Disputed in part. As of October 2, 2017, Hunter was not aware of any disciplinary action that AZPOST has taken against him. (Ex. 35, Hunter Dep. III, at 93:8-12.)

**Hunter and Varnrobinson's Contention that Florence**

**Placed Them on the PCAO Brady List**

316.    The PCAO maintains a Law Enforcement Integrity Database, which has also been referred to as the "Brady list" or "Disclosure List." [James Heard Dep. ("Heard Dep.") 8:12-10:3, attached as Ex. 40~~-~~]

**Responses and Objections:** Not disputed.

317.    To meet the disclosure requirements of Arizona Rule of Criminal Procedure 15.1 and relevant case law, the PCAO keeps track of officers who might have had issues investigated by internal affairs, issues with internal discipline,

**criminal charges raised against them, or similar conduct issues. [Heard Dep. 8:22-9:16 (Ex. 40‑)]**

**Responses and Objections:** Disputed. The PCAO does not have any rationale for why it includes officers on the Brady List or Disclosure List. (Ex. 37, Heard. Dep., at 19:23-22:14):

Q. BY MR. WHELAN: But you can't state with certainty why Officer Hunter was placed on the disclosure list back in 2014?

A. No.

Q. Is the same true for Officer Varnrobinson?

A. It would be.

**318.     In a letter to Chief Hughes dated April 12, 2013, PCAO Law Enforcement Liaison John Stevens, reminded "all departments and agencies that our office has a legal and ethical obligation to disclose evidence that could lead to or be used for impeachment of police officers and departmental employees pursuant to Brady v. Maryland and its progeny." [Heard Dep., Ex. 3; FLORENCE.014533(Ex. 40‑)]**

**Responses and Objections:** Not disputed.

**319.     Stevens' letter requested police agencies in Pinal County, including the Florence Police Department, to notify the PCAO of adverse investigative findings relating to the credibility of officers, including: findings of misconduct involving untruthfulness; findings of misconduct indicating bias or prejudice to a class or group of persons or to specific persons; findings and misconduct involving neglected duty, conduct unbecoming of an officer or failure to perform assigned duties; conviction of a crime; patterns of improper use of force; and existence of a credible allegation of any of the aforementioned misconduct that is subject of an ongoing investigation. [Heard Dep., Ex. 3; FLORENCE.014533 (Ex. 40‑)]**

**Responses and Objections:** Not disputed.

1    **320.    There was a full 9 or 10 member committee that considered**

2    **Plaintiffs' initial placement in the Law Enforcement Integrity Database ("LEID")**

3    **in 2014. [Declaration of Matt Long ("Long Decl."). at ¶ 3— (Ex. 44–)]**

4

5    **Responses and Objections:** Not disputed.

6

7    **321.    Among those committee members, there was a substantial amount of**

8    **discussion concerning Plaintiffs' conduct during the MH interview, about which**
     **several members of the committee were personally aware. [Long Decl. at ¶ 4 (Ex.**

9    **44)]**

10

11   **Responses and Objections:** Not disputed.

12

13   **322.    In a letter to Hunter dated February 4, 2014, the PCAO invited**
     **Hunter to submit information as to why he should not be included in the database.**

14   **[Feb. 4, 2014 Letter to Detective Walt Hunter from John Stevens, Pl. Hunter's Obj.**
     **and Resp. to Def. Daniel Hughes' First Req. for Produc. of Docs. to Pl. Walt**

15   **Hunter, Req. 1. (PLAINTIFFS002840)]**

16

17   **Responses and Objections:** Not disputed.

18

19   **323.    Hunter has no firsthand knowledge of who made the decision to place**
     **him on the PCAO Brady List. [Hunter Dep. 1, 180:22-182:4 (Ex. 6–)]**

20

21   **Responses and Objections:** Not disputed.

22

23   **324.    On February 24, 2014, Edmundo Robaina, attorney for Walt Hunter,**

24   **presented information to the LEID Committee regarding the Committee's**
     **potential placement of Walt Hunter's name in the LEID. [Heard Dep., Ex. 5;**

25   **FLORENCE.014750 (Ex. 40–)]**

26

27   **Responses and Objections:** Not disputed.

28

1

2

3

4

**325.     In a letter dated March 4, 2014, PCAO Law Enforcement Integrity Database Committee Chair Russell J. Anderson informed Robaina that, after carefully considering the facts and Robaina's argument before the Committee, "the Committee unanimously determined that Det. Hunter shall be included in the Law Enforcement Integrity Database" (emphasis in original). [Heard Dep., Ex. 5 (Ex. 40); FLORENCE.014750]**

5

6

**Responses and Objections:** Not disputed.

7

8

9

10

11

12

**326.     In a letter dated March 4, 2014, PCAO Law Enforcement Integrity Database Committee Chair Russel J. Anderson informed Jarris Varnrobinson that, after carefully considering the facts and argument before the Committee, including materials submitted by the FPD concerning Varnrobinson's conduct and additional materials provided by attorney Edmundo Robaina, "the Committee unanimously determined that you shall be included in the Law Enforcement Integrity Database" (emphasis in original). [Heard Dep., Ex. 4 (Ex. 40); FLORENCE.014749]**

13

14

**Responses and Objections:** Not disputed.

15

16

17

18

**327.     In 2017, the PCAO Law Enforcement Integrity Database Committee ("Committee") was made up of Heard, Chief Deputy David Rodríguez, the four bureau chiefs of the various units in the trial division, the Chief Criminal Investigator, and occasionally a senior attorney will sit in. [Heard Dep. 24:4-14 (Ex. 40)]**

19

20

21

22

23

**Responses and Objections:** Not disputed. The four bureau chiefs on the committee are Jill Sosin, Thomas McDermott, Patrick Chapman, Shawn Jensvold, and Mike Keck. (Ex. 37, Heard Dep., at 24:10-13.)

24

25

26

**328.     The Committee members will either receive a summary from Heard relating to an officer's situation, or access the database to review information about the officer. [Heard Dep. 24:15-25:25 (Ex. 40)]**

27

28

**Responses and Objections:** Not disputed. This happens when the Committee is considering whether or not to put someone on the disclosure list. (Ex. 37, Heard Dep., at

1   24:15-25:1.)

2

3       **329.    The Committee discusses each officer and then the Committee holds an open voice vote to determine whether the officer should be maintained on the Disclosure List. [Heard Dep. 25:3-10 (Ex. 40)]**

4

5       <u>**Responses and Objections:**</u> Not disputed.

6

7       **330.    Since Heard has been Committee Chairman, all Committee votes have been unanimous. [Heard Dep. 25:11-14 (Ex. 40)]**

8

9

10      <u>**Responses and Objections:**</u> Not disputed. Heard testified that, to his knowledge,

11  all votes have been unanimous since he became Chairman. (Ex. 37, Heard Dep., at

12  25:11-14.)

13

14      **331.    On April 10, 2017, Deputy County Attorney – Heard emailed the Town with a list of information that the Law Enforcement Integrity Database**

15  **Committee takes into account when considering whether to place an officer on the law enforcement disclosure list, which includes: (1) Misconduct reflecting on the**

16  **truthfulness or possible bias of an employee, including a finding of lack of candor during a criminal, civil, or administrative inquiry or proceeding; (2) any past or**

17  **pending criminal charge brought against the employee; (3) any allegation of misconduct bearing upon truthfulness, bias, or integrity that is the subject of a**

18  **pending investigation; (4) prior findings by a judge that an employee has testified untruthfully, made a knowing false statement in writing, engaged in**

19  **an unlawful search or seizure, illegally obtained a confession, or engaged in other misconduct; (5) policy or procedure violations of a substantive nature, or a pattern**

20  **of minor violations, including failure to follow agency requirements for recording**

21  **communications and obtaining consent to record communications; (6) information that suggests an employee is biased for or against a defendant; and (7) information**

22  **that reflect that the agency employee's ability to perceive and recall truth is**

23  **impaired. [Heard Dep. 31:16-33:8 & Ex. 7 (produced at FLORENCE.014768-769) (Ex. 40)]**

24

25

26      <u>**Responses and Objections:**</u> Not disputed, except to the extent it varies from the

27  email, which speaks for itself.

28

1

2

3

**332.    On April 19, 2017, Town Attorney Clifford Mattice responded to Heard's request with documents containing relevant information based on to the criteria listed in Heard's request to the Town. [Heard Dep., Ex. 7; FLORENCE.014768-76 (Ex. 40)]**

4

5

**Responses and Objections:** Not disputed.

6

7

8

**333.    When considering whether to maintain Plaintiffs on the Disclosure List in 2017, the Committee reviewed information submitted back in 2013 or 2014, in addition to information submitted in 2017. [Heard Dep. 27:20-24 (Ex. 40)]**

9

10

**Responses and Objections:** Not disputed.

11

12

13

**334.    When voting whether or not to include an officer on the Disclosure List, each Committee member reaches a decision based on his or her own rationale. [Heard Dep. 20:6-14 (Ex. 40)]**

14

15

**Responses and Objections:** Not disputed.

16

17

18

19

**335.    When considering whether to keep Hunter on the list in 2017, the Committee received documents from Florence Town Attorney Cliff Mattice, internal affairs investigation documents from the Apache Junction Police Department, and documents submitted by Hunter's counsel, including the complaints Hunter has filed against the Town. [Heard Dep. 42:10-25; 43:16-44:23; Ex. 7 (Ex. 40)]**

20

21

22

**Responses and Objections:** Not disputed.

23

24

**336.    The Committee determined that both names should be maintained on the Law Enforcement Disclosure List. [Heard Dep. 45:16-46:2; & Ex. 9 (FLORENCE.014534) (Ex. 40)]**

25

26

**Responses and Objections:** Not disputed.

27

28

**337.    When voting that Walt Hunter should remain on the Disclosure List, Jim Heard was influenced by the fact that Hunter admitted to persistently**

**violating the Florence PD's policy against audiotaping others, by recording Chief Hughes and other FPD personnel, without their knowledge. [Heard Dep. 27:25-28:21 (Ex. 40)]**

        **Responses and Objections:** Not disputed that that was Heard's rationale, but disputed that Hunter "persistently" violated the policy against unauthorized recording, as the only evidence on record is the single May 4, 2016 briefing room incident.

        **338.    Heard also based his decision on the cumulative effect of Varnrobinson's surreptitious audiotaping of Greg Hazard, Varnrobinson's inadequate police reports and recordkeeping, and Varnrobinson's improper use of Town computers to work on issues related to his personal business. [Heard Dep. 29:12-24; 34:11-35:21; Ex. 7 (Ex. 40)]**

        **Responses and Objections:** Not disputed that that was Heard's rationale.

        **339.    Hughes did not ask the PCAO to put Plaintiffs on the Brady List and did not ask the PCAO to investigate the allegations against them that formed the bases for their terminations. [Hughes Dep. 1 (Vol. 1) 321:15-21 (Ex. 16–); Hughes' Decl. ¶ 68— (Ex. 17–)] Varnrobinson's Complaint That FPD Contacted the Town of Superior Chief**

        **Responses and Objections:** Disputed. On November 6, 2013, Hughes sent Mr. John Stevens, then-Investigator at the PCAO, information regarding whether Hunter and Varnrobinson could be put on the Brady List. (Ex. 02, Hughes Dep. II, at 373:19-377:4.)

        **340.    Varnrobinson applied for positions of Police Office and Reserve Police Officer with the Town of Superior during Neuss' tenure with the Superior Police Department. [Neuss Dec. at ¶ 2, Ex. 1 to Neuss Depo. (Ex. 41)]**

        **Responses and Objections:** Not disputed. (Ex. 38, Neuss Dep., at 8:7-17.)

        **341.    Neuss was contacted by a personal friend, William Tatlock, who offered an opinion, in an unofficial capacity, that Neuss should not hire Varnrobinson. The only reason Chief Neuss could recall Tatlock giving for his**

**opinion was Varnrobinson's attitude. [Neuss Dep. 8:17-9:19, 11:11-25, 24:11-18 (Ex. 41~); Neuss Dec. ¶ 3, Ex. 1 to Neuss Depo. (Ex. 41) Ex. 41~)]**

**Responses and Objections:** Not disputed. Klix and Bill Caldwell from the AZPOST also contacted Chief Neuss to discuss Varnrobinson, which "ticked off" Chief Neuss. Accordingly, he told Hughes to have people stop calling. (Ex. 38, Neuss Dep., at 16:5-19:12.)

**342.    Neuss did not care what reasons were given, because he had decided that he was going to hire Varnrobinson anyway, and did hire him as a Reserve Officer. [*Id.* at ¶ 6. [Neuss Dep. 11:2-7 (Ex. __), Neuss Dec. at ¶ 6 (Ex. __)]**

**Responses and Objections:** Not disputed.

**343.    Neuss also was contacted by several other people not with the Town of Florence who offered very similar opinions about whether he should hire Varnrobinson. [*Id.* at ¶ 4; Neuss Dep. 25:2-25 (Ex. 42~); Neuss Dec. at ¶ 4 (Ex. __)]**

**Responses and Objections:** Not disputed.

### The Conspiracy Claim

**344.    On July 25, 2016, Plaintiffs' submitted responses to Defendants' interrogatories seeking all relevant information related to Plaintiffs' conspiracy claims. In those responses, Plaintiffs simply restate the same allegations asserted in their other claim, without providing any facts to show that any consequences had taken place instead, plaintiffs stated that as to each defendant, and that they "lack knowledge" beyond those facts as to when or how each defendant supposedly conspired. [Pls.' Resps. To Defs.' Interrogs. relating to conspiracy, Ex. 42__];**

**Responses and Objections:** Disputed. Plaintiffs' interrogatory responses speak for themselves.

**345.    Pls.' Resps. To Defs.' Interrogs. relating to defamation, Ex. 43__]**

**Responses and Objections:** n/a

**346.     Varnrobinson has no knowledge that Rankin communicated to Patel that he wanted Varnrobinson terminated. [Varnrobinson Dep. 50:13-16] (Ex. 12)**

**Responses and Objections:** Disputed. During his deposition, Rankin admitted to telling Patel that he wanted Hunter and Varnrobinson fired. (Ex. 05, Rankin Dep., at 231:5-232:14) Varnrobinson therefore has knowledge of this fact. Varnrobinson is also aware that Rankin told others that he wanted to fire Ingulli, Hunter, and Varnrobinson when he became Mayor. (Ex. 27, Varnrobinson Dep. II, at 50:19-51:1.)

**347.     Varnrobinson testified that, as to Patel, he "assumes he must have gotten something" out of Plaintiffs' terminations, but he has no idea what that is. [Varnrobinson Dep. 46:20-47:2] (Ex. 12)**

**Responses and Objections:** Not disputed.

**348.     Varnrobinson never heard Patel make any racial comments. [Varnrobinson Dep. 47:3-5]**

**Responses and Objections:** Not disputed.

## Plaintiffs' Defamation Allegations

**349.     In response to interrogatory responses served on _____, Plaintiffs alleged the following statements as the bases for their defamation claims:**
        **a. Hughes testified in Hunter's post-termination appeal hearing on September 10, 2013, that Hunter should not use his personal email system for work because, for example, some of their cases involve "child pornography";**
        **b. Hughes testified in Varnrobinson's September 24, 2013, posttermination appeal hearing that Varnrobinson had recorded a meeting with Hughes and other offices using a recorder "around his kneck [sic]and**

down the front of his shirt," implying that Varnrobinson had intentionally concealed the recorder;

c. Hughes wrote in his November 8, 2012, written notice of intent to terminate Plaintiffs' employment that:

i. PCAO attorneys were upset to have been recorded by Plaintiffs;

ii. Plaintiffs "took it upon themselves to reinvestigate this case in an effort to discredit fellow employees Tryon and Klix";

iii. "Deputy County Attorney Susan Crawford stated she will give me 5 or more cases that cannot be filed because of [Plaintiffs'] inability to conduct proper investigations";

iv. PCAO attorneys "made it quite clear they did not want cases from [Plaintiffs]"; and

v. "It was made clear that [Plaintiffs] had misled the County Attorneys' Office to believe they were no lead detectives on the Kemp case."

d. Plaintiffs complain that Hughes provided his recommendation with these statements to AZ POST and the PCAO, which were reviewing Plaintiffs' sworn officer certifications and inclusion in the County Attorneys' Integrity Database. As to the "quite clear" and "Kemp case" statements, Plaintiffs additionally complain that these matters were discussed at an AZ POST hearing with the press present.

e. Hughes told fellow Police Officer Klix that Plaintiffs "had taken it upon themselves to reinvestigate her case," which Hughes indicated made Klix "very upset" in his November 8, 2012, memo;

f. Town Mayor Rankin told a Phoenix New Times reporter in November or December 2013 that "I never would have hired those two," referring to Plaintiffs;

g. Assistant Town Manager Jess Knudson, on or about June 18, 2014, issued a statement to the media stating that: Plaintiffs did not meet the standards for detectives set by the law enforcement community that are required to provide sound public safety services to our residents; PCAO has placed [Plaintiffs] on the Law Enforcement Integrity Database based on their job performance"; and "an independent hearing officer supported the Town's claims that [Plaintiffs] acted inappropriately when working as detectives in the Florence Police Department, including violations of multiple provisions of the Town's personnel policies."

**Responses and Objections:** Disputed. Defendants do not identify which particular interrogatory reponse is purportedly quoted here, so Plaintiffs must dispute this SOF.

350.    Plaintiffs served notices of claim on the Town and Chief Hughes on approximately June 6, 2014, true copies of which are attached. [Patel Dec. ¶ 19___; Hughes Decl. ¶ 69___ (Ex. 17)].

**Responses and Objections:** Not disputed.

351.    The only statements that Hunter recalls Mayor Rankin making that Hunter believes was false were that, in newspaper, Rankin stated that Hunter and Varnrobinson should not have been hired and also stated they should have been fired years ago. Hunter believes that Rankin should not have been stating his "opinion" in the newspaper. [Hunter Dep. 1, 292:12-293:3, 293:25-294:3, 294:13-14 (Ex. 6_)]

**Responses and Objections:** Not disputed.

352.    Hughes never provided any information about Hunter or Varnrobinson to ABC news. [Hughes Dep. 1 (Vol. 2) 380:14-381:2]

**Responses and Objections:** Disputed. Hughes testified that he was not familiar with Navideh Forghani, a reporter at ABC15, and that he did not forward her written information. (Ex. 02, Hughes Dep. II, at 383:9-25.) On February 19, 2014, Ms. Forghani requested information regarding Hunter and Varnrobinson from the Florence Public Information Officer, Larry Lawrence. (*Id.* at 385:2-386:7.) The following day, on February 20, 2014, Hughes sent Ms. Forghani, information about the MH case, which was one of the cases that Hunter and Varnrobinson allegedly mishandled. (*Id.* at 384:3-385:1.) In addition, Hughes testified that he could not recall whether or not he told Ms. Forghani that there were five cases that the County attorneys stated Hunter and Varnrobinson mishandled. (*Id.* at 388:14-17.) Hughes was also unsure whether he told Ms. Forghani that Hunter and Varnrobinson were on the Brady List. (*Id.* at 389:10-18.)

See also FLORENCE.ESI.000564.

**Hunter's Second Evaluation by Dr. Pyburn**

353.    Dr. Pyburn conducted a psychological fitness for duty re-evaluation of Hunter on October 3, 2016. [Pyburn Dep. 62:16-23 & Ex. 5 at p. 1 (Ex. 36–)]

**Responses and Objections:** Not disputed.

354.    Hunter provided Dr. Pyburn with audio recording he had made of the squad briefing incident, which she listened to. Based on the recording, she saw him "as much interrogatories seeking all relevant information related to Plaintiffs' conspiracy claims. In those responses, Plaintiffs simply restate the same allegations asserted in their other claim, without providing any facts to show that any consequences had taken place instead, plaintiffs stated that as to each defendant, and that they "lack knowledge" beyond those facts as to when or how each defendant supposedly conspired. [Pls.' Resps. To Defs.' Interrogs. relating to conspiracy, Ex. 42——];

**Responses and Objections:** Unable to admit or dispute, as the Defendants have failed to assert a comprehensible fact.

355.    Dr. Pyburn also found the tone that Hunter had used during the incident had been "confrontational, angry and defensive," that "[h]is statements were at least disrespectful," and that Hunter "lost control in his confrontation with the chief." [Pyburn Dep. 75:18-20 & Ex. 5 (Ex. 36–)]

**Responses and Objections:** Not disputed.

356.    In addition, Hunter's test results regarding his personality profile also indicated that "his anger management is pretty high risk. He is a kind of in your face kind of guy." [Pyburn Dep. 70:2-71:1, 71:11-12, 72:3-9, 73:25-74:2 (Ex. 36–)]

**Responses and Objections:** Not disputed.

357.    Nevertheless, Dr. Pyburn concluded that Hunter's previous depression was now in remission, and that he was therefore "fit to return to duty at the present time. However, law enforcement personnel need to be capable of sound decisions and ability to control emotions, particularly anger and feelings of irritability. . . Disrespect or poor attitude should be dealt with through progressive

1    discipline, if needed." [Pyburn Dep. Ex. 5 at pp. 5-6 (Ex. 36–)]

2        **Responses and Objections:** Not disputed. Dr. Pyburn also stated that Hunter

3
     was not a threat to himself or others. (Ex. 36, Pyburn Dep., at Ex. 05 at 6.)
4

5        358.    In later correspondence with Scott Barber, Dr. Pyburn stated: "Mr.
     Hunter has pre-existing personality and behavior symptoms that suggest he is not
6    a typical police officer," that Hunter's "personality profile suggests a high level of
     narcissism and lack of interpersonal awareness, and that "[t]hese personality
7    factors don't make him unfit, but a poor fit." [Pyburn Dep. 69:20-70:1 & Ex. 7 at
     p. 2 (Ex. 36–)]
8

9

10       **Responses and Objections:** Not disputed.

11

12       359.    Dr. Pyburn further opined:
     Issues of disrespect and poor attitude do not make Mr. Hunter unfit for
13   duty. They are personality qualities that may make him unpleasant and
     problematic. . . . His personality is not a good fit for law enforcement;
14   however, he doesn't have a specific mental health condition that would
     require accommodations or preclude him from doing the job if he chooses to
15   act appropriately. [Pyburn Dep. 69:20- 70:1 & Ex. 7 at p. 2 (Ex. 36–)]
16

17

18       **Responses and Objections:** Not disputed.

19       360.    Hunter alleges that, before Dr. Pyburn even completed her evaluation
     of him, the Town regarded Hunter as disabled and that his disability could not be
20   accommodated. Hunter came to this conclusion because of Pyburn's statement in
     her report that "[a] disability accommodation plan was considered for Officer
21   Hunter." [Hunter Dep. 2, 20:17-22:13 (Ex. 32–)] ~~However, Dr. Pyburn chose the~~
22   ~~accommodation language. *Cite~~

23

24       **Responses and Objections:** Not disputed.
25

26       361.    In her report and communications with the Town, Dr. Pyburn did not
     intend to suggest that Hunter had major depression at the time of the squad
27   briefing incident with Chief Hughes three weeks before she first met with him. Dr.
     Pyburn explained that major depression is a psychopathology that could change
28

**within a matter of weeks. Dr. Pyburn stated it is possible that Hunter had depression during the squad briefing incident, but it is at least equally as possible that he did not. [Declaration of Dr. Connie S. Pyburn, Ph.D. ("Pyburn Decl.") ¶ 5 (Ex. 35)]**

**Responses and Objections:** Disputed. In her deposition, Dr. Pyburn discussed listening to the audio recording of the May 4, 2016 briefing room incident and then testified: "We know he has depression, at least one episode of it here." (Ex. 36, Pyburn Dep., at 75:4-11.)

**362.    Even assuming that Walt Hunter had depression at the time of the squad briefing incident, Dr. Pyburn did not suggest that it was depression rather than his personality that caused his outburst with Chief Hughes. [Pyburn Decl. ¶ 6 (Ex. 35)]**

**Responses and Objections:** Disputed. Her deposition testimony suggests that the May 4th incident was a depressive episode. (Ex. 36, Pyburn Dep., at 75:4-11.)

