**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Walt Hunter, et al.,<br><br>       Plaintiffs,<br><br>v.<br><br>Town of Florence, et al.,<br><br>       Defendants. | No. CV-14-1304-PHX-DMF<br><br><br>**ORDER** |

Plaintiffs, two former employees of the Town of Florence ("Town"), have sued the Town and several Town employees following their terminations. (Docs. 37, 170, 217) Discovery has concluded and Defendants have moved for summary judgment on all counts. (Doc. 245) Based on the briefing and oral argument, the Court will deny in part and grant in part Defendants' motion.

**Legal Standard for Summary Judgment**

Defendants, as the party moving for summary judgment, must demonstrate that "there is no genuine dispute as to any material fact" and so they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If Defendants meet their burden of production and "demonstrate the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), then the burden of production shifts to Plaintiffs to "designate specific facts showing that there is a genuine issue for trial." *Id*. at 324. "The underlying substantive law governing the claims determines whether or not [a disputed fact] is

material." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). The Court must "constru[e] the facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011).

**Undisputed Facts about Relevant Individuals**

Plaintiffs Hunter and Varnrobinson were law enforcement officers in the Florence Police Department ("FPD") where they worked as partners. Both were Detectives. Varnrobinson is African-American; Hunter is not. (Doc. 255 at 112, ¶ 2) Hunter and Varnrobinson were terminated on December 14, 2012. (Doc. 255 at 52, ¶ 172; 53 at ¶ 176; 122 at ¶ 62) After a hearing, Hunter was reinstated but Varnrobinson was not. (Doc. 255 at 54-55, ¶ 182-83) Hunter returned to the FPD in a patrol position and was subsequently terminated in 2017. (Doc. 255 at 58, ¶ 197; Doc. 255 at 88, ¶ 308)

Robert Ingulli was Police Chief until July 13, 2012. (Doc. 255 at 2, ¶¶ 182-83) He was succeeded by Daniel Hughes. Hughes was hired on a temporary basis and his appointment became permanent in November 2012. (Doc. 255 at 24, ¶ 87; Doc. 255 at 121, ¶ 60) Defendant Terry Tryon was the Lieutenant during the relevant time period. (Doc. 255 at 2, ¶ 3) There was a perception that the Florence Police Department was divided between those loyal to Chief Ingulli and those loyal to Lieutenant Tryon. (Doc. 255 at 2, ¶ 5)

Tom Rankin was Police Chief in Florence from 1980 until he was fired in 1994. (Doc. 256-1 at 7-8, 12) He became the acting Mayor of Florence in June 2012. (Doc. 255 at 104, ¶ 372)

As relevant here, Himanshu Patel was the Florence Town Manager until December 14, 2012. (Doc. 255 at 2, ¶ 4) Subsequently, Charles Montoya was Town Manager from January 2013 until July 13, 2015. (Doc. 255 at 112, ¶ 4) Finally, Brent Billingsley was Town Manager from December 2015 through Hunter's termination in 2017. (Doc. 255 at 112, ¶ 5)

. . .

## Count I: Retaliation for Protected Speech

In January 2010, Hunter submitted a written complaint about Tryon to Ingulli ("2010 Letter").[1] (Doc. 255 at 15-16, ¶ 52; Doc. 247-2 at 124-126) In January 2012, Varnrobinson submitted a written complaint about Tryon to the Town's Human Resources Director and Ingulli ("2012 Letter"). (Doc. 255 at 17, ¶ 59; Doc. 247-6 at 110-13) Hunter assisted with preparing the 2012 Letter. (Doc. 255 at 113, ¶ 6) The 2010 and 2012 Letters were not formal police reports but rather were communicating patterns of harassment, corruption, discrimination, and unaccountability in the management of the FPD largely due to Lieutenant Tryon. Among other things, the 2012 Letter alleged that Tryon had tampered with evidence. Plaintiffs had reported and documented this tampering allegation in a formal police report in 2007 and 2008. (Doc 254 at 5)