**363.    Dr. Pyburn did not form or communicate any opinion that it was major depression, as opposed to his personality, that caused Hunter's outburst. [Pyburn Decl. ¶ 7 (Ex. 35)]**

**Responses and Objections:** Disputed. In her deposition, Dr. Pyburn discussed listening to the audio recording of the May 4, 2016 briefing room incident and then testified: "We know he has depression, at least one episode of it here." (Ex. 36, Pyburn Dep., at 75:4-11.)

**364.    At no time during his employment at the FPD did Hunter ever request an accommodation for any physical or emotional problem he was having. [Hunter Depo. Vol. 3, 19:25-20:4 (Ex. 37–)]**

**Responses and Objections:** Not disputed.

**365.   Hunter did not ask for his internal affairs interview related to the squad briefing incident be postponed. [Hunter Dep. 3, 51:25-52:2 (Ex. 37_)]**

**Responses and Objections:** Not disputed.

**366.   Hunter also was upset when he received Scott Barber's May 10, 2016, email relating to his squad briefing grievance. [Hunter Dep. 3, 72-9-73:4 ~~& Ex. 4~~ (Ex. 37_)]**

**Responses and Objections:** Not disputed.

**367.   When Hunter received a notice advising him that he was going to have to go for a psychological fitness for duty exam, having gone through Barber's "sham investigation," he became more convinced that he was going to be terminated and it was "extremely stressful." [Hunter Dep. 3, 74:11-75:1 (Ex. _)]**

**Responses and Objections:** Not disputed.

**368.   Hunter felt that there was no basis to send him for a fitness for duty exam. [Hunter Dep. 3, 75:12-14 (Ex. _)]**

**Responses and Objections:** Not disputed.

**369.   Hunter also felt that the Town would not send him to a psychologist who would be favorable to him. [Hunter Dep. 3, 75:15-25 (Ex. _)]**

**Responses and Objections:** Not disputed.

**370.   After Scott Barber sent Hunter a memo on December 16, 2016 indicating that there was a possibility of some type of transition plan upon return to full duty, Hunter never offered any suggestions or requests for a transition plan. [Hunter Dep. 3, 76:22- 77:6 & Ex. 6 (Ex. 37__)]**

**Responses and Objections:** Not disputed.

1

2

**371.   Based on Hughes' years of experience in law-enforcement, he believes**

3

**that it is a core function of any sworn officer position to be able to remain calm**

4

**under pressure. [Hughes' Decl. ¶ 72—(Ex. 17)]**

5

6

**Responses and Objections:** Not disputed.

7

8

**372.   Tom Rankin became Mayor-elect of the Town of Florence in**

**November 2011, and became the acting Mayor in June 2012. [Declaration of Tom**

9

**Rankin ("Rankin Decl.") ¶ 1 (Ex. 25—)]**

10

11

**Responses and Objections:** Not disputed.

12

13

**373.   Rankin did not make any recommendation or provide input**

**concerning whether Hunter or Varnrobinson should be terminated. In fact,**

14

**Rankin never discussed the issue with Chief Hughes or Himanshu Patel. [Rankin**

15

**Decl. ¶ 2 (Ex. 25)]**

16

**Responses and Objections:** Disputed. Following a April 3, 2012 confrontation

17

18

with Varnrobinson during the execution of a search warrant, Rankin repeatedly

19

complained to Lewis that the "n***er" Varnrobinson had threatened to arrest him. (Ex.

20

07, Lewis Dep., at 176:22-178:5.) Rankin also told Lewis that Varnrobinson no longer

21

"belong[ed]" with the FPD. (*Id.* at 179:25-180:15.)

22

Rankin complained to Town Manager Patel about Varnrobinson's actions during

23

24

the execution of the search warrant. (Ex. 05, Rankin Dep., at 151:21-153:5); (Ex. 47,

25

Rankin Resps. to Varnrobinson's 2d Set of Interrogs., at 6.)

26

27

28

Rankin told Patel that Plaintiffs should be fired. (Ex. 05, Rankin Dep., at 231:5-12.) In fact, Rankin told "a lot of people" that Plaintiffs should be fired. (*Id.* at 231:5-17.)

In late-June or early-July 2012, before Hughes started working as Interim Chief, Hughes, Rankin, and Patel met at a Cracker Barrel restaurant in Casa Grande. (Ex. 08, Ingulli Dep., at 83:14-84:7); (Ex. 05, Rankin Dep., at 131:8-132:10, 134:25-135:3, 142:25-143:13, 217:19-218:7, 219:15-221:13, 266:14-17, 299:5-18.) Rankin admits that he discussed Plaintiffs with Patel and Hughes, and told Hughes that Hughes should "look into" Plaintiffs' December 2010 interview of MH. (*Id.*)

At some time shortly before or shortly after Mayor-elect Rankin was sworn in as Mayor on June 11, 2012 (Ex. 19 at ¶ 17), Morris heard Rankin tell a group of FPD officers that Plaintiffs would be fired as soon as Hughes began working as Interim Chief. (Ex. 17, Adams Dep., at 61:3-22, 64:11-16.).

On July 4, 2012, Rankin told several FPD officers that Ingulli was going to be terminated and replaced by someone from Surprise. (Ex. 08, Ingulli Dep., at 82:13-20); (Ex. 16, Morris Dep. I, at 32:25-33:12.)

**374.    Plaintiffs' police issue expert, Ron Hergert, agrees that the crimes plaintiff suggested Tryon had committed require proof of intent to obstruct or intent to tamper. . [Hergert Dep. 8:1-10 (Ex. 14—)]**

<u>**Responses and Objections:**</u> Not disputed to the extent that Hergert testified that prosecuting obstruction of justice and tampering with evidence requires proof of intent. (Ex. 61, Hergert Dep. II, at 8:1-10.)

**375.    Prior to the time that the Town terminated Hunter's and Varnrobinson's employment, I was not aware that either of them had ever suggested that Terry Tryon had committed any crime. [Rankin Decl. ¶ 3 (Ex. 25)]**

1

2    **Responses and Objections:** Unable to admit or deny, as Defendants have failed

3    to identify to whom the "I" refers. However, assuming the Defendants intended to assert

4    that Rankin was unaware; this fact is disputed.

5       Rankin learned from Tryon that Tryon was under investigation, that Plaintiffs

6    made the allegations against him, and that DPS was "doing an investigation." (Ex. 05,

7    Rankin Dep., at 236:15-237:22.) The DPS investigation started in February 2012 and

8    ended in August 2012. (Ex. 29, DPS Investigation Report, at 3.) Tryon told Rankin the

9    allegations were "unfounded" and a "bunch of bullshit." (Ex. 05, Rankin Dep., at

10   236:15-238:4.)

11

12   **376.    As to whether it was reasonable for a police officer to believe that**
     **Tryon had obstructed justice or tampered with evidence, based on the evidence**
13   **available, Hergert testified that he "would say no." [Hergert Depo. at 21:18-23:5**
     **(Ex. 14)]**
14
     **Responses and Objections:** Disputed. After Varnrobinson filed his January 4,
15
     2012 complaint, in which he asserted his belief that Tryon had tampered with evidence
16
     by returning evidence in the desert rape case and the home invasion case, both Patel and
17
     Ingulli referred the complaint to DPS for investigation. (Ex. 29, DPS Investigation
18
     Report, at 3.) According to Hergert, this indicates that both Ingulli and Baroldy's
19
     superiors at DPS agreed that there was a reasonable basis to conduct a criminal
20
     investigation into Tryon's alleged conduct, as opposed to an administrative
21
     investigation, which is what Patel requested. (*Id.* at 7.) Hergert concluded that the fact
22
     that the evidence did not lead to criminal prosecution does not mean that Hunter and
23
     Varnrobinson did not reasonably believe Tryon's conduct was criminal. (*Id.*)
24
        Hergert testified that he only read a very heavily redacted version of the desert
25
     rape case report, which was "very hard to read…" (Ex. 61, Hergert Dep. II, at 8:11-17.)
26
     Hergert testified that based on the facts in the desert rape case report alone, it would not
27
     be reasonable for Hunter and Varnrobinson to believe Tryon intended to obstruct justice
28

or tamper with evidence. (*Id.* at 21:18-22:3.) However, Hergert also testified that the desert rape case cannot be taken out of the context of Hunter and Varnrobinson's overarching hostile work environment allegation. (*Id.* at 22:4-23:5.) In addition, Hergert stated that it was "certainly reasonable" for Hunter and Varnrobinson to believe Tryon returned the cell phones in the desert rape case with "improper intent." (Ex.61, Hergert Dep., at Ex. 01 at 8.) Hergert also opined that he believed there was room to "question Tryon's true intent with regard to the cell phones." *Id.* Furthermore, Hergert concluded that it was reasonable for Varnrobinson to believe that Tryon committed a crime in the home invasion case "by arbitrarily releasing the weapon without judicial review." (*Id.* at 5.)

**377.   As to whether it's reasonable to think that Tryon would obstruct an investigation because his son was on the football team and somebody at the party was on that team, taking into account that his son brought the girl to the police department and filled out a complaint form, Hergert agrees with Jack Harris: "I don't think it's reasonable, from my outside per looking at this, but not being one of the participants. [Id. at 25:12-26:7]**

**Responses and Objections:** Disputed. In his expert report, Hergert opines that Harris went "afield here" by asserting his opinions instead objectively evaluating whether Hunter and Varnrobinson's beliefs were reasonable. (Ex. 61, Hergert Dep., at Ex. 01 at 6.) In addition, Hergert testified that looking at everything in context, he did not think it was unreasonable that Hunter and Varnrobinson "had questions about [Tryon's] motives and put it in a memo that was then subsequently investigated, as it should have been." Hergert also testified that Tryon should not have been involved in the investigation from the beginning. (Ex. 61, Hergert Dep. II, at 25:12-28:13.)

**378.   Hergert also agreed that he did not personally believe that it's reasonable to believe that the lieutenant would commit a crime because he disliked Varnrobinson, but suggested that because Varnrobinson had prior experience with Tryon that caused him to believe that Tryon disliked him; he might feel that way.**

**[Id. at 28:22-29-30:7]**

> **Responses and Objections:** Not disputed. Hergert testified that it was not reasonable looking at this one event alone, but Varnrobinson had previous experiences with Tryon, which caused him to believe that Tryon disliked him. (Ex. 61, Hergert Dep. II, at 28:22-30:7.)

**379.     Although Hergert repeatedly agreed with Harris that if one looks at the objective evidence relating to the crimes Tryon was accused of, but he opines that the plaintiff's would be the best ones to answer whether their beliefs were reasonable because they felt that Tryon had created a hostile work environment for them. [Id. at 12:24-14:11; 21:18-24:19; 33:14-36:7]**

> **Responses and Objections:** Unable to admit or dispute, as the Defendants have failed to put forth a grammatically correct statement. Hergert repeatedly stated that Tryon should have spoken with Hunter and Varnrobinson, the detectives in charge, before returning any evidence. (Ex. 61, Hergert Dep. II, at 13:12-14:11, 29:8-30:16, 33:7-13, 34:22-35:8, 42:5-16.)

**380.     Hergert would request to Tryon's decision to return a weapon to its owner, Hergert testified: "I wouldn't have believed it. I would not, nor would you, or anyone else who knows only the facts, that the only facts and circumstances comprising the probable cause was the fact it was of the same caliber and that the gentleman was not in Varnrobinson's "shoes and experienced everything he had." [Id. at 33:14-36:7]**

> **Responses and Objections:** Unable to admit or deny, as Defendants have not set forth a comprehensible fact. However, the quotation is incorrect. Hergert testified that Tryon believed Varnrobinson had mistakenly taken Binkley's firearm; thus, Tryon thought it was necessary to return the firearm to Binkley without first discussing it with Varnrobinson. As to whether Hergert believed it was reasonable for Tryon to immediately release Binkley's weapons back to him, Hergert testified: "Can I say that he was unreasonable for seeing it as something wrong? Only if I was in his shoes and experienced everything he had…So I'm not willing to say he was unreasonable for

1    believing it, even though I say I wouldn't have believed it.  I would not, nor would you,

2    or anyone else who knows only the facts, that the only facts and circumstances

3    comprising this probable cause was the fact that it was of the same caliber and that the

4    gentleman was a white male." (Ex. 61, Hergert Dep. II, at 34:22-36:4.)

5

6    **381.    Hergert found it important that in the letter the Pinal County**
     **Attorney's Office sent indicating that they were not prosecuting Lt. Tryon, they**

7    **added language that the letter did not mean that they had found there was no**
     **crime committed Hergert assumed that the PCAO decided to include the language**

8    **when they had the option not to, based on their review of the DPS investigation**
     **report. [Id. at 48:22-50:1]**

9

10

11   **Responses and Objections:** Not disputed.

12

13   **382.    In 2012 and through present, the Florence Town Manager does not**
     **have the final authority to adopt personnel or employment-related policies relating**

14   **to termination or discipline, without the approval of the Town Council. Rather, the**
     **Town Manager must get Town Council approval before any personnel or**

15   **employment policies relates to termination or discipline are adopted by the Town.**
     **[Barber Decl. ¶3 (Ex. 2)]**

16

17   **Responses and Objections:** Section 01.01 of the Town of Florence Personnel

18   Policies and Procedures gives the Town Manager the authority to amend the Town's

19   personnel policies. Specifically, the Policy states that"[T]he Town Manager shall have

20   the authority to make such amendments, as mandated by local, county, state or federal

21   ordinance, regulation or law, and shall also have the authority to make non-substantive

22   amendments. Amendments shall be reported to the Town Council." (Ex. 30, Town of

23   Florence Personnel Policy.) Section 01.01 states further that "[n]one of these provisions

24   shall be deemed to . . . limit the power of the Town Manager to repeal or modify these

25   [personnel] policies." (*Id.*) In addition, Section 101 of the April 2013 revised personnel

26

27

28

policy states that "[t]he Town Manager is the final authority on all matters relating to

this Policy." (Ex. 14, Barber Dep. Ex. 01 at 3.)

Furthermore, Section 109 of the April 2013 revised personnel policy states that "[t]he

Town Manager shall have the authority to make such amendments, as mandated by

local, county, state or federal ordinance, regulation or law, and shall also have the

authority to make non-substantive amendments, which shall be reported to the Town

Council." (*Id.* at 5.) This language is identical to that of the 2007 version of the

personnel policy.

**383.    Plaintiffs served a notice of claim on the Town on approximately June 6, 2014. [Patel Decl. ¶ 19 (Ex. 5)]**

**Responses and Objections:** Not disputed.

**384.    Plaintiffs served a notice of claim on the Town on approximately June 6, 2014. [Hughes Decl. ¶ 69 (Ex. 17)]**

**Responses and Objections:** Still not disputed.

**385.    The job description for FPD Police Officer including the requirements that officers have "skill in establishing and maintaining effective working relationships with other officers," "communicating effectively with management," "being flexible and taking criticism constructively," "following internal procedures," "maintaining productive working relationships," "cultivating a positive work environment," and responding to calls and complaints involving potentially violent situations such as assaults, domestic disturbances, and fights. [Hughes Decl. ¶ 71 Ex. J (Ex. 17)]**

**Responses and Objections:** Disputed, because it is unclear when this job

description was effective. Not disputed except to the extent it varies from the written job

description, which speaks for itself.

1  Edmundo Robaina (#018125)
2  ROBAINA & KRESIN PLLC
   5343 N. 16th Street, Suite 200
3  Phoenix, Arizona 85016
   Telephone: (602) 682-6450
4  Facsimile: (602) 682-6455
5  epr@robainalaw.com

6  Lynne Bernabei (admitted *pro hac vice* July 8, 2014)
7  Peter M. Whelan (admitted *pro hac vice* January 12, 2016)
   Bernabei & Kabat, PLLC
8  1400 16th Street, N.W., Suite 500
9  Washington, D.C. 20036
   Telephone: (202) 745-1942
10 Facsimile: (202) 745-2627
   Bernabei@BernabeiPLLC.com
11 Whelan@BernabeiPLLC.com

12
   *Attorneys for Plaintiffs*
13
14             **UNITED STATES DISTRICT COURT**

15               **DISTRICT OF ARIZONA**

16 Walt Hunter and Jarris A.H.
17 Varnrobinson Vonzombie,
                                        No. 2:14-cv-01304-DMF
18           Plaintiffs,

19 v.                                    **PLAINTIFFS' STATEMENT**
                                         **OF ADDITIONAL FACTS THAT**
20                                       **ESTABLISH A GENUINE ISSUE OF**
21 Town of Florence; Daniel Hughes;      **MATERIAL FACT OR OTHERWISE**
   Himanshu Patel; Tom Rankin; Terry     **PRECLUDE SUMMARY JUDGMENT**
22 Tryon; Charles Montoya,

23           Defendants.

24

25

26

27        Plaintiffs Walt Hunter and Jarris Vonzombie, through undersigned counsel, and

28 pursuant to LRCiv 7.2(m) and LRCiv 56.1(b), hereby submit their statement of

                                    - 111 -

1  additional facts that establish a genuine issue of material fact or otherwise preclude
2  summary judgment.

3  **Florence Personnel**

4  1.      At all times relevant to Plaintiffs' 2012 terminations, the Florence Police
5  Department's (FPD) chain of command consisted of:

6          a.   Chief Robert Ingulli, whose employment was terminated on July 13, 2012
7               after serving for approximately twelve (12) years as Police Chief;

8          b.   Chief Ingulli's successor, Chief Daniel Hughes;

9          c.   Lieutenant Terry Tryon, second in command at the FPD;

10         d.   Five Sergeants: Scott Morris, Samuel Pankey, William Tatlock, Cynthia
11              Adams, and Don Campbell;

12         e.   Three Detectives, including Varnrobinson and Hunter, who worked
13              together as partners handling primarily violent crimes and property crime
14              cases, and Detective Renee Klix, who handled primarily sex crime cases;
15              and

16         f.   Approximately seventeen Patrol Officers. (Ex. 91, Varnrobinson Decl., at
17              ¶ 1(a)-(f).)

18  2.      Varnrobinson was the first African-American police officer or detective to
19  serve in the FPD. (*Id.* at ¶ 2.)

20  3.      Himanshu Patel served as Town Manager from the time of the earliest
21  relevant events in this case through December 14, 2012. (Ex. 06, Patel Dep., at 7:24-8:1,
22  135:20-23.)

23  4.      Charles Montoya served as Town Manager from January 2013 through July
24  13, 2015. (Ex. 10, Montoya Dep., at 41:1-12.)

25  5.      Brent Billingsley began working as Town Manager in December 2015 and
26  served in that role through the time of Hunter's 2017 termination. (Ex. 15, Billingsley
27  Dep., at 66-8.)

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Genuine Issue – Whether Defendants Created an Implied Agreement to Terminate Plaintiffs' Employment.**

6.      On <u>January 4, 2012</u>, Plaintiff Varnrobinson submitted a written complaint to Human Resources Director Jeanette Grady in which he alleged that Tryon had tampered with physical evidence in the Desert Rape and Home Invasion cases, and that Tryon's evidence tampering constituted a felony. (Ex. 06, Patel Dep. at Ex. 8, at 3.) Varnrobinson wrote the complaint with Hunter's assistance, and Hunter provided Varnrobinson with some of the information he needed to include in the complaint. (Ex. 90, Hunter Decl., at ¶ 2.)

7.      Hunter had submitted to Patel in May 2010 a similar complaint about Tryon's alleged evidence tampering, and suggested that Patel have an outside agency investigate the allegations. (Ex. 06, Patel Dep, at Ex. 6.) Patel refused. (*Id.* at 53:16-55:2.)

8.      As part of their typical job duties, FPD officers do not routinely write letters to the Town Manager and Human Resources Director alleging a pattern of interference with multiple criminal investigations by high-ranking officers, such as Lieutenant Tryon. (Ex. 90, Hunter Decl., at ¶ 12.) According to Town policies in effect at the time of the January 4, 2012, complaint, Plaintiffs made these complaints *outside* their chain of command by reporting directly to the Director of Human Resources or the Town Manager, rather than reporting first to a direct supervisor, or, if the complaint was about that direct supervisor, to that supervisor's supervisor. (Ex. 09, Tatlock Dep., at 76:2-79:11, 91:17-93:20, 106:11-22.)

9.      Plaintiffs' chain of command required them to first raise concerns to one of the sergeants, then to the lieutenant if no sergeant was available, and only then to the chief if no sergeant or lieutenant was available. (Ex. 03, Hughes Dep. III, at 518:19-522:20.)

10.      Tatlock ordered Plaintiffs not to report any "work-related issue" outside the chain of command without first "exhaust[ing] all internal avenues." (Ex. 09, Tatlock Dep., at 106:11-22, Ex. 6, at 1.)

11.     On February 2, 2012, as a result of Plaintiffs' January 2012 complaint to HR Director Jeanette Grady, Patel asked the Arizona Department of Public Safety (DPS) to conduct an investigation into Plaintiffs' allegations that Tryon illegally tampering with evidence. (Ex. 06, Patel Dep., at 63:16-64:17, 65:4-15.)

12.     Between March and June 2012, Detective James Baroldy of DPS interviewed Tryon, Hunter, Varnrobinson, and Town Attorney James Manatto in connection with his investigation into Tryon's alleged evidence tampering. (Ex. 29, DPS Investigation, at 19-32.) Tryon's interview was held on June 8, 2012. (*Id.* at 26.) However, Baroldy did not interview other key witnesses, including the FPD evidence custodians who were instructed by Tryon to return the evidence at issue. (*Id.* at 19-32.)

13.     Tryon found out about the DPS investigation from Klix in late February or early March 2012. (Ex. 04, Tryon Dep., at 264:3-20.)

14.     Rankin learned from Tryon that Tryon was under investigation, that Plaintiffs made the allegations against him, and that DPS was "doing an investigation." (Ex. 05, Rankin Dep., at 236:15-237:22.) The DPS investigation started in February 2012 and ended in August 2012. (Ex. 29, DPS Investigation Report, at 3.) DPS investigated Tryon's alleged evidence tampering as potential Class VI felonies. (*Id.* at 1.)

15.     Tryon told Rankin the allegations were "unfounded" and a "bunch of bullshit." (Ex. 05, Rankin Dep., at 236:15-238:4.)

16.     In his subsequent Declaration, Rankin now claims that, prior to the time that the Town terminated Plaintiffs' employment on December 14, 2012, he was not aware that either of them had ever suggested that Tryon had committed any crime. (Rankin Decl., Doc. 248-1, at ¶ 2.)

17.     On March 13, 2012, Rankin was elected Mayor of the Town of Florence. He was sworn in on June 11, 2012.  (Ex. 19, Rankin Answer to Plaintiff's Supp. Complaint, ¶ 17.)

18.     On April 3, 2012, Varnrobinson and Sergeant Adams helped executed a search warrant at the residence of Rankin's son's former girlfriend, who lived with

1    Rankin for some time. (Ex. 05, Rankin Dep., at 106:22-108:6.) As the officers executed

2    the search warrant, Rankin, then Mayor-Elect, arrived at the scene and refused to allow

3    Adams to speak with the subject of the search warrant without him present. (Ex. 17,

4    Adams Dep., at 45:16-20, 47:3-17.) Adams and another police officer told

5    Varnrobinson that Rankin was requesting information about the case and intimidating

6    the officers. (Ex. 27, Varnrobinson Dep. II, at 47:25-48:10.) Varnrobinson informed

7    Rankin of the complaints that he was interfering with the officers' duties, and advised

8    him that he could be arrested for obstruction for such behavior. (*Id.* at 48:11-17.)

9        19.    As soon as Varnrobinson told Rankin he could be arrested, Rankin "went off"

10   and said words to the effect of, "I'm the fucking mayor here," or, "I'm the mayor. I

11   would like to see you fucking arrest me." (*Id.* at 48:18-21.) Varnrobinson tried to calm

12   Rankin down and told him, "I'm not here to say you're under arrest. I'm here to just

13   advise you that you can be placed under arrest for obstructing or interfering with a

14   criminal investigation." (*Id.* at 48:11-25.) Rankin denies making any such statements.