After the 2012 Letter, Patel asked the Arizona Department of Public Safety ("DPS") to investigate the Letter's allegations about Tryon. DPS conducted the investigation between February and August 2012. (Doc. 246 at ¶¶ 59-65; Doc. 258-5)

Plaintiffs allege that, with the 2010 Letter and the 2012 Letter, they "lawfully exercised their First Amendment rights when they reported matters of public concern to" several people outside of their chain of command, that they did so as private citizens not public employees, and that they experienced retaliation because of their speech. (Doc. 37 at ¶¶ 255-282) Defendants argue that Plaintiffs' speech was not protected because it was required by their job duties and that "no reasonable fact finder could conclude that Plaintiffs were terminated in 2012 for anything other than legitimate reasons." (Doc. 245 at 2-4, 7) Plaintiffs dispute this. (Doc. 254 at 5-11) Defendants also argue that Defendants Rankin, Tryon, and Montoya had insufficient knowledge about Plaintiffs' speech and insufficient involvement in employment decisions. (Doc. 245 at 8-9) Plaintiffs dispute this. (Doc. 275-1 at 3-9)

To establish a *prima facie* case of retaliation under the First Amendment, Plaintiffs' burden of proof requires:

---

[1] At oral argument, Plaintiffs stated that Patel was notified of the 2010 Letter. In the record, it appears that Patel was aware of the 2010 Letter by May 2010. (Doc. 256-2 at 214-16)

> a sequential five-step series of questions: (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).

The first step, whether Plaintiffs spoke on a question of public concern or about a matter of personal interest, is a question of law which the Court evaluates "based on the content, form, and context of a given statement, as revealed by the whole record." *Desrochers v. City of San Bernardino*, 572 F.3d 703, 709 (9th Cir. 2009) (internal quotation omitted). *See also Eng*, 552 F.3d at 1070. Plaintiffs argue that the 2010 Letter and 2012 Letter touched on matters of public concern because the Letter alleged racial discrimination and criminal conduct. (Doc. 254 at 3-4) The Court agrees. Although "passing references to public safety[,] incidental to the message conveyed," *Robinson v. York*, 566 F.3d 817, 823 (9th Cir. 2009) (internal quotation marks and citation omitted), do not support a finding of public concern, "reporting police abuse. . . is quintessentially a matter of public concern." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1067 (9th Cir. 2013). Here, the allegations of misconduct were sufficient to prompt a months-long outside investigation. The Court concludes that, viewed in a light most favorable to Plaintiffs, the information in the 2010 and 2012 Letters constituted a matter of public concern.

Second, Plaintiffs must show that the speech occurred in their capacity as a private citizen not a public employee. *Eng*, 552 F.3d at 1071. This is a "practical, fact-specific inquiry." *Dalhia*, 735 F.3d at 1070-71. "While the question of the scope and content of a plaintiff's job responsibilities is a question of fact, the ultimate constitutional significance of the facts as found is a question of law." *Id*. (internal quotations omitted). Here, this genuine issue is a disputed fact. (Docs. 245 at 3, 254 at 4-5, 276 at 3-7) Both the 2010 and 2012 Letters were sent outside Plaintiffs' chain of command, not to Plaintiffs' direct supervisor, and Ninth Circuit precedent indicates that this weighs in favor of a finding that

the speech was conducted as a private citizen. *Hagen v. City of Eugene*, 736 F.3d 1251 (9th Cir. 2013). Moreover, the 2010 and 2012 Letters contained both private, employment concerns along with public, corruption concerns which further underscores the need for a jury to determine this issue. The letters were not routine reports under normal departmental procedures.

Third, Plaintiffs need to show that their speech "was a substantial or motivating factor in the adverse action." *Eng*, 552 F.3d at 1071. This, too, is a fact question. *Id*. Drawing all reasonable inferences in Plaintiffs' favor, the Court concludes that Plaintiffs have presented a cogent story about the deeply intertwined relationship between their speech, their 2012 terminations, and their conspiracy, retaliation, and discrimination claims. (Doc. 245 at 3; Doc. 254 at 5-9; Doc. 276 at 3-7) There are genuine issues of material fact that mean this matter must proceed to a jury.