15   (Ex. 05, Rankin Dep., at 109:22-111:21.) Rankin testified that he did not have any

16   argument with Varnrobinson at the scene. (*Id.* at 163:17-165:13.)

17       20.    Following the April 3, 2012 confrontation with Varnrobinson, who was the

18   FPD's first African-American detective, (Ex. 91, Varnrobinson Decl., at ¶ 2), Rankin

19   repeatedly complained to Lewis that the "n***er" Varnrobinson had threatened to arrest

20   him, (Ex. 07, Lewis Dep., at 176:22-178:5). Rankin also told Lewis that Varnrobinson

21   no longer "belong[ed]" with the FPD. (*Id.* at 179:25-180:15.)

22       21.    Rankin complained to Town Manager Patel about Varnrobinson's actions

23   during the execution of the search warrant. (Ex. 05, Rankin Dep., at 151:21-153:5); Ex.

24   47, Rankin Resps. to Varnrobinson's 2nd Set of Interrogs., at 6.)

25       22.    Rankin told Patel that Plaintiffs should be fired. (Ex. 05, Rankin Dep., at

26   231:5-12.)

27       23.    In fact, Rankin told "a lot of people" that Plaintiffs should be fired. (*Id.* at

28   231:5-17.)

24.     In his subsequent Declaration, Rankin now claims that he did not make any recommendation or provide input concerning whether Plaintiffs should be terminated, and claimed never to have discussed the issue with Hughes or Patel. (Rankin Decl., Doc. 248-1, at ¶ 2.)

25.     On May 7, 2012, Patel submitted his notice of resignation to the Town, effective December 14, 2012. (Ex. 06, Patel Dep., at 90:19-25, 92:1-7, Dep. Ex. 15.) Patel told Ingulli that he (Patel) wasn't going to work under Mayor Rankin ever again. (Ex. 06, Patel Dep., at 237:17-238:12.)

26.     Sometime shortly before May 25, 2012, Patel had telephoned Tim Pickering at Interim Public Management (IPM) to request assistance in selecting an interim police chief. (Ex. 13, Pickering Dep., at 10:16-12:20.) Pickering then identified three candidates and sent their application packets to Patel to review. (*Id.*) Pickering also scheduled interviews to take place on May 25, 2012. (Ex. 13, Pickering Dep., at 10:16-12:20, Dep. Ex. 01.)

27.     On May 19, 2012, then-Detective Klix requested a self-demotion to a Patrol Officer position, effective July 21, 2012. (Ex. 16, Morris Dep., at 31:19-32:3, Dep. Ex. 03.) By self-demoting to Patrol Officer, Klix accepted a 6% pay cut. (Ex. 11, Klix Dep. I, at 11:19-24.) Klix claimed that she wanted to self-demote so that she would no longer have to work under the supervision of then-Chief Ingulli, but by July 21, 2012, the date on which she requested her self-demotion to go into effect, Ingulli had already been fired. (*Id.* at 16:19-20:22, Ex. 02.) Sergeant Scott Morris, Klix's direct supervisor, did not know why Klix decided to self-demote, and thought Klix enjoyed being a Detective. (Ex. 16, Morris Dep., at 32:4-24.)

28.     On May 25, 2012, Patel interviewed Hughes and two other candidates selected by IPM as potential replacements for Chief Ingulli. (Ex. 13, Pickering Dep., at 10:16-12:20, Dep. Ex. 01.) He selected Hughes that same day to be the future interim chief. (*Id.*)

29.     Patel claimed otherwise in his deposition, and asserted that he made the decision to fire Ingulli at most two weeks prior to July 13, 2012, the date on which Patel actually fired Ingulli. (Ex. 06, Patel Dep., at 101:17-105:25.)

30.     Patel also asserts otherwise in the Declaration submitted in support of Defendants' summary judgment motion,  in which he claims that, "[i]n late June or early July 2012, I began to believe that it was best to hire a new Police Chief in order to move the department in a new direction. As a result, I contacted Interim Public Management, a company that assists public employers in locating qualified individuals to fill management roles on an interim basis, until a permanent hire could be found." (Patel Decl., Doc. 247-1, at ¶ 6.)

31.     When he selected Hughes as interim chief, Patel knew that Hughes had resigned his most recent position as Chief of Police in Surprise, Arizona in August 2010 after a Surprise Police Employees Association vote of no-confidence. (Ex. 06, Patel Dep., at 123:18-124:22.)

32.     After resigning from Surprise in August 2010, Hughes applied for five to ten law enforcement jobs, but was not hired for any, and did not work in any law enforcement capacity for almost two years until Patel hired him to become the FPD's Interim Chief. (Ex. 01, Hughes Dep. I, at 59:23-62:16.)

33.     In late-June or early-July 2012, before Hughes started working as Interim Chief, Hughes, Rankin, and Patel met at a Cracker Barrel restaurant in Casa Grande. (Ex. 08, Ingulli Dep., at 83:14-84:7); (Ex. 05, Rankin Dep., at 131:8-132:10, 134:25-135:3, 142:25-143:13, 217:19-218:7, 219:15-221:13, 266:14-17, 299:5-18.) Rankin admits that he discussed Plaintiffs with Patel and Hughes, and told Hughes that Hughes should "look into" Plaintiffs' December 2010 interview of MH. (Ex. 05, Rankin Dep., at 131:8-132:10, 134:25-135:3, 142:25-143:13, 217:19-218:7, 219:15-221:13, 266:14-17, 299:5-18.)

34.     At some time shortly before or shortly after Mayor-elect Rankin was sworn in as Mayor on June 11, 2012 (Ex. 19 at ¶ 17), Morris heard Rankin tell a group of FPD

officers that Plaintiffs would be fired as soon as Hughes began working as Interim Chief. (Ex. 17, Adams Dep., at 61:3-22, 64:11-16.).

35.     On <u>July 4, 2012</u>, Rankin told several FPD officers that Ingulli was going to be terminated and replaced by someone from Surprise. (Ex. 08, Ingulli Dep., at 82:13-20); (Ex. 16, Morris Dep., at 32:25-33:12.)

36.     The FPD Sergeants who worked with Plaintiffs thought that Ingulli protected Plaintiffs, and would not allow the Sergeants to give Plaintiffs any negative evaluations. (Ex. 62, Varnrobinson Appeal Hrg. (Hughes Testimony), at 37:4-38:11.)

37.     In <u>early-July 2012</u>, Patel gave Ingulli the option to resign, but Ingulli refused. (Ex. 06, Patel Dep., at 104:5-22.)

38.     On <u>July 13, 2012</u>, Patel fired Ingulli. (*Id.* at 105:17-25.)

39.     On <u>July 16, 2012</u>, Hughes began working as FPD Interim Chief. (Ex. 24, Hunter Appeals Hrg. I, at 21:15.)

40.     Patel, Hughes, Rankin, and (obviously) Tryon all knew that Tryon was under criminal investigation by DPS for alleged evidence tampering as a result of Plaintiffs' January 2012 complaint. (Ex. 06, Patel Dep., at 63:16-64:17, 65:4-15); (Ex. 05, Rankin Dep., at 236:15-237:22); (Ex. 06, Patel Dep., at Ex. 12); (Ex. 29, DPS Investigation, at 26.) Between Hughes' start date as Interim Chief and Plaintiffs' terminations on December 14, 2012, Plaintiffs received a series of retaliatory reprimands from Sergeants Tatlock and Morris (who reported to Tryon). (Ex. 09, Tatlock Dep., Exs. 6, 9 & 10); (Ex. 16, Morris Dep. I, Exs. 7 & 8.)

41.     Despite Hughes' knowledge that Tryon was being investigated by DPS as a result of Plaintiffs' complaint, he nevertheless placed Plaintiffs under Tryon's direct supervision. (Ex. 06, Patel Dep., at Ex. 12)

42.     In a <u>July 23, 2012</u> letter to Patel, written just one week after he started as Interim Chief, Hughes notified Patel that Tryon would "begin supervising the current detectives [Plaintiffs]. *This will be after the DPS investigation is complete.(wk. of 8-6).*" (Ex. 06, Patel Dep., at Ex. 12) (emphasis added).

43.     Tryon, in fact, began supervising Plaintiffs in August 2012, (Ex. 01, Hughes Dep. I, at 121:21-122:6), even though DPS would not even submit its investigation report to the Pinal County Attorney's Office (PCAO) for a criminal charging review on Tryon's alleged crime of A.R.S. §13-2809, Tampering with Physical Evidence, a Class 6 Felony, until September 12, 2012, (Ex. 29, DPS Investigation, at 16).

44.     In his deposition, Hughes asserted that he did not know that the DPS investigation was an investigation of allegations against Tryon, and further claimed that he did not know it was a criminal investigation. (Ex. 01, Hughes Dep. I, at 100:6–101:10.)

45.     However, shortly after Hughes began working as Interim Chief on July 16, 2012, Patel gave him a copy of Varnrobinson's January 2012 complaint about Tryon's alleged evidence tampering, and discussed with Hughes the details of the DPS investigation. (Ex. 06, Patel Dep., at 70:15-74:14.) Patel also explained the "rift" between FPD officers loyal to newly-fired Chief Ingulli (i.e., Plaintiffs) and those loyal to Tryon, (SOF 5, 87-88), and told Hughes to "clean up the problems," (SOF 88).

46.     Patel also told Hughes to document in detail what Hughes perceived to be Plaintiffs' performance issues. (SOF 155.) However, Patel testified that he was unaware of Hunter and Varnrobinson's alleged performance issues prior to November 8, 2012, when Hughes submitted his termination recommendation memoranda. (Ex. 06, Patel Dep., at 149:18-150:19.) Patel also testified that he was surprised when he received Hughes' termination memoranda. (*Id.* at 149:18-150:13.)

47.     In August 2012, while Tryon was still being investigated by the PCAO for felony tampering with evidence as a result of Plaintiffs' January 2012 complaint, Hughes ordered Tryon to gather evidence of Plaintiffs' job performance. (Ex. 01, Hughes Dep. I, at 107:18-110:20, 143:15-146:23, 152:23-154:8, 165:4-12.)

48.     Hughes also directed Tryon to create case status reports on Plaintiffs. (Ex. 04, Tryon Dep., 307:8-309:11.) In turn, on September 13, 2012, Tryon directed Morris to review case reports on Plaintiffs. (Ex. 04, Tryon Dep., 307:16-309:11, Dep. Ex. 30)

1  Tryon did not direct Morris to conduct such a review of anybody else in the department.

2  (Ex. 04, Tryon Dep., 307:16-309:11.)

3      49.    Moreover, Tryon specifically directed Morris not to inform Plaintiffs about

4  why the FPD was seeking this information. (Ex. 04, Tryon Dep., 311:20-22.)

5      50.    Hughes never conducted a full review of the cases assigned to Klix while she

6  was a Detective, not even after Klix returned to Detective duties in December 2012.

7  (Ex. 01 Hughes Dep., at 143:15-144:20, 147:10-149:4.)

8      51.    On September 24, 2012, Tryon attended a meeting at the PCAO to discuss

9  Plaintiffs, even though the PCAO had not yet determined whether to file felony

10 tampering with evidence charges against him. (Ex. 01, Hughes Dep. I, at 127:16-128:22,

11 Dep. Ex. 11); (Ex. 04, Tryon Dep., at 358:12-17.) This meeting came about because

12 Hughes wanted to discuss with PCAO attorneys "issues" and "ongoing investigations"

13 involving Plaintiffs. (Ex. 24, Hunter Appeal Hrg. I (Platt Testimony), at 139:15-

14 141:18.) One of the issues raised was Plaintiffs' December 2010 interview of an alleged

15 rape victim in the MH case. (Ex. 39, McCormack Dep., at 27:25-29:1.)

16     52.    On September 25, 2012, PCAO Attorney Richard Platt notified Hughes that

17 the PCAO had declined to file felony criminal charges against Tryon. (Ex. 01, Hughes

18 Dep. I, at 127:16-128:22, Ex. 11.) Platt's letter to Hughes explained that the PCAO's

19 "decision not to file felony charges does not mean [they] concluded that no crime was

20 committed." (*Id.*)

21     53.    On October 11, 2012, Human Resources Director Scott Barber, who replaced

22 Grady, wrote a letter to Varnrobinson in which he falsely stated, "the DPS investigator

23 found none of the allegations [against Tryon] to be of provable substance or sustainable

24 . . . Please be advised that . . . this document represents the complete and final response

25 of the Town of Florence to your January 4, 2012, memo." (Ex. 56, Barber

26 Memorandum to Varnrobinson, at 2.)

27

28

54.     In fact, the final DPS report did not contain any conclusions or findings relative to the criminal investigation, but rather referred such determinations to the PCAO. (Ex. 29, DPS Investigation, at 15.)

55.     On October 1, 2012, Tryon submitted a memorandum to Hughes summarizing the alleged deficiencies in Plaintiffs' cases. (Ex. 04, Tryon Dep., at 373:5-374:10, Tryon Dep. Ex. 33.)

56.     Hughes did not independently verify Tryon's evaluation of Plaintiffs' case work and case documentation. (Ex. 01, Hughes Dep. I, at 269:13-274:25, Dep. Ex. 18, at 38-39.) Rather, he merely copied and pasted Tryon's findings directly into his memoranda recommending Plaintiffs' termination. (Ex. 01, Hughes Dep. I, at 269:13-274:25, Dep. Ex. 18, 38-39); (Ex. 24, Hunter Appeal Hrg. I, at 172:20-173:13); (Ex. 04, Tryon Dep., at 379:13-24, Dep. Ex. 33-34.) Hughes' position as Chief of FPD became permanent three days before he recommended that Plaintiffs be terminated. (Ex. 01, Hughes Dep. I, at 276:3-10.)

57.     Hughes' termination memoranda cite Plaintiffs' allegedly poor case work and case documentation, all of which was compiled and evaluated by Tryon. (Ex. 01, Hughes Dep. I, at 269:13-274:25, Dep. Ex. 18, 38-39.) Tryon knew it was not standard operating procedure to write supplements in the Spillman system before Hughes became the Chief in 2012. (Ex. 04, Tryon Dep., at 54:22-57:4, 108:22-109:9.)

58.     Hughes never notified Plaintiffs that Tryon had conducted an exhaustive evaluation of their case work and case documentation, and never gave them an opportunity to respond or offer rebuttal evidence. (Ex. 01, Hughes Dep. I, at 288:8-297:6.)

59.     Hughes did not audio record any of the conversations with the witnesses he cited in the termination memoranda, and did not take any notes of any of those conversations. (Ex. 24, Hunter Appeal Hrg. I, at 173:14-174:12.)

60.     On November 5, 2012, Patel hired Hughes as the FPD's permanent Police Chief. (Ex. 06, Patel Dep., at Ex. 21.)

61.     On <u>November 8, 2012</u>, Hughes submitted his memoranda recommending Plaintiffs' terminations.  (*Id.* at 136:1-21.)

62.     On <u>December 14, 2012</u>, i.e., his last day as Florence's Town Manager, Patel fired Plaintiffs. (*Id.* at 186:9-20.)

63.     On <u>December 17, 2012</u>, the first business day after Plaintiffs' terminations, Klix began working again as a Detective. (Ex. 11, Klix Dep. I, at 48:10-25.) She continued to perform Detective duties until she was promoted to Sergeant on March 10, 2013. (*Id.* at 110:18-23.)

## **Genuine Issue—Whether Hughes Deviated from Policy and Practice in Terminating Plaintiffs.**

<u>Failure to Interview Subjects of Investigation</u>

64.     Uniform standards and policies govern the way law enforcement agencies conduct internal investigations of employees who may be terminated. (Ex. 24, Hunter Appeal Hrg. I, at 523:21-524:9.)  Those standards apply "universal[ly] to law enforcement nationwide." (*Id.* at 524:5-9.)

65.     Pursuant to those procedures and "[p]rinciples of fairness" and "due diligence," investigators must interview all witnesses, including the accused party, and record and document the interviews insofar as they serve as the basis for disciplinary action.  (*Id.* at 524:15-22, 531:20-22.)

66.     Expert Ron Hergert testified that "the purpose of the interview is not only to determine what happened but, in the case of the accused employee, their explanation for it, which is usually the most helpful information when determining later what should the response to the alleged misconduct be . . . because it goes to the mindset or the heart of the person who makes a mistake. . . [There] are different responses, and they all have importance."  (*Id.* at 532:8-22.)

67.     He further explained that the factors that determine what disciplinary response is appropriate come from the statements of the accused employees. (*Id.* at 533:9-13.)

68.     On February 6, 2013, Hughes called Hergert "out of the blue" to ask him to train one of his sergeants in conducting internal investigations.  (Ex. 21, Hergert Dep. I, at 134:14-24.)

69.     Hughes told Hergert that he "fired two detectives for incompetence" and that "he had not interviewed either party[.]" (*Id.* at 134:17-22); (Ex. 24, Hunter Appeal Hrg. I, at 528:4-6.) Hergert took contemporaneous notes of this conversation with Hughes. (Ex. 21, Hergert Dep. I, at 134:1-12.)

70.     Hughes' admission that he terminated two detectives without interviewing them surprised Hergert "because that's not normally what you would do in a termination case."  (Ex. 24, Hunter Appeal Hrg. I, at 528:4-6, 9-11.)

71.     During Varnrobinson's Appeal Hearing, Hughes admitted that he did not interview Varnrobinson about the claims against him before recommending his termination.  (Ex. 62, Varnrobinson Appeal Hrg., at 25:17-21, 29:6-14.)

72.     Hughes deviated from the usual and accepted procedures for investigating officers when he failed to interview Plaintiffs as part of the fact-finding process.  (Ex. 21, Hergert Dep. I, Dep. Ex. 03 at 16.)

73.     Hughes' failure to interview the accused employees "deprived them of the opportunity to present information helpful to their respective causes" and "deprived Hughes of relevant facts that would have helped him make a fair and proper determination regarding this specific issue." (*Id.* at 7.)

74.     Despite Hergert's considerable experience both investigating and reviewing investigations of alleged police misconduct, he could not recall any other case where an accused employee was not advised of the issues under investigation and questioned about their conduct. (*Id.* at 16.)

75.     Hergert had personally worked on prior investigations with Hughes when he was chief of the Surprise Police Department, and, in each of those cases, Hughes provided the accused employees with written notice of the claims against them and the opportunity to respond.  (*Id.* at 18.)

76.     Current law enforcement best practices require that employees be afforded the opportunity to respond to allegations against them with very rare exceptions not applicable here. (*Id.* at 17.)

77.     The FPD's applicable order, Florence PD General Order IV-02 - Internal Affairs, supports a presumption that an employee accused of misconduct will be interviewed as part of the fact-finding process and afforded the opportunity to make a statement and be properly represented during the process. (Ex. 3, Hergert Dep. I at 138:1-22, Dep. Ex. 03 at 17.)

78.     As such, Hergert determined that Hughes' failure to notify or interview Plaintiffs about the charges against them violated both law enforcement best practices and the Florence Police Department policy.  (Ex. 21, Hergert Dep. I, Dep. Ex. 03 at 17.)

79.     Patrick Cote, who, like Hergert, had significant law enforcement experience, including roles as a police captain and chief, (Ex. 24, Hunter Appeal Hrg. I, at 501:13-505:5), agreed that it would be "highly unusual" for a police chief to fail to interview officers about charges against them, (*Id.* at 507:17-508:3). Such a practice would "raise[ ] some red flags regarding that so-called investigation." (*Id.* at 508:1-3, 509:5-6.)

Failure to Notify Subjects of Charges

80.     Standard practice in conducting internal investigations requires a police department to document the allegations in writing and provide them to the officer under investigation to notify him that he is, in fact, under investigation before being interviewed. (*Id.* at 507:3-16.)  This notification is known as a "*Garrity* warning." (*Id.*)

81.     The *Garrity* admonition informs an officer, *inter alia*, that he has "the right to be informed of the allegations involved."  (*Id.* at 516:7-15.)

82.     Hughes admitted that he did not inform Varnrobinson that he was under investigation before recommending his termination. (Ex. 62, Varnrobinson Appeal Hrg., at 25:17-21. 29:6-14.)

83.     Hergert concluded that Hughes deviated from the usual and accepted procedures for investigating officers when he failed to provide Plaintiffs written notice of the investigation into their conduct. (Ex. 21, Hergert Dep. I, Dep. Ex. 03 at 16.)

84.     According to Cote, it would be unusual for a police chief to fail to inform officers of an investigation, and doing so would raise "red flags." (Ex. 25, Hunter Appeal Hrg. II, at 507:17-508:1-3.)

85.     In fact, Cote never heard of an investigation in which the officer who is the subject of the investigation was not informed of the allegations against him. (*Id.* at 508:20-509:4.)

86.     With respect to the investigation performed in this case, Cote stated, "Well, quite simply, the – I don't call it an investigation. I characterize it as a witch hunt." (*Id.* at 510:21-22.)

Other Deviations in the Investigative Process

*Bias*

87.     Hergert testified that, particularly for small agencies, it is "an established practice" to engage neutral third parties to investigate "because [of] how close everyone is together, that there could be a perception of unfairness to have a supervisor within the agency investigate [a claim] who might be friends with or related to someone." (Ex. 21, Hergert Dep. I, at 114:24-115:9.)

88.     One of the witnesses whose purported statements Hughes relied upon in justifying Plaintiffs terminations was Pinal County Deputy Attorney Susan Crawford, a known long-time friend of Tryon, against whom Plaintiffs had previously filed complaints. (Ex. 21, Hergert Dep. I, Dep. Ex. 03 at 5.)

89.     Hughes failed to avoid or minimize perceptions of bias and unfairness when he decided to conduct the investigation himself, rather than engaging a neutral third party to conduct the investigation. (*Id.*).

*Failure to Consider Disciplinary and Performance Histories*

90.     Hughes admitted that Varnrobinson's performance evaluations indicated that he always met or exceeded performance expectations. (Ex. 62, Varnrobinson Appeal Hrg., at 36:1-10.)

91.     Varnrobinson's performance evaluations stated that he did a good job in managing his cases, and directly contradicted Hughes' analysis on this issue. (*Id.* at 36:11-18.)

92.     It is uncontested that Varnrobinson had no disciplinary history of any kind; nonetheless, Hughes recommended his termination instead of a lesser action. (*Id.* at 39:5-13.)

93.     Hergert noted that Hughes' memoranda recommending his termination failed to contain or cite any documentation establishing that he considered Plaintiffs' performance and disciplinary history in deciding the appropriate discipline. (Ex. 21, Hergert Dep. I, Dep. Ex. 03 at 17-18.)

94.     Rather, Hergert stated, "my overall impression of this investigation is that Hughes authored his reports to justify a disciplinary decision that had already been made beforehand." (*Id.* at 18.)

95.     Hergert concluded that Hughes violated accepted best practices when he failed to objectively consider Plaintiffs' performance and disciplinary history as part of the disciplinary decision-making process. (*Id.* at 17-18.)

96.     Insofar as Hughes based his termination recommendations on Plaintiffs' missteps in the MH interview in December 2010, Hughes also violated generally accepted practices, because the issue had already been addressed as a performance issue, and he used it as a disciplinary issue to justify termination. (Ex. 21, Hergert Dep. I, at 121:13-122:16.)

*Failure to Record and Conduct Follow-Up Investigations*

97.     Hughes admitted that he did not interview Chief Ingulli about any of the allegations against Plaintiffs, even though most of the conduct that Hughes relied upon

to justify their terminations occurred while Ingulli was Chief. (Ex. 62, Varnrobinson Appeal Hrg., at 29:15-17.)

98.    In fact, Hughes did not interview *anyone* before he recommended that Plaintiffs be terminated. (*Id.* at 29:18-20.) Nor did he review Plaintiffs' personnel file. (*Id.* at 35:18-31.)

99.    According to Hergert, Hughes failed to perform a fair, impartial, and complete investigation because he failed to conduct formal recorded interviews of the complainants, (Ex. 21, Hergert Dep. I, Dep. Ex. 03 at 7, 8, 11, 12), and failed to further investigate the factual issues that arose during the investigation, (*Id.* at 7, 9, 11, 12, 14.)