Once Plaintiffs survive the first three steps, the burden shifts to Defendants for steps four or five. *Eng*, 552 F.3d at 1071-72. At step four, the governmental agency must show whether it "had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Although step four "is ultimately a legal question, like the private citizen inquiry, its resolution often entails underlying factual disputes." *Eng*, 552 F.3d at 1071. Alternatively, the government can show at step five "that it would have reached the same [adverse employment] decision even in the absence of the [employee's] protected conduct." *Eng*, 552 F.3d at 1072. This "is purely a question of fact." *Id*. Defendants do not expand on each of these individual steps but instead argue that "no reasonable fact finder could conclude that Plaintiffs were terminated in 2012 for anything other than legitimate reasons." (Doc. 245 at 7) Plaintiffs responded with a cogent story that includes illegitimate reasons. (Doc. 275-1 at 13-18) The jury will have to determine which story is credible.

<u>Qualified Immunity: Town</u>. It is undisputed that, on his last day as Town Manager, Patel terminated Plaintiffs. (Doc. 255 at ¶ 62) As Defendants acknowledge, the governing case law permits Plaintiffs to establish Town liability by showing "that the individual who

committed the constitutional tort was an official with 'final policy-making authority' and that the challenged action itself thus constituted an act of official governmental policy." *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992) (citations omitted). Defendants argue the Town of Florence cannot be found liable, and so they are entitled to summary judgment, because Plaintiffs cannot show that the Town Manager, Defendant Patel, "had the final authority to implement significant employment-related policies." (Doc. 245 at 16)

This argument misstates the governing law:

> "When determining whether an individual has final policymaking authority, we ask whether he or she has authority '*in a particular area, or on a particular issue.*' *McMillian v. Monroe County*, 520 U.S. 781, 785 (1997) (emphasis added). For a person to be a final policymaker, he or she must be in a position of authority such that a final decision by that person may appropriately be attributed to the [municipality]."

*Lytle v. Carl*, 382 F.3d 978, 983 (9th Cir. 2004). In other words, the guiding question is who had final policymaking authority in the specific area at issue here, namely employee discipline. *Barone v. City of Springfield, Oregon*, 2018 WL 4211169, at *12 (9th Cir. Sept. 5, 2018) (citing *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 738 (1989)).

The 2007 version of the Town's Personnel Policies and Procedures manual stated that the "Town Manager has authority to take disciplinary action against any classified or unclassified employee. The Town Manager may delegate this authority to any management employee for subordinate employees." (Doc. 258-8 at 5) A subsequent version reiterated that the "Town Manager is the final authority on all matters relating to this Policy." (Doc. 258-7 at 4) Because the governing policies delegated authority for disciplinary authority to the Town Manager, the Court concludes that summary judgement is not appropriate.

<u>Qualified Immunity: Individuals</u>. The individual Defendants argue that they are entitled to summary judgment on their affirmative defense of qualified immunity because Plaintiffs cannot show that Plaintiffs' rights were "clearly established" at the time of the violation. (Doc. 245 at 5-6) Defendants rely on *Huppert v. City of Pittsburg*, 574 F.3d 696

(9th Cir. 2009), overruled by *Dahlia v. Rodriguez*, 735 F.3d 1060 (9th Cir. 2013), and argue that Plaintiffs were conducting typical police duties and that reporting misconduct was required by the FPD's Code of Conduct rather than the responsibilities outlined in the job descriptions. (Doc. 245 at 3)

As noted above, the analysis of job duties is practical and driven by the specifics of Plaintiffs' employment. *Garcetti v. Ceballos*, 547 U.S. 410, 424-25 (2006). Here, Defendants do not provide job descriptions of Plaintiffs or any specifics regarding their actual duties and, instead rely entirely on the then-governing Code of Conduct. (Doc. 245 at 3) The Code of Conduct in effect at the time stated that "[f]ailure to report to an appropriate superior authority incompetence, misconduct, inefficiency, neglect of duty, or any other form of misconduct or negligence of which the employee has knowledge" was a basis for disciplinary action. (Doc. 255 at 20, ¶ 71) This Code of Conduct was so broad that it covered issues like inefficiency, something beyond what could be considered a typical police officer and detective function. Defendants' attempt to have an expansive Code of Conduct swallow specifics in a job description and actual job duties would immunize nearly all conduct.[2]

. . .