**Genuine Issue – Tryon's Actions in the Desert Rape Investigation, and Whether It Was Reasonable for Plaintiffs to Believe Tryon Illegally Tampered with Evidence.**

100.    On October 27, 2007, Detective Gary Lewis responded to a call reporting a sexual assault that allegedly occurred at a high school party in an outdoor location known as "the Flats." (Ex. 33, Hunter Dep. I, at 272:4-14.) This case has been referred to as the "Desert Rape" case throughout this litigation. (*Id.* at 269:14-22.)

101.    Although the alleged assault occurred within the Pinal County Sheriff's Office's jurisdiction, and not the FPD's, Tryon ordered FPD officers to investigate anyway. (Ex. 33, Hunter Dep. I, at 282:13-20); (Ex. 08, Ingulli Dep., at 176:14-25); (Ex. 07, Lewis Dep., at 183:8-19); (Ex. 04, Tryon Dep., at 42:18-20.) Hunter was assigned to investigate the case on October 29, 2007. (Ex. 04, Tryon Dep., at 50:21-25.)

102.    On the night of the alleged assault, several individuals, including Mickey Tryon, Lt. Tryon's son, brought the 15-year-old victim to the FPD. (Ex. 33, Hunter Dep. I, at 271:19-272:3, 304:20-305:12.)

103.    When the alleged victim's blood was tested at the hospital later that evening, her blood alcohol content was 0.288. (*Id.* at 275:2-6, Dep. Ex. 14 at 35.)

104.    Several witnesses in the Desert Rape case used their cell phones to take photographs and video recordings of the alleged assault, and two witnesses surrendered

their cell phones that same evening to Morris. (*Id.* at 273:15-276:5, Dep. Ex. 14 at 149-162.) Evidence Technician Paul Brannon extracted the contents of the two cell phones. (*Id.* at 277:3-6, Dep. Ex. 14 at 161-163.) Tryon asked his son if he had any images of the victim on his phone, but his son denied taking or having any. (Ex. 46, Tryon's Resps. to Hunter's 1st Set of Interrogs., at 2.)

105.    Tryon wanted to return the two cell phones containing audio and visual evidence to their owners on the night of the alleged assault. (Ex. 33, Hunter Dep. I, at 274:18-275:2); (Ex. 04, Tryon Dep., at 53:16-22.)

106.    A central dispute of fact in this case is whether Pinal County Attorney Jeff Sandler advised Tryon that he could release the phones back to their owners, and whether Tryon directed Brannon to do so. Detective Gary Lewis testified that Tryon ordered the cell phones to be released. (Ex. 07, Lewis Dep., at 119:23-120:7, 127:1-4); (Ex. 33, Hunter Dep. I, at 277:3-6, Dep. Ex. 14 at 161-163.) Hunter testified that, when he confronted Tryon about the returned cell phones, Tryon stated that Sandler had directed him to return them. (Ex. 33, Hunter Dep. I, at 287:9-13.) However, during a subsequent meeting, Sandler told Hunter that he had not directed Tryon to return the phones. (*Id.* at 287:14-23.)

107.    During the DPS investigation, Tryon told DPS Detective Baroldy that he "may have told Brannon it was ok to return the cellular telephones based on the conversation with Sandler." (Ex. 29, DPS Investigation and Findings, at 7.) Tryon also admitted that he may have told Brannon that the cell phones could be returned after he extracted any evidence from them. (Ex. 46, Tryon's Resps. to Hunter's 1st Set of Interrogs., at 3.) However, in his deposition testimony, Tryon contradicted his prior statements and denied that he told Brannon to return the cell phones, or that he spoke with Sandler about returning them. (Ex. 04, Tryon Dep., at 47:11-15, 53:2-54:5, 84:20-90:13, 91:9-93:4.)

108.    In his expert report, Hergert opined that the factual discrepancies concerning the release of these two cell phones "raised questions in both Hunter's and

Varnrobinson's minds about Tryon's honesty," and that, based on this and other "questionable conduct by Tryon," it was "reasonable for Varnrobinson and Hunter to think he [Tryon] took these actions with improper intent." (Ex. 61, Hergert Dep. II, Dep. Ex. 1 at 7-8.)

109.   As lead investigator, Hunter should have been the one to decide when to return the cell phones. (*Id.* at 13:21-23.) Hunter later obtained search warrants for the phones and re-confiscated them, but, by that time, the owners had erased the footage of the alleged assault. (Ex. 07, Lewis Dep., at 119:23-120:7, 212:16-213:13.)

110.   On October 29, 2007, Hunter and Tryon met with a Florence High School football player, who showed them a video of the alleged assault on his cell phone. (Ex. 33, Hunter Dep. I, at 282:21-283:3, Dep. Ex. 14 at 33.) Hunter wanted to keep the football player's phone, get a warrant, and download the video; Tryon therefore called Sandler to seek legal advice on how best to obtain the video. (*Id.*)

111.   Another dispute of material fact in this case is whether Sandler told Tryon that Hunter could download the video without a warrant and then email it to himself. Hunter testified that Tryon told him that Sandler advised them to download the video without a warrant and return the phone to the student. (*Id.*) Although Hunter indicated to Tryon that he preferred to get a warrant before obtaining any files, he followed Tryon's instructions by downloading the video and sending it to his email account. (*Id.* at 277:11-279:17, Dep. Ex. 14 at 33-34); (Ex. 29, DPS Investigation, at 21.)

112.   During his deposition, Tryon denied that Sandler gave him permission to email the video file, but was unable to explain why he allowed Hunter to do so in front of him. (Ex. 04, Tryon Dep., at 62:13-25, 74:11-75:20.)

113.   In his expert report, Hergert noted that whether or not Tryon told Hunter, citing Sandler, that it was acceptable to email the video file to Hunter's email account, as opposed to extracting the file by a certified technician, is a significant factual dispute in this case. (Ex. 61, Hergert Dep. II, Dep. Ex. 1 at 7.)

114.   Hunter did not learn about this factual dispute until after the DPS investigation concluded; thus, this information was not included in either his or Varnrobinson's complaint about Tryon's illegal return of evidence, which referred only to the two cell phones that Tryon authorized Brannon to return to their owners on the night of the alleged assault. (*Id.* at 8.)

115.   In December 2007 or January 2008, shortly after learning that Tryon had ordered the two phones to be returned to their owners, Hunter reported Tryon's improper return of evidence to Ingulli, Tryon's supervisor. (Ex. 33, Hunter Dep. I, at 286:8-287:25.)

**Genuine Issue – Tryon's Actions in the Home Invasion Case, and Whether It Was Reasonable for Plaintiffs to Believe Tryon Illegally Tampered with Evidence.**

116.   On November 23, 2008, Varnrobinson responded to the scene of an armed robbery at a residence. (Ex. 53, FPD Home Invasion Report, at 15.) This became known as the "Home Invasion" case. (Ex. 33, Hunter Dep. I, at 6:20-22.)

117.   The robbery was committed by two armed white males wearing ski masks. (Ex. 53, FPD Home Invasion Report, at 13.) The assailants held one victim at gun point and demanded money. (*Id.* at 15.) During the robbery, one shot went off in the residence; a single .223 caliber shell casing was later found on the living room floor. (*Id.*)

118.   One of the victim's housemates told Varnrobinson that, on the morning of the robbery, he found a cell phone lying on the ground near a fence in his backyard that he believed belonged to one of the suspects. (*Id.* at 17.)

119.   On December 13, 2008, Aaron Binkley requested a welfare check on his ex-girlfriend, Chantell Delacruz, at their shared residence, because Delacruz was threatening to commit suicide with a firearm. (*Id.* at 18.) Varnrobinson and Sergeant Samuel Pankey responded to the request. (*Id.*)

120.    To ensure Delacruz's safety, Varnrobinson and Pankey agreed to remove all firearms from the house for safekeeping. (*Id.*) Among the firearms found in Binkley and Delacruz's shared bedroom was an AR-15 style rifle that used .223 caliber bullets. (*Id.*) The firearm matched the description from the Home Invasion case, the victims of which lived within miles of Binkley and Delacruz. (Ex. 27, Varnrobinson Dep. II, at 83:19-84:4.)

121.    Therefore, Varnrobinson determined that he had probable cause to confiscate the firearm for testing in connection with the Home Invasion case. (*Id.*) Accordingly, he placed an evidence hold on the firearm. (Ex. 53, FPD Home Invasion Report, at 18.) Binkley was advised that he would be able to retrieve his firearms on December 17, 2008, and that the AR-15 would be held for processing to rule it out in an unrelated case. (*Id.*)

122.    Sandler and Florence Town Attorney James Manatto told Varnrobinson that he had the legal standing to seize the unsecured weapons from Delacruz's house, and probable cause to seize the AR-15 as potential evidence. (*Id.* at 19.)

123.    On December 15, 2008, Tryon, who was not involved in the Home Invasion investigation, ordered Binkley's firearm to be returned to him without Varnrobinson's knowledge, and before it could be tested. (Ex. 04, Tryon Dep., at 110:10-112:6, 119:19-25, 140:4-8); (Ex. 53, FPD Home Invasion Report, at 19.) Tryon then told Hunter that Varnrobinson could not "go around taking guns from every white guy in town," or words to that effect. (Ex. 04, Tryon Dep., at 103:14-17.)

124.    Hunter wrote a case supplement in the Spillman system in which he documented Tryon's return of the weapon, and Tryon's comment about "every white guy." (Ex. 90, Hunter Decl., at ¶ 1.) Ingulli read Hunter's supplement and ordered him to remove it from Spillman so that Tryon would not look bad. (*Id.*)

125.    In his 2010 grievance submitted to Ingulli, Hunter complained about Tryon returning this firearm. (Ex. 53, Hunter 2010 Complaint, at 2.) As a result, on April 22,

2010, Patel issued a written reprimand to Tryon. (Ex. 04, Tryon Dep., at 117:24-118:9, Dep. Ex. 4.)

126.    In his expert report, Hergert stated that "Detective Varnrobinson clearly did believe he had probable cause to hold the weapon as evidence in the criminal case; therefore, it was reasonable for him to believe Lieutenant Tryon committed a crime by arbitrarily releasing the weapon without judicial review." (Ex. 61, Hergert Dep. II, Dep. Ex. 1 at 5.)

**Genuine Issues – Plaintiffs' Reasons for Reviewing Klix's Investigation in the Kemp Case, and Hughes' Failure to Review Klix's Investigation.**

127.    On February 22, 2009, a nine-year-old boy was shot in the head and killed in his bedroom in the Town of Florence. (Ex. 11, Klix Dep. I, Dep. Ex. 11 at 11.) The boy's father, James Kemp, and the boy's two-year-old brother were the only two people present at the time of the shooting. (*Id.*) This case has been referred to throughout this lawsuit as the "Kemp case." (Ex. 01, Hughes Dep. I, at 207:5-12.)

128.    Detective Klix was assigned to lead the investigation of the Kemp case. (Ex. 11, Klix Dep. I, Dep. Ex. 11, at 1.)

129.    Officer Jeff Palmer was the first FPD officer to arrive at the Kemp residence on February 22, 2009. (*Id.* at 5.) Mr. Kemp told Palmer that his younger son shot his older son. (*Id.* at 6.)

130.    Mr. Kemp claimed that his two-year-old son had retrieved the pistol used in the shooting from a drawer in the nightstand in Mr. Kemp's room. (*Id.*) Palmer observed that the nightstand drawer was closed, that the drawer was "heavy and awkward to open," that the drawer did not open on his first attempt, and that he could only open the drawer by using two hands to pull on the side of the drawer. (*Id.*)

131.    After Klix arrived at the Kemp house on the day of the shooting, she instructed Palmer to direct Mr. Kemp to exit the residence to secure the scene. (*Id.*) As Kemp was leaving the residence, he told Palmer that he needed to retrieve some

1   paperwork from his office. (*Id.*) Palmer watched Kemp enter the office and look

2   through some paperwork next to his desk. (*Id.*) Palmer told Kemp to hurry up, and

3   asked what he was looking for. (*Id.***)** Kemp replied that he was looking for the Gerber

4   life insurance policy on his son who had been shot. (*Id.*) Palmer told Kemp that he could

5   retrieve the policy at a later time, and Kemp replied that it was important that he find the

6   policy so that he could call Gerber. (*Id.*) Kemp found the life insurance policy and took

7   it with him as he left the residence. (*Id.*) Palmer informed Klix of Kemp's actions. (*Id.*)

8       132.    Sometime later that same afternoon, Randi Kemp, the mother of the two

9   Kemp boys and wife of James Kemp, arrived home from work. (*Id.* at 12.) Klix told the

10  Kemps that their nine-year-old son had died. (*Id.*) In response, Mr. Kemp exclaimed,

11  "What?! No!" (*Id.*) However, Mr. Kemp had already observed the gunshot wound to his

12  son's face, and his son's eyeball coming out of its socket. (*Id.* at 12-13.) Mr. Kemp had

13  also insisted on locating the son's life insurance policy before exiting the house. (*Id.*)

14      133.    As the crime scene investigation continued that day, February 22, Klix

15  notified Mr. Kemp that the FPD would have to seize and inventory all of his weapons.

16  (*Id.* at 13.) Mr. Kemp replied, "I know my 2nd amendment rights and I intend on

17  exercising it to the fullest." (*Id.*)

18      134.    On the day of the shooting, Klix sat with Mr. Kemp at his kitchen table and

19  asked him about the circumstances surrounding the shooting. (*Id.* at 14.) Klix did not

20  give Mr. Kemp any Miranda warning before questioning him. (Ex. 11, Klix Dep. I, at

21  87:3-88:20.)

22      135.    At the scene, a gunshot residue analysis was conducted on both Mr. Kemp

23  and his two-year-old son. (*Id.* at 143:13-15.) Between Palmer and Klix's arrivals, Mr.

24  Kemp had washed his hands. (*Id.* at 143:13-144:14.) However, the gunshot residue kits

25  showed that Mr. Kemp had gunshot residue on his hands. (*Id.* at 144:5-14, Dep. Ex. 13.)

26      136.    After his son's funeral, Mr. Kemp went to the FPD and asked Klix when his

27  guns would be returned. (*Id.* at Dep. Ex. 11 at 17.) During that conversation, Mr. Kemp

28

told Klix for the first time that his son's last words were, "Where did you get that, [name of two-year-old]?" (*Id.*)

137.    Klix learned soon thereafter that Mr. Kemp had previously been investigated by Child Protective Services in Washington state for allegedly physically abusing his now-deceased nine-year-old son. (*Id.* at 18.)

138.    In her report on the Kemp case, Klix noted that, "[a]fter reviewing analysis results that have been completed thus far and reviewing scene documentation and initial interviews, an additional interview [with Mr. Kemp] needs to be conducted. There are several inconsistencies and behaviors that need clarified." (*Id.*); (Ex. 11, Klix Dep. I, at 173:15-177:21.)

139.    To clarify these "inconsistencies and behaviors," Klix arranged for a second interview of Mr. Kemp to take place at the FPD. (*Id.* at 174:5-175:8.) Without asking her supervisors for approval, Klix invited a detective from the Pinal County Sheriff's Office (PCSO) to observe her interview of Mr. Kemp. (*Id.*) According to Klix, when Chief Ingulli learned that she had invited a PCSO detective to join the interview, he "yelled" at her. (*Id.* at 175:22-176:7.)

140.    Klix testified that, because Ingulli "yelled" at her, she decided not to conduct a formal post-Miranda advisement interview of Mr. Kemp. (*Id.* at 176:19-177:18.) She did nothing else to clarify the "inconsistencies" that she had identified in Mr. Kemp's behavior. (*Id.* at 175:22-177:21.) Klix testified that she "figured [she] had enough and [she] turned everything in" to the PCAO. (*Id.* at 176:24-177:14.)

141.    On November 9, 2009, over eight months after the shooting, the PCAO told Klix that there was not enough evidence to charge Mr. Kemp and requested that she conduct a further investigation into several substantial areas of the case. (Ex. 01, Hughes Dep. I, at 213:14-214:8, Dep. Ex. 30.)

142.    Klix did not submit her charging review forms in the Kemp case until on or about January 25, 2010. (Ex. 11, Klix Dep. I, at 197:25-198:10.)

143.    Pinal County Deputy Attorney Greg Hazard thought that Klix made significant mistakes during her investigation of the Kemp case. (Ex. 23, Hazard Dep., at 50:20-51:15.) Hazard considered it a "big oversight" that Klix failed to conduct a "formal post-Miranda advisement interview" of Mr. or Mrs. Kemp. (*Id.* at 51:7-15.)

144.    Hazard thought it was certainly possible that the father and not the three-year-old had shot and killed the nine-year-old boy. (*Id.* at 48:6-13.)

145.    Rankin testified that, even if Mr. Kemp was not a suspect, he should have been properly interviewed. (Ex. 05, Rankin Dep., at 301:2-302:15.)

146.    In contrast, Hughes claimed that the PCAO attorneys at the September 24, 2012 meeting (one of whom was Hazard) stated that they were satisfied with Klix's investigation of the Kemp case. (Ex. 24, Hunter Appeal Hrg. I, at 96:20-22.)

147.    Hughes never conducted a thorough review of Klix's case records like he did with Plaintiffs,' even after Klix returned to detective duties in December 2012, and even though the Kemp case was still an open case in 2013. (Ex. 01 Hughes Dep. I, at 143:15-144:20, 147:10-149:4); (Ex. 11, Klix Dep. I, at 223:8-224:10, Dep. Ex. 20.)

148.    FPD Officers and staff members actively discussed the Kemp case for years following the shooting, including Klix's failure to conduct a formal post-Miranda advisement interview of Mr. Kemp. (Ex. 17, Adams Dep., 65:10-66:1.) People in the Town of Florence were still discussing the case two years later. (*Id.* at 66:13-67:12.)

149.    As a result, it was Adams—not Plaintiffs—who suggested to Ingulli that he engage an outside expert to review the Kemp case to see whether any further investigation could be conducted. (*Id.* at 66:2-12.)

150.    Ingulli asked Plaintiffs to review the case records of Klix's investigation in the Kemp Case to determine whether any further investigation could be conducted, and told Plaintiffs to keep their review to themselves, so as not to exacerbate the rift within the agency. (Ex. 08, Ingulli Dep., at 110:14-113:8, 208:14-208:22.)

151.    Varnrobinson welcomed a review of the Kemp investigation because he doubted that a 3-year-old could pry open a hidden drawer on a nightstand, pull out a

1  Kimber 1911—a large pistol with a triple-action safety—and shoot his brother in the

2  forehead. (Ex. 27, Varnrobinson Dep. II, at 118:13-119:19.)

3      152.    Varnrobinson was troubled by Mr. Kemp's history of domestic violence

4  against his dead son, and by Mr. Kemp's insistence on finding his dead son's life

5  insurance policy while police were still trying to secure the scene. (*Id.*) At the

6  instruction of then-Chief Ingulli, Plaintiffs wanted to make sure the right person was

7  being prosecuted for the child's death, and not a 2- or 3-year-old child who, later in life,

8  would wrongly think that he killed his brother. (*Id.*)

9
10  **Genuine Issue—Whether the PCAO Attorneys' Reactions to Varnrobinson's Recording of Hazard Was a Real Reason for Plaintiffs' Termination.**

11
12      153.    As part of Plaintiffs' review of the Kemp case, Varnrobinson reviewed Klix's

13  case file and wrote notes in the margins. (Ex. 33, Hunter Dep. I, at 234:13-235:4.)

14  Hunter never wrote any notes on the Kemp case file. (*Id.*)

15      154.    As part of the review, Varnrobinson spoke with Greg Hazard at the PCAO

16  about the case. (Ex. 91 Varnrobinson Decl., at ¶ 6.) Varnrobinson took notes as he

17  spoke to Hazard, and recorded the conversation so that he would have a complete record

18  from which he later could write a report. (*Id.*) Hazard did not know that Varnrobinson

19  was recording the conversation. (Ex. 23, Hazard Dep., at 35:18-24.) On the top of his

20  handwritten notes of his conversation with Hazard, Varnrobinson wrote, "Recorded

21  Telephone." (Ex. 27, Varnrobinson Dep. II, Dep. Ex. 9 at 35.)

22      155.    No Town or FPD policy prohibited Varnrobinson from recording individuals

23  outside the FPD at the time that he recorded his conversation with Hazard. (Ex. 01,

24  Hughes Dep. I, at 234:9-247:11.)

25      156.    Hunter did not definitively learn that Varnrobinson had recorded a

26  conversation with Hazard without Hazard's knowledge until Hunter received Patel's

27  November 28, 2012 Notice of Intent to Terminate, which falsely accused Hunter of

28  recording the conversation with Hazard. (Ex. 90, Hunter Decl., at ¶ 4.)

157.    Plaintiffs were encouraged to audio-record all conversations related to active investigations, so that they could later write detailed and accurate reports of the conversations. (*Id.* at ¶ 5.) The FPD even provided Plaintiffs with digital audio-recorders for that purpose. (*Id.*)

158.    Plaintiffs presented Hughes with the Kemp case file with Varnrobinson's handwritten notes so that Hughes would be aware of their efforts to investigate the Kemp case. (Ex. 33, Hunter Dep. I, at 234:13-235:4); (Ex. 93, Hughes Resps. to Varnrobinson's 2d Set of Interrogs., at 3.) Hughes first learned that a conversation with Hazard had been recorded when reviewing Varnrobinson's handwritten notes. (Ex. 24, Hunter Appeal Hrg. I, at 173:14-174:12.)

159.    Hughes told PCAO Investigator James McCormack that he had potential concerns with the way the Kemp case had been investigated, and asked McCormack to review the case file and see if he agreed with how the FPD investigated the case. (Ex. 39, McCormack Dep., at 12:21-14:6.) McCormack agreed to the request, but thought it was "unusual" for a police chief to ask the PCAO to review a case file to determine whether his agency properly conducted an investigation. (*Id.*)

160.    Hughes personally gave McCormack a copy of the Kemp case file to review. (*Id.* at 12:21-14:6.) Hughes did not give McCormack a copy of the official Kemp case file out of Spillman. (Ex. 11, Klix Dep. I, Dep. Ex. 11.) Instead, Hughes gave McCormack the version of the Kemp case file that contained Varnrobinson's handwritten notes indicating he had recorded a conversation with Hazard. (Ex. 27, Varnrobinson Dep. II, Dep. Ex. 9 at 35.)

161.    Hughes and Tryon scheduled a September 24, 2012 meeting at the PCAO with PCAO Chief Criminal Deputy Attorney Richard Platt, PCAO Criminal Supervising Prosecuting Attorney/Bureau Chief of Special Crimes Unit Susan Crawford, PCAO Deputy Attorney Greg Hazard, and PCAO Investigator James McCormack. (Ex. 24, Hunter Appeal Hrg. I, at 95:22-96:10, 149:5-11.)

162.    Hughes called Platt to schedule the meeting purportedly because Hughes wanted to discuss the Kemp case and other investigations conducted by Plaintiffs. (Ex. 24, Hunter Appeal Hrg. I, at 150:8-12.)

163.    A day or two before the September 24, 2012 meeting, McCormack showed Hazard photocopies of notes that he had received from Hughes concerning a telephone conversation with Hazard, and the notes stated, "recorded," indicating that the conversation had been recorded. (Ex. 24, Hunter Appeal Hrg. I (Hazard testimony) 223:21-222:21.)

164.    "The major concern brought up at the September 24, 2012 meeting was the lack of trust between the PCAO and the FPD as a result of the secret recording." (SOF 117.)

165.    PCAO attorney Crawford was "concerned" about the recording of Hazard, but was not "upset." (Ex. 22, Crawford Dep., at 61:13-24.)

166.    No one present at the meeting—including Hazard—knew whether it was Hunter or Varnrobinson who had actually recorded the conversation with Hazard. (Ex. 22, Crawford Dep., at 61:13-24); (Ex. 24, Hunter Appeal Hrg. I (Hazard Testimony), at 225:4-10); (Ex. 24, Hunter Appeal Hrg. I (Platt Testimony), at 136:1-141:18.)