---

[2] A similar argument was rejected by a District Judge in the District of Arizona on the same legal issue:

> In the last sentence of a long footnote in their motion, Defendants cite an Eloy Police Department General Order requiring employees to report their colleagues' misconduct, suggesting that this order required Plaintiffs' complaints and therefore deprived them of First Amendment protection.... The Court cannot conclude, however, that this is enough to establish that Plaintiffs' complaints were unprotected. As the Supreme Court has made clear, the inquiry about whether a plaintiff's speech was required by his or her job duties is a practical one that must look to the specifics of the plaintiff's employment. *Garcetti [Ceballos]*, 547 U.S. at 424-25 ("The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes."); *see also Dahlia II*, 735 F.3d at 1069. Defendants' footnote does not discuss the practical requirements of Plaintiffs' job.

*Drake v. City of Eloy*, 2015 WL 6168419, at *7 (D. Ariz. 2015).

Further, Defendants reliance on *Huppert* is misplaced. The *Huppert* analysis rested on job duties under California law, not a departmental Code of Conduct.

> *Ceballos [Garcetti]* said that speech which "owes its existence to an employee's professional responsibilities" is not protected by the First Amendment. *Id.* at 421. Additionally, if the public employee was paid for the speech-e.g., drafting a memorandum, creating a report, advising a supervisor-then that compensation might be indicative of the nature of the speech. *Id.* at 422. An adverse employment action for this type of speech "does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421-22. **Our inquiry should be practical and look beyond the job description to the duties the employee actually performs.** *Id.* at 424.

*Huppert v. City of Pittsburg*, 574 F.3d 696, 704 (9th Cir. 2009) (emphasis added). *Huppert* discussed the holding in the Seventh Circuit decision in *Morales v. Jones*, 494 F.3d 590 (7th Cir. 2007):

> that a police officer's conversations with superiors and assistant district attorneys discussing an arrest was obviously part of the officer's duties. *Id.* at 597. On the other hand, the court concluded that being deposed as a witness in a separate § 1983 action for retaliation by the police chief against another police officer was clearly not part of an officer's job. *Id.* at 595, 598. The Fifth Circuit has determined that one indicator might be whether an individual complains "up the chain of command" or instead relays "his concerns to persons outside the work place." *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir.2008).

*Id.* at 705.

*Huppert* involved police officers who had been assigned to a specific investigation, directed to stop the investigation by one supervisor and then directed to continue it by another, and then wrote a memorandum to their Chief and City Manager at the conclusion of the investigation. *Huppert*, 574 F.3d at 705-706. Further, under California law, the *Huppert* Plaintiffs' investigation into improper conduct at the city-owned golf course was squarely within their job responsibilities as was their work with the FBI and their testimony to the county grand jury. Defendants have identified no similar legal duty under Arizona law regarding the 2010 and 2012 Letters. *See Drake v. City of Eloy*, 2015 WL 6168419, at *6 (D.Ariz. 2015).

> Our holding does not imply that a police officer might never be protected if he speaks on issues such as corruption, for we recognize that "[e]xposing

- 8 -

governmental inefficiency and misconduct is a matter of considerable significance." *Ceballos*, 547 U.S. at 425, 126 S.Ct. 1951. Even though we find that, under California law, testimony such as Huppert's is within the duties of a police officer, speech outside one's official duties remains protected by the First Amendment. *See id.* at 422, 126 S.Ct. 1951 (noting that a letter to the newspaper is similar to speech undertaken by citizens on a daily basis); *Freitag*, 468 F.3d at 545 (holding that complaints to an elected official and independent reviewing officer are outside a prison guard's work duties).