167.    Hughes assumed that both Plaintiffs were involved, and held them equally responsible for recording Hazard, regardless of who actually turned on the recorder. (Ex. 24, Hunter Appeal Hrg. I, at 192:2-21); (SOF 161.) Neither Hughes nor Tryon ever asked Hunter whether he had recorded a conversation with Hazard, and never told Hunter that he was under investigation for allegedly recording a conversation with Hazard. (Ex. 24, Hunter Appeal Hrg. I, at 173:14-174:12.)

168.    Patel did not actually know at the time he fired Hunter or Varnrobinson whether it was one or both of them who had recorded Hazard, but viewed it as both of them because "it was very common for them to work joint cases. Even cases that are assigned individually and each of them are jointly involved in the matters related to the case in the investigation." (Ex. 06, Patel Dep., at 203:8-25.)

169.    The Hearing Officer who presided over Plaintiffs' termination appeal hearings determined that Hunter was not involved in recording anyone at the PCAO. (Ex. 33, Hunter Dep. I, Dep. Ex. 06 at 7.)

170.    In his expert report, Hergert opined that termination was not the appropriate remedy for recording a PCAO attorney without prior permission, if the recording officer had a clean disciplinary record, positive performance reviews, and a willingness to accept responsibility. (Ex. 21, Hergert Dep. I, Dep. Ex. 01 at 9.)

171.    Plaintiffs were the only detectives investigating the Kemp case from August 2012 until their terminations on December 14, 2012. (Ex. 11, Klix Dep. I, at 212:23-213:6.) After their terminations, no one from FPD investigated the case. (*Id.* at 213:7-12.)

172.    In the three months following the September 24, 2012 meeting with the PCAO, the purpose of which purportedly was the Kemp investigation, neither McCormack nor any other PCAO investigator did anything to further investigate the Kemp case; the case "was still out there." (Ex. 39, McCormack Dep., at 31:18-33:8.)

173.    At the time of Hughes' investigation into Plaintiffs concerning their reinvestigation of the Kemp case, no charges had been filed in the case, which had occurred over three years prior. (Ex. 11, Klix Dep. I, at 197:25-199:8, Dep. Ex. 15.) The PCAO did not prosecute the case until 2013, when Mr. Kemp pled guilty to child endangerment and was sentenced to one year of supervised probation. (Ex. 11, Klix Dep. I, at 223:8-224:10, Dep. Ex. 20.)

**Genuine Issue – Whether the PCAO Attorneys' Reaction to Plaintiffs' Interview in the MH Rape Investigation Was a Real Reason for Plaintiffs' Termination.**

174.    In December 2010, Plaintiffs interviewed a minor alleged rape victim ("MH") after attempting unsuccessfully to arrange for her to be interviewed by a trained forensic interviewer at the Family Advocacy Center. (Ex. 91, Varnrobinson Decl., at ¶ 3.) As with all interviews they conducted, Plaintiffs audio-recorded the interview with MH.

1   (*Id.*.) This case is referred to in the summary judgment pleadings as the "MH" case or

2   "Guilliams" case.

3       175.    Plaintiffs were reluctant to conduct the interview of MH because they had not

4   completed either the eight-hour or the forty-hour training session on forensic

5   interviewing techniques, and because they did not generally investigate sex crimes,

6   which were typically assigned to Detective Klix. (*Id.* at ¶ 4.)

7       176.    Plaintiffs nevertheless conducted the interview of MH because there were no

8   other options available, and Sergeant William Tatlock ordered them to interview her.

9   (*Id.* at ¶ 5.)

10      177.    After listening to the audio-recording of Plaintiffs' interview of MH, PCAO

11  Attorney Crawford requested that a meeting be held with members of the PCAO and the

12  FPD to review and critique Plaintiffs' interviewing techniques, and to offer suggestions

13  for improvement. (Ex. 22, Crawford Dep., at 34:19-37:21); (Ex. 25, Hunter Appeal Hrg.

14  II, (Gates Testimony), at 362:13-363:6, 374:1-13.) The meeting took place in September

15  or October 2011. (*Id.*

16      178.    Crawford did not want Hunter or Varnrobinson punished or disciplined for

17  any mistakes that they made in interviewing MH, (Ex. 22, Crawford Dep., at 37:22-

18  38:7), and the meeting was not intended to be disciplinary in nature, (Ex. 25, Hunter

19  Appeal Hrg. II, at 371:22-372:8).

20      179.    These sorts of meetings, where PCAO attorneys critique officers'

21  interviewing techniques, are a common occurrence within each agency. (Ex. 25, Hunter

22  Appeal Hrg. II, at 369:3-8, 369:20-370:4.) Gates felt that Plaintiffs were receptive to the

23  attorneys' criticism and to Gates' training. (*Id.* at 370:13-22.)

24      180.    By the conclusion of the meeting, the attendees determined that Gates would

25  provide additional training to Plaintiffs regarding proper forensic interviewing

26  techniques. (Ex. 22, Crawford Dep., at 39:21-40:3.) The PCAO attorneys considered

27  this to be a training issue, and not a disciplinary issue. (Ex. 08, Ingulli Dep., at 235:18-

28

1   236:12.) Accordingly, Ingulli did not discipline Plaintiffs for any mistakes that they

2   made in the MH interview. (*Id.* at 235:18-236:12.)

3       181.    Following the meeting, both Plaintiffs enrolled and participated in an eight-

4   hour forensic interview training class. (Ex. 25, Hunter Appeal Hrg. II, at 372:9-17.)

5       182.    Gates did not hear anything else about the MH case for over a year, until

6   Tryon called Gates' personal cell phone and asked him to speak with Hughes, who had

7   recently started working as Interim Chief, about Plaintiffs' interview of MH. (*Id.* at

8   374:14-22.)

9       183.    At about the same time, shortly after Hughes started as Interim Chief, Rankin

10  told Hughes that he should "look into" Plaintiffs' December 2010 interview of MH.

11  (Ex. 05, Rankin Dep., at 217:19-218:7.) Rankin had only recently learned about this

12  interview—he learned about it sometime between March 2012, when he was elected

13  Mayor, and June 2012, when he was sworn in. (*Id.* at 191:23-197:4); (Ex. 19, Rankin

14  Answer to Plaintiff's Supp. Complaint, at ¶ 17.)

15      184.    At Tryon's request, Gates met with Hughes in September 2012 to discuss

16  Plaintiffs' interview of MH and brought the case file and the recording of Plaintiffs'

17  interview. (Ex. 01, Hughes Dep. I, at 241:3-245:12); (Ex. 25, Hunter Appeal Hrg. II

18  (Gates Testimony), at 374:14-375:15, 378:1-379:2.)

19      185.    Hughes asked Gates for his opinion on Plaintiffs' missteps during the MH

20  interview, and Gates told Hughes he thought it was a training issue. (Ex. 88, Hunter-

21  Gates Conversation, at 01:53-03:44.) Gates told Hughes that PCAO had held the 2011

22  meeting to discuss Plaintiffs' missteps, and that after that meeting Gates considered the

23  matter resolved. (*Id.*; Ex. 24, Hunter Appeal Hrg. I (Hughes testimony), at 182:13-

24  183:20.) Gates never complained to Tryon or Hughes about the MH interview, and

25  suspected that Tryon "backdoored" Plaintiffs by bringing the MH interview to Hughes'

26  attention. (Ex. 88, Hunter-Gates Conversation, at 01:53-03:44.)

27      186.    To "backdoor" someone is to "use deceitful, duplicitous, or morally

28  questionable means to circumvent someone's authority, influence, or integrity for the

sake of one's personal gains." *See* https://idioms.thefreedictionary.com/backdoor (last accessed Apr. 22, 2018).

187.    Plaintiffs' interview of MH took place on December 12, 2010, over eighteen months before Hughes started working for the Town of Florence as Interim Chief. (Ex. 09, Tatlock Dep., at 26:19-22.)

188.    As of Plaintiffs' September 2013 appeal hearings, the MH case had not yet gone to trial, so Hughes could not possibly have known in November 2012 what impact, if any, Plaintiffs' interview of MH would have on the outcome of the trial. (Ex. 25, Hunter Appeal Hrg. II (Gates Testimony), at 384:13-14.)

**Genuine Issue—Whether PCAO Attorneys' Other Purported Concerns About Plaintiffs' Performance on Other Cases Was a Real Reason for Plaintiffs' Termination.**

189.    In his November 8, 2012 memoranda recommending Plaintiffs' terminations, Hughes wrote that, at the September 24, 2012 meeting, the PCAO attorneys "made it quite clear they did not want cases" from Plaintiffs. (Ex. 01, Hughes Dep. I, Dep. Exs. 38 & 39 at 6) (SOF 124.) However, Hughes did not mention any purported concerns about the way Plaintiffs "handled rape cases," (Ex. 01, Hughes Dep. I, Dep. Exs. 38 & 39 at 6), as Defendants allege he discussed with the PCAO attorneys, (SOF 120-21.) Nor did Patel mention any such concerns in his Notices of Intent to Dismiss, submitted to Plaintiffs on November 29, 2012. (Ex. 06, Patel Dep., at 151:5-16, Dep. Exs. 25 & 26.)

190.    In fact, PCAO Attorney Greg Hazard never told Hughes that he did not want cases from Plaintiffs, and did not hear any other PCAO attorneys make such a statement. (Ex. 23, Hazard Dep., at 54:2-16.)

191.    Crawford thought it was not likely that she told Hughes that she did not want any cases from Plaintiffs because that was "not how we do business" at the PCAO, and she had never before refused to accept a case because of the detective serving as the case agent. (Ex. 22, Crawford Dep., at 60:22-61:12.)

192.    At Hunter's termination appeal hearing, Hughes admitted that he had never received any written complaints from any County Attorneys regarding problems or concerns with Plaintiffs' investigations. (Ex. 24, Hunter Appeal Hrg. I, at 193:11-22.)

193.    In his termination recommendation memoranda, Hughes also wrote that, at the September 24, 2012 meeting, the PCAO attorneys "made clear" that Plaintiffs had "misled the County Attorney's Office to believe they were now lead detectives on the Kemp case." (Ex. 01, Hughes Dep. I, Dep. Exs. 38 & 39 at 6.)

194.    Defendants now no longer claim that Plaintiffs intentionally "misled" the PCAO; instead, they now assert that Hazard merely "expressed concern" that Varnrobinson had "created confusion" by implying that he and Hunter had been assigned to replace Klix as lead detectives in the Kemp investigation. (SOF 122.)

195.    In fact, Hazard experienced no such confusion, and made clear that he could easily determine the identity of the case agent for any particular case with a quick phone call to the agency investigating the case. (Ex. 23, Hazard Dep., at 18:3-19:9.)

196.    In his termination recommendation memoranda, Hughes wrote further that, at the September 24, 2012 meeting, Crawford stated "she will give me 5 or more cases that cannot be filed because of [Plaintiffs'] inability to conduct proper investigations." (Ex. 01, Hughes Dep I., Dep. Exs. 38 & 39 at 6).

197.    Defendants now no longer claim that Crawford told Hughes she couldn't file cases because of Plaintiffs' "inability to conduct proper investigations;" instead, they now assert that Crawford "had declined to prosecute several cases," none of which she could identify, based on reasons she also could not identify with any specificity. (SOF 123.

198.    In fact, Crawford testified that she never told Hughes during the September 24, 2012 meeting that Plaintiffs were unable to conduct an investigation. (Ex. 22, Crawford Dep., at 62:23-64:11, 74:25-75:14.)

199.    In January 2013, Mike Deltenre of AZ POST asked Tryon, who was also present at the September 24, 2012 meeting, whether he could identify any "cases that

one or both [Plaintiffs] were assigned [that were ever dismissed or not filed due to reports being incomplete and/or the investigations being poorly conducted." (Ex. 78, Deltenre Email to Tryon, at 1.) Tryon could only point to Plaintiffs' December 2010 interview of MH. (*Id.*)

### Genuine Issue—Whether Plaintiffs' Internet Usage Was a Real Reason for Plaintiffs' Termination.

200.    In his deposition, Tryon testified that he personally directed IT to perform an internet usage report for Plaintiffs (but not Klix), purportedly because a person named "Shawn" in IT, who was "doing some type of service to the system," had determined that Varnrobinson was "actively working on a personal Website" and that "Hunter was also on the Internet quite often." (Ex. 04, Tryon Dep., at 390:25-392:13.)

201.    In contradiction to Tryon's testimony, Hughes testified during Hunter's termination appeal hearing that he (Hughes) directed IT to perform an internet usage report on Plaintiffs because the FPD had "terminated a crime analyst for…doing things on the internet." (Ex. 24, Hunter Appeal Hrg. I, at 103:5-104:1.)

202.    Hughes claimed that he asked IT to review Hunter's internet usage because he "has access to the computer and is in his office a lot on the computer," (Ex. 24, Hunter Appeal Hrg. I, at 103:5-104:1), and that internet usage is "just one of those things you look at through your normal course of duty," (*Id.* at 103:5-104:1).

203.    However, Plaintiffs were not the only FPD employees with access to a computer. A majority of Town employees have their own username for the Town computer system, and any FPD employee with a username can log into any computer in the department. (Ex. 26, Bennington Dep., at 14:10-24.)

204.    Nor were Plaintiffs the only FPD employees who had their own computer workstations. All the following people also had their own computer workstations: Hughes; Tryon; Klix; Administrative Secretary Larry Lawrence; Sergeants Adams, Pankey, Tatlock, and Morris; dispatchers; dispatch supervisors; crime analysts; and

1   evidence technicians. (Ex. 90, Hunter Decl., at ¶ 6.)

2       205.   At Hughes' request (not Tryon's), Town IT Manager Dan Bennington created

3   internet usage Reports for Plaintiffs, spanning from August 2012 to October 2012. (Ex.

4   26, Bennington Dep., at 34:24-35:2); (Ex. 24, Hunter Appeal Hrg. I, at 103:20-104:1,

5   105:5-106:5.)

6       206.   Hughes did not direct Bennington to create internet usage reports for any FPD

7   employee other than Plaintiffs. (Ex. 24, Hunter Appeal Hrg. I (Bennington Testimony),

8   at 115:4-116:13.)

9       207.   Bennington is not aware of any other instance in which any member of the IT

10  Division created an internet usage report for any other FPD officer or employee. (Ex.

11  26, Bennington Dep., at 37:12-20.)

12      208.   When Hughes received Bennington's reports about Plaintiffs' internet use, he

13  asked Tryon to "look into" them, (Ex. 24, Hunter Appeal Hrg. I (Hughes Testimony), at

14  119:4-10), even though Tryon remained under investigation as a result of Plaintiffs'

15  2012 complaint.

16      209.   Hughes did not ask Tryon to review Klix's internet usage or her open cases,

17  purportedly because she was not a Detective at the time that Hunter and Varnrobinson's

18  performances were reviewed; however, Hughes still did not review Klix's internet usage

19  or open cases when she returned to her Detective duties. (Ex. 01, Hughes Dep. I, at

20  123:7-22; 144:1-13, 147:10-149:25.); (Ex. 04, Tryon Dep., at 329:21-330:24.)

21  **Genuine Issue—Whether the Other Reasons Hughes Identified in His Termination**
22  **Memoranda Were Real Reasons for Recommending Plaintiffs' Terminations.**

23
24      210.   The justifications set forth in both Plaintiffs' termination recommendations

25  are nearly identical. (Ex. 01, Hughes Dep. I, Dep. Exs. 38 & 39.) Hughes stated that he

26  viewed both Plaintiffs as equally responsible for the actions that either of them took

27  individually. (Doc. 247-14, Hughes Decl., at ¶ 37.) Nowhere in Hughes'

28

1    recommendations did he state that Plaintiffs were "falsely inflating the amount of work

2    they were actually doing." (Ex. 01, Hughes Dep. I, Dep. Exs. 38 & 39.)

3        211.    In his termination memoranda, Hughes criticizes the fact that Plaintiffs

4    conducted the interview of MH in December 2010 at the FPD station rather than the

5    Family Advocacy Center ("FAC"), and that a FAC advocate was not present. (Ex. 01,

6    Hughes Dep. I, Dep. Exs. 38 & 39 at 1.) However, Hughes did not investigate the facts,

7    and therefore did not learn that Plaintiffs had advised Sergeant William Tatlock that the

8    FAC was not available, and that Tatlock had ordered them to conduct the interview

9    anyway. (Ex. 24, Hunter Appeal Hrg. I, at 178:6-179:8.) In fact, Hughes never spoke

10   with Plaintiffs about any of the allegations regarding the MH interview. (*Id.* at 180:5-13,

11   183:14-20.)

12       212.    Although Hughes was aware that the concerns about Plaintiffs' interview

13   skills had already been addressed two years prior, Hughes did not note this fact in his

14   termination memoranda. (Ex. 24, Hunter Appeal Hrg. I, at 182:13-183:6); (Ex. 21,

15   Hergert Dep. I, at 119:13-122:16.)

16       213.    In his termination memoranda, Hughes stated, falsely, that Plaintiffs "took it

17   upon themselves" to reinvestigate the Kemp case "in an effort to discredit follow (sic)

18   employees Tryon and Klix." (Ex. 01, Hughes Dep. I, Dep. Exs. 38 & 39 at 4).

19       214.    Hughes testified that Plaintiffs did not tell him that Ingulli had instructed

20   them to review the Kemp Case. (Ex. 01, Hughes Dep. I, at 207:24-208:24.) However,

21   Tryon testified that Plaintiffs had informed Hughes of that fact. (Ex. 04, Tryon Dep., at

22   320:23-322:8.) A central dispute of material fact exists as to whether Hughes knew that

23   Plaintiffs had been authorized to re-investigate the Kemp case at the time that he cited

24   this as a basis on which to terminate them.

25   **Genuine Issue – Whether Rankin, Tryon, and Morris Used Racial Epithets to**

26   **Refer to Varnrobinson.**

27

28       215.    Rankin admitted that he referred to Varnrobinson as a "n***er," but

- 146 -

1   claimed he only did so once. (Ex. 05, Rankin Dep., at 122:15-21.)

2   216.   Rankin also admitted that he may have said: "It's funny Plaintiffs were friends

3   because one is a cowboy and one is a nigger," and that he probably referred to Plaintiffs

4   as "salt and pepper," in reference to their respective races. (*Id.* at 269:1–16.)

5   217.   Lewis testified, however, that, Rankin usually referred to Varnrobinson as a

6   "n***er" or a "dirty n***er." (Ex. 07, Lewis Dep., at 177:13-178:5.)

7   218.   Rankin complained to Lewis that, on one specific occasion, "that n***er"

8   (Varnrobinson) had threatened to arrest him when Varnrobinson was assisting with the

9   execution of a search warrant. (*Id.* at 176:22-178:5.)

10  219.   Lewis testified that he also heard Tryon and Morris refer to Varnrobinson as a

11  "n***er" on multiple occasions. (*Id.* at 17:19-18:3, 176:2-21.)

12  220.   Tryon and Morris deny ever referring to Varnrobinson as a "n***er." (Ex. 04,

13  Tryon Dep., at 130:6-15); (Ex. 16, Morris Dep., at 75:18-25); (Ex. 05, Rankin Dep., at

14  270:3–273:4.)

15  **Genuine Issue – Whether Patel Had Knowledge that Rankin, Tryon, and Morris**
16  **Used Racial Epithets to Refer to Varnrobinson.**

17
18  221.   Lewis testified that he met with Ingulli and Patel on two separate occasions in

19  March 2010 and, at both meetings, told Patel that Tryon, Morris, and Rankin had used

20  the racial epithet, "n***er," to refer to Varnrobinson, and had used the racial epithets

21  "rag head" and "dot Indian" to refer to Patel. (Ex. 07, Lewis Dep., at 110:4-115:1-5,

22  171:12-172:1, 176:2-5, 183:20-185:24.)

23  222.   Patel denied that Lewis told him that he had heard Tryon, Morris, and Rankin

24  refer to Varnrobinson as a "n***er," and denied that Lewis told him that Rankin and

25  Tryon had referred to him as a "rag head" and a "dot Indian." (Ex. 06, Patel Dep., at

26  27:13-29:10.)

27  223.   Ingulli and Lewis both testified that they met with Patel at a restaurant or café

28  on Hunt Highway. (Ex. 08, Ingulli Dep., at 181:10-184:6); (Ex. 07, Lewis Dep., at

1    183:20-23.) At that meeting, Lewis again told Patel about Tryon, Morris, and Rankin's

2    use of racial epithets to refer to Patel and Varnrobinson. (Ex. 08, Ingulli Dep., at

3    181:10-184:6); (Ex. 07, Lewis Dep., at 183:20-185:24.)

4    224.    Lewis also told Patel that Tryon was trying to retaliate against Plaintiffs. (Ex.

5    07, Lewis Dep., at 187:18-25.)

6    225.    Patel denied that the meeting on Hunt Highway ever occurred or that any

7    discussion regarding racial epithets aimed at Varnrobinson ever took place. (Ex. 06,

8    Patel Dep., at 34:12-36:21.)

9    226.    On July 23, 2012, Hughes sent Patel a status update, in which he stated his

10   intent to assign Tryon to be Plaintiffs' direct supervisor. (Ex. 04, Tryon Dep., at 300:7-

11   302:9.) Despite Lewis' reports that Tryon had referred to Varnrobinson as "n***er,"

12   Patel approved Hughes' plan. (Ex. 06, Patel Dep., at 71:8-75:1, Dep. Ex. 12.)

13

14   **Genuine Issue—Whether Hughes Violated FPD Policy When He Interrogated Plaintiffs about the Myers Case.**

15

16   227.    On November 21, 2012, Hughes interrogated Plaintiffs about their

17   investigation of the Myers case. (Ex. 57, November 21, 2012 Audio Recording, at 01-

18   23:50); (Ex. 01, Hughes Dep. I, at 263:22-264:1.)

19   228.    Hughes had previously written in his November 8, 2012 termination

20   memoranda that one of the justifications for terminating Plaintiffs was their

21   performance in investigating the Myers case. (Ex. 01, Hughes Dep. I, Dep. Exs. 38 & 39

22   at 6-7.)

23   229.    Varnrobinson had previously sought assistance with the Myers case from his

24   supervising sergeant and the evidence technician because it was his first suspected

25   homicide investigation. (Ex. 57, November 21, 2012 Audio Recording, at 03:12-04:15.)

26   Varnrobinson also requested that Hughes review his case summary and provide

27   feedback. (*Id.* at 05:11-21.)

28

230.    Hughes rejected Varnrobinson's request for a round table to workshop the investigation. (*Id.* at 07:50-08:00.) Although Varnrobinson expressed his need for assistance with the case summary, Hughes viewed it as complete and told Varnrobinson that he should not submit it unless it was done. (*Id.* at 02:22-43, 07:34-45.)

231.    Hughes would not allow Varnrobinson to respond to Hughes' criticisms (*Id.* at 01:40-44.) Hughes explicitly told Varnrobinson to "sit there and listen." (*Id.* at 08:00-08.)

232.    Although Hughes filed his termination recommendations with Patel two weeks before this 35-minute meeting, Hughes did not inform Plaintiffs about their potential terminations during the meeting. (Ex. 91, Varnrobinson Decl., at ¶ 9); (Ex. 57, November 21, 2012 Audio Recording.) He also did not mention the Kemp case or that he believed they recorded Hazard in violation of Town policy. (*Id.*) Instead, Hughes told Plaintiffs that he would like them to alter their conduct in the future. (*Id.*)

233.    Hughes gave Varnrobinson one week to amend the Myers case file and instructed him to complete all future reports on Spillman forms. (Ex. 57, November 21, 2012 Audio Recording, at 12:00-12:16.) Hughes also instructed Varnrobinson to provide him with a weekly report comprised of his cases and an approximate number of working hours. (*Id.* at 24:00-25:07.) Hughes further told Varnrobinson to notify dispatch when he left the Police Department to conduct interviews. (*Id.*  at 25:07-25:41.)

234.    At the end of the meeting, Hughes told Varnrobinson and Hunter that he wanted them to take over the sex offender notifications, and, in response to Hunter's inquiry about whether they would receive training on the notifications, replied that they would. (*Id.* at 35:15-27.)