*Huppert*, 574 F.3d at 709–10. Also, *Huppert* was explicitly overruled by *Dalhia v. Rodriguez*, 735 F.3d 1060 (9th Cir. 2013), in August 2013 before Plaintiffs' termination appeal hearing in September 2013. "Moreover, *Garcetti [Ceballos]*, *Dahlia II*, and even *Huppert* concerned speech required as part of a plaintiff's official position." *Drake v. City of Eloy*, 2015 WL 6168419, at *7.

Based on the facts presented, the Court concludes that summary judgment for the individual defendants on qualified immunity grounds is not appropriate.

### Count II: Conspiracy

Defendants allege that Plaintiffs cannot meet their burden on their conspiracy allegation. (Doc. 254 at 23; Doc. 276 at 18)

> A civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage. To prove a civil conspiracy, the plaintiff must show that the conspiring parties reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement. To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy. A defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from evidence of the defendant's actions.

*Gilbrook v. City of Westminster*, 177 F.3d 839, 856–57 (9th Cir. 1999) (internal quotations and citations omitted). *See also Lacey v. Maricopa County*, 693 F.3d 896, 935 (9th Cir. 2012).

Plaintiffs allege that in April 2012, when Defendant Rankin was Mayor-Elect, Varnrobinson and another sergeant were executing a search warrant at the home of Rankin's son's former girlfriend. At the scene, Rankin's behavior was interfering with the officers' work and Varnrobinson told Rankin that such behavior could lead to an arrest for

- 9 -

obstruction. Varnrobinson claims that there was a confrontation; Rankin denies it. Subsequently, a non-party witness testified that Rankin repeatedly used the N-word to describe Varnrobinson. Rankin testified during his deposition that he told Defendant Patel, and others, that Plaintiffs should be fired; he later submitted an affidavit denying that he discussed Plaintiffs' termination with Hughes or Patel. (Doc. 248-1; Doc. 256-1 at 29-30, 40, 43, 60; Doc. 256-5 at 45-47; Doc. 257-5 at 13-14; Doc. 267-1 at 14) Rankin also testified at his deposition that he had a long history of using the N-word and having complaints filed against him. (Doc. 256-1 at 8-18)

Rankin's inconsistencies, viewed in the light most favorable to Plaintiffs, creates a genuine issue of material fact on Count II. Moreover, "[a]cts which seem otherwise innocent, when viewed in the context of the surrounding circumstances, may justify an inference of complicity. That principle applies squarely in this case, where the caustic political environment surrounding plaintiffs' discharges may [permit] the jury to infer that an ulterior motive lay at the heart of [Defendants'] actions." *Gilbrook*, 177 F.3d at 857 (internal quotations and citations omitted). Accordingly, the Court will deny summary judgment on this Count.

### Count III: Hunter's Due Process Claim

In April 2013, between Hunter's termination and the termination hearing, Hughes notified FPD personnel of an opportunity to become a detective. At least four people submitted letters of interest, including Hunter. Hunter was not selected. (Doc. 255 at 62, ¶¶ 210-12) Hunter was reinstated at the FPD as a FPD Patrol Officer in October 2013. (Doc. 255 at 58, ¶ 197) In June 2013, before Hunter's termination hearing, the Town Council approved Defendant Hughes' recommendation to eliminate the position of "Police Detective" from the Town's classification system. Since then, there has not been a separate Police Detective position. (Doc. 255 at 61, ¶¶ 207-09) In November 2013, the Police Department's policy ADM-10 became effective. (Doc. 255-7 at 5) This policy is titled "specialized/temporary assignment procedures" and includes "Criminal Investigations (Detective)" as a "Special assignment" position for a period of five years. (Doc. 255-7 at

6) Policy ADM-10 states that "an officer is not eligible to apply for a specialized assignment if the officer has received any major disciplinary action within the last 12 months." (Doc. 255-7 at 5) Hunter's discipline, as recommended by the Hearing Officer and adopted by the Town, constituted major disciplinary action. (Doc. 255 at 167, ¶ 337)

The Third Amended Complaint alleges that Hunter's due process rights were violated when Defendants represented to Hunter that the Detective position had been eliminated. (Doc. 27 at 45, ¶305) Defendants moved for summary judgment on this claim arguing that Hunter has not provided any evidence to show that the decision was made for improper purposes and that, in any event, the decision was a legislative one, subject to legislative immunity. (Doc. 345 at 20-21) The Court agrees. The transformation of Detective duties from a permanent position to a temporary assignment was a legislative one. *See Bogan v. Scott-Harris*, 523 U.S. 44 (1998). Moreover, Hunter has produced no evidence that Policy ADM-10's requirements were in anyway improper. The Court will grant summary judgment on this Count.