235.    Although the audio recording shows that Hughes gave Varnrobinson permission to record the meeting and requested a copy of the recording (*id.* at 00:05-00:10), Hughes testified during Varnrobinson's termination appeal hearing that he was unaware that Varnrobinson was recording the meeting at the time, (Ex. 01, Hughes Dep. I, at 260:18-261:10; Ex. 62, Varnrobinson Appeal Hrg. (Hughes Testimony), at 20:9-

22:6). Hughes further testified that he did not find out that Varnrobinson was recording the meeting until the end of the meeting when Hughes thought he asked, "are you recording this?" (*Id.*) In his deposition, Hughes admitted that his testimony in the appeal hearing was incorrect. (Ex. 01, Hughes Dep. I, at 265:13-21.) Yet, Hughes still denied that Varnrobinson asked for Hughes' permission to record the meeting. (*Id.* at 258:5-259:11, 261:21-265:17.)

### Genuine Issue—Whether Patel Conducted an Independent Investigation into Hughes' Rationales for Recommending Plaintiffs' Terminations.

236.     During Patel's entire tenure as Town Manager for the Town, the Town Manager had sole authority to terminate FPD employees. (Ex. 06, Patel Dep., at 134:22–135:1.)

237.     Hughes submitted Plaintiffs' termination recommendation memoranda to Patel on or around November 8, 2012. (Ex. 01, Hughes Dep. I, at 266:1-7, 278:9-15.) Patel received those memoranda on November 19, 2012. (Ex. 06, Patel Dep., at 146:16-23.)

238.     Hughes did not submit any signed witness statements or recordings of witness interviews along with his recommendations. (*Id.* at 199:16-200:1.)

239.     Patel did not know if Hughes provided Plaintiffs with an opportunity to respond to the content of the termination memoranda before he submitted them to Patel. (*Id.* at 200:2-21.)

240.     After receiving Hughes' termination recommendation memoranda, Patel claimed that he independently reviewed the recommendations by reviewing (1) an audio recording of Plaintiffs' interview of MH; (2) the Kemp case file; and (3) Plaintiffs' Spillman logs of their case reports. (*Id.* at 152:5-14.)

241.     Patel also claimed that he spoke with Hughes, Crawford, Belinda Sichling (the FPD Record's Clerk), HR Director Scott Barber, and possibly Town Attorney

1  James Manatto. (*Id.* at 170:14-171:21.) Patel did not take notes of any of those

2  purported conversations.  (*Id.* at 173:8-174:4.)

3      242.    Patel did not know that the MH interview had taken place almost two years

4  before Hughes submitted his termination recommendations. (*Id.* at 153:8-19.) Nor did

5  Patel know that Gates brought the MH case file to Hughes only because Tryon had

6  specifically asked him to. (*Id.* at 165:22-167:10.) Patel did not confirm whether

7  Plaintiffs' conduct during the MH interview violated any law, ordinance, or FAC

8  protocol. (*Id.* at 153:25-155:18.)

9      243.    With regard to the Kemp case, Patel testified that he was concerned that

10  Plaintiffs re-investigated it without authorization; however, Patel did not bother to ask

11  Hunter, Varnrobinson, or Ingulli whether Plaintiffs were authorized, (*id.* at 156:16-

12  159:2.)

13      244.    With regard to the Spillman logs, Patel's explanation of his review of the logs

14  is as follows: "But it's just -- just to look at the data analysis of the -- on the cases and

15  their status. It's all on the computer." (*Id.* at 170:1-12.)

16      245.    With regard to his conversation with Sichling, Patel stated that Sichling told

17  him that she input info on Plaintiffs' cases in the Spillman system, but did not know

18  whether Sichling also input information on Klix's cases, or if Plaintiffs or Ingulli asked

19  her to do so. (*Id.* at 171:24-173:7.)

20      246.    Patel also based his decision to fire Plaintiffs on the fact that they seemed

21  "very inactive" on the expensive Spillman system. (*Id.* at 169:22-173:16.)

22      247.    Tryon testified, however, that it was not standard operating procedure to write

23  supplements in the Spillman system before Hughes became the Chief in 2012. (Ex. 04,

24  Tryon Dep., at 54:22-57:4, 108:22-109:9.)

25      248.    With regard to his purported conversation with Crawford, Patel stated that

26  their discussion focused on Plaintiffs' alleged "inability to conduct proper

27  investigation." (Ex. 06, Patel Dep., at 160:10-21.) However, Crawford does not recall

28  this purported conversation, and does not recall ever discussing Plaintiffs with Patel.

(Ex. 22, Crawford Dep., at 65:5-24). Crawford never stated that Plaintiffs were unable to conduct investigations. (*Id.* at 63:8-15.)

249.    Hughes based his termination recommendations in part on Plaintiffs' purported excessive internet use, but Patel also failed to review the Florence Internet Use Policy while he was deciding whether or not to terminate Plaintiffs. (Ex. 06, Patel Dep., at 180:15-19.)

250.    On November 29, 2012, Patel issued his Notices of Intent to Terminate Plaintiffs (NOIs). (Ex. 06, Patel Dep., at 151:5-16, Dep. Ex. 25-26.) Plaintiffs' responses were due on December 10, 2012, and Patel's last day as Town Manager was scheduled for December 14, 2012. (Ex. 06, Patel Dep., at 186:9-20, Dep. Exs. 25-26.)

251.    At the time he issued the NOIs, Patel still did not know whether it was Hunter or Varnrobinson who had recorded Hazard. (Ex. 06, Patel Dep., at 202:17-203:14.)

**Genuine Issue:  Whether Plaintiffs Had a Meaningful Opportunity to Respond to Patel's Notifications of Intent to Terminate Them.**

252.    Patel received Plaintiffs' responses to the NOIs on December 10, 2012 at 2:00 PM, (Ex. 06, Patel Dep., at 195:25-197:15), just four days before he issued Plaintiffs their termination notices on December 14, 2012, which was also his last date of employment with the Town, (*id.* at 7:24-8:1, 188:2-7).

253.    Varnrobinson's response was 20-pages long and expressly stated that he believed the termination recommendation was retaliatory. (Ex. 27, Varnrobinson Dep. II, at 43:11-14, Dep. Ex. 8.)

254.    Patel did not view Varnrobinson's explicit statement in his written response that "[i]t is my honest belief that this action is a retaliatory effort by Lieutenant Terry Tryon . . ." as a complaint of retaliation, (Ex. 06, Patel Dep., at 205:18 – 208:10), and therefore did not investigate this allegation, (*id.* at 205:18-208:21).

255.    Patel did not think Tryon could retaliate against Plaintiffs because Tryon did not write the termination memoranda. (*Id.* at 207:5-208:21.) In fact, Tryon did draft part

1    of the termination memoranda because he submitted a memorandum to Hughes

2    summarizing the deficiencies in Plaintiffs' cases, (Ex. 04, Tryon Dep., at 373:5-374:10,

3    Dep. Ex. 33), the findings of which Hughes copied and pasted directly into the

4    termination memoranda, (Ex. 01, Hughes Dep. I, at 269:13-274:25, Dep. Ex. 18, 38-39);

5    (Ex. 24, Hunter Appeal Hrg. I, at 172:20-173:13).

6        256.    Patel also never listened to the recording of Hazard at issue in Hughes'

7    termination memoranda, never received witness statements from Hughes in support of

8    his memoranda, and never requested the documents and recordings that Varnrobinson

9    cited in his written response, such as voice messages, meeting recordings, and

10   Varnrobinson's awards and performance evaluations, all of which Varnrobinson stated

11   were available for review. (Ex. 06, Patel Dep., at 198-202.)

12       257.    The only actions Patel took to investigate Plaintiffs' written responses were

13   reviewing the responses themselves and consulting with Barber and Mannato. (*Id.* at

14   197:24-198:2.) Patel testified that he completely deferred to Hughes' stated reasoning

15   for terminating Plaintiffs. (*Id.* at 208:12-18.)

16       258.    Rather than investigate Plaintiffs' December 10, 2012 responses to the NOIs

17   during his last week as Town Manager, Patel instead organized his office and labeled

18   files in preparation for his December 14, 2012 resignation, and attended a farewell party

19   thrown on his behalf at the Windmill Winery. (Ex. 06, Patel Dep., at 186:9-190:24, Dep.

20   Ex. 25-26); (Ex. 06, Patel Dep., at 197:14-202:16, 205:13-208:21, Dep. Ex. 30.)

21       259.    On his last day of work, Patel officially terminated Plaintiffs' employment.

22   (Ex. 06, Patel Dep., at 197:16-18.)

23       260.    Patel did not speak with Plaintiffs between November 29, 2012, when he

24   presented the NOIs, and December 14, 2012, when he terminated them. (*Id.* at 200:22-

25   201:13.)

26       261.    Patel admitted that, when he terminated Plaintiffs, he still did not know which

27   of them had recorded the conversation with Hazard, and so decided that both were

28   responsible. (*Id.* at 203:8-14.)

1

2

3

**Genuine Issue—Whether Plaintiffs Were Fired for Misconduct or for Purported "Incompetence and Unsatisfactory Work."**

4

5

262.    Hughes claimed that he personally investigated Plaintiffs prior to

6

recommending their terminations, rather than engaging a neutral outside agency to

7

conduct the investigations, because he considered the investigations solely an

8

"administrative review" of Plaintiffs' job performance, and that no misconduct was

9

involved. (Ex. 24, Hunter Appeal Hrg. I, (Hughes Testimony), at 183:7-186:22.)

10

263.    Yet, Hughes ordered that the AZ POST be notified of the Detectives'

11

termination because "misconduct was involved" in their terminations. (Doc. 247-14,

12

Hughes Decl., at ¶ 49.)

13

264.    Hughes and Tryon did, in fact, notify AZ POST that Plaintiffs' terminations

14

involved misconduct. (Ex. 44, Tryon Notifies Arizona POST of Hunter's Termination.)

15

265.    Following Plaintiffs' September 2013 termination appeal hearings, Hughes

16

published to PCAO documentation about Plaintiffs' terminations for the purpose of

17

getting Plaintiffs included on the PCAO Law Enforcement Integrity Database, i.e. the

18

"*Brady* list." (Ex. 02, Hughes Dep. II, at 374:2-377:1-4.) The *Brady* list is a list of

19

officers who have engaged in conduct that casts doubt on their ability to testify

20

truthfully. (Ex. 37, Heard Dep., at 10:9-11:4.)

21

**Genuine Issue—Whether the Town Council Delegated Policymaking Authority to the Town Manager.**

22

23

266.    The purpose of Section 01.01 of the Town of Florence Personnel Policy (the

24

"Policy") in effect at the time of Plaintiffs' termination is "to establish Town of

25

Florence personnel policies and describe overall content and relationships to other

26

regulations." (Ex. 30, Town of Florence Personnel Policy.)

27

28

267.   Section 01.01 gives the Town Manager the authority to amend the Town's personnel policies, (*id.*), stating that "[t]he Town Manager is the final authority on all matters relating to this Policy," (Ex. 14, Barber Dep., Dep. Ex. 01 at 3).

268.   Section 01.01 states further that "[n]one of these provisions shall be deemed to . . . limit the power of the Town Manager to repeal or modify these [personnel] policies." (Ex. 30, Town of Florence Personnel Policy.)

269.   The Town revised the Policy in April 2013. (Ex. 14, Barber Dep., at 17:19-20.) The April 2013 edition of the Policy superseded the edition dated September 27, 2007. (*Id.* at 15:6–17.) HR Director Scott Barber was the primary author of the April 2013 version of the Policy. (*Id.* at 18:19-19:16.)

270.   The general purpose of the April 2013 Policy was "to establish a system of personnel administration to assist the Town organization in its role of serving the citizens of Florence." (Ex. 14, Barber Dep., Dep. Ex. 01 at 3.)

271.   Section 109 of the April 2013 revised personnel policy continued to give the Town Manager the authority to amend the Town's personnel policies. (Ex. 14, Barber Dep., Dep. Ex. 01 at 5.)

272.   Montoya testified that, as Town Manager, he had the ultimate authority to approve or reject administrative rules, including ADM-10, a personnel policy that altered the process by which FPD law enforcement officers could apply for "specialized positions." (Ex. 10, Montoya Dep., at 160:18-161:8); (Ex. 02, Hughes Dep. II, at 414:22-416:4, 422:1-12, Dep. Ex. 53)

**Genuine Issue—Whether the Town Ignored Retaliation Complaints.**

273.   Patel gave Hughes a copy of Varnrobinson's January 2012 complaint about Tryon's alleged evidence tampering shortly after Hughes began working as Interim Chief in July 2012. (Ex. 06, Patel Dep., at 73:3-74:14.). Varnrobinson alleged, *inter alia*, that he had been ""been harassed by Terry Tryon since he became Lieutenant," that Tryon had "intentionally create[d] a hostile work environment," and that "Tryon

1    stated to Hunter, 'Varn can't go around taking guns from every white boy in town!'"

2    (Ex. 06, Patel Dep., Dep. Ex. 08.) Varnrobinson also listed a number of specific

3    examples of Tryon's harassment, including, *inter alia*, writing Varnrobinson up on

4    fabricated charges; ordering the FPD sergeants to engage in harassing behavior toward

5    Varnrobinson; tampering with Varnrobinson's Detective scores; interfering with

6    Varnrobinson and Hunter's criminal investigations; and failing to keep Varnrobinson's

7    personal information confidential. (*Id*.) Moreover, Varnrobinson requested "to be

8    protected from retaliatory acts," indicating his belief that he was opposing unlawful

9    conduct. (*Id.* at 4.) By that time, Hunter had complained multiple times, beginning with

10   his December 2010 written complaint, that Tryon was trying to "f**k him" (Ex. 06,

11   Patel Dep., at 47:7-49:15, Dep. Ex. 06.)

12       274.    A central dispute of material fact exists as to whether the Town maintained

13   written policies and procedures against retaliation, and, if so, whether those policies

14   were enforced. Patel testified that the Town had a "very strong policy" against

15   retaliation; thus, if there was any evidence of retaliation, the perpetrating employees

16   would be held accountable. (Ex. 06, Patel Dep., at 45:9-21.) However, Barber testified

17   that the Town did <u>not</u> have any written policies or procedures concerning retaliation or

18   whistle blowing. (Ex. 14, Barber Dep. at 27:3-30:9, 82:22-83:4.)

19       275.    Patel also testified that he had never terminated anyone in the FPD based on

20   the Town's alleged anti-retaliation policy, and that he was not concerned that Tryon

21   might retaliate against Hunter. (Ex. 06, Patel Dep., at 46:1-4, 49:16-50:24.)

22       276.    Patel further stated that the chain of command protected Hunter from any

23   possible retaliation by Tryon because Hunter did not report directly to Tryon, and

24   because Ingulli would intercede if any retaliation became apparent. (*Id.* at 50:2-24.)

25   However, on July 23, 2012, Hughes told Patel that he planned to install Tryon as the

26   direct supervisor over Plaintiffs upon the completion of the DPS investigation, which

27   would eliminate the chain of command protection against retaliation, (Ex. 04, Tryon

28   Dep., at 300:7-302:9), and Patel approved of this decision, (Ex. 06, Patel Dep., at 56:13-

58:5, 63:16-67:2, 71:8-73:15, Dep. Exs. 9 & 10); (Ex. 01, Hughes Dep. I, at 112:12-19). Even worse, Hughes testified that Tryon began supervising Plaintiffs in August 2012, (Ex. 01, Hughes Dep. I, at 121:21-122:6), i.e., *before* the DPS investigation did concluded on September 25, 2012, (Ex. 01, Hughes Dep. I, at 127:16-128:22, Dep. Ex. 11.)

**Genuine Issue:  Whether Defendant Tryon Retaliated Against Detective Lewis and Sergeant Adams.**

277.    Tryon retaliated against Lewis for reporting Tyron's inappropriate conduct to Ingulli and Patel. (Ex. 07, Lewis Dep., at 77:14-78:25, 90:17-24.) In April 2010, shortly after Lewis reported Tryon's behavior to Patel and Ingulli, Lewis resigned from his full-time position at the FPD, but stayed on as a Reserve Officer. (*Id.* at 12:5-10, 64:10-11.) However, during his tenure as a Reserve Officer, Tryon and other members of the FPD continuously told Lewis that he was "not needed" for his assigned shifts, and then attempted to terminate his reserve status based on an alleged lack of hours. (*Id.* at 91:21-96:13). Their efforts were ultimately successful; as soon as Hughes became interim Chief, he terminated Lewis. (*Id.* at 90:19-21.)

278.    Sergeant Adams began working at the FPD in 2008, and became a Sergeant in 2010. (Ex. 17, Adams Dep., at 29:7-8, 40:3-4.) Adams reported Tryon's misconduct multiple times to Grady and Patel, and he treated her inappropriately throughout her time at the FPD. (*Id.* at 29:2-19.)

279.    Adams first reported Tryon on November 9, 2011, after he had unjustifiably tried to give her a lower score on her performance evaluation than she had actually earned, which would have caused her evaluation to fall below AZ POST standards. (*Id.* at 34:22-37:1, Dep. Ex. 11.) Second, on December 20, 2011, Adams sent a written complaint to Patel stating that Tryon had repeatedly hit the wall in the FPD station, and near her office, with his fist. (*Id.* at 30:5-32:1, Dep. Ex. 08.) However, shortly

1    thereafter, Adams withdrew her complaint due to her fear of retaliation. (*Id.* at 32:22-
2    33:12, 84:13-85:13, 101:23-102:17, Dep. Exs. 06 & 07.)

3        280.    Following these complaints, Tryon promoted Sergeant Tatlock to "Senior
4    Sergeant," so that he would have seniority over Adams. (*Id.* at Dep. Ex. 13 at 6-7.)
5    Tatlock and Adams became Sergeants at the same time and had been equals for the
6    previous two-and-a-half years. (*Id.* at 40:3-41:10.) However, Ingulli decided to end
7    Adams' probationary period early, such that she held seniority over Tatlock and should
8    have been promoted over him. (*Id.* 38:9-39:22, Dep. Ex. 13 at 6-8.) Adams
9    subsequently filed a grievance with Tryon regarding his decision, but Tryon told her
10   that the decision was final. (*Id.*)

11       281.    On April 19, 2013, Adams took a police report filed by a county health
12   inspector who complained that Rankin had intimidated and threatened her at the local
13   high school's Relay for Life cancer walk. (*Id.* at 51:12-56:25, Dep. Exs. 05 & 10.)

14       282.    Soon after Adams took the police report against Rankin, FPD Officer Miguel
15   Acevedo told Adams that Rankin planned to "get rid of" her. (*Id.* at 58:1-11, 100:9-20.)
16   Adams reported this to Hughes, who told her that he had not heard such statements. (*Id.*
17   at 58:12-19.) In addition, Rankin also told Patel and "anybody that'd listened (sic) to
18   me" that he thought Adams should be fired, and also cited her actions on April 3, 2012,
19   when Adams confronted Rankin at Ms. Sepulveda's residence while they were
20   executing a search warrant. (Ex. 05, Rankin Dep., at 224:8-229:4.)

21       283.    Due in part to Tryon's actions, Adams resigned from the FPD on October 25,
22   2013. (Ex. 17, Adams Dep., at 18:15-20:18, Dep. Ex. 02.)

23
24   **Genuine Issue—Whether the Hearing Officer Who Presided over Plaintiffs'**
     **Appeals Was Physically Unable to Hear Testimony.**

25
26       284.    When Varnrobinson's counsel, Neil Landeen, first spoke about the parties'
27   jointly-requested stipulation concerning prior testimony, Hearing Officer Richard
     McAnally replied, "I'm sorry. What?" (Ex. 62, Varnrobinson Appeal Hrg., at 7:5-7.)
28

285.    During Hughes' direct examination, McAnally asked, "Can you speak a little louder?" (*Id.* at 19:3.)

286.    During Hughes' cross-examination, Landeen asked Hughes about the Town's third rationale for terminating Varnrobinson, and McAnally interjected, "Rationale what?" (*Id.* at 30:7-12.)

287.    During Patel's direct examination, McAnally misheard the number "forty-six" as the number "twelve" multiple times. (*Id.* at 59:17-60:17.)

288.    Also during Patel's testimony, McAnally interrupted his response with, "Pardon?" (*Id.* at 88:22-89:1.)

289.    During Trenton Schaefer's testimony, McAnally asked him to clarify his answer concerning the time span of Varnrobinson's internet usage that he reviewed, because McAnally "misunderstood" him. (*Id.* at 96:19.)

290.    McAnally also asked Schaefer to repeat his answers at least three times. (*Id.* at 103:6-13, 104:1-6, 104:15-16.)

291.    McAnally further asked Landeen to repeat at least one of his questions to Schaefer. (*Id.* at 115:1-4.)

292.    During James Carriers' testimony, McAnally asked him to repeat his name. (*Id.* at 120:12-15.)

293.    Also during Carriers' testimony, McAnally asked him to pull the microphone closer to him (Carriers). (*Id.* at 124:10-11.)

294.    During Hunter's testimony, McAnally asked him to repeat the name of the case that he was discussing. (*Id.* at 138:22-139:13.)

295.    During Varnrobinson's testimony, McAnally asked Manatto to repeat exhibit numbers at least four times. (*Id.* at 175:7-15, 192:16-193:1.)

296.    Also during Varnrobinson's testimony, McAnally cut him off and stated, "You're talking too fast." (*Id.* at 199:20-21.)

297.    McAnally further falsely stated that Varnrobinson had already testified that he had seen Exhibit 4, when, in fact, Varnrobinson actually stated that he had never seen the document and questioned its authenticity. (*Id.* at 203:14-204:2.)

298.    After counsel had already played Varnrobinson's recording of his conversation with PCAO Attorney Greg Hazard during the hearing, McAnally asked to listen to it again. (*Id.* at 204:9-17.)

**Genuine Issue—Whether the Hearing Officer Refused to Consider Varnrobinson's Evidence and Demonstrated a Bias Against Varnrobinson.**

299.    During Hunter's testimony in Varnrobinson's termination appeal hearing, Varnrobinson's counsel, Landeen, asked him if he had any information to support Varnrobinson's claim that his termination was motivated in part by his race. (Ex. 62, Varnrobinson Appeal Hrg., at 139:15-17.) Hunter then attempted to discuss Hughes' history of discriminatory activity in his past law enforcement positions, and Manatto objected, but offered no basis for his objection. (*Id.* at 139:18-140:5.)

300.    Hearing Officer McAnally then prevented Hunter from testifying further about Hughes' history of discrimination by stating, "That has nothing to do with this case. Ask a question specifically and strike that from evidence. *Whatever Hughes may have had – problems – if he did, it's no concern to me.*" (*Id.* at 140:2-5) (emphasis added). McAnally thereby refused to hear testimony concerning Hughes' history of discriminatory behavior, which would have supported Varnrobinson's claim that Hughes terminated him in part based on racial animus. This is despite the fact that Town of Florence Uniform Personnel Rule 11 afforded Varnrobinson the right to appeal his termination by alleging unlawful discrimination on the basis of race. (Ex. 06, Patel Dep., Dep. Ex. 27 at 2566.)

301.    When Hunter again attempted to testify as to the research that he had conducted on Hughes to support his belief that Hughes maintained a racially discriminatory animus against Varnrobinson, McAnally cut him off by stating, "I'm

going – same thing. We're not going to discuss anything like this. It's all hearsay. It has nothing to do with this case." (Ex. 62, Varnrobinson Appeal Hrg., at 140:19-141:5.)

302.    When McAnally agreed to stipulate to the parties' exhibits for purposes of submitting them into evidence, Manatto requested that he ignore Varnrobinson's exhibits concerning racial discrimination because there had "been no evidence in this case" of it. (*Id.* at 171:17-172:2.) In fact, as stated above, McAnally refused to hear such evidence. (*Id.* at 139:15-141:5.)

303.    In continuing with this pattern of ignoring Varnrobinson's evidence of racial discrimination, McAnally explicitly "guarantee[d]" that he would not "pay any attention" to Varnrobinson's documentary exhibits submitted in support of his claim that Hughes discriminated against him on the basis of his race. (*Id.* at 172:3-18.)