### Count IV: Pre-Termination Due Process

The parties do not dispute that Plaintiffs were entitled to notice and an opportunity to be heard before their terminations. The question is whether they received it.

Plaintiffs submitted pre-termination letters to Defendant Singh, the then-Town Manager. Plaintiffs allege that they did not have a meaningful pre-termination opportunity to be heard because Singh decided to terminate them despite the information in their letters. They also infer that Singh was too busy between the time he received their letters and the date he wrote their termination letters to have given their letters a meaningful review or conduct any inquiry into the allegations in their letters. (Doc. 254 at 28-30) Defendants argue they are entitled to summary judgment on this count because Singh testified at his deposition that he did read the letters and because the post-termination hearing cured any defects in the pre-termination process. (Doc. 276 at 11-12) The Court agrees.

The Ninth Circuit does "not require[] that the decisionmaker in a pretermination hearing be impartial, so long as due process is provided in a post-termination hearing."

- 11 -

*Walker v. City of Berkeley*, 951 F.2d 182, 183 (9th Cir. 1991). In other words, Plaintiffs were not entitled to have any additional investigation conducted after they submitted their letters or nor were they entitled to a decision maker with an open mind.

Here, it is undisputed that Plaintiffs had a post-termination hearing and, as described in more detail below, the Court concludes that the post-termination hearing satisfied Plaintiffs' due process rights. Accordingly, the Court concludes that Plaintiffs cannot meet their burden to show their pre-termination due process rights were violated and will grant Defendants summary judgment on this count.

### Count V: Varnrobinson's Due Process Claim

Defendants argue that Varnrobinson's post-termination rights were satisfied because he had a post-termination hearing. (Doc. 245 at 21-22). Varnrobinson argues that his post-termination hearing did not satisfy his due process rights because the transcript indicated that the Hearing Officer could not hear the testimony and did not permit him to present evidence in support of his bias claim. (Doc. 255 at 158-165)

The Court has reviewed the transcripts of the hearing and concludes that the Hearing Officer conducted an appropriate hearing. (Doc. 261-8) Although the Hearing Officer did request clarifications from witnesses and counsel, the Court's review indicates that this was no more or less frequent than any other adjudicator who is following live testimony.[3] (Doc. 255 at 148-60) Moreover, the requests for clarifications often covered dates and other numbers and indicate that the Hearing Officer was ensuring that he had accurate and precise information on which to base his decisions. Finally, the Court notes that the transcript indicates that counsel understood the microphones presented a challenge. (Doc. 261-8 at 23, p. 87-88)

Varnrobinson's bias allegations all stem from the Hearing Officer's ruling that Hunter's testimony about Defendant Hughes' prior work history at other employers before the FPD was inadmissible hearsay. (Doc. 261-8 at 37, p. 141) Even if reasonable minds

---

[3] It appears that the hearing was taped and subsequently transcribed. (Doc. 261-8 at 56, p. 219) The Court notes that ensuring accurate and precise information during live testimony without the benefit of a live feed from a court reporter is all the more challenging.

- 12 -

could differ on the Hearing Officer's hearsay ruling, the Court's review of the transcript indicates that Varnrobinson cannot "overcome [the] presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). The Court will grant summary judgment on this count.