304.    When Manatto expressed to McAnally that it was "reprehensible" to accuse Hughes of racial discrimination, McAnally again expressed his refusal to consider evidence of racial discrimination by stating that this argument "passes through one ear and out the other at this stage." (*Id.* at 174:5-7.)

305.    McAnally further commented, without being prompted to do so, that Varnrobinson's claim that he could return to work for the FPD after bring claims of racial discrimination against Hughes was "strange" because he did not see how Varnrobinson and Hughes "could ever get along" after that, but that, regardless, arguments concerning racial discrimination were "free and worthless" to him. (*Id.* at 174:11-16).

306.    During Patel's cross-examination, and while Patel was refusing to provide a direct response to the question posed by Landeen, McAnally interrupted Landeen to state that Patel was "trying to answer your questions as much as he can." (*Id.* at 74:11-18.)

307.    McAnally interrupted Landeen a second-time by qualifying one of his questions to Patel concerning the Town's prior discipline of Varnrobinson for the MH case interview. (*Id.* at 81:21-82:10.)

308.   During Varnrobinson's testimony, his counsel asked him whether he "ever ha[d] any conversation with [his] supervisors regarding [his] internet use." (*Id.* at 163:8-9). Varnrobinson began by responding, "In fact, I spoke with Sergeant –," and McAnally cut him off by stating that he could only reply "yes" or "no" to the stated question. (*Id.* at 10-18). However, McAnally made no such interjections during the Town's case-in-chief, including during Hughes' and Patel's testimony. (*Id.* at 5-119.)

309.   McAnally twice refused to sustain a relevance objection from Varnrobinson's counsel, despite the fact that McNally had already prevented Hunter from testifying about Hughes' racial animus on alleged relevance grounds. (*Id.* at 178:6-12, 191:3-7.)

310.   When Varnrobinson attempted to answer Manatto's question about whether he recalled a meeting with Hughes on November 21, 2012, by responding that he did recall the meeting because he had recorded it, McAnally interjected and inexplicably stated, "Please answer the question." (*Id.* at 181:19-182:3.) When Varnrobinson attempted to conclude his response to Manatto's question, which implied that Varnrobinson did not have permission to record Hughes during the meeting, by stating that Hughes had lied about not giving him permission to record the meeting, Manatto objected, and McAnally sustained the objection by asserting, incorrectly, that there was "no question in front of" Varnrobinson. (*Id.* at 191:11-192:8.)

311.   During Varnrobinson's cross-examination, Manatto asked him six different times why he did not respond orally to the Town's Notice of Intent to Dismiss, in addition to his written response, and Varnrobinson answered each time that he felt his written response was sufficient. (*Id.* at 192-95.) However, when Landeen objected that the question had been "asked and answered six times," McAnally mischaracterized Varnrobinson's testimony by stating, "I know it has been asked and answered six times, but he still gives a different answer every time he answers the question." (*Id.* at 195:15-21.). In fact, Varnrobinson had consistently responded that he felt his written rebuttal was a sufficient and detailed response. (*Id.* at 192-95.)

312.     When Varnrobinson testified about recording his conversation with PCAO Attorney Hazard, McAnally asked him, "Why in the world did you do that?" (*Id.* at 199:6-8.) When Varnrobinson attempted to answer McAnally's question with "Well, first of all --," McAnally abruptly cut him off by stating, "No, wait a minute. Don't tell me, first of all." (*Id.* at 9-11.)

313.     When Varnrobinson explained that he had not violated any FPD policy by recording Hazard because the policy only forbade secret recordings of members of the FPD, which Hazard is not, McAnally responded, "I'm not interested in that." (*Id.* at 200:7-14.) After further explanation about the policy by Varnrobinson, McAnally inappropriately stated, "I appreciate all your excuses you've given, but that's all I have to ask of you." (*Id.* at 206:1-2.)

**Genuine Issue – Whether the Hearing Officer Actions in Upholding Varnrobinson' Termination and Rejecting Hunter's Termination Demonstrate His Bias and Impartiality.**

314.     Hunter's termination appeal hearing took place on September 9 and 10, 2013. (Ex. 33, Hunter Dep. I, Dep. Ex. 06 at 1.)

315.     On September 26, 2013, McAnally found that Hunter's termination should be overturned because two of the rationales for Hunter's termination, i.e., Hunter's performance while interviewing the alleged rape victim in the MH case and the secret recording of a PCAO attorney, could not be used to support his termination. (*Id.* at 11-12.)

316.     Specifically, McAnally found that Plaintiffs' missteps in the MH interview had already been handled through additional trainings; thus, it was an "invalid" basis for termination. (*Id.* at 6.) Second, McAnally determined that Varnrobinson recorded Hazard alone and that Hunter was not involved. (*Id.* at 7.)

317.     With respect to Hunter's internet usage, McAnally found that Hunter spent "40 percent of his time on social media," (Plaintiffs strongly dispute this finding), but that this was "not by itself sufficient to justify termination." (*Id.* at 9.) Finally,

1  concerning Hunter's case reports, McAnally found that some of the reports violated

2  "standard conduct," but that this was "correctible under ret[r]aining and positive

3  supervising." (*Id.* at 10.)

4      318.    McAnally therefore concluded that Hunter's termination could not be

5  sustained. (*Id.* at 13.)

6      319.    Varnrobinson's termination appeal hearing was held on September 24, 2013.

7  (Ex. 92, Varnrobinson Appeal Hrg. Findings of Fact, at 1.)

8      320.    Concerning the MH interview, McAnally found that this charge could not be

9  sustained on "double jeopardy" grounds. (*Id.* at 7.)

10      321.    Despite Varnrobinson's truthful testimony that his recording of PCAO

11  Attorney Hazard in connection with the Kemp re-investigation did not violate FPD

12  policy because Hazard was not an FPD employee, and despite the submission of an

13  affidavit by Ingulli stating that he had did not recall ever issuing a policy forbidding

14  such a recording, McAnally found that "[t]his excuse is not acceptable" and sustained

15  the charge. (*Id.* at 10-12.)

16      322.    Regarding Varnrobinson's internet usage, McAnally disregarded testimony of

17  Varnrobinson's expert on the validity of the Town's Internet Use Report, and instead

18  sustained the charge, focusing largely on Varnrobinson's internet usage on only one

19  work day in October 2012. (*Id.* at 12-15.)

20      323.    Finally, with respect to Varnrobinson's case reports, McAnally found that

21  they were "below the standard" and could also be used to justify his termination. (*Id.* at

22  15-16.)

23      324.    McAnally therefore upheld Varnrobinson's termination, noting that he

24  (McAnally) had been the "subject of criticism" by Varnrobinson during his appeal

25  hearing, (*id.* at 16), when, in fact, Varnrobinson had merely expressed concern that

26  McAnally had "already made a conclusion just based on his characterization of [him] as

27  a witness," (Ex. 62, Varnrobinson Appeal Hrg., at 208:9-11). By this statement,

28  Varnrobinson was referring to the clear bias that McAnally has displayed against

1    Varnrobinson and in favor of the Town as explained above. (Ex. 91, Varnrobinson

2    Decl., at ¶ 11.)

3        325.    Therefore, despite the nearly identical charges against Hunter and

4    Varnrobinson, McAnally chose only to uphold Varnrobinson's termination. (Ex. 92,

5    Varnrobinson Appeal Hrg. Findings of Fact, at 18.)

6    **Genuine Issue – Whether Town Manager Montoya Participated in the Disciplinary**
7    **Actions Taken Against Hunter.**

8        326.    On October 9, 2013, Town Manager Charles Montoya reinstated Hunter,

9    demoted him from a Detective to a Police Officer, reduced his salary by 5%, and

10   retroactively suspended him without pay for six months. (Ex. 10, Montoya Dep., at

11   107:1-22, 156:9-13, Dep. Ex. 05.)

12       327.    Montoya testified that someone in the Town Attorney's office wrote the letter

13   that notified Hunter of his reinstatement, pay cut, and suspension, and that Montoya

14   merely signed it. (*Id.* at 101:20-103:16, Dep. Ex. 05.) Similarly, on summary judgment,

15   Montoya asserts that he relied on the advice of counsel when executing Hunter's

16   reinstatement letter, (Montoya Decl., Doc. 247-24, at ¶ 2), and that he "had no

17   knowledge of the specific reasons" why Plaintiffs were previously terminated or of the

18   complaints that they made concerning Tryon, (*Id.* at ¶ 7). Montoya refused to testify on

19   these issues during his deposition. (Ex. 10, Montoya Dep., at 41:22-42:20, 47:7-48:12,

20   56:11-19, 60:13-61:5, 62:20-63:9, 87:1-88:9, 103:9-12, 178:5-17.)

21       328.    Before demoting and suspending Hunter and cutting his salary, Montoya did

22   not listen to recordings or read transcripts of Plaintiffs' appeal hearings or perform any

23   other independent inquiry into the facts supporting the Hearing Officer's decision, or

24   into what disciplinary action Hunter's conduct warranted. (*Id.* at 84:6-85:9, 98:5-99:5,

25   105:3-23, 107:1-108:1.)

26       329.    Montoya admitted that he did not provide Hunter with any process before

27   cutting his salary and suspending him without pay. (*Id.* at 95:15-96:10.)

28

- 165 -

330.    When Montoya issued Hunter's disciplinary action, he did not follow the statutorily required procedures governing police officer discipline. (Ex. 10, Montoya Dep., at 89:11-91:25, Dep. Ex. 03.)

331.    While serving as Town Manager, Montoya had multiple conversations about Plaintiffs, including with Hughes, but never in the absence of Town Attorney Manatto. (Ex. 10, Montoya Dep., at 44:17-20, 46:21-47:4, 47:14-16, 48:3-4, 55:9-56:2, 60:2-12.) During his deposition, Montoya refused to answer any questions regarding the substance of any conversations that he had about Plaintiffs in the presence of the Town Attorney and Hughes, citing attorney-client privilege. (*Id.*)

332.    Montoya first heard about Plaintiffs' termination appeals from Manatto shortly after becoming Town Manager, but Montoya refused to disclose what he learned about those appeals, citing attorney-client privilege. (*Id.* at 41:1-25, 42:15-44:2, 56:4-19.)

333.    Montoya had discussions about Hunter's disciplinary actions, but also refused to testify about the content of those conversations, citing both attorney-client privilege and statutory protection. (Ex. 10, Montoya Dep., at 57:1-63:24, 103:2-12, Dep. Exs. 1 & 5.)

334.    Montoya testified that his belief that Hunter's termination was warranted was based in part on legal advice, the content of which he refused to disclose. (Ex. 10, Montoya Dep., at 177:18-178:15.) Days after the lawsuit was filed, Montoya and the Town issued a press release, which stated that "claims that [Plaintiffs] were fired for whistleblowing or that there is corruption in the Florence Police Department are unsubstantiated, frivolous and irresponsible." (Ex. 09, Montoya Dep., at Exs. 12 & 13.)

### **Genuine Issue – Whether Hughes Prevented Hunter's Reinstatement as a Detective.**

335.    Hunter was reinstated to the FPD on or around October 15, 2013. (Ex. 02, Hughes Dep. II, at 415:23-25.)

336.    Ten days later, on October 25, 2013, Hughes issued ADM-10, a new policy that eliminated the permanent position of Detective and created a new specialized Detective "Assignment." (Ex. 02, Hughes Dep. II, at 414:22-416:4, 422:1-12, Dep. Ex. 53, at 2.) The job duties for the former detective "position" and the new detective "assignment" were the same. (*Id.* at 423:4-7.)

337.    ADM-10 prohibited officers with significant discipline in the prior 12 months from applying for the special assignments. (*Id.* at 414:22-416:4, 422:1-12, Ex. 53, at 2.) This rendered Hunter ineligible for the detective specialized assignment because of the discipline imposed by Montoya, (Ex. 10, Montoya Dep., at 156:23-158:6), despite his extensive experience working as a Detective in the FPD since 2004, (Ex. 90, Hunter Decl., at ¶ 11).

338.    At the time Hughes initiated the policy change, Hughes was aware that Hunter wanted to be reinstated to his prior Detective position. (Ex. 02, Hughes Dep. II, at 417:6-418:14.)

339.    Hunter applied for a Detective Special Assignment in June 2014, but Hughes refused to consider it, and claimed that Hunter's application did not comply with the new procedure set out in ADM-10. (Ex. 02, Hughes Dep. II, at 419:6-420:8, 423:16-425:6, Dep. Ex. 53.) However, Hughes did not inform Hunter that he had purportedly failed to adhere to ADM-10 until after Hughes had already filled the two Detective Special Assignments. (*Id.* at 426:15-25, Dep. Ex. 53.)

### <u>Genuine Issue – Whether Defendants Intentionally Delayed Hunter's Re-Certification Process.</u>

340.    A material dispute of fact in this case is whether Hughes and the Town intentionally delayed Hunter's re-certification process with the Arizona Peace Officer Standards and Training Board (AZ POST). In a memorandum sent by Hughes to Hunter on November 8, 2013, Hughes stated that "we fully anticipated being able to put you into regular patrol duty once we moved through the training period," but that "[w]e did

1    not anticipate being told by AZPOST that we would have to go through a process

2    substantially similar to that followed for a new officer. (Ex. 02, Hughes Dep. II, at

3    347:14-18, 365:10-23, Dep. Ex. 43 at FLORENCE.003187-88.)

4        341.    However, during his deposition, Hughes admitted that AZ POST never told

5    him that Hunter would have to go through such a process. (Ex. 02, Hughes Dep. II, at

6    348:5-14.) Rather, AZ POST had told Hughes in writing on October 22, 2013 that

7    Hunter's active certification from his prior position with the Kearny Police Department

8    meant that "he is fine acting as a peace officer now." (*Id.* at 348:19-350:19, Dep. Ex.

9    42.)

10       342.    Despite this, Hughes wrote back to the AZ POST to inform them of Hunter's

11   six-month suspension, which led AZ POST to conduct another background

12   investigation of Hunter. (*Id.* at 350:20-351:8.)

13       343.    Hughes and other members of the FPD communicated with AZ POST

14   throughout the re-certification process, which was significantly delayed, causing Hunter

15   to remain on code enforcement duty throughout. (*Id.* at 352:20-23, 353:16-20.)

16       344.    On January 10, 2014, Hughes emailed Michael Rosenberger, Compliance

17   Specialist for AZ POST, to raise the issue of "whether or not [Hunter] refused the

18   mandated polygraph examination," based on Hunter's refusal to answer one question

19   that he wanted to defer to his attorney. (*Id.* at Dep. Ex. 43 at FLORENCE.003181.)

20       345.    Hughes also sent AZ POST several materials concerning the charges against

21   Hunter at issue in his reinstatement hearing, many of which were not sustained by the

22   Hearing Officer. (*Id.* at 357:5-18-358:25.) AZ POST rejected all of these charges

23   against Hunter. (*Id.* at 359:7-10.)

24       346.    On January 17, 2014, Jack Lane, Compliance Manager for AZ POST, sent

25   Hughes a letter concerning Hunter's re-certification. (*Id.* at 347:14-18, 365:10-23, Dep.

26   Ex. 43 at FLORENCE.003169-70.) In this letter, Lane explained the facts at issue,

27   including that, on December 23, 2013, Tryon certified in writing to AZ POST that

28   Hunter met AZ POST standards; that the FPD brought "several issues" that Hughes

"had concerns over" to Rosenberger's attention during his audit of Hunter's background investigation; and that Hughes had emailed Rosenberger on January 17 regarding Hunter's polygraph examination. (*Id.*)

347.   In his letter to Hughes, Lane set forth the AZ POST's position on Hunter's re-certification. (*Id.*) Specifically, he stated that Tryon's written certification constituted the FPD's "statement that you attest to the fact that Officer Hunter meets minimum AZ POST standards," and that, "if you feel this is not the case, you should rescind the A1 Form you submitted." (*Id.*)

348.   Lane further stated that Rosenberger's audit of Hunter's background investigation also "indicates he meets AZ POST minimum standards," but noted that there were "minor differences in Officer Hunter's recollection of events" when his AZ POST medical report was compared to his reports from prior employers. (*Id.*) However, the AZ POST did not find those minor exceptions to rise to the level of disqualifying Hunter, but instead stated that the FPD was not prevented from "utilizing its own discretion" to refuse to hire Hunter. (*Id.*)

349.   Finally, Lane noted that the "AZ POST feels that Officer Hunter has met the standard of submitting to the polygraph examination," that Hunter gave no indication of deception during his examination, and that, "[w]hat you [Hughes] may consider unsatisfactory responses or deception would be an agency decision to disqualify and not appoint." (*Id.*)

350.   In other words, the AZ POST's position was that Hunter met AZ POST standards and that, if the FPD wanted to refuse to re-hire him, it would need to use its discretion to do. (*Id.*)

351.   Despite AZ POST's stated position on January 17, 2014 that Hunter could be re-certified, which was twice reiterated in subsequent emails to Sergeant Tatlock in February 2014, the FPD continued to delay the completion of the process by failing to timely submit Hunter's AZ POST medical report to Rosenberger, and by continuing to

raise issues concerning the report that AZ POST considered to be "minor" and not to affect Hunter's certification. (Ex. 02, Hughes Dep. II, at 361-365.)

352.   Not until July 2014 did the FPD finally take Hunter off of code enforcement duty. (*Id.* at 367:17-368:5, Dep. Ex. 44.)

353.   Moreover, Hughes' subsequent handwritten notes from a meeting with his attorney indicate that he sought legal advice on whether the FPD could be held civilly liable for sending the information about Hunter to AZ POST that caused his re-certification to be delayed. (*Id.* at 369:13-373:10, Dep. Ex. 45 & 46.)

354.   In his notes, Hughes cites A.R.S. § 41-1828.01(C), which states: "(C). Civil liability may not be imposed on either a law enforcement agency or the board for providing information specified in subsections (A) and (B) of this section if there exists a good faith belief that the information is accurate." (*Id.*)

355.   During his deposition, Hughes denied seeking legal advice on this issue, (*id.*); therefore, an issue of fact exists as to whether Hughes was contemplating the FPD's potential civil liability for sending information about Hunter to AZ POST during his re-certification process.

**Genuine Issue -- Whether Hughes and the Town Sent Documents to the PCAO to Support Plaintiffs' Inclusion on the *Brady* List.**

356.   On November 6, 2013, John Stevens at the PCAO emailed Hughes about information that Hughes had provided to the PCAO for purposes of including Plaintiffs on the *Brady* list. (Ex. 02, Hughes Dep. II, at 374:2-375:3.) Hughes identified himself as the only employee at the FPD who could have provided such information to the PCAO. (*Id.* at 376:6-14, 377:1-4.)

357.   Hughes later testified that the Town's Attorney, James Manatto, had submitted documents concerning Hunter to the PCAO, but that he did not know which documents were provided, (Ex. 03, Hughes Dep. III, at 461:10-22), thereby contradicting his earlier testimony about personally providing information to the PCAO.

358.    Hughes further testified that he spoke with then-County Attorney Landon Voyles at the PCAO about Plaintiffs prior to their appeal hearings in September 2013. (*Id.* 465:2-266:23.)

359.    Hughes testified that Danielle Roberts, Assistant Town Attorney, also sent information about Plaintiffs to the PCAO, but did not recall when she did so. (*Id.* at 467:7-21.)

**Genuine Issue—Whether Hughes Repeatedly Stared at Hunter in an Aggressive, Confrontational Manner for the Purpose of Provoking a Reaction from Him.**

360.    Hughes repeatedly stared down Hunter in an aggressive, confrontational manner (colloquially referred to as "mad-dogging"). (Ex. 34, Hunter Dep. II, at 83:4-84:9, 146:8-19, Dep. Ex. 09.)

361.    During a break in Hughes' April 2016 deposition in this case, Hughes stood in the hallway and stared aggressively at Plaintiffs. (*Id.* at 76:19-24, 146:8-19, Dep. Ex. 09.) Hughes did the same thing the following day during a break in Varnrobinson's deposition. (*Id.*)

362.    After a May 4, 2016 squad briefing at the FPD, which Hughes rarely attended, (*Id.* at 91:9-12), Hughes once again "mad-dogged" Hunter, (*Id.* at 146:8-19, Dep. Ex. 09.) This incident is referred to in this lawsuit as the "briefing room incident."

363.    During the briefing room incident, Hughes entered the briefing room, stood across the room from Hunter with his back against the wall, and immediately began to stare directly at Hunter. (*Id.* at 92:2-8, Dep. Ex. 09.) Hughes did not speak to any officers in the briefing room. (Ex. 03, Hughes Dep. III, at 546:17-20.)

364.    Hunter attempted to ignore Hughes by looking at the ground. (Ex. 34, Hunter Dep. II, at 92:12-13, Hunter Dep. Ex. 09.) Hughes then asked Hunter, "Is there something wrong?" (*Id.* at 94:3-6, Dep. Ex. 09.) Hunter responded that he was tired of Hughes "staring [him] down," complained about Hughes' retaliatory effort to "ruin [Hunter's] career," and exited the briefing room. (*Id.* at 94:6-17, Dep. Ex. 09.)

365.    Officer Jarrod Ballad and Officer Kevin Mount could not see whether or not Hughes had been staring at Hunter. (Ex. 75, Ballard Dep., at 10:4-11:11, Dep. Ex. 01); (Ex. 76, Mount Dep., at 7:6-8:18, Dep. Ex. 01.) Sergeant Don Campbell testified that he did not know whether or not Hughes had been staring at Hunter and could not offer an opinion one way or the other. (Ex. 77, Campbell Dep., at 46:11-13, 48:9-20.)

366.    During Hughes and Hunter's exchange, Sergeant Scott Morris said to Hunter, "Walt, that's enough." (Ex. 86, Morris Dep. II, at 20:10-11.) Campbell reported that he then told Hunter "to handle the issue behind closed doors." (Ex. 77, Campbell Dep., at 12:11-13, Dep. Ex. 03.) Hunter then exited the room and muttered "whatever" to himself on the way out of the room. (*Id.* at 13:6-7, 13-19.)

367.    Later in the day on May 4, 2016, Hughes and Barber placed Hunter on paid administrative leave at Hughes' request. (Ex. 34, Hunter Dep. II, at 95:16-18, Dep. Ex. 09); (Ex. 03, Hughes Dep. III, at 554:19-555:6.)

368.    On an earlier occasion, Officer Cody Linderoth had observed Hughes "mad-dogging" Hunter during a staff meeting at the FPD. (Ex. 14, Barber Dep., at 39:19-23, Dep. Ex. 03.)

369.    Following the briefing room incident, Barber obtained a statement from Linderoth in which Linderoth confirmed that he had observed Hughes staring at Hunter and that Hughes looked "like he wanted to eat [Hunter's] lunch." (Ex. 14, Barber Dep., at 53:10-54:14, Dep. Ex. 06.)

370.    Barber agreed that this incident suggested that Linderoth believed there was friction between Hunter and Hughes, which may have made it more likely that Hughes stared at Hunter on a different occasion. (Ex. 14, Barber Dep., at 59:9-17.) Barber testified that he had no reason not to believe Linderoth's account. (*Id.* at 59:23-60:2.)

371.    Hughes denied staring at Hunter on each of these occasions. (Ex. 03, Hughes Dep. III, at 555:21-559:10.)

**Genuine Issue – Whether Defendants Failed to Investigate Hunter's May 2016 Complaint of Hughes' Retaliation.**

372.    On May 5, 2016, Hunter complained about Hughes' retaliatory actions, including his aggressive staring on several separate occasions, to Barber, in an emailed titled, "Continuing Retaliation by Chief Hughes." (Ex. 14, Barber Dep., at 39:19-25, Dep. Ex. 03.) Hughes denied each of Hunter's allegations. (Ex. 03, Hughes Dep. III, at 555:15-558:2, 559:2-10, 563:20-22.)

373.    Hunter also requested that Human Resources conduct a full investigation, including by interviewing everyone present during the briefing room incident. (Ex. 34, Hunter Dep. II, at 95:22-96:2, Dep. Ex. 09.)