**Counts III and V: Liberty Interest in Name Clearing Hearing**

At oral argument, Plaintiffs alleged that they were entitled to an additional name clearing hearing before the Pinal County Attorney's Office ("PCAO") placed them on the Pinal County's law enforcement integrity list, otherwise known as the *Brady* List. Plaintiffs also argue that there is a genuine issue of material fact about who provided PCAO documents and when. (Doc. 255 at 170-171) Plaintiffs acknowledged in their Third Amended Complaint that PCAO had a copy of the Hearing Officer's full decision before Plaintiffs were placed on the *Brady* List. (Doc. 37 at 34, ¶¶ 232-33) *See Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) ("Factual assertions in pleadings . . . are considered judicial admissions conclusively binding on the party who made them.") The Court concludes that Plaintiffs received the process to which they were due when they had their post-termination hearing. That PCAO used the information in an unfavorable way does not mean Plaintiffs were denied their constitutional rights.

**Counts VI, VII, VIII: Varnrobinson's Race Discrimination & Retaliation Claim**

The Third Amended Complaint alleges that Defendants discriminated and retaliated against Varnrobinson on the basis of race. (Doc. 37 at 52-58) Defendants' motion for summary judgment argues that Varnrobinson was fired for legitimate reasons. (Doc. 245 at 23) In response, Varnrobinson argues that Defendants' reasons were pretextual because he had been rated as meets or exceeds expectations on his performance reviews, he was treated differently than another detective, and that Defendants Tryon, Rankin, and Morris used a racial epithet—the N-word—about him. (Doc. 275-1 at 32-34) Varnrobinson points to inconsistent deposition testimony about whether Defendants Rankin, Tryon, and Morris had used the N-word to refer to Varnrobinson.[4] (Doc. 255 at 146-47, ¶¶ 215-20) Rankin

---

[4] The Court notes that in his deposition, Rankin acknowledged using the N-word about other people at other times in his life. (Doc. 256-1 at 8-18)

acknowledges doing so at least once and a former employee of FPD stated in his deposition that Tryon and Sgt. Morris did so on multiple occasions. (Doc. 255 at 146-47, ¶¶ 215-20) Varnrobinson also points to inconsistent deposition testimony about whether Defendant Patel knew that Rankin, Tryon, and Morris had used the N-word to refer to Varnrobinson. (Doc. 255 at 147-48, ¶¶ 221-22) Patel denied all knowledge but Lewis and Ingulli testified at their depositions that they told him. (Doc. 255 at ¶¶ 147-48, 221-225)

This deposition testimony presents "multiple examples of direct evidence that implicate [racial] discrimination. Direct evidence of discriminatory intent consists of evidence which, if believed, proves the fact [of discriminatory animus] *without inference or presumption*. Racist . . . statements constitute such direct evidence of discrimination. Direct evidence need not be specific and substantial. *Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274, 1280 (9th Cir. 2017) (internal quotations and citations omitted; emphasis in original).

Varnrobinson only needs to show "only minimal proof and does not even need to rise to level of preponderance of evidence." *Palmer v. Pioneer Inn Associates, Ltd.*, 338 F.3d 981, 984 (9th Cir. 2003) (internal quotations omitted). Here, he has presented direct evidence of racist statements sufficient to defeat summary judgment. *Mayes,* 846 F.3d at 1282.

### Count IX: Defamation

The Third Amended Complaint and the Second Supplemental Complaint allege that Defendant Hughes and the Town submitted defamatory information to the Arizona Peace Officer Standards and Training Board ("AZ POST"), the Pinal County Attorney's Office, and ABC 15 television station. (Doc. 37 at ¶¶ 400-411; Doc. 217) Defendants moved for summary judgment on this claim arguing that Plaintiffs' notice of claim was untimely and that Plaintiffs cannot meet their burden of proof. (Doc. 245 at 25-30)

In response, Plaintiffs argue that there remain two genuine issue of material fact.[5] First, Plaintiffs argue that Defendant Hughes' cover letter to AZ POST falsely stated that

---

[5] The Court assumes that this indicates Plaintiffs have conceded that summary judgment is appropriate on the other defamation allegations in the Third Amended Complaint.

the Hearing Officer had "ruled the other two [charges filed against Hunter] had been addressed through training." That cover letter transmitted Hughes' termination memorandum and the Hearing Officer's Order. Plaintiffs argue that they were further defamed because the transmitted termination memorandum stated that Plaintiffs had taken it upon themselves to reinvestigate a matter. Plaintiffs acknowledge that the Hearing Officer concluded that Plaintiffs had been directed to reinvestigate this matter and that AZ POST had a copy of that Order. (Doc. 255 at 183-84)

Assuming without deciding that the notice of claim was timely, the Court concludes that summary judgment is appropriate. Under Arizona law, a claim for defamation requires the Court to "consider actual damage to reputation in the real world by measuring the defamatory aspect of a publication by its natural and probable effect on the mind of the average recipient." *Yetman v. English*, 811 P.2d 323, 329 (Ariz., 1991).