374.    On May 10, 2016, Barber acknowledged his receipt of Hunter's complaint and stated that the allegations related to the ongoing litigation in this case and were therefore outside the scope of his responsibility. (Ex. 14, Barber Dep., at 42:4-43:5, Dep. Ex. 04.) Accordingly, Barber did not investigate Hunter's allegations of retaliation with regard to Hughes' staring during his and Varnrobinson's depositions. (Ex. 14, Barber Dep., at 45:16-21.)

375.    Despite Hunter's request that he do so, Barber also failed to interview the individuals present during the briefing room incident. (*Id.* at 41:1-8.) Instead, he asked them for statements via email. (*Id.* at 41:9-10.)

376.    With regard to Hunter's allegation that Hughes stared at him in the officers' room at the FPD, Barber did not attempt to find witnesses to those alleged incidents. (*Id.* at 64:14-5.)

377.    [BLANK]

378.    Hughes discussed with Barber each of Hunter's allegations in his May 2016 complaint. (Ex. 03, Hughes Dep. III, at 562:17-563:2.)

379.    Ultimately, Barber concluded that none of Hunter's allegations could be confirmed. (Ex. 14, Barber Dep., at 62:3-22, Dep. Ex. 06.) Barber testified that he had no concerns that Hughes was retaliating against Hunter due to Barber's "characterization of Chief Hughes." (Ex. 14, Barber Dep., at 73:1-74:5.)

380. Moreover, Barber testified that the Town does not have any written policies or procedures regarding retaliation or whistle blowing. (*Id.* at 27:3-30:9, 82:22-83:4.)

381. Town Manager Brent Billingsley was aware that Hunter had reported Hughes' retaliation. (Ex. 15, Billingsley Dep., at 21:19-22:6.) Billingsley testified that, although he took Hunter's complaints very seriously, he did not believe that it was his responsibility to investigate whether or not the retaliation occurred. (*Id.* at 24:21-27:8.) Instead, according to Billingsley, it was HR and the PCAO's job to conduct such an investigation. (*Id.* at 27:14-18.)

382. However, Billingsley was unaware of whether Barber investigated Hunter's retaliation reports. (*Id.* at 27:17-28:24.) Billingsley was also not concerned that Hughes retaliated against any other subordinates at the FPD, despite Varnrobinson's reports of such retaliation. (*Id.* at 34:19-35:24.)

**Genuine Issue – Whether Hunter's Disability Caused His Conduct During the May 4, 2016 Briefing Room Incident and During the Resulting December 15, 2016 Internal Investigation Interview.**

383. Hunter passed a psychological screening test in 2003 when he became a police officer at the FPD. (Ex. 85.)

384. After staring Hunter down during the briefing room incident, Hughes ordered Hunter to undergo a psychological fitness for duty evaluation with Dr. Connie Pyburn. (Ex. 03, Hughes Dep. III, at 564:15-565:3, 575:4-12, Dep. Ex. 71.)

385. On May 18, 2016, Hughes sent Pyburn a background memorandum on Hunter, which Hughes prepared with Barber. (Ex. 36, Pyburn Dep., at 33:25-34:8, Dep. Ex. 02.)

386. Dr. Connie Pyburn conducted the fitness for duty evaluation on May 26, 2016. (Ex. 36, Pyburn Dep., at 31:12-14, Dep. Ex. 01 at 6.) Pyburn determined that Hunter was not fit to return to duty. (*Id.*)

387. Pyburn's initial fitness for duty report noted that, on Hunter's most recent performance evaluation from the period of October 15, 2014 through October 16, 2015, he was rated as "full performance" in all areas. (*Id.* at 2.)

388. Pyburn diagnosed Hunter with "DSM-V Major Depression," which includes symptoms of "sleep disturbance" and "feelings of sadness or depression." (Ex. 36, Pyburn Dep., at 51:6-12.)

389. To qualify as depression under the DSM-V, the condition must have lasted for more than two weeks at the time the diagnosis is made. (*Id.* at 51:10-12.) Pyburn diagnosed Hunter twenty-two days after the May 4, 2016 briefing room incident. (Ex. 36, Pyburn Dep., at 31:12-14, Dep. Ex. 01 at 6.)

390. Pyburn also noted that Hunter "has had acute stress, difficulty sleeping and believes he is being retaliated against," and implied that, at the time of diagnosis, Hunter lacked the "ability to control emotions, particularly anger and feelings of being persecuted." (*Id.*)

391. Pyburn further stated that "[m]ajor depression is a psychopathology that could change within a matter of weeks," (Ex. 36, Pyburn Dep., Dep. Ex. 01 at 6), meaning that, despite the fact that she determined that Hunter was in remission from major depression at the time of his follow-up fitness for duty examination on October 3, 2016, he could have relapsed by the time that Hughes recommended his termination on January 24, 2017, a fact of which Defendants were well-aware based on Pyburn's warning that "returning to work in the same environment could lead to a relapse of symptoms." (*Id.*)

392. Pyburn testified that a person who was once suffering from or diagnosed with major depression could enter remission, and then could later reenter a period of major depression. (Ex. 36, Pyburn Dep., at 53:1-5.)

393. On June 28, 2016, Hughes notified Hunter that he would be placed on leave pursuant to the Family and Medical Leave Act, and that the leave would be without pay

once Hunter exhausted his available accrued leave. (Ex. 03, Hughes Dep. III, at 574:21-575:7, Dep. Ex. 78.)

394.   Hughes also notified Hunter that he would be expected to undergo a follow-up fitness for duty examination in October, and that any disciplinary action for the briefing room incident would be put on hold until after that evaluation. (*Id.* 576:5-22, Dep. Ex. 78.)

395.   On or about October 3, 2016, Pyburn conducted a follow-up fitness for duty examination on Hunter, the purpose of which was "to determine if Officer Hunter was psychologically fit to function in full law enforcement duties," and in which she reviewed the list of purported "essential functions" of Hunter's job provided to her by the Town. (Ex. 36, Pyburn Dep., at Ex. 05, at 1.)

396.   In her report, Pyburn noted that Hunter was "less anxious" than he had been in May 2016, and concluded that his major depression was in remission, that he was not a threat to himself or others, and that he was fit to return to duty. (*Id.* at 64:14-68:8, Dep. Ex. 05 at 2 & 6.)

397.   On October 26, 2016, Barber stated the Town was "ready and willing to return him to full duty if he is deemed to now be fit for duty," and asked Pyburn what "actions or speech" Hunter might exhibit to signal a "reoccurrence of psychological disease or defect" that Pyburn initially diagnosed (major depression). (*Id.* at 69:3-7, Dep. Ex. at 06.) Barber also asked Pyburn whether her conclusion that Hunter was fit for duty "allow[ed] for an unqualified return by Mr. Hunter to all duties and functions, with or without reasonable accommodation." (*Id.*)

398.   In Pyburn's response, which Barber received on December 13, 2016, (Ex. 01, Hughes Dep. I, Dep. Ex. 79), Pyburn warned that Hunter's "returning to work in the same environment could lead to a relapse of symptoms. The most telling symptoms are generally increased anger, defiance or disrespect to authority," (Ex. 36, Pyburn Dep., Dep. Ex. 07).

399.    Pyburn also told Barber that Hunter had "returned to his likely prior functioning when he was first hired in Florence," and that she did not recommend "revisiting fitness for duty" if problems arose in the future. (*Id.* at 2.)

400.    Pyburn did "not necessarily support Hunter's full return to all duties and functions, as it is often prudent to have a transition plan from no duty to full duty; light duty would be acceptable first to make sure [Hunter] can handle the stress." (Ex. 36, Pyburn Dep., Dep. Ex. 07 at 2.)

401.    Hughes also received a copy of Pyburn's response to Barber's questions regarding the risk that Hunter might relapse.  (Ex. 03, Hughes Dep. III, at 580:9-15.)

402.    No Town employees ever even discussed the possibility of accommodating Hunter, despite Barber's concern that Hunter's major depression could relapse. (Ex. 14, Barber Dep. at 90:18-21, 103:5-7.) The Town also lacked any forms, policies, or procedures through which Hunter could have requested accommodations while out on administrative leave. (*Id.* at 112:13-21, 113:2-3.)

403.    On November 21, 2016, Hughes requested that the Apache Junction Police Department (AJPD) conduct an internal investigation on behalf of the Town into Hughes' allegations that Hunter violated Town policies regarding Insubordination, Conduct Unbecoming, and Use of Digital Recorders during the briefing room incident. (Ex. 03, Hughes Dep. III, at 587:15-588:11, Dep. Ex. 81 at 3.)

404.    That same day, November 21, 2016, AJPD Lieutenant Jeffery Kirkham was assigned to conduct the investigation. (*Id.*  at 588:15-589:1, Dep. Ex. 81 at 3-5.)

405.    Despite the fact that the investigation was initiated on November 21, 2016, Hunter was given less than 24-hours notice to attend a mandatory interview on December 15, 2016 in connection with the internal investigation initiated by Hughes. (*Id.* at Dep. Ex. 81 at 51.)

406.    Hunter had asked Barber on November 8, 2016, for a copy of the Town psychologist's report from his October 3, 2016 follow-up fitness for duty examination,

1   but Barber refused to provide it to Hunter prior to his December 15, 2016 interview

2   Kirkham. (Ex. 14, Barber Dep., Dep. Ex. 11.)

3        407.   Only on December 16, 2016, the day after Hughes' interview with Kirkham,

4   did Barber finally email Pyburn's follow-up fitness for duty report to Hunter, along with

5   her letter warning him about the risks of relapse. (Ex. 03, Hughes Dep. III, at 577:10-

6   578:13, 580:16-23, Dep. Exs. 79 & 80.)

7        408.   In his email, Barber told Hunter that the Town was evaluating Pyburn's

8   suggestion of implementing a transition plan. (Ex. 14, Barber Dep., Dep. Ex. 11.)

9   However, the Town never implemented a transition plan. (Ex. 14, Barber Dep., at

10   96:11-97:12.)

11        409.   Barber admitted that, during Hunter's December 15, 2016 interview with

12   Kirkham, Hunter exhibited all the symptoms that Pyburn identified as indicative of a

13   relapse of major depression – increased anger, defiance, and disrespect of authority. (*Id.*

14   at 134:13-22.)

15        410.   Hughes also admitted that Hunter sounded angry and disrespected Hughes'

16   authority during the Kirkham interview. (Ex. 03, Hughes Dep. III, at 581:12-582:13.)

17        411.   As Pyburn acknowledged, "depressed men in our culture generally present as

18   angry." (Ex. 36, Pyburn Dep., at 31:5-6.)

19        412.   Billingsley did not consider Hunter's mental state when he decided to

20   terminate Hunter. (Ex. 15, Billingsley Dep., at 74:2-76:10.) At the time Billingsley

21   decided to terminate Hunter, he was aware that Pyburn had identified anger, defiance,

22   and disrespect to authority as the most telling symptoms of a relapse of major

23   depression. (*Id.* at 86:9-14.) However, Billingsley did not consider whether Hunter's

24   behavior was a sign that he had, in fact, relapsed. (*Id.* at 87:9-12.)

25

26

27

28

**Genuine Issue – Whether Hunter Violated a "Direct Order" During the May 4, 2016 Briefing Room Incident**.

413.    Sergeant Scott Morris claims that his "that's enough" statement to Hunter during the briefing room incident was a direct order to Hunter to "quit being disrespectful" to Hughes. (Ex. 86, Morris Dep. II, at 27:20-28:9.) Morris neither told Hunter that Morris' statement was a direct order nor warned Hunter of any potential consequences if Hunter failed to comply with the order. (Ex. 77, Campbell Dep., at 28:10-29:8.)

414.    Morris did not report his belief that Hunter violated a direct order in his memorandum describing the briefing room incident or in his subsequent email to Barber answering Barber's questions about the incident. (*Id.* at 40:3-24, Dep. Ex. 01-02.) Morris also did not discipline Hunter for his actions, despite his authority to do so. (*Id.* at 40:25-41:12.)

415.    In Campbell's memorandum about the briefing room incident and in his email to Barber, Campbell also did not identify Morris' statement to Hunter as a direct order. (*Id.* at 7:10-8:8, 11:23-12:10, Dep. Ex. 01, 03.)

416.    Campbell later claimed in his interview with AJPD Investigator Kirkham that Morris' "that's enough" was a direct order and stated that Hunter failed to comply with it. (*Id.* at 52:25-53:4.) Campbell claimed that he considered Morris' statement to be a clear order for Hunter to become completely silent immediately, even if that meant Hunter had to stop speaking mid-word, which Hunter failed to do. (*Id.* at 22:1-23:14, 51:5-52:3.)

417.    In his written report and subsequent interview with Kirkham, Campbell did not report that his own statement that Hunter should "handle the issue behind closed doors" was a direct order; yet, during his deposition, he first claimed that he <u>did</u> consider it a direct order. (*Id.* at 12:14-18, 52:4-24.) Campbell further claimed that he believed Hunter violated his direct order merely by stating "whatever" as Hunter exited the room. (*Id.* at 12:19-14:1, 41:6-42:21.)

418.    During his deposition, Plaintiffs' counsel asked Campbell to explain how stating "whatever" violated Campbell's direct order, but Campbell was unable to do so. (*Id.* at 42:25-43:6.)

419.    Campbell also could not explain why a hypothetical instruction from a superior stating, "Hey, pass me the map book" is not a direct order, while "That's enough" did constitute a direct order. (*Id.* at 48:23-51:4.)

420.    Although Campbell purportedly believed that Hunter violated his direct order, Campbell neither made that allegation at any time between the briefing room incident on May 4, 2016 and his deposition on March 7, 2017, nor reprimanded Hunter for failing to comply. (*Id.* at 55:11-57:17.)

421.    Campbell does <u>not</u> think Hunter should have been terminated for his actions during the briefing room incident. (*Id.* at 58:3-17.)

**<u>Genuine Issue—Whether Defendants Interfered with and Gave False Testimony During the Purportedly Neutral Outside Investigation of the Briefing Room Incident.</u>**

422.    Hughes chose the AJPD to investigate the briefing room incident, purportedly to ensure neutrality, due to Hunter's ongoing lawsuit against Hughes and the Town. (Ex. 03, Hughes Dep. III, at 587:15-588:11, Dep. Ex. 81 at 3.)

423.    Despite his purported desire for neutrality, Hughes and Florence Town Attorney Manatto together drafted a list of questions that they wanted Kirkham to ask Hunter as part of the investigation. (Ex. 03, Hughes Dep. III, at 597:20-598:7); (Ex. 12, Klix Dep. II, Dep. Ex. 30.)

424.    On December 4, 2016, Klix sent Kirkham the list of questions, which she had been given by Hughes. (Ex. 12, Klix Dep. II, at 310:7-22, Dep. Ex. 30.)

425.    On December 15, 2016, Kirkham interviewed Hunter in connection with the internal investigation of the briefing room incident. (Ex. 03, Hughes Dep. III, Dep. Ex. 81 at 11.)

426.    As part of his investigation into the May 4, 2016 briefing room incident, Kirkham interviewed Hughes on December 28, 2016, and Hughes swore to answer all questions truthfully. (*Id.* at 587:5-12, 589:22-24, Dep. Ex. 81 at 42.)

427.    Hughes testified that there was no policy in effect between August and November 2012 that prohibited members of the FPD from recording conversations with individuals outside of the FPD. (Ex. 01, Hughes Dep. I, at 236:20-237:22.) However, despite this knowledge, Hughes told Kirkham that prior FPD Chief Ingulli had a policy against recording, categorized as a "serious violation." (Ex. 03, Hughes Dep. III, at 590:7-593:14, Dep. Ex. 81 at 46.) Hughes knew at the time that he spoke to Kirkham that the FPD policy handbook did not even consider unauthorized recording to be a "serious offense." (*Id.* at 593:16-596:8, Dep. Ex. 81 at 46 & Dep. Ex. 82 at 1.)

428.    Kirkham had not asked Hughes whether FPD policy had always classified unauthorized recordings as a "serious offense"—Hughes offered this false information unprompted. (*Id.* at 591:7-594:21.)

429.    Hughes gave this sworn testimony by telephone from his FPD office, where he could easily have accessed all FPD policies on authorized recordings, but did not do so. (*Id.* at 614:5-615:1.)

430.    In his 2016 memorandum recommending Hunter's re-termination, Hughes noted correctly that the unauthorized recording policy did not state whether a violation was a "serious or less serious offense." (*Id.* at 602:15-603:1, Dep. Ex. 85 at 1.)

431.    Hughes also later admitted during his deposition that, at the time of the May 4, 2016 briefing room incident, the FPD recording policy to which he was referring in his interview with Kirkham did <u>not</u> classify unauthorized recording as a "serious offense." (*Id.* at 593:16-23, Dep. Ex. 81 at 46.) That policy stated that only a "serious offense" could result in a "suspension, demotion or termination," while termination was not an option for "less serious offenses." (Ex. 87, FPD Rules of Conduct 03, Add. 1.)

432.    Within months after his false testimony to Kirkham, Hughes altered the FPD recording policy, and made unauthorized recording a serious offense for the first time.

1    (Ex. 03, Hughes Dep. III, at 594:22-596:8, Dep. Ex. 82 at 4.) The policy also noted that

2    serious offenses "may result in a suspension, demotion, or termination." (*Id.*) These

3    were the only changes that Hughes made to FPD policies in 2017. (Ex. 03, Hughes Dep.

4    III, at 595:21-23.)

5        433.   Hughes' false testimony to Kirkham was not the first time that he gave false

6    testimony about Plaintiffs under oath. On November 21, 2012, Varnrobinson, Hunter,

7    Hughes, and Tryon met to discuss the Eric Myers case. (Ex. 57, November 21, 2012

8    Audio Recording, at 00:01-23:50); (Ex. 01, Hughes Dep. I, at 263:22-264:1.) The audio

9    recording shows that, at the start of the meeting, Hughes gave Varnrobinson permission

10   to record the meeting, and even requested a copy of the recording. (Ex. 57, November

11   21, 2012 Audio Recording, at 00:05-00:10.)

12       434.   Nevertheless, Hughes testified falsely, under oath, in both Varnrobinson's

13   September 2013 appeal hearing and in Hughes' subsequent deposition, that he was

14   unaware at the time that Varnrobinson was recording the November 2012 meeting. (Ex.

15   62, Varnrobinson Appeal Hrg. (Hughes' Testimony), at 8:12-9:5, 20:9-22:6; (Ex. 01,

16   Hughes Dep. I, at 260:18-261:10.)

17       435.   Hughes further testified, falsely, that he did not find out that Varnrobinson

18   was recording the November 2012 meeting until the end of the meeting when he asked

19   Varnrobinson, "are you recording this?" (Ex. 62, Varnrobinson Appeal Hrg. (Hughes'

20   Testimony), at 20:9-22:6); (Ex. 01, Hughes Dep. I, at 260:18-261:10.)

21

22   **Genuine Issue – Whether Hunter Was Terminated for Symptoms Caused by his**

23   **Disability.**

24       436.   On January 24, 2017, Hughes notified Hunter in writing of his intent to fire

25   him for alleged "willful and repeated" violations of policies, including policies

26   prohibiting insubordination, conduct unbecoming, and unauthorized use of a digital

27   recorder. (Ex. 03, Hughes Dep. III, at 598:18-601:5, Dep. Ex. 83 at 1-2.) All three

28   alleged policy violations are based on Hunter's conduct during the briefing room

incident, which Hughes perceived to be "angry" and "disrespectful" to his authority as Chief. (*Id.* at 600:1-21, Dep. Ex. 83 at 1-2.)

437.    On February 2, 2017, Hughes sent Town Manager Billingsley a written recommendation that Hunter be terminated. (*Id.* at 601:18-20, Dep. Ex. 85.)

438.    On February 21, 2017, Billingsley notified Barber of his intent to fire Hunter, and emphasized what he perceived to be Hunter's "level of anger, frustration, defensiveness, and combativeness . . . coupled with his disregard for department policy and lack of respect for supervisors," as well as his alleged anger displayed during the Kirkham interview. (Ex. 15, Billingsley Dep., at 55:22-24, Dep. Ex. 12 at 5.)

439.    Billingsley was aware that Hunter had reported Hughes' retaliation against him, but did not believe it was his responsibility to investigate whether or not the retaliation occurred. (Ex. 15, Billingsley Dep., at 21:19-27:8.)

440.    Billingsley testified that he read Hunter's Third Amended Complaint and Supplemental Complaint. (*Id.* at 23:23-24:13, 93:15-19.) However, at the time he decided to terminate Hunter, Billingsley claimed that he was not aware of the 2012 DPS investigation into Tryon's alleged evidence tampering. (*Id.* at 93:22-97:22.)

441.    Billingsley terminated Hunter on March 27, 2017. (*Id.* at 97:23-98:2, Dep. Ex. 14.)


**Genuine Issue – Whether Defendants Published Defamatory Statements about Plaintiffs.**

442.    Plaintiffs first learned on April 4, 2014 that Hughes had sent his November 8, 2012 termination memoranda to AZ POST. (Ex. 90, Hunter Decl., at ¶ 7); (Ex. 91, Varnrobinson Decl., at ¶ 7.) Plaintiffs served their Notices of Claims concerning their defamation claims against the Town and Hughes on June 5, 2014. (Ex. 83, Notice of Claim Against the Town); (Ex. 84, Notice of Claim Against Hughes.)

443.    In his October 28, 2013 cover letter to Mike Deltenre of AZ POST, with which the termination memoranda and other documents were enclosed, Hughes wrote that the Hearing Officer sustained two of the four charges files against Hunter, but "ruled the other two had been addressed through training." (Ex. 82, Hughes Submission to AZ POST, at 1.) This statement was false, and Hughes knew or should have known it was false at the time he made it.

444.    In fact, the Hearing Officer had ruled on September 26, 2013—over a month earlier—that only Rationale No. 1 had been addressed through training. (Ex. 33, Hunter Dep. I, Dep. Ex. 06 at 10-11.) The Hearing Officer ruled that Rationale No. 2—that Hunter had allegedly secretly recorded a conversation with Hazard—"was undertaken solely without assistance of Walt Hunter." (*Id.*)

445.    Accordingly, Hughes knew or should have known on October 28, 2013 the falsity of his statement in the termination memoranda that he submitted to AZ POST that "the notes also indicated *the Detectives* again called the County Attorney's Office on August 13, 2012 and recorded the phone to the County Attorney's Office," and that the PCAO attorneys were "extremely upset to have been recorded by *these two detectives*." (Ex. 82, Hughes Submission to AZ POST, at 9-10) (emphasis added).

446.    The termination memoranda that Hughes submitted to AZ POST on October 28, 2013 also stated falsely that "[i] would appear that [Plaintiffs] took it upon themselves to reinvestigate this [Kemp] case in an effort to discredit follow employees Tryon and Klix." (*Id.* at 8.)

447.    In fact, the hearing officer ruled on September 26, 2013 that "[i]t is equally clear that [Plaintiffs] were assigned verbally by Chief Ingulli to re-investigate the Kemp shooting." (Ex. 33, Hunter Dep. I, Dep. Ex. 06 at 11.)

448.    Plaintiffs first learned that Rankin said to a *Phoenix New Times* reporter that "I would never have hired those two," referring to Plaintiffs, several days after the publication of the December 5, 2013 article containing the quote. (Ex. 90, Hunter. Decl., at ¶ 10); (Ex. 91, Varnrobinson Decl., at ¶ 12.)

1

2

3   DATED: April 23, 2018                Respectfully submitted,

4                                        BERNABEI & KABAT, PLLC

5                                        By: /s/ Peter Whelan

6                                        Lynne Bernabei
7                                        Peter M. Whelan

8                                        Edmundo Robaina

9                                        ROBAINA & KRESIN, PLLC
10

11                                       *Attorneys for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

1

2      I hereby certify that on April 23, 2018, I electronically transmitted the attached

3   document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4   Notice of Electronic Filing to the following CM/ECF registrants:

5
      Stephanie Cerasano
6      Sonya K. Boun
      Jackson Lewis, P.C.
7      2398 East Camelback Road, Suite 1060
      Phoenix, AZ 85016
8

9      *Attorneys for Defendants*

10

11                                        By: /s/ Peter M. Whelan

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28