Plaintiffs acknowledge that AZ POST's investigator "reviewed all materials and proceedings pertaining to Hunter's and Varnrobinson's termination, including listening to the entirety of their reinstatement proceedings." (Doc. 37 at ¶ 220) To the extent that Hughes' cover letter had inaccurately summarized the Hearing Officer's Order it was transmitting the Hearing Officer's Order and the AZ POST investigator read the Order. Moreover, the transmittal of the termination memorandum, which the Order subsequently modified, was a necessary portion of the underlying record. Considering "actual damage to reputation in the real world," the Court finds none on these facts and will grant summary judgment on this count.

**Counts X, XI: Hunter's ADA Claims**

Hunter was terminated in 2017 after an incident at a squad briefing and a subsequent interview where Hunter was upset. (Doc. 246 at ¶¶ 292-315) He alleges that he was disabled from major depression at the time, that his disability caused his behavior at the squad briefing, and that he was improperly denied an accommodation. (Doc. 275-1 at 39-41)

. . .

At summary judgment, Hunter, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)). In other words, Hunter must point to evidence that a reasonable jury could use to return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "To prevail on an ADA claim of unlawful discharge, the plaintiff must establish a prima facie case by showing that: (1) he is a disabled person within the meaning of the statute; (2) he is a qualified individual with a disability; and (3) he suffered an adverse employment action because of his disability." *Hutton v. Elf Atochem North America, Inc.*, 273 F.3d 884, 89 (9th Cir. 2001).

Defendants allege that Hunter has not met his burden of demonstrating the first part of the test, namely that he suffered from major depression at the time of the squad briefing incident. (Doc. 245 at 34-36) The Court agrees. Hunter has not provided any alternative evaluation or report and, as counsel acknowledged during oral argument, Hunter's claim relies entirely on an inference from a fitness for duty evaluation. But the evaluation did not find he had major depression at the time of the squad briefing incident and the author of the report, Connie S. Pyburn, Ph.D., subsequently clarified that she had not "intend[ed] to suggest that Walt Hunter had major depression at the time of the squad briefing incident." (Doc. 247-30 at 2, ¶ 2)

Alternatively, Defendants argue that Hunter has not met his burden of showing he met the second part of the test, namely that he was a "qualified individual." (Doc. 245 at 35) A "qualified individual" is a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8). Defendants argue that Hunter's behavior indicated that he could not perform essential job functions with or without an accommodation. (Doc. 245 at 35-36; Doc. 276 at 23-24) The Court agrees. Hunter has pointed to no evidence that shows he could perform the essential functions of a law enforcement officer under the ADA standard. Accordingly, the Court

will grant summary judgment on these counts.

### Punitive Damages

Defendants argue that punitive damages are not available as a matter of law under any of Plaintiffs' theories of the case. (Doc. 245 at 36-37; Doc. 276 at 24-25) The Court agrees that the weight of case law indicates that all avenues of relief against the Town are foreclosed. However, because a jury will decide the relevant claims against the individual Defendants, summary judgment is not available for those punitive damage claims.

### Conclusion

The following claims will proceed to trial: Varnrobinson's claims for discrimination and retaliation and both Plaintiffs' claims for First Amendment retaliation and conspiracy. The Court will set a final pretrial conference by separate order.

**IT IS THEREFORE ORDERED** granting in part and denying in part Defendants' Summary Judgment Motion on All Claims. (Doc. 245)

Dated this 28th day of September, 2018.

_____
Honorable Deborah M. Fine
United States Magistrate Judge